1

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3    SHAWN C. SHARP,
              Plaintiff
4      vs.
                         Civil Action 00-2156
5    SUPERINTENDENT JOHNSON, et al.,
              Defendants.
6

7
      Transcript of Non-Jury Trial Proceedings on Tuesday, October
8    16, 2007, United States District Court, Pittsburgh,
     Pennsylvania, before Amy Reynolds Hay, Magistrate Judge.
9

10   APPEARANCES:

11    For the Plaintiff:        Pro se

12

13

14

15    For the Defendants:        Scott A. Bradley, Esq.
                        Office of the Attorney General
16                      564 Forbes Avenue
                        6th Floor, Manor Complex
17                      Pittsburgh, PA  15219

18

19   Court Reporter:           Juliann A. Kienzle, RMR, CRR
                        Fifth Floor USPO & Courthouse

20              700 Grant Street
                Pittsburgh, PA 15219
21              (412) 261-6122

22

23

        Proceedings recorded by mechanical stenography;
24  transcript produced by computer-aided transcription.

25

1  (Proceedings held in open court; Tuesday, October 16, 2007.)

2       THE COURT:  This is the time that was set for trial

3  in the matter of Shawn C. Sharp versus Superintendent Johnson,

4  et al., at Civil No. 00-2156.

5       Mr. Sharp, it has come to my attention this morning

6  that you were verbally abusive to the U.S. Marshals and to the

7  state correctional officers and that you were uncooperative

8  with their instructions, and that you've also forecasted

9  similar conduct to occur before this Court.

10       I am warning you now that should you act in that

11  fashion, it will not be tolerated, and if you choose to ignore

12  this one and only warning from the Court that you must comport

13  yourself professionally in this courtroom, then you will act

14  at your peril because the punishment will be dismissal of the

15  case.

16       That said, it's also my understanding that you have

17  expressed to the marshals this morning that you are lacking

18  certain medication that you take.  I need to find out from you

19  what that medication is and whether it's something that you

20  take daily.

21        MR. SHARP:  It's something I take daily.

22        THE COURT:  What is the medication?

23        MR. SHARP:  Prilosec.  I also have severe

24  headaches, I just take ibuprofen or something, but the

25  Prilosec is basically for the acid reflux.  I haven't had that

3

1  basically since I have been at SCI-Greene.  I have repeatedly

2  asked for this medication.  I have medication cards that I

3  brought with me specifically to show you.  I'm supposed to be

4  on this medication every day and I haven't been getting it.

5  I'm also on a special diet that necessitates me to eat six

6  times a day.  I haven't gotten any of that since I have been

7  at SCI-Greene.  I have been having stomach pain all the time I

8  have been in their RHU with no medication.  I don't think that

9  it's right that I should be subjected to this retaliation.

10  This is why I'm upset and using abusive language toward the

11  officers because the officers aren't respecting the fact that

12  I'm supposed to have medical treatment.  So if I'm not treated

13  fairly -- I don't feel I should have to treat anyone else

14  fairly if they don't treat me fairly.

15        THE COURT:  You will need to treat everyone with

16  respect and dignity while you are here.  I will have someone

17  look into the matter and to see because it's not something

18  that the marshals can handle because you are not technically

19  in their custody.  You are in the custody of the state

20  correctional officers.

21      I am sure that Mr. Bradley can look into this

22  matter and we can find out what needs you have and whether, in

23  fact, this is medication that is to be prescribed to you,

24  whether it can be provided.

25      Are you physically able to proceed this morning?

1  You appear to be able to do so.

2      MR. SHARP:  I'm saying I'm having severe stomach

3  pain.  I'm not going to sit here and mince words with you.  I

4  feel bad.  I have been feeling bad all week.

5      THE COURT:  Well, you have not brought this matter

6  to the attention of the Court until this morning, and, in

7  fact, it was only brought to the attention of the marshals.

8  If you have been at SCI-Greene for a week and haven't brought

9  it to the Court's attention, there isn't anything I can do

10  immediately to assist you in this matter.

11      MR. SHARP:  I understand that, Your Honor.  What

12  I'm saying to you is I have brought it to the attention of the

13  staff at SCI-Greene and I don't have any way of -- paperwork

14  that I had, I had to make sure it was sent before I left

15  Dallas to make sure that it got to you, the motions that I was

16  filing.  So, once I got to Greene, everything shut down.

17  There is no way for me to communicate with you while at

18  SCI-Greene unless they give me envelopes.  I don't have any

19  envelopes.

20          THE COURT:  At this point, you seem to be perfectly

21  capable to the Court of sitting here and explaining to me your

22  predicament this morning, so we are going to proceed.  We will

23  take a midmorning break at which point I will explore this

24  matter a little further and see what we can do.

25          That said, I think I need to provide some

1  instructional information to you in terms of the courtroom

2  setup and how this is going to work because, as you can see,

3  there are monitors set up.  Ultimately, we will have some of

4  your witnesses appearing via video technology and so that's

5  what the screens are for.  There are microphones at the desk,

6  which you'll need to use so that I can hear you and so that

7  the witnesses will ultimately be able to hear you.  You are

8  not -- counsel should remain seated, counsel and you will

9  remain seated to ask the witnesses questions so that the

10  microphones can be beneficial for that purpose.  If there's a

11  document that you need to have presented to a witness or that

12  you need the Court to look at, I'm going to ask Mr. Bradley if

13  he would be kind enough to obtain that document, just turn

14  around and obtain that document from you and he can present it

15  to the courtroom deputy to present to me or to the witness.

16         That said, I think then we're ready to begin.

17  We'll begin in our customary fashion which will be because you

18  are the plaintiff, I'm going to have the courtroom deputy

19  swear you in and you will be able to present your testimony to

20  the Court in a narrative fashion.  At the conclusion of that,

21  Mr. Bradley will, I'm sure, have some questions that he'll

22  want to ask you, and then we'll proceed on with the other

23  witnesses that you wish to present to the Court.

24      MR. BRADLEY:  Excuse me, Your Honor, just before we

25  get to that, and for the record, I did contact one of the

1  defendants here, who is now a deputy superintendent at

2  SCI-Greene, and asked him to look into the matter Mr. Sharp

3  just raised with regard to his medication and diet and he has

4  indicated he will do that.

5        THE COURT:  Thank you.  Then it seems that that

6  matter should be taken care of forthwith this morning.  As I

7  said, we'll be taking a midmorning break and I will inquire

8  into it and see where we are in that process.

9        MR. SHARP:  Before we get started, can I speak to

10  Mr. Corbett --

11        THE COURT:  Mr. Bradley.

12        Can I speak to you for a minute, Mr. Bradley.

13        THE COURT:  Yes.

14        I assume you want to do this off the record.

15     (Discussion off the record.)

16        THE COURT:  Mr. Sharp, as you can see, there is a

17  court reporter here and she's going to take down your

18  testimony, so I would ask you to be cognizant of that fact

19  while you're giving us your narrative to explain to us the

20  points that you want the Court to understand about your case

21  today so that she can take everything down.

22         MR. BRADLEY:  Is he going to take the witness

23  stand?

24         THE COURT:  I'm going to have him testify from

25  where he is.

1       You may certainly turn around or sit wherever you

2   think is best.

3       SHAWN SHARP, a witness having duly affirmed, testified as

4   follows:

5       MR. SHARP:  I'm a little puzzled -- I'm a little

6   puzzled because in your pretrial instructions -- before I get

7   started, you said that there was some specific things that you

8   didn't want me to mention and I don't know if you'll stop me

9   in the middle.  You know what I'm saying?

10       THE COURT:  We have issued orders, that you have

11   received copies of, that indicate what issues remain before

12   the Court and what the testimony will be concerning.  If you

13   would like me to, I can go through that list.

14       MR. SHARP:  Yes, because I'm a little sketchy on

15   that.  And there are some things I don't understand and I

16   don't want to get started and you say that I'm not allowed to

17   say certain things.  You know what I'm saying, Your Honor?

18       THE COURT:  In the pretrial instructions that were

19   dated and sent to you September 5th, the Court indicated that

20  there are two claims to be heard at this trial, first, at

21  Count One, the claim under 42 United States Code, Section 1983

22  that the defendants' policies and practices violated your

23  right to practice your religion as a Sunni Muslim as

24  guaranteed by the First and Fourteenth Amendments to the U.S.

25  Constitution.

1          Second at Count Two, you claim the defendants have

2   imposed a substantial burden on your religious exercise which

3   is in violation of the Religious Land Use and

4   Institutionalized Persons Act at 42 United States Code,

5   Section 2000cc.  That order also indicated that no testimony

6   would be received concerning any of the other claims that were

7   previously dismissed.  That would be Counts Three and Four

8   specifically of your second amended complaint.

9          There will be no testimony or evidence concerning

10  any claims against the defendants who have been dismissed in

11  this case and that would include Defendants Blaine, Stowitzky,

12  Miller, Fisher, Lockett, Matcus and Blakey.

13          Any claims relating to your administrative custody

14  circumstances will not be permitted.  Any claims of

15  retaliation will not be permitted, and any claims concerning

16  any loss of property or any claim for compensatory damages.

17          MR. SHARP:  Am I clear that punitive damages has

18  not been dismissed?

19          THE COURT:  That's not a claim, that's a matter

20  that can be addressed later.

21          MR. SHARP:  Right.

22          Now, because there's a part in which you just said

23  about burden, the burden, substantial burden.

24          THE COURT:  Yes.

25          MR. SHARP:  If you're not going to allow me to

1    mention certain consequences of my religious pursuits, do you

2    understand what I'm saying then, how can I stipulate a burden

3    if you're saying that as a direct result of you dismissing

4    certain claims that were not raised correctly by the attorney,

5    you're saying I can't raise the consequences of my religious

6    pursuit, which is a substantial burden.

7            THE COURT:  Well, what we will do is I want you to

8    proceed to explain to me, first of all, your claims, what is

9    it you claim the defendants have done.  To the extent that you

10   stray into areas that this Court has already ruled upon, which

11   will not be presented at trial, I am sure that Mr. Bradley

12   will file an objection, or lodge an objection and we will

13   address it.  So we're -- this is not the time that we are

14   going to revisit this Court's previous orders.

15           MR. SHARP:  No.  I'm not trying to do that.  I

16   don't want -- in other words, you understand what I'm saying,

17   I'm not trying to disrespect the Court's orders, I'm just

18   trying to find out what you are allowing me to present because

19   I wrote you a letter explaining to you that I really didn't

20  understand because in a prior order, didn't you correct --

21  correct me if I'm wrong, didn't you dismiss my Fourteenth

22  Amendment claims?

23          THE COURT:  Not your claim concerning First

24  Amendment religious freedom claim.  That has not been

25  dismissed through the Fourteenth Amendment.  That's the claim

1  we're going to hear.  So I want you to proceed to tell me how

2  it is that the First Amendment that guarantees you the right

3  to practice your religion, how the defendants have violated

4  that and how they have violated the Religious Land Use and

5  Institutionalized Persons Act.  So what you need to do is tell

6  me the facts so that I can then apply those facts to the law

7  to determine whether in fact the defendants have violated your

8  rights.

9       MR. SHARP:  I just didn't know if I was allowed to

10 tell you everything that happened.

11      THE COURT:  We're going to have you tell the Court

12 in a narrative fashion.  If Mr. Bradley believes you are going

13 into an area the Court has ruled upon or that is

14 objectionable, he will be entitled to make those objections

15 and the Court will rule on those objections as they are made.

16      MR. SHARP:  Okay.  Thank you.  I'm sorry if I'm

17 taking a little bit long, but this is new to me.

18      I can't remember the extract date that I arrived at

19 SCI-Pittsburgh, but I arrived there and was placed on

20  disciplinary custody status for an altercation that had

21  transpired at Somerset, which is what the attorney general has

22  brought up as exhibits in his record, which I confirmed that

23  yes, they did occur.  I was released in the population upon

24  completing I believe it was 90 days of DC time, somewhere

25  around in there.

1        When I got out, basically I met the chaplain.

2  There was a chaplain prior to Defendant Ibrahiym who was the

3  chaplain who I had spoken with and I had explained to him,

4  listen, there's a large segment of Muslims in this institution

5  that are not being accommodated.  So prior to him being, I

6  don't know if they terminated his contract, what happened, but

7  basically he had explained to me that I would have to go

8  through the process of religious accommodation.

9        I started investigating the process of religious

10  accommodation for me as an individual, tried to participate in

11  what was available within the chaplain facilities, et cetera,

12  et cetera, and in the process of that happening, Tanko

13  Ibrahiym, Defendant Ibrahiym was hired as a new chaplain for

14  the Islamic community.

15        Now, I never had a problem with Chaplain Ibrahiym.

16  He seemed like a fairly reasonable individual, although we

17  differed idealogically on what specifically our beliefs was,

18  and I explained that to him.  We had numerous conversations in

19  which I explained to him, I said, listen, you know, we don't

20  have the same beliefs.  And he understood that.  So I said,

21  well, listen, because we're facing that particular problem,

22  how do I go about resolving the issue of us having a community

23  of Muslims here who are not being accommodated because the

24  Wahabi community, which is what they're called --

25          I want to correct something that has been put into

1  the files.  These individuals are not Shiites.  That's

2  something I wanted to correct early on in this discussion.

3  They are, in fact, a faction of Sunni Muslims.  They are

4  called the Wahabi sect.

5        THE COURT:  Let me interrupt you so I'm clear.

6  When you were at SCI-Pittsburgh, there were religious

7  practices, services being conducted and that would be for

8  which group?

9        MR. SHARP:  For, well, predominantly it was run by

10  the Wahabi community, what -- they're a Sunni Muslim faction.

11  And I don't know if you want me to into a little history about

12  that.

13        THE COURT:  I just needed to know what you were

14  talking about because I didn't know whether there was some

15  policy, some procedure, some practice, some group

16  participation that was in place, or whether you were looking

17  to add something new.

18        MR. SHARP:  Well, no, they had -- I believe the

19  community was called Masjidullah, that was the name of the

20  particular community, but the community's particular

21  denomination is Wahabi.

22        THE COURT:  All right.

23        MR. SHARP:  They're not Shiites, because I've seen

24  a lot of documentation where they have used all types of

25  terminology in filings, they call -- someone has referred to

1   them as Shiites.  Even my attorney referred to them as

2   Shiites.  They are a faction of Sunni Muslims.  I'm a Sunni

3   Muslim.  They are Sunni Muslims, but there is a vast

4   difference, and we'll get into it, I'll explain that to you.

5           So once we had that cleared, then I explained to

6   him, I explained not only am I as an individual not being

7   accommodated because these guys, you know, basically run the

8   chapel while you're here, I said, you know, there are other

9   individuals of my faith, and, you know, we would like to have

10  our services.  So he said, listen, in order for you to do

11  that, you have to file a request for religious accommodation.

12  So I said, okay.  Show me where I have to get that information

13  from and I'll gladly begin doing it and I'll let everybody

14  know of my faith this is what you have to file.  So he said,

15  let the brothers know that I don't have the forms, which were

16  these -- now they issue these DC-52 forms, but in the inmate

17  handbook originally they didn't have these forms.  So he

18  explained to me, he said, look, have the brothers write out a

19  request slip and fill out the request slip and give it back to

file:///A|/sharp10-16-07(1).txt

20  me and I'll take care of it from there and we'll see what we

21  can do.

22            So we did that.  When we did that, mysteriously

23  nobody got passes to Taleem anymore.  Taleem is a study of, a

24  period of study that they have weekly where there are classes

25  held for that particular religious denomination.

1       So -- and we weren't on the list to even -- well, I

2   wouldn't attend Jumah.  Jumah is a Friday prayer service that

3   every Muslim is obligated to attend, if he is able to.

4       Taleem is a study period where Muslims gather

5   because it is obligatory for us to study and learn about our

6   religion.

7       So Taleem is a study period that we were allotted

8   or that Muslim community is allotted, and Jumah is like

9   Christians or Catholics would call church on Sunday.  You

10  understand what I'm saying?

11      THE COURT:  Yes.

12      MR. SHARP:  So, mysteriously, once we started

13  explaining to them -- to him, look, this is what we want, and

14  things of that nature, then we weren't getting passes to go to

15  Taleem anymore.  And many of the brothers, you know, that may

16  have tried to go to Jumah and at least sit through the sermon,

17  if they couldn't fulfill the prayer part, they weren't getting

18  passes for that.

19      THE COURT:  Let me interrupt you.  First of all,

20  whatever was happening with regard to others is not before the

21  Court, so you need to confine your remarks to me and testimony

22  to me in terms of what was happening with you.

23          Tell me what it was you requested.  You said you

24  filled out this form.  What did you request?

25          MR. SHARP:  I requested to have separate Taleem

1  services.  I requested to have access to the chapel for a

2  Jumah, which is the Friday prayer service.  And basically what

3  I asked for was everything that any other Muslim community

4  present in the Department of Corrections has access to.  They

5  have access to books, they get certain funding, they have

6  feasts two times a year that they celebrate.  We have certain

7  other holidays that we celebrate and I wanted access to that.

8        Also, included in that was a request for a hair

9  exemption.  You said I couldn't mention that, but that was

10  included in my request for religious accommodation and I have

11  brought proof to confirm that I did do that.

12        Okay.  In the process of all of that taking place,

13  I went and I looked up in the inmate handbook something

14  pertaining to religious accommodation.  I want to see if I

15  have the policy here which is DC-Administrative 819 because I

16  would like to read that into the record, if I may.

17        THE COURT:  Depending on how long it is.

18        MR. SHARP:  It's not very long.  It's not very

19  long.

20          THE COURT:  If it's lengthy, we'll just admit it as

21  a document.

22          MR. SHARP:  I know I have it in the case, but I

23  wanted to see if I could find it.

24          Is it all right if I get up and get this stuff out

25  of the box?

1        THE COURT:  Yes, but we need to be mindful of

2  moving the case forward.

3        MR. SHARP:  I'm trying to.  I'm trying to be as

4  quick as I can.  I'll read it from a case since I can't

5  specifically find the particular one that I'm looking for.

6        This is right out of Allah versus Menei.  It has

7  the policy in it.  Recognition of faiths.  This is out of the

8  inmate handbook DC Administrative 819.  Religious activities.

9  The religion directive stated purpose is to establish general

10  guidelines for institutional religious activities.  It details

11  present procedure regarding inmate access to chapel

12  facilities, religious articles and accoutrements, literature,

13  special foods and religious advisors from the outside

14  community.  The recognition of faith section of the religion

15  directive provides as follows:  Section 8.  Recognition of

16  faiths.  (A), requests for recognition of faiths that are not

17  well known will be handled as follows:

18        No. 1.  Institutional officials will secure

19  information from the recognized outside faith group authority,

20  including publications which describe the goals, beliefs and

21  practices of the group.

22        No. 2.  All such information material will be

23  forwarded to the director of chaplaincy services for the

24  bureau who will determine the authenticity and religious needs

25  of the group.

1        That's the section that I pretty much want to read.

2  That is from inmate handbook of the Department of Corrections.

3        THE COURT:  The document that you were reading that

4  from is a case.  What is the case citation?

5        MR. SHARP:  Allah versus Menei, cited as

6  844 F.Supp. 1056.

7        THE COURT:  What jurisdiction and year is it?

8        MR. SHARP:  It's Pennsylvania 1994.

9        THE COURT:  So I assume you made the request?

10       MR. SHARP:  I made the request.

11       THE COURT:  Then what happened?

12       MR. SHARP:  Then I also, on top of that, because I

13  was aware of the fact that you had to -- like if a group of

14  people were providing -- because it specifically states, if

15  there is a group that is collectively asking for this, then

16  you have to provide information on the group to the chaplain

17  of what your beliefs are, what you're asking for on top of

18  your individual request.

19       THE COURT:  Did you do that?

20          MR. SHARP:  I submitted this.  Do I submit it as

21  Exhibit A?

22          THE COURT:  You can submit that as Plaintiff's

23  Exhibit 1.

24          What should we entitle that?

25          MR. SHARP:  Religious Accommodation Request for

1  Ahlus Sunnati wal Jama'ah.

2        THE COURT:  I have it marked here.  Testify about

3  it, and when you're finished, then we'll hand it up and admit

4  it as Exhibit 1.

5        MR. BRADLEY:  Your Honor, I believe I have copies

6  of this, if you will give me a minute.

7        MR. SHARP:  I would like to submit this.  This is

8  the directive that I was just reading from, DC-Administrative

9  819.  I would like to submit that as Exhibit 2, but I will be

10  using that as well.

11        THE COURT:  Document 2 is the Policy 819?

12        MR. SHARP:  Right, and its supplements along with

13  DC-Administrative 807.  So I brought those specifically for

14  you to have those.

15        THE COURT:  Any objection to the admission of these

16  documents?

17        MR. BRADLEY:  No, Your Honor.

18        THE COURT:  They are admitted.

19        MR. BRADLEY:  Would you like me to mark them?

20          THE COURT:  The courtroom deputy will mark it.  I

21  appreciate your offer.

22          You may proceed.

23          MR. SHARP:  In compliance with this policy which

24  states that all material be forwarded to the Chaplaincy

25  Department and they, in turn, would process it according to

1  whatever procedures they have are.  I provided each defendant,

2  which is Price, Stickman, Dickson, Blaine, Winstead and the

3  Islamic Chaplain Tanko Ibrahiym on 10-14-99, and basically,

4  what I did was, explained to them, listen, you have a group of

5  individuals here, right, under this policy, we're to provide

6  this information to you and explain to you why we are

7  requesting or at least because you said I can't mention "we,"

8  but at the time that's what I was writing, we are requesting

9  that we be provided with services.

10      THE COURT:  That's understood.  You were requesting

11  this.

12      What happened as a result of your request?

13      MR. SHARP:  As a result of the request, Tanko

14  Ibrahiym informed me, listen, we're going to work something

15  out.  We're going to probably have you have religious services

16  on Wednesdays at a slot that we have open for you.  Great.

17  I'm waiting for this to happen.  In the process, I'm not

18  getting any passes to even participate in Taleem, which was

19  pretty much the only thing I could participate in because our

20  beliefs are so different.

21        I ended up getting with Deputy Superintendent

22  Krysevig, I catch him because I worked in the gym, I caught

23  him, I said, listen, can I speak to you for a minute?  I'm

24  having a problem and I know you probably got a copy of this

25  paper and I would like to explain to you what is going on.  He

1  said, sure.  We stepped in the gym.  I explained to him, I

2  said, listen you have 40, 50 inmates here who are not being

3  provided for as a Muslim community, and I mean, like, we've

4  submitted the paperwork, you know, Ramadan is coming up, which

5  is the period of fasting for Muslims, and we would really like

6  to be able to participate in the fast and do the other things

7  that any other Muslim community is allowed to do.

8        Yeah -- this is what he said.  Yeah, I got this

9  paperwork that you sent me.  We haven't had a chance to do

10  anything on it, but we'll be having a meeting on how we're

11  going to run Ramadan.  I said, okay, great.  Maybe we can work

12  something out there because I'm a little concerned about the

13  guys not being able to fast.  I know I want to fast, I want to

14  try to at least some of that time.

15        What ended up happening is -- I'm not sure --

16  exactly sure of the particular date, although I have request

17  slips here, I believe it was on 11-28-99; yes, 11-28-99 a

18  meeting was held with Deputy Superintendent Krysevig, Rhoda

19  Winstead, who was program services director, Tanko Ibrahiym,

file:///A|/sharp10-16-07(1).txt

20  the Islamic chaplain, and also I believe it was Chaplain

21  Terza, who was the Catholic chaplain who was just newly hired

22  to work in the chapel and become the facility director for the

23  Chaplaincy Department.  So when we had this meeting, I

24  explained to them, I said, right now at present you have a

25  number of Islamic -- Islamic, not just our community, another

1   community, but a number of Muslim communities within this

2   institution who are not being provided for during the month of

3   Ramadan, which is a period of fasting.  I said, it doesn't

4   seem fair that you have -- that the Wahabi community is

5   permitted to go to the chapel, break their fast, perform the

6   prayer and then go eat.  I said, why is it that no one else is

7   allowed to do what they're allowed to do and we've got a

8   community just as big as theirs?

9          So it got into a thing where Deputy Krysevig said,

10  listen, I don't want to deal with that right now.  I just want

11  to get through this Ramadan.  I want to know what your

12  suggestions are on how we should handle this Ramadan, and

13  things of that nature, and we'll deal with that situation

14  another time.  I said to him, in all fairness, everyone should

15  be allowed to go and break the fast, perform the prayer just

16  like any other group in this institution.  He said, look, I'm

17  not going to change the way I'm doing this.  Now, I'll let you

18  guys go to the gym, you guys, you other guys can go over there

19  in the gym, you guys can work that out and that will be that,

20  but I'm not going to let all you guys go to the chapel.  I

21  said, okay, well, we can work it out, I don't have a problem

22  with that.  We can work that out.  That's a reasonable thing

23  as long as you allow everybody to come together and pray

24  separately, according to what their mandates dictate and break

25  the fast according to what their mandates dictate, just like

1  this other group.

2       He really didn't like that, though.  It seemed like

3  he had a problem with that at some point.  I said, listen, I

4  think we pretty much got that worked out.  I don't have a

5  problem with how you want to do that.

6       Now, my next question to you is, what about this

7  request that we submitted for religious accommodation?  He

8  went into a whole thing, like, hey, we dropped the ball, I

9  know we haven't processed it.  I know we talked about that.  I

10  know we discussed that.  But, look, I'm not going to deal with

11  that right now.  I said, well, you know, I have been waiting

12  for a couple months now.  I mean if you look at the date,

13  10-14-99, I said this is over 11-28-99 we're having this

14  meeting, you've had this paperwork in your possession, as well

15  as the chaplain has had our request, and he keeps telling us

16  we're going to have these Wednesdays for this Taleem.  Is

17  there anything being done about this?  Well, why do you need a

18  separate Taleem anyway?  I'm trying to explain to him, we

19  don't have the same beliefs.  This individual is not of our

20  faith.  He's -- well, he's Muslim.  Sure, he's Muslim.  I'm

21  not disavowing the fact that he's Muslim.  What I'm saying is

22  he doesn't believe like we believe.  So he said, well, this is

23  your Imam.  That's like the highest station you can give to a

24  person of the Islamic faith as far as within the community.

25  He's like your leader.  This is what he tells me.  He said,

1  he's your leader.  I said, all due respect, Deputy Krysevig,

2  he's not my leader.  You can't appoint him as my Imam.  Our

3  religion dictates a certain manner in which an Imam is

4  appointed.  You can't say that.  I'm telling you he's your

5  Imam.  Ms. Winstead jumped in.  Mr. Sharp, you have a very

6  nasty attitude and I don't like your attitude.  If you keep it

7  up, you know, we can create problems for you, too.  We're not

8  going to have you do that stuff before like you were doing

9  before, disrupting what we're doing here.  Ms. Winstead, I'm

10  not trying to disrupt anything.  First of all, I have no

11  problem with Mr. Ibrahiym.

12        THE COURT:  Let me interrupt you at this point and

13  try to give you some guidance here.  I want to hear what your

14  complaint is --

15        MR. SHARP:  I'm trying to explain it to you.

16        THE COURT:  Excuse me.  I won't interrupt you

17  unless it's absolutely necessary.  Let me say something.

18        You need to focus a little bit because you're

19  talking about a period in 1999 and I know that there are other

file:///A|/sharp10-16-07(1).txt

20  matters that have occurred.  We have a finite period of time

21  in which to get your testimony and the testimony of your

22  witnesses before the Court.  I cannot have you recounting

23  every conversation verbatim and think that we're going to get

24  this case tried in our lifetimes.  So, I need you to focus.  I

25  don't want you to not include facts, but you don't need to

1  give it to me verbatim.  It's easy just to say you requested

2  X, Y and Z, the response from Defendant A was this, the

3  response from Defendant B was that.  Do you understand what

4  I'm saying?  I appreciate --

5        MR. SHARP:  Because I remember this so vividly,

6  these conversations.

7        THE COURT:  I understand that, but we need to in

8  the interest of time --

9        MR. SHARP:  I'm sorry, Your Honor.

10        THE COURT:  -- become a little more focused.

11        MR. SHARP:  So, anyway, what ended up happening is

12  they ended up saying, look, we dropped the ball, we never

13  processed this paperwork.  We never -- you know, we dropped

14  the ball on that, Deputy Krysevig admitted that.  That's the

15  one thing I distinctly recall was him saying, we dropped the

16  ball.

17        I said, look, what about this Wednesdays thing?  I

18  said, now, from what I understand, we can go to Taleem today

19  because if I'm not mistaken that day or that next day was a

20  Wednesday.  Well, I'm going to tell you -- this is what he

21  said.  This was his response.  I want this on the record.

22  This is important.  He said, I want you to tell your brothers

23  not to go to Taleem.  I said, what do you mean?  He said, I

24  want you to tell your brothers, send the word out that I don't

25  want -- not to go to Taleem.  I said, Deputy Krysevig, I can't

1  order inmates not to attend a religious service that they have

2  a pass for.  He said, I don't care nothing about what they

3  have a pass for, I'm telling you to tell them not to go.  I

4  said, I just can't do that because, first of all, I'm an

5  inmate --

6        THE COURT:  Mr. Sharp.

7        MR. SHARP:  This is brief.

8        THE COURT:  You're telling me three times what he

9  told you.  Once is enough.  I can hear it.

10        MR. SHARP:  He ordered me to do that and I told him

11  I can't do that, I can't order another inmate.  We went to

12  Taleem that night.  We had classes for the first time since I

13  had been there.  They had ranks of guards lined up in a

14  kangaroo line with a security team out in front of the chapel,

15  inmates, what set do you rock with?  This is what they were

16  saying.  We didn't understand what was going on.  We had no

17  problems, we went to the Taleem.  The next day, I was put in

18  solitary confinement.  Okay.

19        Now, from there I wrote and continued to request

20  that the process for our religious accommodation or my

21  religious accommodation be addressed.  It was not.  I filed a

22  grievance.  The grievance was subverted, never responded to,

23  sidetracked and derailed.  I wrote everybody under the sun

24  trying to get a response on this.  I have all the responses,

25  request slips, and I have stacks of stuff here, Your Honor,

1  that I can submit as exhibits, if you want me to.

2         THE COURT:  That's entirely up to you.  You are

3  permitted to submit whatever documentary evidence you believe

4  will prove your case.

5         MR. SHARP:  I have here -- we'll start with these

6  request slips here.  They're dated 12-1-99.

7         THE COURT:  I don't mean to interrupt.  You have

8  several pieces of paper there, are they all request slips and

9  responses?

10        MR. SHARP:  Yes.

11        THE COURT:  Are they all under one particular

12  grievance number?

13        MR. SHARP:  No.  This is -- this is prior to the

14  grievance.  You must try to resolve the issue.

15        THE COURT:  So these papers that you have in your

16  hand now, they're all concerning the request?

17        MR. SHARP:  Right.

18        THE COURT:  No matter how many pages there are,

19  let's call them the request documents.

20        MR. SHARP:  Dated from 12-1-99 to 12-10-99.

21        In each one of these --

22        THE COURT:  Don't read them to me, summarize.

23        MR. SHARP:  In each one of these you will see the

24  fact that we genuinely requested religious accommodation.  I

25  don't know if you're going to allow me to say this, but I also

1  bring up the fact that you locked me up solely because I asked

2  for this religious accommodation.

3        THE COURT:  I understand that.

4        MR. SHARP:  I didn't want to bring that up.

5        THE COURT:  That's not part of your case, but I

6  understand that's in the document.

7        MR. SHARP:  This was -- I explained that I filed

8  this in accordance with policy.

9        THE COURT:  All right.  That we will admit, unless

10  there's an objection, as Plaintiff's Exhibit 3.

11        MR. BRADLEY:  No, Your Honor.

12        MR. SHARP:  Now, I would like to read

13  Deputy Krysevig's response into the record, just his response.

14        THE COURT:  It is in the record once you admit

15  that.  You can summarize it.

16        MR. SHARP:  Well, it's very short.

17        THE COURT:  I understand that.  Summarize.

18        MR. SHARP:  What his remarks were, you did not

19  follow my advice, right, to tell your brothers not to come to

20  Taleem, to come to a religious service that everyone in the

21  institution is supposed to be allowed to attend if they

22  requested, that is why you are being confined.

23          THE COURT:  All right.  We'll receive those

24  documents as Exhibit 3.

25          MR. SHARP:  The next process is the grievance which

1  I believe he also submitted in his record.  Grievance

2  No. PIT 0997-99.

3        THE COURT:  What was the number?

4        MR. SHARP:  PIT 0997-99.

5        THE COURT:  All right.

6        MR. SHARP:  All of the appeals I submitted for

7  that.

8        THE COURT:  I'm sorry, that was the grievance

9  number?

10        MR. SHARP:  Yes, that was the grievance number.  He

11  also used it as exhibits in his response.

12        In it it says that we were to submit the proper

13  request.  I'm just referring to it, but I believe you already

14  have a copy, but I will submit a copy of the grievance

15  response to that.

16        THE COURT:  No. 4 will be the grievance at

17  PIT 0997-99 and the responses thereto.

18        MR. SHARP:  Right.  And I would just bring to the

19  Court's attention that at that particular time, there was

file:///A|/sharp10-16-07(1).txt

20  mention that I had not properly filed the request for

21  religious accommodation.  Someone assumed that this was all we

22  filed, but that's not true.  Tanko Ibrahiym asked us to each

23  individually file, write out on the request --

24          THE COURT:  I understand that.  You're already told

25  me that and you told me that was done.

1          MR. SHARP:  And we did that.  I'm saying why the

2   response says what it says.  It says we did not, we did not

3   submit --

4          THE COURT:  And I understand that you dispute that.

5   Just so you understand, you don't need to keep telling me 17

6   times that you dispute what they say.  It's sufficient for you

7   to say you dispute it once.

8          MR. SHARP:  The second thing that I would like to

9   bring into evidence is a PRC review sheet and I would like to

10  have this documented into evidence.  And the reason why I'm

11  documenting it into evidence is that while in my confinement I

12  was asked to sign or write a contract agreeing that I will not

13  engage in any religious activity in the Department of

14  Corrections, and if I agree to that, then I will be released

15  from the hole.  I have it in writing.

16         THE COURT:  That will be document No. 5.

17         Any document to objections to 4 and 5, Mr. Bradley?

18         MR. BRADLEY:  None to 4.

19         THE COURT:  4 was the grievance and responses.

20    4 is admitted.

21    No. 5?

22    MR. BRADLEY:  No objection.

23    THE COURT:  No. 5 is admitted.

24    What happened next, Mr. Sharp?

25    MR. SHARP:  In the interim, Tanko Ibrahiym, the

1  Islamic chaplain, would come back and forth into the RHU.  I

2  was a block worker there so I would speak to him off and on,

3  you know, about what was going on, what my situation was as

4  far as me being confined in the hole.  He told me, he said,

5  look, I didn't intend for you to be in the situation that

6  you're in.  He said, look, I understand what you were trying

7  to do.  I said, well, you know, my thing is, I only did what

8  you told me to do.  Why am I in the position I am in of being

9  confined?  He said, look, that's something that I have no

10  control over, something that security did, but when I spoke to

11  them, I didn't intend for them to have you in that situation.

12  So, I said, okay.  Well, look, Deputy Superintendent Krysevig

13  gave me an order that I have to request a hair exemption.  And

14  I have the PRC sheet here.  I was trying to locate it and I'm

15  going to locate it because I know I have it, I had it

16  yesterday.  He specifically ordered me, if you're going to

17  have a valid religious reason for having one, we will give you

18  that.  So I said, okay, no problem.  I don't have a problem

19  with that.  I submitted a request for religious accommodation

20  as far as my grooming exemption was concerned.

21        THE COURT:  So you submitted that request?

22        MR. SHARP:  Right.  And it was approved.  I have

23  the paperwork here from Chaplain Terza where he issued me a

24  card.  And he also issued me documents which I want to have in

25  the record verifying that I have a grooming exemption.

1          THE COURT:  Who approved it?

2          MR. SHARP:  Chaplain Terza.

3          THE COURT:  We can look for that later.  I'll note

4   that there's an exhibit that goes with that.

5          MR. SHARP:  And that was actually approved and he

6   had submitted it as part of -- that was approved.  And that

7   was the only thing out of the entire religious accommodation

8   request that I had submitted that was actually granted by

9   SCI-Western was the fact that my religious accommodation

10  request was approved for my hair exemption, my grooming

11  exemption as part of my faith.

12          Now, there's a reason why we ended up having to get

13  to this point as far as SCI-Western is concerned.  I would

14  like to submit this as a very important document.  It's what

15  Mr. Ibrahiym was teaching the class from -- it is a pamphlet

16  called Al-Aqeeda At-Tawheed -- when he first arrived at

17  SCI-Pittsburgh.  In it it makes some very important points

18  here.  It explains what Aqeedah is.  Aqeedah, so you

19  understand, Your Honor, is belief and it goes into individuals

20  who they consider deviants, not Muslims, okay.  They give you

21  deviant groups emerged during the era of the Khalaf.  I have

22  an inmate that will be testifying and verifying this is what

23  he was teaching.  Not Mr. Ibrahiym -- yes, Tanko Ibrahiym, the

24  chaplain at SCI-Pittsburgh.  This is what they were teaching

25  in the classes.

1      THE COURT:  Were you attending those classes?

2      MR. SHARP:  I tried to.

3      THE COURT:  A simple yes or no.  Were you attending

4  those classes?

5      MR. SHARP:  Yes, until I submitted my religious

6  accommodation because of what they were teaching.  They were

7  teaching inmates that we were deviants and not Muslims and I

8  had a problem with that.  We were not allowed to have a

9  separate class of our own to teach anything contradictory to

10  that.  So that's where I said, okay, look, if you're going to

11  continue to teach this and you're allowing these guys over

12  here to teach this stuff to these guys, allow us to at least

13  teach something comparable for what we believe.

14      THE COURT:  We're going to mark this as Exhibit 6.

15      MR. SHARP:  Right.  I would just quote one section

16  of it that I have highlighted.  There are many other deviant

17  sects of the past and present such as Af-Rafida, Habashi,

18  which is my community, and the Nation of Kufr, which is

19  disbelief by the Nation of Islam is who they were referring

20  to.  I would just note in the record that this is what they

21  teach.  I have highlighted here what they refer to us as,

22  deviants, repeatedly in their classes.  This is what Chaplain

23  Tanko Ibrahiym was allowing to be taught.

24          THE COURT:  We're going to mark that as an exhibit.

25          Any objection to its admission?

1        MR. BRADLEY:  No, Your Honor.

2        THE COURT:  It's admitted.

3        MR. SHARP:  Now, I had requested -- I had wanted a

4   witness, Joe Heckle to -- I've written him and I haven't

5   gotten any response because I was moved from SCI-Greene so

6   quickly -- from SCI-Dallas and brought to SCI-Greene, I don't

7   even know if he responded or not to let him know that I was

8   having a trial on this particular date, so I had gotten a

9   number of letters from him and he had contacted the Department

10  of Corrections, I'm trying to find out, listen, what is the

11  situation with this guy here, I know this guy --

12       THE COURT:  Let me stop you here.  Who is this

13  person?

14       MR. SHARP:  Joe Heckle.  He works for the

15  Pennsylvania Prison Society.

16       THE COURT:  What is that?

17       MR. SHARP:  It's an advocacy group.  It's like a

18  watchdog, but they work with the Department of Corrections.

19  If I'm not mistaken, they are actually contracted by the

20  Department of Corrections.

21         THE COURT:  Did you have some correspondence with

22  him?

23         MR. SHARP:  Yes.  I wrote him on numerous occasions

24  saying, look, I'm being locked down, held in confinement

25  solely for trying to get my religious accommodation.

1          THE COURT:  All right.  Well, he's not here.

2          MR. SHARP:  Right.  I have his letters.  I don't

3  know -- I can bring his letters tomorrow, but I don't know --

4  that's what I'm asking you, I don't know if I'm allowed to

5  bring his letters here and allow them to be entered in as

6  evidence.  We did try to contact the Department of Corrections

7  about this matter.

8          I have letters here that I wrote to Governor Ridge.

9  I have letters that I wrote to Mr. Mike Naught in response.  I

10  have letters from the Islamic Supreme Council requesting them,

11  look, we're willing to come in here, let the chaplain see the

12  services for these guys free of charge.

13          THE COURT:  The documents that you wrote to other

14  sources are not pertinent here.  Mr. Heckle's letters to you

15  would be pure hearsay.  Mr. Bradley couldn't cross-examine

16  those statements because he's not here.

17          And I will for the record note that trial was set

18  in this matter in June.  I don't know when you tried to

19  contact Mr. Heckle, but this case has been set for trial since

20  the middle of June.  That said, he's not here.

21      MR. SHARP:  What about the letters from

22  Jeffrey A. Beard and from the governor's office where they are

23  responding to letters that I wrote, am I allowed to submit

24  them as evidence?

25      THE COURT:  No.  It's hearsay.

1          MR. SHARP:  Suffice it to say that I wrote numerous

2    government officials complaining, and, in the interim, it was

3    determined because there were a number of phone calls and

4    letters from different government officials inquiring as to

5    what the heck I was talking about, they attempted to transfer

6    me to SMU, Special Management Unit, in case you haven't heard

7    of it.

8          Now, bear in mind, I haven't had a misconduct.

9    There was never any misconduct.  Like, there's a difference

10   between --

11         THE COURT:  I understand.  Again, the issue of your

12   custody determination is not before the Court.

13         MR. SHARP:  I'm not arguing it for that sake.

14         THE COURT:  Then let's move on.  I need to know how

15   it is you say these defendants imposed on your religious

16   beliefs.

17         MR. SHARP:  I'm getting to that.

18         THE COURT:  We need to get there.

19         MR. SHARP:  What happened is this.  In the process

file:///A|/sharp10-16-07(1).txt

20  of them dealing with that situation, they said, look, we're

21  going to get you out of here because we're getting all these

22  phone calls.  We tried sending you to SMU, we couldn't do that

23  because you didn't have any misconduct charges, you never had

24  a misconduct.  I never had a misconduct the whole time I was

25  locked down on confinement.  So, finally they said, look,

1  we're going to transfer you to SCI-Greene.

2        I get to SCI-Greene.  It is determined that a

3  security report was filed in my jacket as far as of a

4  grievance that I filed that stated that you are here because

5  you were caught with weapons.

6        THE COURT:  Again, this is not something that is

7  before the Court.  I'm not sure that you're explaining to me

8  how, if at all, that is relevant to what it is you say the

9  defendants in this case did to prevent you from practicing

10  your religion.

11        MR. SHARP:  I am saying that is a direct relation

12  to why -- this is what they did to prevent me from practicing

13  my religion.  My argument has always been that they

14  actually -- this is not a due process issue, I am saying that

15  the burden that they placed on me was to falsify documents in

16  order to prevent me from having access to religious recourse.

17  Is that permissible?

18        THE COURT:  If that's what you say they did, then

19  that's what you say they did.

20        MR. SHARP:  Okay.  What I'm saying is that they

21  falsified a security report and put it in my jacket because

22  they couldn't transfer me any other way.  It was solely

23  because of the fact that I submitted a request for religious

24  accommodation and advised others, in accordance with policy,

25  to do so.

1       Now, what I'm saying is that you can't do that.

2  That's my argument.  They're going to say we can.  Whether

3  you'll allow me to argue that issue or not, that's up to you.

4  But I'll move on.

5       When I got to SCI-Greene and I was able to finally

6  prove that I never had any weapons, never had a misconduct,

7  never had a confiscation slip for these things, why am I here?

8  I was told by Deputy Stowitzky, you know why you're here.  We

9  got a phone call two weeks before you got here that we were

10  not supposed to let you out.  You pissed Deputy Krysevig off.

11  I don't know what you did, but we don't care nothing about

12  whether or not you had a misconduct or not.  We're not letting

13  you out of the hole.

14       I remained in the hole for at least a good seven,

15  eight months.  In the process of that seven or eight months,

16  Deputy Superintendent Stickman, who is the defendant, became

17  the superintendent of the institution.  I spoke to him and I

18  said, Deputy Superintendent, what is going on, man?  I thought

19  I was being transferred here to start over?  He said, well,

20  you were.  What are you doing still in the hole?  Did you get

21  in trouble?  I said, no, I didn't.  He said, I'm going to be

22  superintendent here and that's not right.  And if you

23  genuinely haven't gotten in any other trouble, I'll release

24  you from the hole.

25          THE COURT:  Again, Mr. Sharp, I don't need chapter

1  and verse.  You need to be cognizant of the fact that there is

2  a small amount of time here.

3         MR. SHARP:  I'm trying, Your Honor, I'm trying.

4         THE COURT:  You had a conversation with him to try

5  to get the matter resolved.

6         MR. SHARP:  He finally did release me from the hole

7  because he knew that that wasn't right.

8         When I got out of the hole, I was at SCI-Greene and

9  I submitted another request for religious accommodation.

10        THE COURT:  What did you specifically request?

11        MR. SHARP:  The same thing I asked for in the first

12  one.

13        THE COURT:  I want to make sure it's clear on the

14  record.

15        MR. SHARP:  What I have been asking for all along.

16  And I also requested that they continue my grooming exception.

17  I have a copy of my grooming exemption.  Denied everything

18  else.  I wrote a request to Mrs. Mears, who I believe is a

19  defendant.  I explained to her, I said, look --

20          THE COURT:  What did you ask her?

21          MR. SHARP:  When I first got there, when I first

22   got into population, I was explaining to her that Ramadan was

23   approaching and that you have members of our faith who would

24   like to participate in a fast.

25          THE COURT:  What did you want?

1       MR. SHARP:  That's --

2       THE COURT:  I don't want to handcuff you, so to

3 speak, but it is not before this Court what other people

4 wanted and what other people may have said to you or to the

5 defendants in this case.  What is before me is what you asked

6 to have done and what you say it is these defendants did or

7 did not do.

8       MR. SHARP:  I just told you.  We want -- I wanted,

9 let me put it this way --

10       THE COURT:  You said "we."

11       MR. SHARP:  I wanted to participate in the fast and

12 I told her about that.

13       THE COURT:  Her response was?

14       MR. SHARP:  Her response was she called a meeting

15 with Chaplain Moneck, Chaplain Ibrahium and myself and another

16 inmate, I believe -- I can't think of the other inmate's name

17 off the top of my head -- as representatives of our particular

18 faith, and I explained to them, listen, we don't go to the

19 chapel because we know that Mr. Bakr is a Wahabi.  While in

20  the hole at SCI-Greene I watched his sermons.  I know what he

21  teaches.  We don't pray in the same direction.  None of that.

22  So I don't want to be disruptive to your service, but we would

23  like to be able to participate in fast.  He said, okay.  Look,

24  that's going to be up to him to determine, dah, dah, dah.

25        THE COURT:  Up to who?

1       MR. SHARP:  Mr. Bakr.  All you have to do -- all we

2  want to do is get the slips, the forms you fill out saying we

3  would like to participate in fast, fill those out and send

4  them in.  As it stood at that particular time, you had to go

5  over there, sit in the chapel on Fridays, listen to his sermon

6  and wait for him to give you the forms after the sermon was

7  over.  We didn't want to be subjected to that because he

8  taught certain beliefs that were contradictory to what I

9  believed.

10       THE COURT:  I understand that.  You've already

11  explained that.  Now you've explained it to Ms. Mears and

12  those others who were there.  What happened?

13       MR. SHARP:  Ms. Mears said for that particular

14  year, I will allow you to participate in the fast by getting

15  the forms or sending a request slip and filing it and you will

16  be put on the list and you will not have to go to the chapel

17  and sit over there in the chapel to participate.

18       The following year came around and what ended up

19  happening is I believe Ms. Mears left the institution or

20 something, but right before she was leaving the institution,

21 Ramadan was fast approaching and we explained, look, we're

22 having the same situation again.  She said, look, you'll have

23 to fill out the new forms that Chaplain Abu Bakr has put

24 together.

25        Now, this new form was totally -- I mean I wish I

1  had a copy of it.  It went so far as to say we were not

2  permitted to purchase commissary.  We were basically under

3  contract to pledge our allegiance to his particular faith.  It

4  said all types of things.  It was like four or five pages

5  long.  We can't sign that.  This is getting out of hand.  A

6  few brothers -- one of the brothers, one particular brother

7  that will be testifying said, the reason why he's explained

8  that he had done this to the community was that he didn't want

9  us over there.  Imam Abu Bakr told them, this is to keep those

10  guys from coming over here and sitting in the benches that are

11  not of our faith and taking up our time.

12        So I said, okay, I filed the complaint and I would

13  like to have this entered because not too long after I heard

14  that, there was a sermon given on videotape where Imam Bakr

15  specifically taught the Muslims that we were deviants, we

16  don't pray in the same direction.  And they had a videotape of

17  this.  Once it was brought to my attention that I saw the

18  videotape which was aired on the institutional channel two or

19  three times on Friday, and I believe it was two or three times

20  --

21        THE COURT:  I get it.  Two or three times.  We

22  don't need to know it was Fridays.

23        MR. SHARP:  What ended up happening, I went to

24  security Captain Coleman.  Actually, first I went to

25  Mahlmeister, the unit manager.  You got this guy teaching

1 these Muslim guys, these other guys that we're not Muslims and

2 they're putting this on the jail station. This could cause a

3 lot of problems these guys running around selling this to the

4 wrong person, somebody could get physically hurt because it's

5 serious. You're saying I'm not a Muslim. This is my faith.

6 He said, well --

7       THE COURT: Mr. Sharp, first of all, slow down so

8 that the court reporter can get what you're saying. She takes

9 down -- I don't know if you understand this, she takes down

10 every word that you say, that I say, that Mr. Bradley says, so

11 you have to slow down a little bit. I know that you're

12 excited about this, but slow it down, No. 1.

13       No. 2, we cannot continue to have verbatim of these

14 conversations. Give me the critical points that you want to

15 make.

16       You bring it to this person's attention that this

17 video has been shown?

18       MR. SHARP: Right.

19       THE COURT: It's going to be a problem. What did

20  you ask to be done?

21          MR. SHARP:  I specifically asked, could you remove

22  this tape from being shown?

23          THE COURT:  Who did you ask that of?

24          MR. SHARP:  Unit manager Mahlmeister.  He's one of

25  the witnesses I asked to be called to verify that I did this.

1   Coincidentally, at the same time that this was

2 taking place, Captain Coleman walked on block.  He's security

3 captain.  So I'm telling him, I'm, like, Captain Coleman, I

4 need to speak to you.  There was another witness, London

5 Linton, who is a witness, he will be verifying, standing right

6 there and saw the whole thing.  I said, listen, this guy is on

7 TV saying blah, blah, blah, saying, et cetera, et cetera, et

8 cetera, and it's offensive for him to do that.  Could you

9 please remove that tape because we don't have anything to

10 combat that and that can create a problem, a security threat.

11 He said, I'll look into it.  I filed all the paperwork.  The

12 response was that they continued to show it.  They said, we

13 don't find anything wrong with what he said.  If what he said

14 is his opinion, he's entitled to express his opinion.  That's

15 his freedom of speech.  We can't take the tape off because

16 that's what he feels and we don't see there's anything

17 offensive in what he says.

18   I filed the paperwork on it.  Here's the grievances

19 for it.  I guess we can -- what exhibit are we on now?

20          THE COURT:  Exhibit 7.  This is the grievance over

21  the videotape?

22          MR. SHARP:  Yes.

23          MR. BRADLEY:  There's an inmate request to staff

24  that is separate from the grievance.  I don't know if you want

25  to mark that separately.

1        THE COURT:  We'll do 7 as the inmate request to

2  staff and 8 as the grievance.

3        Any objection to their admission?

4        MR. BRADLEY:  No, Your Honor.

5        THE COURT:  Then they're admitted.

6        Now, Mr. Sharp, we've got those marked.  You can

7  continue.

8        MR. SHARP:  Also, I had submitted a request for

9  religious accommodation pertaining to Jumah and Taleem

10  services, as well as access to religious books that was denied

11  by central office.  And it was received on December 24, 2002.

12  I will submit that along with the grievance that I filed

13  appealing it as Grievance No. 39662.

14        I don't know how you want me to mark this.

15        THE COURT:  We'll mark the inmate request as No. 9.

16  What was the grievance number?

17        MR. SHARP:  39662.

18        THE COURT:  That will be No. 10.

19        MR. BRADLEY:  No. 9 is actually a memo from the

file:///A|/sharp10-16-07(1).txt

20  facility chaplain, the program director George Moneck to

21  Inmate Sharp indicating that his request under 819 had been

22  denied by central office.

23          THE COURT:  All right.

24          MR. SHARP:  Do you want all the appeals that went

25  with that, Your Honor, all the paperwork that I submitted with

1 that?

2          THE COURT:  With which?  The grievance?

3          MR. SHARP:  With that grievance, the first level of

4 appeals, the letters of request that I wrote, et cetera.

5          THE COURT:  Yes.  That will all be part of Exhibit

6 10.

7          We have another exhibit.

8          MR. BRADLEY:  There is another inmate request to

9 staff.

10          THE COURT:  No. 11, inmate request to staff.

11          Any objection to the admission of 9, 10 and 11?

12          MR. BRADLEY:  No objection.

13          THE COURT:  They are admitted.

14          I neglected to ask if there's any objection to the

15 admission of No. 6 which is the teaching lesson?

16          MR. BRADLEY:  I believe you did ask and I had no

17 objection.

18          THE COURT:  I didn't have it checked off.

19          Mr. Sharp, what we're going to do is we're going to

20  take a very brief recess since we seem to be at a pause.

21  We're going to take a ten-minute recess.  I'll see what

22  Mr. Bradley has been able to ascertain concerning your

23  medication circumstance.

24        MR. SHARP:  Is it possible I can get some Maalox?

25        THE COURT:  We're going to look into that.  We'll

1  resume here in ten minutes, but for right now, we are

2  adjourned.

3        We're in recess for ten minutes.

4    (Whereupon, there was a brief recess in the proceedings.)

5        THE COURT:  Mr. Sharp, you may proceed.

6        MR. SHARP:  Excuse me one second.

7        MR. BRADLEY:  Your Honor, these are the hair

8  exemption documents.

9        THE COURT:  That would be No. 12.

10       Any objection to their admission?

11       MR. BRADLEY:  I question their relevance in this

12  portion of it, but in terms of the documents themselves, I

13  have no objection.

14       THE COURT:  They will be admitted and the relevance

15  objection is noted.

16       Mr. Sharp.

17       MR. SHARP:  I believe we're at the point where I

18  was denied my request for religious accommodation at

19  SCI-Greene.

20          THE COURT:  Yes.

21          MR. SHARP:  Subsequent to that, I filed an amended

22  complaint requesting that certain defendants be joined.  And

23  primarily we have not had -- well, I have not had access to

24  participate in any activities of my faith with those of my

25  faith for the last eight, nine years.  I have until recently

1  not been allowed to fast.

2         MR. BRADLEY:  Your Honor, I am going to object to

3  this portion.  It appears to go well beyond any of the

4  complaints that have been filed in this matter.

5         THE COURT:  And it does.  You are restricted to the

6  time period.

7         MR. SHARP:  I'm explaining what happened up to this

8  point; am I correct?

9         THE COURT:  Right.  I don't know, are we going into

10  what is happening at SCI-Dallas?

11         MR. SHARP:  No.  I'm not talking about anything at

12  Dallas.  I'm not allowed to participate in religious service.

13  This has never changed.  This is nothing new.  I have always

14  made this claim.

15         I'm trying to understand what you're objecting to.

16         I'm not allowed to practice with those of my faith.

17  That has not changed since all of this story.  I have never

18  been allowed to practice with those of my faith, my religion.

19         And the argument has been presented that I can

20  practice within the existing framework of what is being

21  provided by the Department of Corrections, correct?  This is

22  what you have in your own statement.

23          THE COURT:  Mr. Bradley is not on the witness

24  stand.

25          MR. SHARP:  I'm trying to understand, that's what

1  their claim is.

2         THE COURT:  I understand that.

3         MR. SHARP:  What I'm saying is that there is a

4  contradiction here because in one instance, you will tell me

5  to participate in what is available, right?  What is available

6  is for a person that is not of my faith to teach me how I am

7  not a Muslim.

8         THE COURT:  I understand.  We have been through

9  that.

10         MR. SHARP:  This has been an ongoing process at

11  each institution I have been at, SCI-Western and SCI-Greene.

12  I have been prohibited and prevented, confined for pursuing my

13  religious right.  This is the burden that has been placed on

14  me.

15         I have only two options, either to completely go

16  against my religious requirements because all Muslims, I don't

17  care what denomination you are, are required to gather and

18  study Islamic knowledge, as well as through congregation we

19  pray, if they are able to.  That is an obligation.  I have no

20  choice in the matter on that.  This is what I'm bound to do.

21  It is not just a matter of you being required to do it as an

22  individual yourself.  So what I'm arguing is that just like

23  any other Muslim has that requirement for their faith, because

24  of my faith, I am required to do this.

25          Primarily, I would also bring to your attention

1  that it's of the highest violation of the establishment clause

2  of the United States Constitution for you to intentionally

3  suppress the efforts of someone to pursue their religion while

4  at the same time engendering and espousing a specific

5  ideology.

6          THE COURT:  I understand that, and I understand

7  that is your argument.  But right now what I'm interested in

8  are the facts that you say support that argument because we're

9  not going to do argument.

10         MR. SHARP:  I'm not.  In other words, I'm closing.

11  I'm closing.  Basically, what I'm saying happened is that, in

12  summation, I was -- I validly submitted a request for

13  accommodation.  I was confined for that.  That's my argument.

14  Whether you allow me to make that argument or not is up to

15  you, but I'm saying that is the burden that was placed upon me

16  is that I was confined solely for pursuit of my request for

17  religious accommodation, to suppress my pursuit of religion

18  and to deny me my First Amendment constitutional right.

19         Now, this continued on at SCI-Greene, knowing that

20  documents were falsified to confine me, and even after there

21  was no factual basis to keep me confined.

22          When I was released into population, I was still

23  denied access to religious accommodation because what happened

24  is, they found out the roadblock to put up is, say, we'll give

25  him his contract, all he wants to participate in is the fast,

1  well, we'll come up with this lengthy contract that violates

2  his religion, that even half of the Muslim at SCI-Greene don't

3  want to sign to participate in the fast, that way he won't

4  come over here.  I have witnesses to testify here is what

5  Chaplain Ibrahiym as well as some of the other things he

6  taught on the television --

7          THE COURT:  Again, Mr. Sharp, what we're interested

8  in is what happened to you.  Were you asked to sign this

9  contract?

10         MR. SHARP:  I was told the only way I could

11  participate in the fast at SCI-Greene was to sign this

12  contract.  That was the only way I could fast, so, therefore,

13  I was not allowed to fast during my Ramadan.  And if I would

14  go to Jumah, Friday services, it would not be a service that

15  was led by anyone of my faith.  It would not be valid, and, in

16  fact, I would be subjected to all types of foul critique by a

17  person who is not of my faith.  And I'm comparing it to a

18  Catholic trying to lead a Protestant service, or vice versa.

19              I want to close out with one last thing from

20  Jeffrey A. Beard.  It is a statement and it is a falsified

21  statement, but I'm going to read it into evidence.

22          THE COURT:  Well, that would be hearsay, sir.  I

23  don't know what it is.  You have to first tell me what it is.

24          MR. SHARP:  I wrote him a letter.  It was

25  originally directed to the Honorable Rick Santorum and Jeffrey

1  A. Beard responded back writing to me directly, so this is not

2  hearsay.

3          THE COURT:  It is hearsay, sir.  It's a statement

4  made out of court by another individual.

5          MR. SHARP:  So his signature on this --

6          THE COURT:  It doesn't matter.  He's not a

7  defendant.

8          MR. SHARP:  I got a problem with that.  Can I ask

9  you a question?

10          THE COURT:  You can ask a question.

11          MR. SHARP:  He was joined as a defendant,

12  Mike Knott was joined as a defendant.  We have two defendants

13  that are not present and have never been present during any of

14  these proceedings and nothing was dismissed against them, so

15  I'm trying to understand how --

16          THE COURT:  I will explain it to you.  You

17  petitioned the Court to add -- I can't remember the name of

18  the other individual that you say, it was Mr. Beard and --

19          MR. SHARP:  Jeffrey A. Beard and Mike Knott,

20  K-N-O-T-T.

21        THE COURT:  You petitioned the Court --

22        MR. SHARP:  To join them as defendants.

23        THE COURT:  In December, on December 3, 2001, you

24  submitted pro se, because you were pro se at the time, you had

25  not yet obtained counsel, you moved the Court to add

1  additional defendants, to file an amended complaint adding

2  additional defendants, which would have included Beard and

3  Knott, among others, who are now defendants.

4        MR. SHARP:  Right.

5        THE COURT:  September 30 of 2002, the Court granted

6  your motion to amend the complaint indicating that because you

7  had proceeded pro se and had not attached a copy of a proposed

8  amended complaint, the Court couldn't rule on whether any of

9  those individuals would be properly added as a defendant, but

10  did allow that you would be entitled to amend your complaint

11  to add whatever defendants you wanted to add.

12        And then on the 21st of February 2003, after you

13  had obtained counsel, at your request, the counsel filed at

14  Document 49, the amended complaint, which included all of the

15  individuals that you had named in your motion, except for

16  Beard and Knott, and it included three other defendants who

17  had not previously been included in your motion requesting the

18  amendment.

19        The fair inference is that those were the people

20  that you wanted to be named in your amended complaint and

21  that's who has been named in the amended complaint and that's

22  where we are.

23          MR. SHARP:  May I enter an objection to that?

24          THE COURT:  No.  That is the state of the record.

25          MR. SHARP:  Can I -- I'm not allowed to object to

1  what you're saying, or disagree with it?

2      THE COURT:  You can disagree with it, if you would

3  like.  I'm reading to you from documents that are part of the

4  court record.

5      MR. SHARP:  Right, and I would like to enter an

6  objection.

7      THE COURT:  You can note your objection.  It's

8  noted for the record.

9      MR. SHARP:  That's all I want.

10      THE COURT:  I'm reading to you what is on the

11  record.

12      MR. SHARP:  I don't want to ever have it be

13  construed that I waived my right to challenge them as

14  defendants, as you are aware, Your Honor.

15      THE COURT:  We're not going to argue that.  We're

16  done with that point.  We're finished with that point.  You've

17  noted that you believe that you needed to add two defendants

18  who weren't added.  We're not arguing that.  That's come and

19  gone.  You can certainly preserve that issue if you feel you

20  want to.

21      MR. SHARP:  That's all I want you to say, that I'm

22  allowed to preserve that as an issue.

23      THE COURT:  You can.

24      MR. SHARP:  I'll appeal.

25      THE COURT:  Anything further?

1        MR. SHARP:  You just got me --

2        THE COURT:  Mr. Bradley will have some questions

3  for you.

4        MR. SHARP:  I don't know if you're allowing me to

5  enter this.  But I wanted to read into the record or have

6  entered into the record a statement of policy by Jeffrey A.

7  Beard.  You're saying he's not a defendant, but he is the

8  Department of Corrections head and he establishes the policy

9  and the policy says that we don't hold separate services for

10  Lutheran, Baptist, Methodist, Pentecostal, et cetera.  As

11  individuals wishing to worship as one of these may do so at

12  the -- what the department will not do is recognize separate

13  facets of the same group.  At most institutions we offer only

14  one Catholic service, one Protestant service, one Jewish

15  service and one Muslim service.

16        Now, this was directed to Honorable Rick Santorum

17  as an answer, and I am saying that that is a falsification.

18  At SCI-Greene and -- you want me to stop?

19        THE COURT:  Go ahead, at SCI-Greene --

20          MR. SHARP:  At SCI-Greene, the Nation of Islam has

21  separate services at one time, the Moorish Science Temple had

22  separate services, as well as the Wahabi community had

23  service, the Christian community who has three or four

24  different services, so what he's saying is that the Catholic

25  has one service, the Protestant has one service.  Aren't they

1  both Christians?  And if he's saying that he's only providing

2  one service for the religion of Islam because they're all

3  Muslims, Catholic and Protestant services are both Christian.

4  Why is it that the Islamic beliefs are being treated any

5  differently than the Christian beliefs?

6         THE COURT:  I understand that's your argument.

7         MR. SHARP:  Yes, pretty much in a nutshell.  That's

8  unfair.  That's biased.  Not only that, but what I'm saying is

9  that why is it that all these other separate groups and at

10  every other institution you have five or six Islamic -- you

11  may have five or six different Islamic services going on.  You

12  may have Nation of Islam, Temple of Islam, Moorish Science

13  temple, the Shiite community, and the Wahabi community.  Why

14  are we not included in any of those services, or why are we

15  not -- this is what I'm arguing, why aren't we permitted to

16  have these services?  I don't think it's fair.

17         THE COURT:  I understand that's your argument.

18         MR. SHARP:  I'm done.

19         THE COURT:  All right.

20          Mr. Bradley, you may cross-examine.

21          MR. BRADLEY:  Thank you, Your Honor.

22              CROSS-EXAMINATION

23  BY MR. BRADLEY:

24  Q.  Mr. Sharp, now you indicated that one of the Muslim groups

25  at SCI-Pittsburgh when you were there was a Sunni group?

1  A.  Yes.

2  Q.  Is that correct?

3  A.  Yes.

4  Q.  And you are a Sunni Muslim?

5  A.  Yes.

6  Q.  The same at SCI-Greene, it was a Sunni group at

7  SCI-Greene; is that correct?

8  A.  Uh-huh.

9  Q.  You have to answer yes or no.

10  A.  Yes.

11  Q.  And, again, you were still a Sunni Muslim when you were at

12  SCI-Greene?

13  A.  Without question.

14  Q.  Now, you've indicated that the Sunni sect at both

15  Pittsburgh and Greene is this Wahabi sect?

16  A.  Yes.

17  Q.  What is that based on?

18  A.  What it is based on is the teachings of Muhammad Ibn Abdul

19  Wahhab.

20  Q.  My question is, what do you base your understanding that

21  the community at Pittsburgh and Greene were Wahabis?

22  A.  That's what they teach.  I mean I know their teachings.  I

23  brought books here specifically dealing and detailing their

24  teachings.

25          If I can give a little history.

1          THE COURT:  No.

2  BY MR. BRADLEY:

3  Q.  You've answered the question.

4          I believe it was your Exhibit 9 which was the memo

5  from Father Moneck to you indicating that your request under

6  819 filed at Greene had been denied?

7  A.  Uh-huh.

8  Q.  Since that denial, have you made a request for religious

9  accommodation of your group or your individual sect?

10  A.  At Dallas?

11  Q.  Anywhere.

12  A.  Yes.  Actually, I have.  I've done it at Dallas, but you

13  won't let me go into that.

14  Q.  Did you submit another 819 request at Greene after Father

15  Moneck indicated to you that your request had been denied by

16  central office?

17  A.  No, the proper procedure is to grieve it.

18  Q.  You grieved it?

19  A.  I grieved it all the way to the top.

20  Q.  That was the last act you took with respect to the

21  request?

22  A.  You can't do anything other than that.

23          THE COURT:  Let me caution you once more.  Because

24  of the court reporter, you need to let Mr. Bradley finish his

25  question before you start to answer because the court reporter

1  can't take you down both at the same time.

2  BY MR. BRADLEY:

3  Q.  I want to focus on some of the defendants that you've

4  identified in this matter, specifically at SCI-Greene.  Imam

5  Abu Bakr Muhammad; you're familiar with him?

6  A.  Imam Abu Bakr Muhammad is --

7  Q.  You're familiar with him?

8  A.  Back there in the corner, correct.

9  Q.  I believe that's Imam Abu Bakr Muhammad.  Do you know him

10  as Imam Abu Bakr?

11  A.  I call him Chaplain.  I don't call him Imam.

12  Q.  What specifically are you saying that Imam Muhammad or

13  Imam Abu Bakr did with respect to your rights?

14  A.  I'm saying that he impeded them.  I'm saying that we were

15  never allowed to participate in religious services that would

16  be valid for our community.

17  Q.  I understand that is what you're saying overall.  What

18  specifically are you saying that he did?

19  A.  I'm saying that he taught a doctrine that we were

20  heretics, non-Muslims.  Specifically, he would continue to

21  teach, and witnesses will come and verify that he taught that,

22  in his Taleems and in his Jumah services that we were heretics

23  who did not pray the same directions as him and we were not

24  Muslims.

25  Q.  So with respect to him, it was just his teachings?

1  A.  It was his teaching that we were not Muslims and his

2  effort to stop us from coming into the chapel to participate

3  in Ramadan by coming up with that form, a contract, because

4  that's not Department of Corrections policy.  He made that up

5  and made it policy so that we would not be allowed to

6  participate in the fast.  He intentionally did that.  That's

7  my contention.  I have witnesses that will verify he pretty

8  much said that, in a nutshell.

9  Q.  Other than his teachings and the contract, is there

10  anything else he did?

11  A.  That was -- I'm saying that was enough to me.  Not letting

12  us -- in other words -- let me see how I can explain this.  He

13  would not allow us to teach any form of Islam other than what

14  he taught.  Can you understand that, what I'm saying?  We

15  weren't allowed to do that.  He was a direct -- he had a

16  direct hand in making sure that didn't happen.

17  Q.  That was through his teachings and through this contract

18  for Ramadan?

19  A.  And that was through him saying, no, no one else is

file:///A|/sharp10-16-07(1).txt

20  allowed to teach over here but me.  This is what I'm teaching.

21  That was his policy at SCI-Greene.  You couldn't hold a class

22  unless you went through him and he wasn't letting us have any

23  classes.

24  Q.  You've also listed Father Moneck, George Moneck.  Can you

25  identify who he is?  He's not here in the courtroom.  Can you

1  identify who he is by position?

2  A.  Father Moneck, if I remember correctly, was at SCI-Greene.

3  He was the chaplain, the Catholic chaplain of SCI-Greene.  He

4  was the head facility chaplain.

5  Q.  He was the program director for the chapels?

6  A.  Right.

7  Q.  What did he do to interfere with your religious rights?

8  A.  Specifically, he gave the recommendation that we not be

9  granted this religious accommodation.

10        There's a vote sheet that has to go around for us

11  to be granted accommodation before it is sent to Harrisburg,

12  and he denied that.  He denied it.  He said, no, we're not

13  going to have that, we're not going to have that.

14  Q.  He made a recommendation not to approve your request?

15  A.  As far as I know, yes.

16  Q.  Do you know if he had the final say in that?

17  A.  Well, I don't think he had the final say, but he had a say

18  in it.  He was part of it and he was aware of the fact that we

19  were pursuing that.  He sent me the denial.  I mean, like, if

20  I'm not mistaken, on one of the pieces of paper he gave me, he

21  specifically wrote out the denial knowing we had a right to

22  practice our religion.

23  Q.  He indicated it was denied by central office, isn't that

24  what that document said?

25  A.  That's true.  But even after that, he went beyond that

file:///A|/sharp10-16-07(1).txt

61

1  because once it was made aware to him that his employee, Abu

2  Bakr, was teaching other inmates that we were heretics, he had

3  a duty to stop that and he didn't do that, so he allowed him

4  to do that and we brought that to his attention.

5  Q.  That was I believe through the grievance you filed?

6  A.  Not just through the grievance.  I spoke to him personally

7  and complained about this.  It wasn't just left up to a

8  grievance.  Complained to him, look, man, this guy is teaching

9  that we're heretics, we don't get to teach anything to

10  contradict that, that's not fair.

11  Q.  Let me just take an aside from that.  Did Imam Muhammad

12  ever mention you by name in any of the sermons, did he

13  specifically mention Shawn Sharp?

14  A.  He said the Habashis are deviants.  They pray in a

15  different direction.  They aren't Muslim.  They claim -- I'm

16  sure he still has the tape, probably.  Interesting watch.

17  Q.  With respect to Jean Mears, she was also not present, but

18  can you identify what her --

19  A.  She was program services director at SCI-Greene.

20  Q.  To your understanding, was she responsible for the

21  Chaplaincy Department?

22  A.  She oversaw all programs for all inmates, and that

23  included religion.

24  Q.  Now, I believe you testified that you initially went to

25  her and asked her about getting involved in Ramadan.  She

1  helped you out with that?

2  A.  The first year.  The first year she said, okay, this first

3  time I'm going to allow you -- and I have the request I

4  submitted, the first time she allowed us to participate in the

5  fast.  The second year she did not.  She said that we would

6  have to sign that contract in order for us to participate in

7  the fast, and that contract had in it where we would agree to

8  follow his particular -- we would agree that we were inherent

9  to his particular ideology of Islam was part of it, as well as

10  we couldn't buy commissary -- there's a whole lot of stuff.

11        THE COURT:  Mr. Sharp, again, slow down.

12  BY MR. BRADLEY:

13  Q.  Was there anything else that Ms. Mears did that you felt

14  interfered with your ability to practice your religion?

15  A.  Well, I feel that what she specifically did was she

16  assisted him in implementing his policy of not allowing --

17  well, Imam Abu Bakr's policy and ideology of not allowing any

18  other religious service or teachings other than what he

19  taught, which is Wahabism.

20  Q.  She did that by --

21  A.  Her actions.  She -- her and I had a very good

22  relationship as far as speaking to each other.  I would catch

23  her --

24          THE COURT:  Mr. Sharp, I'm going to have to stop

25  you.  The question is, what did she do?

1 MR. SHARP:  Yes.

2 THE COURT:  You're talking about a dialogue, a

3 conversation you had.  What did she do?

4 MR. SHARP:  She made it clear to me that we were --

5 she would not allow any other religious teachings in the

6 department or in SCI-Greene other than what Chaplain Abu Bakr

7 taught.  And she told me that personally numerous times.

8 BY MR. BRADLEY:

9 Q.  Was that after your request had been denied, your 819

10 request?

11 A.  Yes, even after that.  Before and after.

12 Q.  Defendant Coleman you've identified, you indicated that

13 you had this conversation with him about the videotape that

14 you had witnessed with Imam Abu Bakr saying those things, and

15 without getting into all of that, is it your claim that

16 Defendant Coleman didn't do anything about that tape?

17 A.  Definitely one of my claims.

18 Q.  What else about anything Mr. Coleman did?

19 A.  Well, the falsified documents that were in my jacket, it

20  is my claim that he was --

21  Q.  That is the administrative custody?

22  A.  That's why I'm saying so -- primarily that, once it was

23  brought to his attention that, look, this is being taught and

24  we're not being allowed to refute that.

25  Q.  That's your claim with regard to Mr. Coleman?

1 A.  Yes.  And he was made aware of it and he saw it, he should

2 have seen it.

3 Q.  In your initial request made at SCI-Pittsburgh, which is

4 Exhibit No. 1, the three-page typewritten paper --

5 A.  Can I correct you?  That is not the original request that

6 we submitted as individuals for religious accommodation form.

7 That was the information that I provided separately pertaining

8 to us as a group, and the policy is very clear, provide

9 information as a group, you have to provide information to the

10 chaplain.  I not only provided it to the chaplain, I also

11 provided to all the staff members who you see headed at the

12 top of that, so I submitted a separate -- he didn't have DC-52

13 forms when he first came, he didn't have those forms, so we

14 said, look, if you can find out what the information is on the

15 forms, provide it to me on a separate -- type it up, write it

16 out and I will submit it for you.  That was never done.

17        THE COURT:  That's what document No. 1 is, Exhibit

18 No. 1?

19        MR. SHARP:  This is totally separate from our

20  request for religious accommodation -- for my request for

21  religious accommodation.  It was written out on a separate

22  sheet and given to him.  I was never returned a copy of that

23  form that I submitted to him.  It was basically a DC-52 form.

24  I never got it back.  This was a separate document that I

25  submitted as per his instructions detailing what our separate

1  and distinct beliefs were.  So there's two different things

2  that we're talking about here.  This is not a request for

3  religious accommodation.  This is information about our faith

4  group that had to be provided along with the request for

5  religious accommodation.  There's a difference.

6  BY MR. BRADLEY:

7  Q.  All you brought forward today is the separate three-page

8  typewritten document explaining the nature of your religion?

9  A.  Correct.  He received 40 of them.  There were 40 of them.

10  I have a complete list of all the inmates who submitted it,

11  but I know I can't admit that into evidence, but, yes, there

12  were 40 of them submitted to him.  I have witnesses who will

13  verify they were written out.

14  Q.  But you don't have a copy of that?

15  A.  No, because the reason why I don't have a copy of it is

16  because he took those and he never provided us with a copy of

17  them.

18  Q.  Did he take a copy of this?

19  A.  No.  I actually sent copies out.  He didn't take a copy, I

20  gave him a copy and sent one to each individual staff member.

21  That's why I have a copy of this.

22  Q.  But you don't have a copy of that other --

23  A.  No, because I submitted the form to him separately.  You

24  don't keep a copy of that form, you submit that to the

25  chaplain separately, and this is how I got copies of this back

1  because they sent me back copies.  He never sent me back

2  copies of anything that I submitted to him, not even this.

3  This happened to be the extra copy that I had, I made copies

4  of it.  He never submitted back any of my stuff to me.

5  Q.  What was the group name you submitted this under?

6  A.  Ash'ari, Habashi all of that.  There are numerous names.

7  Q.  The Habashi, am I going to see that in here?

8  A.  Habashi should be in there, too.

9  Q.  Can you point that out to me?

10  A.  I believe it would have been on -- I do not see it here as

11  a reference.  I only used Ahlus Sunnati wal Jama'ah, but let

12  me clarify something for you.  For those of my particular

13  faith, Habashi means black, African, who our teacher is, our

14  shaykh is.  That's why we're called Habashi because our sect

15  is from Ethiopia and we have -- I particularly and those of my

16  faith have an ethnic affinity of being a direct connection to

17  a shaykh who is from Ethiopia, in case that clarifies

18  anything.  It's like we use terms like Wahabi, Salafi, these

19  are terms that are interchangeable, but we're talking about

20  the same group.  You can refer to us as Ash'ari, Muslims,

21  there are numerous names for us.  So I mean like if I don't

22  put it here when I mention Ahlus Sunnati wal Jama'ah, that's

23  general enough that it covers all of that.

24  Q.  When you were at SCI-Pittsburgh, what, to your knowledge,

25  what religions were being accommodated in terms of being

1  offered services?

2  A.  Moorish Science temple.

3  Q.  Is that considered a Muslim group?

4  A.  Yes.  I wouldn't consider it Muslim, but to them, they

5  would.  Nation of Islam.

6  Q.  Is that considered a Muslim group?

7  A.  To them, they would be considered Muslim group.  And the

8  Masjidullah community, those were just Muslim communities that

9  were serviced.

10  Q.  Is that in addition to the Wahabi community?

11  A.  The Masjidullah community is the Wahabi community.  Or

12  Salafi, too, that's primarily what we call them, Salafis.

13  Those terms are interchangeable.

14  Q.  So that's three Muslim groups that were recognized by the

15  Department of Corrections?

16  A.  Masjidullah, Nation of Islam and Moorish community.

17  Q.  What other religions were offered accommodation?

18  A.  He had a number of Christian services, Catholic, they had

19  like maybe four or five different Christian services

20  throughout the week that I could think of off the top of my

21  head.

22  Q.  Can you identify those by name?

23  A.  I know they had Catholic and Protestant, I think they had

24  Jehovah Witness.  There were two more.  I know they had the

25  Jewish community would come in.  I can't think of the other

1  two communities, but there were like two other services, I

2  think, during that particular time that were Christian in

3  nature.

4  Q.  At SCI-Greene --

5  A.  No, at SCI-Greene.  Excuse me.

6  Q.  I'm asking another question.  This is a whole new

7  question.

8         At SCI-Greene, to your recollection, what religions

9  were accommodated, recognized by the department?

10  A.  I know you had the Catholic, I know you had the Protestant

11  community, then you had like these small, like, Jehovah

12  Witness study groups, you had different classes for different

13  groups throughout the week for the Christian community.  You

14  had the Jewish community, which had like their own services.

15  I don't know particularly what they did or how many of them

16  there were.  There was the Nation of Islam, at one time there

17  was the Moorish Science Temple, I don't know if they're still

18  practicing, what they're doing, and you had the Chaplain Abu

19  Bakr's classes and what he taught.  And I believe there was

20  also a separate Nation of Islam service because there was a

21  disagreement between the Nation of Islam that there were two

22  different ideologies within the Nation of Islam that ended up

23  being accommodated because the guy won a lawsuit on the same

24  issues I'm raising now, so I think they did have two different

25  Nation of Islam services.

1  Q.  Getting to your religion, what is the -- strike that.

2        At SCI-Pittsburgh, did you ever provide the Imam

3  Ibrahium with written information from your group other than

4  what you wrote in this letter?

5  A.  Yes, I gave him all types of information.  I gave him

6  books, some of these books that I have here.

7        THE COURT:  If there are specific books, sir, that

8  you provided, you need to provide them for the record.

9        THE WITNESS:  I'm going to.  I need to get them

10  together.

11        Reliance of the Traveller by Nuh Ha Mim Keller.

12        Islamic Beliefs & Doctrine According to Ahl

13  al-Sunna, A Repudiation of "Salafi" Innovations.

14        There was another book that I had provided called

15  al Baani Unveiled, which is one of their shaykhs, and another

16  one is called How to Debate With the So-called Salafiyyah,

17  which is their group, Wahabi Salafiyyahs.

18  BY MR. BRADLEY:

19  Q.  You gave these three books --

20  A.  Oh, yeah, we had stacks of stuff that we gave him.

21  Q.  I'm asking you gave these --

22  A.  Oh, yeah.

23        MR. BRADLEY:  That's all the questions I have, Your

24  Honor.

25        THE COURT:  All right.

70

1        Before we take a lunch recess, let me do some

2   housekeeping matters here concerning the witnesses for this

3   afternoon.  Are there witnesses here in the courtroom that you

4   intend to present other than -- let's do it this way.  The

5   witnesses that you have indicated you wish to present that are

6   currently inmates include John Blount, Damian Brome, Troy

7   Calhoun, Anthony Deloatch and London Linton.  We have

8   arrangements to connect those people by video conferencing and

9   we're going to talk about that in a minute.

10        Other than those witnesses, are there other

11   witnesses you're presenting?

12        MR. SHARP:  I would like to call all of the

13   defendants.

14        THE COURT:  The defendants, I'm sure, will be

15   called.  I'll ask Mr. Bradley, but I'm relatively certain he's

16   going to do that.

17        Mr. Bradley, are all the defendants going to take

18   the stand?

19        MR. BRADLEY:  Yes.

file:///A|/sharp10-16-07(1).txt

20          THE COURT:  Then he will do an examination and you

21  may cross-examine them, which is the normal procedure.  So

22  they will all testify and you will have your opportunity to

23  cross-examine them on their testimony.

24          That said, let me get to the inmate witnesses.

25          MR. SHARP:  Excuse me.  You were asking is there

1  anyone else that I would like to call?

2        THE COURT:  That's here, that you've subpoenaed

3  that's here.

4        MR. SHARP:  No.

5        THE COURT:  That's your responsibility.

6        MR. SHARP:  Right.  I didn't know how to subpoena.

7  I couldn't -- I was trying to figure that out, how I would go

8  about doing that.  That's not a problem.  I can function

9  without them.

10        THE COURT:  I'm looking at the summary which I

11  requested that you provide to Mr. Sanchez to let me know what

12  the witnesses were going to be testifying about.  And I know

13  that you had this conference and then this document was filed.

14  So let me ask you about Mr. Deloatch.  Exactly what is it he's

15  going to testify about?

16        MR. SHARP:  I'm trying to remember because, see,

17  you know him by that name and I don't know him by that

18  particular name.  If I remember correctly, he was at

19  SCI-Western with me.  He was an individual who was present

20  when I submitted my individual request for religious

21  accommodation.  He was also -- well, you said he can't mention

22  the fact that he was also an inmate who at this same time was

23  submitting his --

24          THE COURT:  That's not relevant.

25          MR. SHARP:  He witnessed, you know, the Taleem

1  incident that I was telling you about that transpired prior to

2  me being locked up, and he witnessed me being instructed to

3  tell my brothers not to go to Taleem services or to attend any

4  religious services, he's a witness to that.

5       THE COURT:  Anything else?

6       MR. SHARP:  As well as he can verify that we

7  submitted these books, I submitted books, had these books in

8  Mr. Ibrahiym's presence, what he was asking about.

9       THE COURT:  Anything else?

10       MR. SHARP:  I think that would be it because he was

11  only at SCI-Western with me so he would cover that incident.

12       THE COURT:  Mr. Blount?

13       MR. SHARP:  If I'm not mistaken, he was the Imam up

14  there.  It doesn't say it on that summary, he was the Imam

15  at -- he was the Wahabi or Salafi inmate Imam at SCI-Western.

16  He was -- he worked with Chaplain Ibrahiym, can verify that we

17  were attempting -- we followed the policy as far as it goes

18  for submitting requests for --

19       THE COURT:  Did you have any conversations with

20  him?  Was he present when you --

21        MR. SHARP:  Yes.

22        THE COURT:  Tell me that.  Tell me what the facts

23  are because he's not going to be allowed to testify generally.

24        MR. SHARP:  He was there.  He was right there --

25  when I was in the chapel, he was in the chapel because we all

1  went at the same time, so we would have a large group of

2  inmates present in the chapel.

3        THE COURT:  What is it that he witnessed, what

4  conduct, what actions or inactions of the defendants did he

5  witness that you want to call him to testify about?

6        MR. SHARP:  He witnessed the officers outside of

7  the chapel questioning us about what sect --

8        THE COURT:  Not "us."

9        MR. SHARP:  Me, questioning me about what sect I

10  was with, et cetera, et cetera, as far as me getting into the

11  chapel to even practice my religion.  He was present during

12  the time that I was compiling the list of individuals, I had a

13  stack of request slips that he had instructed us to fill out

14  that were the individual requests that we had to sit and type

15  -- Mr. Ibrahiym had me type out a list of names once all the

16  slips were in of who the 40 individuals were that requested,

17  so he saw me right there under his instruction compiling this

18  information, as instructed by Chaplain Ibrahiym.  He also

19  spoke to Ibrahiym about my situation.

20          THE COURT:  Do you know this for a fact?  Were you

21  present?

22          MR. SHARP:  He told me specifically, in other

23  words, he is going to testify what he heard -- what those two

24  talked about.  I wasn't there at that conversation, but he

25  told me what was discussed in that conversation.

1          THE COURT:  What else is he going to testify about?

2          MR. SHARP:  And he's also going to testify about

3  the differences in our beliefs.

4          THE COURT:  No.

5          MR. SHARP:  He's not allowed to testify or give

6  evidence about the distinction between what he believes and

7  what I believe?

8          THE COURT:  No.  You have indicated what it is that

9  you believe you have been denied.

10          MR. SHARP:  Right.

11          THE COURT:  What his opinion is is different, is

12  not your opinion and it's not at issue here.  He's not going

13  to be allowed to generalize over what was happening --

14          MR. SHARP:  No.  No.  You misunderstand what I'm

15  saying, Your Honor.  He is considered by the Salafi community

16  to be an Imam, an inmate Imam, bear in mind.  He can speak

17  about the beliefs -- and I'm not talking about what happened

18  here and here, no, we're talking about our beliefs,

19  doctrine-wise the distinction between his beliefs, or theirs

20  as a group, their beliefs and what we as individuals believe

21  because I think that that is essential because if they're

22  saying that we should be -- we can practice within that

23  framework, here's an individual that is an Imam and has been

24  documented as an Islamic Imam for the Department of

25  Corrections inmates, then he can say, we don't believe the

1  same thing and here's what we don't believe as the same thing,

2  that validates us not being put together.

3        THE COURT:  What else is he going to testify about?

4        MR. SHARP:  That's primarily what I want him to

5  confirm.

6        THE COURT:  All right.

7        Mr. Calhoun?

8        MR. SHARP:  Mr. Calhoun was at SCI-Greene with me.

9        THE COURT:  What does he know?

10       MR. SHARP:  He was present when the sermons that

11  were discussing the Habashi or the Ahlus Sunnati community and

12  what he taught, he was part of that community.  He can verify

13  what was being taught, that these things were being taught.

14       THE COURT:  I think that's cumulative.  You've

15  already entered into evidence the information concerning what

16  his teachings were.

17       MR. SHARP:  He is the one that was there when he

18  said, I don't want these guys coming over here for the fast,

19  to participate in Ramadan.  And I'm saying he was present

20  watching this man prevent us from doing things to prevent us

21  from engaging in Ramadan.

22          THE COURT:  He may testify to that.

23          MR. SHARP:  Like the contracts and things of that

24  nature, what he said, so I would like for him to testify.

25          THE COURT:  He may testify as to what he said.

1        MR. SHARP:  What he heard himself, I'm saying I

2 want him to say what he heard.

3        THE COURT:  All right.

4        Mr. Linton.

5        MR. SHARP:  Mr. Linton was present at SCI-Greene

6 and at SCI-Western.  He was in the hole with me when Tanko

7 Ibrahiym came to visit and expressed to me that he did not

8 intend for me to be confined in the hole as a result of

9 submitting --

10        THE COURT:  Mr. Linton was there?

11        MR. SHARP:  You have cells --

12        THE COURT:  My question is he heard that

13 conversation?

14        MR. SHARP:  He heard it.  He also heard him give

15 the sermon at SCI-Greene, lecturing about us not being

16 Muslims.  That's what he will pretty much testify to, as well

17 as other derogatory statements by staff members, calling me

18 Rastafari and Muslim and all types of names like that.  I

19 don't know if you're going to allow him to speak --

20        THE COURT:  No.  He may testify about matters that

21  concern your complaint.  If it's not part of your complaint,

22  if these are not defendants who made remarks and statements,

23  they will not be permitted.

24        MR. SHARP:  So he won't be allowed to testify about

25  that.  Okay.  No problem.

1          THE COURT:  I think we've covered everybody.  There

2   are very narrow confines of what they're going to be allowed

3   to testify to because we're not going to get into cumulative

4   testimony and going on and on and on about what was being

5   taught.  You've already given me a document that sets that

6   forth.  I'll allow you one witness to corroborate that, but we

7   don't need ten to do it.

8          MR. SHARP:  I understand.

9          THE COURT:  We're going to recess for lunch.  We'll

10  start back at one-fifteen and I think we're going to start

11  with the witnesses from SCI-Dallas first because the

12  connection is harder to make and it may take us a little bit

13  of time over lunchtime to get that accomplished, so the

14  witnesses from SCI-Dallas will be available.

15           Do you have a particular order in which you want to

16  call them?

17          MR. SHARP:  I can't give it to you after lunch, can

18  I?

19          THE COURT:  I would like to give them some lead

20    time on this, if that's possible.

21          MR. SHARP:  I would have to sit down and try to

22    figure that out.  If you can give me a little time to do that,

23    I'll try to be as quick as I can to try to figure out how I

24    want to do this.  I'd like to start with Chaplain Ibrahiym.

25          THE COURT:  No.  Of the inmates at SCI-Dallas we're

1  going to do the inmates first.

2         MR. SHARP:  Mr. Brome.  I'll go Mr. Brome,

3  Mr. Calhoun, then Mr. Deloatch, then -- then there was one

4  last one.

5         THE COURT:  Blount.

6         MR. SHARP:  Then Mr. Blount after that.

7         THE COURT:  We're going to start at one-fifteen.

8  As I said before, their testimony is limited to matters that

9  are relevant to your claim.  Anything beyond that, just so you

10  understand, Mr. Bradley will object and I will sustain as

11  being irrelevant to your case and your claims.  We will

12  proceed from there.  If it's at all possible, we'd like to get

13  through those witnesses this afternoon.  Since we've made all

14  these arrangements to have them ready and available, I'd like

15  to get that accomplished if we can.  So you'll have an

16  opportunity to ask them some questions, then, obviously, there

17  will be some cross-examination.

18         MR. SHARP:  Can I ask you a question?

19         THE COURT:  Yes.

20          MR. SHARP:  Is there any possible way I can get

21  some Maalox or something?  I'm trooping it through here.

22          THE COURT:  I'm going to discuss this with the

23  marshals.  I'll see what I can do.  That's all I can tell you

24  right now.

25          Anything else before we adjourn for lunch?  Then we

1  are adjourned.  We will reconvene until one-fifteen.

2  (Whereupon, there was a brief recess in the proceedings.)

3        THE COURT:  We're back on the record.

4        If I recall correctly and if my notes are accurate,

5  I believe, Mr. Sharp, you are calling as your next witness,

6  Mr. Damian Brome, and I believe that he is on the video

7  screen.

8        MR. SHARP:  That's not Damian Brome.

9        THE COURT:  Sir, can you tell me your name?

10        THE WITNESS:  John Blount.

11        THE COURT:  Can we proceed with him since he's

12  here?

13        MR. SHARP:  Sure.  Certainly.

14        THE COURT:  You have to speak in English.

15        MR. SHARP:  I'm greeting him.

16        THE COURT:  But you need to speak it in English.

17        MR. SHARP:  I understand that.

18        Peace be upon you.

19        THE COURT:  Have the witness sworn, let's do that

20  first.

21      JOHN BLOUNT, a witness having duly affirmed, testified as

22  follows:

23          THE COURT:  You may proceed, Mr. Sharp.

24              DIRECT EXAMINATION

25  BY MR. SHARP:

1  Q.  Could you tell me, were you ever housed at SCI-Western?

2  A.  Yes.

3  Q.  Can you tell me from what years, from when to when you

4  were being housed at SCI-Western?

5  A.  From January '04 to 2005, January.

6  Q.  And during that time, did you participate in the religious

7  activities of the chapel for the Islamic community of

8  Masjidullah at that time?

9  A.  Yes, I did.

10  Q.  Who was the outside chaplain during the time that you were

11  housed at SCI-Western?

12  A.  Imam Tanko Ibrahiym.

13  Q.  In the course of your being housed there, were you also

14  appointed as the Islamic representative or Imam for the

15  Masjidullah community?

16  A.  Yes, I was.

17  Q.  Could you explain to us what that means, for the record.

18  A.  Well, basically, among the inmates, I was considered to be

19  the spiritual advisor, but I normally addressed or went to the

20  Imam who was hired by the Department of Corrections with any

21  problems or situations that may have arose amongst ourselves.

22  Q.  And that person would be Brother Tanko Ibrahiym, correct?

23  A.  Yes.

24  Q.  During the course of your being housed at SCI-Western, is

25  it true that there was also another community there that

1 called themselves Ahlus Sunnati wal Jama'ah or the Habashi

2 community?

3 A.  It was a multitude of different communities that were

4 there, but, yes, the al-Ahbash was one.

5 Q.  Tell me about some of the other communities then, if you

6 could.  What were some of the names of some of the other

7 communities that were present at that time?

8 A.  You had the Moorish Americans, you had the Sunni, you had

9 the al-Ahbash and you had the Ash'ari.

10 Q.  How many various Islamic services were held?

11 A.  Well, it's not a simplistic -- you had initially -- when I

12 came out into public in about '97, there were several

13 religious services on Friday, but it was -- when Tanko

14 Ibrahiym had become Imam, it became one service, one exclusive

15 service.

16 Q.  That would provide for -- would that provide for the

17 Nation of Islam?

18 A.  No, not at all.

19 Q.  Would it provide for the Ash'ari community?

20  A.  Not at all.

21  Q.  Would it provide for the Habashi community?

22  A.  You know, not at all.

23  Q.  During the time that I entered into SCI-Western, were you

24  aware of my, as an individual, filing of a request to have

25  religious services for myself and those of my faith?

1 A. You made me privy to such a paper.

2 Q. Did you ever see in the course of you being Imam, you were

3 often present in the chapel while certain things were being

4 done or business was being conducted that had to do with

5 anything related to Islamic nature, correct?

6 A. Not anything, certain things.

7 Q. So, like, say, for example, if, say a Wednesday, there's

8 Taleem service, correct?

9 A. Correct.

10 Q. And I needed to get over there to speak to the chaplain

11 and he's in his office while the Taleem is going on, you could

12 be sitting in that office while I'm standing there at his desk

13 talking to him, correct?

14 A. I could be.

15 Q. Do you ever recall me handing him -- let me do it this

16 way. Do you ever recall me submitting in front of you a

17 request for a religious accommodation?

18 A. Yes.

19 Q. Was I the only one?

20  A.  There was some fellows before you who had done so.

21  Q.  Did you ever happen to see Imam Ibrahiym tell me to

22  compile a list of individuals who were of my faith who were

23  submitting the same request as I was?

24  A.  Yes.

25  Q.  I want to digress into -- did you ever used to have

1 personal conversations with Brother Ibrahiym after I was gone?

2 A.  Personal conversation, yes, we had.

3 Q.  Because I'm curious as to what his response was to my

4 being confined as a result of my religious request?  Were you

5 privy to any of his responses?

6       MR. BRADLEY:  Your Honor, I'm going to object to

7 the hearsay nature of that.  There's really no context or

8 other indication of when, where the initial comment was made

9 and it sounds like this comment was actually made after

10 Mr. Sharp was transferred from SCI-Pittsburgh to SCI-Greene.

11       MR. SHARP:  Not true.

12       THE COURT:  I'm going to sustain the objection, but

13 I'm going to say to you if you can lay some foundation as to

14 what time frame we're talking about, what particular

15 conversations we're talking about, then you may -- I may

16 permit you to do it, we'll see.

17       MR. SHARP:  Okay.

18 BY MR. SHARP:

19 Q.  Do you recall when I originally got there, there was no

20  Taleem for the Habashi community, correct?

21  A.  Correct.

22  Q.  During the process of the time that I was there, there was

23  one Taleem, do you recall that?  In other words, there was

24  only one time where we were ever all allowed to have -- in

25  other words, you were teaching a class, I remember correctly,

1  I was teaching a class with the Habashis and Brother Ibrahiym

2  was also teaching a class.  Do you recall that?

3  A.  Yes.

4        THE COURT:  Do we know a time frame?

5        MR. SHARP:  This was prior to my confinement which

6  was around or after the meeting of 11-28 that I mentioned to

7  Your Honor in which they instructed me not to -- to tell my

8  brothers not to go to Taleem.

9        THE COURT:  November 28th of what year?

10        MR. SHARP:  '99.  This was --

11        THE COURT:  I believe that's what you had said this

12  morning.

13        MR. SHARP:  I believe it was '99.

14        THE COURT:  Okay.

15  BY MR. SHARP:

16  Q.   When we were going in, do you recall a lot of officers

17  being outside of the chapel that particular day?

18  A.  Yes.

19  Q.  Did they ask you any questions when you were going in?

20  A.  No.  They didn't ask me any questions, but I observed

21  numerous officers and the security lieutenant outside looking,

22  peering in the window.

23  Q.  Did they mention why they were there?  Do you have any

24  idea why they were there?

25  A.  They didn't mention why they were there, but being we --

1       MR. BRADLEY:  I object to any further --

2       THE COURT:  Sustained.  Your conclusions are your

3  conclusions and they are not permitted.  He doesn't know so he

4  can't answer.

5       MR. SHARP:  Thank you.

6  BY MR. SHARP:

7  Q.  Not too long after that, I was removed from the general

8  population, correct?

9  A.  I believe that same evening or the next day.

10  Q.  So the next day I was removed from general population.

11  Right after that incident, did you speak to Tanko Ibrahiym

12  about my being removed, right after that?  We're talking about

13  right after I was removed from general population, did you

14  happen to speak to Tanko Ibrahiym about what had happened to

15  me?

16  A.  Yes, I did.

17  Q.  What did he say?

18  A.  He felt it necessary to have you removed because he felt

19  that you were causing a harm to the communities at large and

20  he didn't think that it would go to this extent and that he

21  regretted having it get so big.

22  Q.  Let me ask you this.  During the entire time that you

23  would see me interact with Brother Ibrahiym in the chapel,

24  right?

25  A.  Right.

1  Q.  This was on a regular basis that I would deal with him,

2  correct?

3  A.  Right.

4  Q.  Did you see me always following what he instructed me to

5  do?  In other words, when you saw me filing the paperwork and

6  you saw me in the office, wasn't I asking him how do I do

7  this?

8  A.  In reference to how to address the particular paperwork

9  that he --

10  Q.  Right, was instructing me on what to file.  In other

11  words -- let me clarify.  When I'm asking him how do we get

12  our religious service, he's giving me instructions.  Did you

13  ever see me go outside of those instructions?

14  A.  I can't say I have.

15  Q.  Now, I want to get into --

16        MR. SHARP:  I want to change channels because he's

17  giving me information on confirming what I wanted to lay the

18  groundwork for as far as my interaction with Mr. Ibrahiym.

19        Now, as I expressed to you before, Your Honor, this

20  is an individual who is knowledgeable on the differences that

21  my faith, I have as a belief and why separate services should

22  be provided.  In other words, although there are entire books

23  written on what I believe, he can also explain the differences

24  in what our beliefs are.  I don't know if you will allow that

25  testimony to be submitted at all.

1       THE COURT:  You may briefly do this.  You have

2  given me some indication previously this morning as to why the

3  service that was being provided was not sufficient for your

4  purposes.  This witness may very briefly detail the

5  differences.

6       MR. SHARP:  I had given a document to Mr. Bradley

7  that was the Tawheed pamphlet.  I don't have that back here

8  and I would like to present that now.

9       THE COURT:  Is that one of the documents that you

10  offered as an exhibit?

11       MR. BRADLEY:  It's No. 6, Your Honor.

12       MR. SHARP:  I don't know if he can see this.  I

13  don't think we have any document capability to show him what

14  that document is.

15  BY MR. SHARP:

16  Q.  I'll ask you, there's an al-Aqeeda class they used to

17  have, it was called al-Aqeedah at-Tawheed, Lesson One, Part

18  One.  Are you familiar with this pamphlet?

19  A.  Vaguely.

20  Q.  I don't know if you can hold it up to the camera and he

21  can see it to see the front of it?

22       THE COURT:  I don't know that that's going to tell

23  him anything.

24       MR. SHARP:  I want him to see the very, very front.

25  It says:  The first principle of and foundation of Aqeedah.

1  It's meanings, categories and components.

2       It was a pamphlet that was taught by Brother

3  Ibrahiym and others in the classes and it dealt with the

4  meanings, belief, faith, trust, I'tiqat.

5       Tawheed --

6       THE COURT:  You have to slow down.

7       Second of all, you're probably going to have to let

8  me have the Court's copy back so that the court reporter can

9  type the words that you're pronouncing.

10      And, thirdly, you need to ask the witness a

11  question.

12      MR. SHARP:  What I would like to do before you do

13  that, I want to see if he can actually see this document from

14  that camera.  If it's held closer to the camera, he would be

15  able to see it.

16      THE COURT:  He can see what you're holding, but I

17  don't think we can zoom in it on.

18      MR. SHARP:  Hold it in front of it.

19      THE COURT:  I don't think that works.

20          The reason you said you wanted to inquire of

21  Mr. Blount is to detail the differences.  You need to ask him

22  that question.

23          MR. SHARP:  The first thing I wanted to do was

24  confirm that this item was used by Tanko Ibrahiym.

25          THE COURT:  Ask him.

1  BY MR. SHARP:

2  Q.  Do you recall this pamphlet?  You can't see this pamphlet,

3  but it's called al-Aqeedah at-Tawheed, Lesson One, Part One.

4  Was this ever used in classes and taught to the Masjidullah?

5  A.  Yes.

6  Q.  In this pamphlet, is it true that it says -- I'll read it

7  to you and you explain it.

8        THE COURT:  I'm going to stop you there, Mr. Sharp.

9  He can't know whether it's true or not.  He can only say that

10  you just read something and you say it's in the document, so

11  you can't ask him that question.

12        MR. SHARP:  I'm going to ask him to explain this.

13  BY MR. SHARP:

14  Q.  It says:  There are many other deviant sects of the past

15  and present such as Ar-Rafida, the Shi'a, Habashi community,

16  and the Nation of Kufr, et cetera.

17        It says:  It was out of this defense of Islam that

18  the science of Tawheed emerged with its precisely defined

19  categories and components.

20          So, in this particular class, was it taught that

21  the -- or was it taught by Tanko Ibrahiym, the Masjidullah

22  community, taught in the classes on a regular basis that the

23  Habashi is a deviant sect?

24  A.  Ain't no question.

25  Q.  And this was also taught by Tanko Ibrahiym, correct?

1  A.  That's my Imam.

2  Q.  It goes on and it says --

3      THE COURT:  Mr. Sharp, you need to ask him -- I'm

4  not going to allow you to read the entire document.

5      MR. SHARP:  I'm only reading two sentences.

6      THE COURT:  You need to ask him the question you

7  were going to ask him, to explain the differences.

8      MR. SHARP:  I'm laying the foundation.

9      THE COURT:  You don't need to lay the foundation,

10  you need to ask the question.

11  BY MR. SHARP:

12  Q.  Explain to me what is the difference between the Habashi

13  community who say they are Sunni Muslim and the Sunni Muslim,

14  as we term as the Wahabi, is there a difference and could you

15  explain?

16  A.  There's a tremendous difference.  Firstly, the manner in

17  which we pray, the direction in which we pray, our fundamental

18  belief in that the singling out of Allah alone for worship,

19  the belief in the names and the attributes of Allah, our

20  manner in how we understand this.  It's a tremendous

21  difference as I believe that Allah is in the heavens whereas

22  you believe that he is everywhere.  I believe that we pray

23  toward the east and you pray in some other direction other

24  than that.  And I believe that the Tawheed, which means to

25  single a law out and worship, we have some major

1  misunderstandings of differences about this.  Similar to and

2  between a Catholic and a Protestant.  One can't imagine that a

3  Catholic leads a Protestant in prayer, or vice versa.  I

4  believe that the manner how you believe is strange and not in

5  accordance to how the profit of Muhammad of 1428 years taught

6  us its differences.

7  Q.  We've had this discussion before, you and I, true?

8  A.  I reject what you believe and you reject what I believe.

9  Q.  That is very true.

10      Let me ask you this.  You made a statement that we

11  pray in a different direction.  So, if we were all provided

12  religious services together, right, and the call for prayer

13  was made, being as though we pray southeast and you pray in

14  the easterly direction, could we accomplish prayer?

15  A.  There have been problems, there have been problems because

16  of that.

17  Q.  So we couldn't even pray together congregationally because

18  we would be facing two different directions.  So, I mean,

19  maybe you can clarify for the Judge why that would be a

file:///A|/sharp10-16-07(1).txt

20  problem.  Why would that be a problem?

21  A.  We have to pray -- when we're being led in prayer, we have

22  to pray in rows or lines.  We are in a single room, a large

23  room, a chapel, a multipurpose area, this is chaos.  It's not

24  possible for us to have rows going in every direction.  This

25  is not possible.

1  Q.  So it's just not possible.

2          Is it permissible for you to pray behind someone

3  that is not of your faith?

4  A.  Well, you can pray behind me, but I would not pray behind

5  you.

6  Q.  If I'm not of your faith, I couldn't lead you in prayer,

7  could I?

8  A.  I wouldn't pray behind you.  You can pray behind me,

9  though.

10  Q.  So, in other words, the answer is no?

11  A.  No.

12  Q.  One final question.  Pertaining to three scholars, Ibn

13  Abdul Wahhab and I believe Ibn Taymiyyah and Ibn Qayyim, you

14  are a student of their methodology, correct?

15  A.  I'm a student of the methodology of Muhammad and they are

16  students of his.

17  Q.  So, in other words, you are in accordance with their

18  beliefs, true?

19  A.  I'm in accordance with Muhammad's beliefs and they are in

20  accordance with them.

21  Q.  You hold they are certainly in accordance with his

22  beliefs, correct?

23  A.  Correct.

24  Q.  And you would agree that we do not accept those

25  individuals, correct?

1  A.  Correct.  You're very insulting to them.

2  Q.  I would agree.

3         Are there any other differences that you are aware

4  of as far as our beliefs are concerned?

5  A.  Between myself and you?

6  Q.  Well, just between the Habashi or Ash'ari community and

7  the Salafi or Wahabi community at large, are there any

8  other -- faith-wise, practice-wise?

9  A.  Well, first you're addressing me as a Wahabi or something

10  like this and this is not what I am, I'm a follower of

11  Muhammad, the prophet 1428 years ago, but I understand what

12  you mean.  There are tremendous differences, like I said, like

13  the basic tenets, prayer is like the second tenet in Islam and

14  we can't agree on this, we can't pray in the same direction.

15  Our beliefs as in how we understand our law, this is called

16  Tawheed, understanding of this.  This is tremendous, in Islam

17  is different.  I understand the Lord to be in the heavens

18  where you understand him to be everywhere.  I understand Allah

19  to be, for lack of words, he has names -- certain names and

20  characteristics and you reject these things, and that's

21  insulting and offensive to a person who adheres to the

22  methodology that I adhere to.

23  Q.  What about the madhhab, M-A-D-H-H-A-B, the four schools of

24  Fifiqh, F-I-F-I-Q-H, which is like Islamic jurisprudence, the

25  methodology in which we practice?

1          THE COURT:  What is the question?

2  BY MR. SHARP:

3  Q.  Do you follow a particular madhhab?

4  A.  No.  I reject that principle.  No, I don't.

5  Q.  So you would have a problem worshiping with someone who

6  followed madhhab, would you not?

7  A.  That's not a yes or no type of question.  It's complex.

8  Q.  But suffice it to say, you do not accept any one and you

9  do not practice specifically any one of the four schools of

10  Islamic jurisprudence?

11  A.  No.  I reject that principle.

12          MR. SHARP:  I've asked the questions that I wanted

13  to establish.

14          THE COURT:  I'm going to ask Mr. Bradley who is

15  counsel for the defendant if he has any questions for you.

16                  CROSS-EXAMINATION

17  BY MR. BRADLEY:

18  Q.  Mr. Blount, my name is Scott Bradley.  I represent the

19  Department of Corrections defendants in this case.  Just on

20  that last question, you said that you reject along the line of

21  the question Mr. Sharp asked, you said that you reject the

22  four schools of jurisprudence?

23  A.  Yes.

24  Q.  Is that you personally reject that or your particular

25  faith rejects this?

1  A.  That is from the methodology from my particular belief,

2  it's not a personal fitness, the general belief.  We do not

3  adhere -- we do not adhere to the exclusion of any other Imam.

4  They believe that you have to cling or follow one single

5  person whereas we believe that we take what we can from the

6  people, from good.

7  Q.  Now, how would you identify your group or your sect?

8  A.  Sunni.

9  Q.  Generally Sunni?

10  A.  Generally Sunni.

11  Q.  Do you distinguish it further than that?

12  A.  We adhere to the methodology of the people before us, the

13  Salafiyyah.

14  Q.  Mr. Sharp asked you about a conversation you had with Imam

15  Ibrahiym shortly after he was placed into administrative

16  custody.  You indicated that Imam had indicated to you that

17  there were concerns about Mr. Sharp.  Do you recall giving

18  that testimony?

19  A.  Yes, I do.

20  Q.  Did Imam Ibrahiym at any point during that conversation

21  indicate to you that he did not want Mr. Sharp to believe as

22  he believed?

23  A.  Yes, he did, he wanted him to believe as we believe.

24  Q.  What did he specifically say to you?

25  A.  He considered him a good fellow and he wished good for

1  him.  This is what he told me, that he wished good for him and

2  that he wished that he had adhered to the principles that we

3  adhere to.

4  Q.  Can you recall any other aspect of that conversation you

5  had with Imam Ibrahiym?

6  A.  Yes.  That he regretted Mr. Sharp being placed in

7  administrative custody and that he would hope that he would

8  never have to do that again.

9  Q.  That who would never have to do that again?

10  A.  That he would never have to take such drastic steps toward

11  another Muslim.

12  Q.  Did he specifically say what steps he took?

13  A.  He was specifically talking about having him placed in

14  administrative custody.

15  Q.  So you're saying that Imam Ibrahiym said to you that it

16  was his decision to have Mr. Sharp placed in administrative

17  custody?

18  A.  I didn't hear, what did you say again?

19  Q.  Are you saying that Imam Ibrahiym told you that it was his

20 decision, Imam Ibrahiym's decision to have Mr. Sharp placed in

21 administrative custody?

22 A.  No.  He told me what I just said.  He didn't say all the

23 things that you just said.

24 Q.  Let's start over.  What did Imam Ibrahiym say to you?

25 A.  That he wished he would not have had to have him placed in

1  administrative custody or take those steps.  I don't know if

2  he was responsible for signing the paper and having him placed

3  in it, but --

4  Q.  Did he mention what steps he had to take?

5  A.  No, he didn't categorically tell me that.

6  Q.  Mr. Sharp also asked you about him, about Mr. Sharp

7  submitting a religious accommodation request to Imam Ibrahiym.

8  Do you recall that?

9  A.  Yes.

10  Q.  Do you remember what document was provided to Imam

11  Ibrahiym by Mr. Sharp?

12  A.  I believe it was a religious accommodation form.

13  Q.  Do you have a specific recollection of what it looked

14  like?

15  A.  No.  It's been some time now, I can't recall.

16  Q.  Do you recall if there were a number of other documents

17  submitted along with it?

18  A.  I do recall that, yes.

19  Q.  And what were those other documents?

20  A.  I think -- I believe it was some explanations of the

21  tenets of the Habashi and the madhhab, those people that

22  followed that methodology that accompanied that form.

23  Q.  And do you recall what form these items took?

24  A.  I believe photocopies from books.

25          MR. BRADLEY:  That's all the questions I have, Your

1  Honor.

2        THE COURT:  All right.

3        Thank you, sir.  We appreciate your testimony.

4        I believe that the next witness would be Mr. Brome.

5        MR. SHARP:  Wasn't Mr. Deloatch supposed to be

6  first?

7        THE COURT:  The order that I wrote down was Brome,

8  Deloatch, Calhoun and Linton.

9        MR. SHARP:  The reason I'm asking is Mr. Brome was

10  at Greene and I wanted to try to deal with the Western

11  situation, I wanted to try to deal with the Western -- Mr.

12  Anthony Deloatch was at Western with Mr. Blount, so if we kept

13  the testimony of Blount and Deloatch together, that may be

14  helpful, or else I'll be jumping back and forth and you won't

15  know where I am.

16        THE COURT:  I will.  We called for Mr. Brome.  This

17  is the order you indicated this morning.  So we'll be able to

18  jump around.

19        MR. SHARP:  I just didn't want to cause any

20   confusion.

21          THE COURT:  Mr. Brome, this is Judge Hay.  Can you

22   hear me?

23          THE WITNESS:  Yes, I can.

24          THE COURT:  My courtroom deputy is going to have

25   you swear that you will give truthful testimony in this

1  matter.  So, if you will, listen to her give you the oath,

2  please.

3        THE WITNESS:  Yes, I declare and affirm.

4     DAMIAN BROME, a witness having affirmed testified as

5  follows:

6        THE COURT:  Mr. Sharp is going to now ask you

7  some questions.  When he finishes, counsel for the defendant,

8  Mr. Scott Bradley will ask you some questions as well.

9           DIRECT EXAMINATION

10  BY MR. SHARP:

11  Q.  Good afternoon, Mr. Brome.  How are you today?

12  A.  I'm all right.

13  Q.  I wanted to start off with a little history, if I may.

14  Where did you and I meet?

15  A.  I believe it was SCI-Huntingdon.

16  Q.  In the course of that time, we often did a lot as far as

17  trying to establish a particular faith group, am I correct?

18        MR. BRADLEY:  Your Honor, I'm going to object to

19  the relevance.

20          THE COURT:  Sustained.

21          Mr. Sharp, this I assume predates your time at

22  SCI-Western.

23          MR. SHARP:  That's why I was trying to lay -- take

24  you back.  He was at Greene with me, not at Pittsburgh.

25          THE COURT:  But it predates your time at SCI-Greene

1  that you're going to ask him questions about?

2      MR. SHARP:  Okay.  Not a problem.

3      THE COURT:  The objection is sustained.

4      MR. SHARP:  I'll go another way with this.

5  BY MR. SHARP:

6  Q.  At SCI-Greene, were you aware of any efforts on my part to

7  have religious accommodation for my faith?  I'll put it that

8  way.

9  A.  Yes, I am.

10  Q.  In that time, did you see me facing difficulty in that

11  effort?

12  A.  Yes.

13  Q.  What sort of difficulty did you see me facing in that

14  particular effort?  Let me be more specific.  During your time

15  at SCI-Greene, did you work anywhere near the chapel?

16  A.  Yes, I did, I worked in program services, which is where

17  the chapel is located.

18  Q.  In that time, did you ever have an opportunity to hear

19  Chaplain Abu Bakr speak about me in particular and those in my

20 faith group?

21 A.  Yes, I did.

22 Q.  What were some of the things that he said or that you may

23 have heard him say?

24 A.  Well, he made a couple declarations that he considered

25 your faith not Muslims, he didn't want you to go to Jumah and

1  Taleem services.

2  Q.  Are you aware of the religious services at SCI-Greene

3  being videotaped?

4  A.  Yes, I am.

5  Q.  Did you ever happen to watch any of the videotapes of his

6  services stating these things as well?

7  A.  Yes.

8  Q.  What types of things were said in those videotapes?

9  A.  Pretty much he covered a lot of issues as far as dealing

10  with the Ash'ari and how he considered them, that they weren't

11  Sunni Muslims, that they went against what the prophet told.

12  He told the congregation not to listen to them.  A couple

13  things.

14  Q.  You had also, as you stated -- you stated that you also

15  heard him say this outside of the television?

16  A.  Yes, I did.  I have spoken to him myself on it.

17  Q.  Could you give me some information on what the differences

18  are that you are aware of pertaining to the faith group of the

19  Habashi or Salafi?

20          MR. BRADLEY:  Objection.  I think the last witness

21  was identified as an inmate Imam, so he might have some basis

22  of knowledge, but there's been no basis of knowledge for this

23  inmate to describe those differences, as well as being

24  cumulative.

25          THE COURT:  The objection is sustained.

1  BY MR. SHARP:

2  Q.  Were you aware of -- when you saw these videotapes being

3  aired on the Department of Corrections channel, did you ever

4  happen to see me express to the staff that I felt that it was

5  a problem for them to be showing that?

6  A.  Yes, I did.

7  Q.  What was the result of that?  What was said?

8  A.  While I was there with you, it was simply talking to Imam

9  Abu Bakr.

10      THE COURT:  Who was it who said that?

11  BY MR. SHARP:

12  Q.  Do you recall who the staff member was that told you that?

13  A.  I believes what the chaplain -- I can't remember his name

14  at the time.  He left SCI-Greene, I believe.

15      MR. SHARP:  He's talking about Chaplain Monet.

16  Q.  He's going to ask him -- was it Father Monet?

17  A.  Father Monet, yes.

18  Q.  So he specifically stated that I would have to speak to

19  Chaplain Abu Bakr about what he said?

20   A.  Yes.

21         MR. SHARP:  Other than that, I have no further

22   questions from the witness.

23         MR. BRADLEY:  No questions, Your Honor.

24         THE COURT:  Thank you, sir.

25         The Commonwealth does not have any questions for

1  you.

2         Mr. Calhoun is the next witness.

3         While we're waiting for Mr. Calhoun, Mr. Sharp,

4  Mr. Brome mentioned the chaplain in answering my question,

5  what was his name?  I believe he said Monet.

6         MR. SHARP:  I think it was Monet or Moneck.  It was

7  either one of those two, I'm not sure of his name, but he used

8  to be the head chaplain; he left.

9         THE COURT:  I wanted to know if you knew the name.

10  I believe he said Monet.

11         MR. SHARP:  I believe it was Moneck.

12         THE COURT:  Mr. Calhoun, this is Judge Hay.  Can

13  you hear me?

14         THE WITNESS:  Yes.

15         THE COURT:  Before we get testimony from you, my

16  courtroom deputy needs to administer the oath to you, so if

17  you will please listen to her and then respond when she asks.

18         TROY CALHOUN, a witness having been duly sworn,

19  testified as follows:

20          THE COURT:  Mr. Calhoun, Mr. Sharp will ask you

21  some questions, then the counsel for the defendants may have

22  some questions for you.

23          Mr. Sharp, you may proceed.

24              DIRECT EXAMINATION

25  BY MR. SHARP:

1  Q.  Mr. Calhoun, how are you doing today?

2  A.  I'm all right.

3  Q.  I'm maintaining.  We're here today discussing some issues

4  pertaining to things that transpired in SCI-Greene,

5  specifically dealing with services that were issued or that

6  were held by Chaplain Abu Bakr.  Are you familiar with Mr. Abu

7  Bakr?

8  A.  Yes.

9  Q.  Did you as an individual participate on a regular basis in

10  the Islamic services at SCI-Greene?

11  A.  Yes.

12  Q.  So you were part of that community at that particular

13  time, right?

14  A.  Yes.

15  Q.  Let's say from what year to what year?

16  A.  From '99 to 2005.

17  Q.  In that time, you often would go to the Friday services

18  that were held for the general population, correct?

19  A.  Yes.

20  Q.  Did Chaplain Abu Bakr ever give sermons about the Habashi

21  community or the Ash'ari community?

22  A.  Well, I would recall him stating that he didn't want,

23  like, other guys just coming over to chat and hanging around,

24  you know, hanging in the pews and stuff.  If you wasn't part

25  of the service, he was saying he didn't want, you know, no

file:///A|/sharp10-16-07(1).txt

105

1 individuals just coming over there hanging out, so to speak,

2 you know, not if he wasn't participating in the service.

3 Q.  Was this particular time during Ramadan?

4 A.  Yes.  Excuse me, I think it was more than once, but I

5 remember during Ramadan because -- go ahead.

6 Q.  Do you recall him sometime after that issuing a contract

7 to participate --

8 A.  Yes.

9 Q.  -- in the fast?  What were some of the things in the

10 contract?

11 A.  Well, you couldn't go to commissary.  If you was caught in

12 the chow hall, you were taken off the list.  Couldn't go to

13 the commissary, couldn't bring food to the chapel, things of

14 that nature.

15 Q.  Did he ever implement this policy -- let me ask you this.

16 Did this also entail you agreeing to certain beliefs in the

17 contract, saying that you held certain beliefs in order -- in

18 other words, I swear and affirm that I hold this particular

19 belief and follow this particular methodology, et cetera, et

20  cetera, in the contract, or something to that nature?

21  A.  I can't remember verbatim what the contract said, but I do

22  remember stating that, like I said about the commissary, you

23  know, not bringing nothing, nothing to the chapel, stuff like

24  that.  I can't remember everything.  There was some other

25  things checked off, but I can't remember.

1  Q.  Did you ever see me mention to Imam Abu Bakr, saying I had

2  a problem with the items that were on that fasting list?

3  A.  Well, I remember a lot of people because it was like, you

4  know, I guess new to a lot of guys and they didn't want to --

5  a lot of people was in disagreement with the contract.

6  Q.  Was I one of those individuals who was in disagreement?

7  A.  Yes.

8  Q.  Did you see me specifically disagreeing with him or trying

9  to speak to him about that?

10  A.  I don't specifically recall that.

11  Q.  Do you remember an incident with a sermon that you

12  attended that was videotaped and aired on the jail station

13  where Abu Bakr began to slander certain communities?

14  A.  Well, every Friday the service was videotaped, and I can't

15  recall exactly as far as like the slander part, but for the

16  most part, I remember the services were taped.

17  Q.  Do you recall in his services that you attended, would he

18  speak about other communities?

19        MR. BRADLEY:  Your Honor, I believe this subject

20  has already been covered with this witness.  Objection.

21          THE COURT:  Sustained.

22          MR. SHARP:  No further questions.

23          THE COURT:  Mr. Bradley, any questions.

24          MR. BRADLEY:  Yes, Your Honor, briefly.

25                CROSS-EXAMINATION

1  BY MR. BRADLEY:

2  Q.  Mr. Calhoun, my name is Scott Bradley.  I'm representing

3  the Department of Corrections in this case.

4        With regard to the contract, it sounds like it

5  focused on sort of the idea that if you're going to fast, that

6  you were going to hold to that fast; is that correct?

7  A.  You were going fast?

8  Q.  By signing this, you were indicating that you were going

9  to fast, but you were going to fast according to the rules,

10  you weren't going to commissary, you weren't going to bring

11  food, is that what you recall this contract being?

12  A.  Yes.

13        MR. BRADLEY:  Nothing further.

14        MR. SHARP:  Can I ask another question?

15        THE COURT:  You may.  Briefly.

16            REDIRECT EXAMINATION

17  BY MR. SHARP:

18  Q.  Did that contract also contain an agreement that you held

19  a specific Islamic belief in it?

20          THE COURT:  That has been asked and answered and

21  that's not proper redirect.

22          MR. SHARP:  I don't recall ever asking that

23  question.

24          THE COURT:  You did.  It's been asked and answered

25  and that's not proper redirect.

1        MR. SHARP:  Okay.

2        No further questions.

3        THE COURT:  Thank you, sir.

4        Mr. Deloatch is the next witness.

5        MR. SHARP:  Is it possible to have a copy of that

6  contract?

7        THE COURT:  Is it an exhibit?

8        MR. SHARP:  What do you mean?

9        THE COURT:  Have you already offered it --

10        MR. SHARP:  I don't have a copy.

11        THE COURT:  I don't have one either.  I don't know

12  that the defense does.  You needed to have your exhibits.

13        MR. SHARP:  I requested it.  You didn't allow me

14  discovery.  I requested it.

15        THE COURT:  We're not going down that road.  You

16  had discovery.  You were under orders to be prepared to go to

17  trial.  I don't have the document, Mr. Bradley doesn't have

18  the document, so the answer to the question is it doesn't seem

19  possible for you to have a copy of the document today.

20       Mr. Deloatch, this is Judge Hay.  Can you hear me?

21       THE WITNESS:  Yes.

22       THE COURT:  Before we get to your testimony, the

23  courtroom deputy needs to have you sworn.

24       ANTHONY DELOATCH, a witness having affirmed, testified as

25  follows:

1          THE COURT:  Thank you, sir.  Mr. Sharp will have

2  some questions for you and then possibly Mr. Bradley, who is

3  counsel for the defendants, will have some questions.

4          Mr. Sharp you may proceed.

5                DIRECT EXAMINATION

6  BY MR. SHARP:

7  Q.  Good afternoon, Mr. Deloatch.

8  A.  Good afternoon.

9  Q.  Were you ever housed at SCI-Western?

10  A.  Yes.

11  Q.  What years, from when to when were you housed there?

12  A.  From 1996 to 2003.

13  Q.  During that time, during the course of that time, did you

14  and I -- well -- did you ever see me file a request for

15  religious accommodation?

16  A.  Yes.

17  Q.  Where did you see me file that?

18  A.  At Western.

19  Q.  But where specifically at Western?

20  A.  Through the chaplain's office.

21  Q.  Did you ever see Chaplain Ibrahiym and myself discussing

22  this religious accommodation issue?

23  A.  No, I didn't personally witness it, but I know y'all had a

24  discussion on it.

25  Q.  But did you ever see me personally hand in or write out a

1  request for a religious accommodation?

2  A.  Yes.

3  Q.  How did that come to be, let me ask you that.

4  A.  At the time we weren't quite getting the religious

5  accommodations that we wanted, being as though the Taleem and

6  the Jumah.  As a group, we filed the request slips to give

7  these accommodations.

8  Q.  So you're saying as a group -- wait a minute.  When you

9  say, as a group we filed request slips, did we file one slip

10  or was it individual slips submitted?

11  A.  Individual slips submitted.

12  Q.  So, in other words, I myself submitted it and other

13  individuals did as well?

14  A.  Absolutely.

15  Q.  But me as an individual filing my own slip, you are

16  aware --

17  A.  Yes.

18  Q.  Do you recall us ever having a Taleem?

19  A.  No.

20  Q.  So we never had an individual, separate Taleem service?

21  A.  No.

22  Q.  During the course of the services that they did provide

23  for us, the one service that they did provide for us, do you

24  recall all of officers standing in front of the chapel?

25  A.  Yes.

1  Q.  Can you elaborate?

2        THE COURT:  You need to ask him --

3        Hold on a second, Mr. Deloatch.

4        You need to ask him a question.  Elaborate on what?

5  BY MR. SHARP:

6  Q.  In other words, what did you see when we were trying to

7  enter to have the one service or circle participate in the one

8  service, we were supposed to be allowed, I was allowed to

9  participate -- since you say I can't say "we," right -- that I

10  was supposed to be allowed to participate?

11  A.  When we went down to the chapel area, officers were

12  standing there across from the chapel and asked us why we were

13  down there and what were we following?

14  Q.  What do you mean by what were we following?

15  A.  From what I understand, were we following the Salafi

16  methodology, or were we following the Ahlus Sunnati wal

17  Juma'ah?

18        MR. SHARP:  No further questions, Your Honor.

19        MR. BRADLEY:  No questions.

file:///A|/sharp10-16-07(1).txt

20          THE COURT:  Thank you, sir.  That's all.

21          That would conclude all of the witnesses at

22  SCI-Dallas, correct?  I don't know if anybody is still there

23  to hear me, but thank you so much for helping to make these

24  arrangements this afternoon.

25          What we're going to do is we're going to take about

1  a ten-minute recess because we need to get the next connection

2  with SCI-Greene for Mr. Linton.  So we'll take a ten-minute

3  recess to allow that to happen.

4     (Whereupon, there was a brief recess in the proceedings.)

5        THE COURT:  Mr. Linton, this is Judge Hay.  Can you

6  hear me?

7        THE WITNESS:  Yes, ma'am.

8        THE COURT:  I'm going to ask my courtroom deputy to

9  have you sworn in as a witness and then Mr. Sharp will have

10  some questions to ask you.

11     LONDON LINTON, a witness having been duly sworn,

12  testified as follows:

13        THE COURT:  Mr. Sharp, you may proceed.

14             DIRECT EXAMINATION

15  BY MR. SHARP:

16  Q.  Mr. Linton, how are you today?

17  A.  I'm all right.

18  Q.  I'm going to ask you some questions today about the things

19  that occurred at SCI-Greene.  Were you housed at SCI-Greene?

20  A.  Yes.

21  Q.  From when to when were you housed at SCI-Greene prior to

22  today?

23  A.  I came in '99, then I left in 2006 and came back in 2007.

24  Q.  During that time, we were next door neighbors, correct?

25  A.  Yes, sir.

1  Q.  On D block, if I'm not mistaken, right?

2  A.  Yes, D block.

3  Q.  Do you recall an incident pertaining to my approaching

4  Mr. Mahlmeister pertaining to a videotape that was being aired

5  on the institutional channel?

6  A.  Yeah, I recall.

7  Q.  Tell me what you remember.  The video --

8  A.  The videotape or the conversation with Mahlmeister?

9  Q.  The conversation specifically with Mahlmeister.

10  A.  Well, you brought it to his attention that on the

11  videotape, the Imam was talking about people in the

12  institution that was not Muslims, was acting like Muslim, or

13  something to that effect.

14  Q.  Then after having that discussion, do you recall Captain

15  Coleman coming to the block?

16  A.  Yeah.

17  Q.  Do you recall me having a discussion with him about this

18  situation?

19  A.  Yeah, I remember you talking to him, but I was in my cell

20  so I couldn't actually specifically say what y'all was talking

21  about, but I do recall you talking to him.

22  Q.  Later on that next day, is it -- and I'm going to lay some

23  groundwork here -- is it possible for us to communicate being

24  next door neighbors from cell-to-cell?

25  A.  Yes.

114

1 Q. So if we were watching the same thing, could we talk to

2 each other while we were watching?

3 A. Yes.

4 Q. Do you remember me calling to you and telling you to turn

5 your television on to watch the sermon I spoke to

6 Mr. Mahlmeister about?

7 A. Yes.

8 Q. In that sermon, did you see Chaplain Bakr speaking about

9 those of my particular faith saying that they were not Muslim?

10 A. Yeah. He was holding I think you called it a Qiblah, or

11 something to that effect.

12 Q. You could watch this -- how many times do you think they

13 would repeat this on the jail station so that you could see

14 it?

15 A. Well, that particular day they showed it, I think it was

16 on a Friday, they showed it during Jumah, I think they

17 replayed it on Sunday, I'm not sure.

18 Q. Over all, do you recall what Mr. Mahlmeister's response

19 was since you were present to hear what Mr. Mahlmeister said?

20          MR. BRADLEY:  Your Honor, I'm going to object to

21  hearsay of what Mr. Mahlmeister might have said.

22          THE COURT:  Objection is sustained.

23          MR. SHARP:  All right.

24          I have no further questions, Your Honor.

25          Yes, I do.  Excuse me.

1        THE COURT:  You may.

2  BY MR. SHARP:

3  Q.  Not long after that incident, Mr. Linton, do you recall

4  them coming to shake my cell down?

5        MR. BRADLEY:  Objection, Your Honor.  Beyond the

6  scope of this action.

7        MR. SHARP:  I want to get to what it's all about,

8  give me just a moment.

9        THE COURT:  I'll overrule the objection for the

10  moment, but I'm not going to give you a very long leash on

11  this.

12  BY MR. SHARP:

13  Q.  Do you remember me discussing with you specifically, since

14  you and I were very close friends, letters that I had received

15  from the Islamic Supreme Council?

16  A.  Yes.  I don't know what the letter stated, but I remember

17  you telling me about it.

18  Q.  Do you recall me explaining to you that they have written

19  the institution?

20  A.  No, I don't remember that.

21  Q.  Do you recall that not long after I had received that

22  envelope, that they came and shook down my cell?  Do you

23  recall right after that that they shook my cell down?

24  A.  I remember them shaking your cell down, but I don't know

25  if it was because of the envelope.

1       MR. SHARP:  I'd like to enter some exhibits.

2       THE COURT:  Are you going to have the witness talk

3  about them?

4       MR. SHARP:  Yes.

5       THE COURT:  How can he do that?  He doesn't have

6  the exhibits in front of him.

7  BY MR. SHARP:

8  Q.  After I made that complaint -- and do you recall them

9  confiscating a lot of religious material during that

10  shakedown?

11  A.  Yeah.

12  Q.  Was it a box of books?  A few items?  What was it, do you

13  recall?

14       MR. BRADLEY:  Your Honor, I recall -- at this

15  point, I'm going to object.  There haven't been any of the

16  named defendants identified as part of this.  This is really

17  the first time this has been broached in any of the

18  proceedings.

19       THE COURT:  The objection is sustained.  This is

20  not relevant.  No relevance has been shown.

21        MR. SHARP:  Well, I'm saying that the relevance is

22  that this was per the order of Captain Coleman.

23        THE COURT:  There has been no foundation laid.

24        MR. SHARP:  That's what I was trying to lay.  I

25  don't know how you want me to lay a foundation, but I'm trying

1  to explain to you what ended up happening was as a result of

2  me presenting this information to Mr. Mahlmeister and Captain

3  Coleman, the next day my cell was shook down -- well, actually

4  it wasn't the next day, but within that week.  I had contacted

5  the Islamic Supreme Council and they had contacted them about

6  this matter.

7         THE COURT:  I understand, but what does this

8  witness know about that?  That's the point.

9         MR. SHARP:  They confiscated all my religious

10  literature as a result --

11         THE COURT:  Again, what does this witness know

12  about that claim?

13         MR. SHARP:  He saw them taking the literature.

14         THE COURT:  I haven't heard that testimony.

15         MR. SHARP:  That's what I was trying to get to.

16         THE COURT:  You need to ask him that question.

17  BY MR. SHARP:

18  Q.  During the time this shakedown occurred, did they take

19  religious literature from me?

20  A.  I seen them leave with a box.

21       THE COURT:  Who is "they"?

22       MR. SHARP:  Officers of the security team under

23  Captain Coleman.

24       THE COURT:  By name.  You can't just say

25  "officers."

1      MR. SHARP:  CO Michaels I believe it was.  Hold on

2  just a second.  I don't know what this name is, CO --

3      THE COURT:  Are any of the defendants in this

4  action the people who you say came and took matters out of

5  your cell?

6      MR. SHARP:  No.

7      THE COURT:  Then there's no further inquiry into

8  this matter.  It's irrelevant.

9      MR. SHARP:  If it was per their order?

10      THE COURT:  It's irrelevant.  Do you have evidence

11  to establish that?

12      MR. SHARP:  That's what I'm trying to do now.  You

13  won't let me finish.

14      THE COURT:  Ask this witness what he knows.

15  BY MR. SHARP:

16  Q.  Do you remember me asking CO Mega who instructed him to

17  come to my cell and take my literature?

18  A.  I don't know the officer's name, but I recall you asking

19  the question.

20  Q.  Didn't the officer say, Captain Coleman told me to come

21  down here?

22  A.  Yeah.

23          MR. SHARP:  That's what I'm trying to do to begin

24  with.

25          No further questions.

1          THE COURT:  Any further questions, Mr. Bradley?

2          MR. BRADLEY:  One moment.

3          I have no questions.  Thank you, Your Honor.

4          THE COURT:  Mr. Sharp, there aren't any exhibits

5  for this witness, I take it?

6          MR. SHARP:  No.  I've asked the questions that I

7  want to ask and I've established what I wanted to establish.

8          THE COURT:  Then, Mr. Linton, thank you so much for

9  your testimony.

10          Thank you to the people at SCI-Greene for making

11  these arrangements this afternoon.  That will conclude our

12  video conferencing.

13          Mr. Sharp, if you'll just give us one minute so we

14  can shut down this video conferencing equipment, then I will

15  hear further from you.

16      (Whereupon, there was a brief pause in the proceedings.)

17          THE COURT:  Mr. Bradley, have we made an

18  arrangement with North Carolina for Ms. Mears?

19          MR. BRADLEY:  Yes.

20         THE COURT:  Is there a particular time, or we don't

21  know.

22         MR. BRADLEY:  I believe it's two o'clock tomorrow

23  afternoon.

24         THE COURT:  I didn't know whether those

25  arrangements have been made.  Great.

1       Mr. Sharp, you had some other exhibits that you

2  wished to offer.

3       MR. SHARP:  Yes.

4       I have documents here stating that a letter was

5  sent to the Islamic -- by the Islamic Supreme Council and it

6  was directly pertaining to my request for religious

7  accommodation at SCI-Greene.  If you read the policy, the

8  policy kind of changed when I moved to Greene in that they

9  required that an outside organization had to confirm that you

10  were of that particular faith and needed this specific

11  accommodation.  So what I did was I wrote them letters and had

12  them -- let people be abreast at what was taking place at

13  SCI-Greene and what I needed.  They sent me a copy of the

14  letter that they had sent to the Department of Corrections at

15  SCI-Greene.  I got the letter back, like, in other words, I

16  got part of the envelope.  All of this was happening around

17  the same time that I was explaining the situation that

18  transpired with Captain Coleman and Mr. Abu Bakr here giving

19  his sermon.  The people had sent them this letter and I don't

file:///A|/sharp10-16-07(1).txt

20  know if he was made aware of this letter or what, but part of

21  the letter was taken apart, et cetera, et cetera, et cetera.

22  I explained about that.  Then the sermon took place about us

23  not being Muslims, et cetera, et cetera, et cetera.  Then

24  after that, and when I complained about the fact that he had

25  given this sermon, my stuff was confiscated, all of my

121

1 religious literature was confiscated.  To date, I have not

2 gotten back any of that religious literature.  I have a

3 confiscation slip here.  It says one folder of possible STG,

4 which is security threat group material, that was my religious

5 material.  It was an entire box of religious books.  Never got

6 them back.  They just said, you're a threat to security, took

7 my religious stuff.  So I would like to have this documented,

8 Your Honor, that he was a witness to that and saw that take

9 place.  Here are the exhibits that I would like to have on

10 that matter.  This is directly related to my religious

11 accommodation request at SCI-Greene.

12        THE COURT:  They will be received and the record

13 will reflect what the witness said about this matter.

14        MR. SHARP:  I understand.

15        THE COURT:  Not what you say the witness said.  So

16 I think we are at document 13.  Confiscation of religious

17 materials grievance.

18        MR. BRADLEY:  Your Honor, I would object to the

19 extent that it appears that this is being offered as some sort

20  of claim of retaliation which has been specifically excluded

21  from this case.  As well, to my recollection, there were no

22  allegations in any of the complaints, even as amended, that

23  ever raised this issue.  So, to my understanding, insofar as

24  it's a retaliation claim that was specifically dismissed

25  insofar as it would be a religious accommodation claim, it has

1  never been pled in the complaint.

2        THE COURT:  Mr. Sharp?

3        MR. SHARP:  Your Honor, I would say -- I don't have

4  to make an allegation of retaliation.  What I'm saying is that

5  they placed a substantial burden on me to impede me from

6  practicing my religion.  I didn't use the term "retaliation,"

7  he did.  All I'm saying is that they did this in an effort to

8  burden me, to impede me, to prevent me from pursuing religious

9  accommodation as a matter of right.  I'm not saying that they

10  retaliated against me.  I never used that terminology, he did.

11  So I'm saying that it should be entered into the record.  It

12  has always been my claim that they have done everything they

13  could to impede me, and this is part of that impediment and

14  burden they have placed on me by denying me access to my

15  religious material.  Simple and plain.  If you confiscate it

16  as security threat group material and say you cannot have it

17  because it is a threat to security and it is nothing but

18  religious material, you're denying me access to my religion.

19  That's all I'm saying.

20          THE COURT:  The government's objection is noted,

21  but the documents will be received for the limited purpose

22  outlined by Mr. Sharp.  There is no retaliation issue at

23  claim, nor is there any claim concerning the fact that

24  whatever property they may or may not have taken you didn't

25  get back.

123

1        MR. SHARP:  I'm not trying to argue that they had

2  to compensate me for it, all I'm saying is that it was taken.

3  It has been gone for years.

4        THE COURT:  Anything further you want to address?

5        MR. SHARP:  There was a question that he had asked

6  me pertaining to whether or not I had asked for any other

7  religious accommodations at SCI-Greene.

8        Didn't you ask me that, Mr. Bradley?

9        THE COURT:  Well, you need to tell me what it is

10  you want to do.  What do you have?

11         MR. SHARP:  I don't know if this is relevant to

12  what he's asking.

13         THE COURT:  What do you have?

14         MR. SHARP:  I did request a blood exemption when

15  they were taking DNA.  I didn't want them to draw blood from

16  me, which is not permissible according to my religion, and I

17  believe that was granted.  If I'm not mistaken, that was

18  actually granted, but he did ask and I'm willing to provide

19  that, if that's what he needs.

20          THE COURT:  I take it that wouldn't be a claim,

21  though --

22          MR. SHARP:  I'm not making it as part of the claim,

23  but he did ask me.

24          Now, there was one other point I want to make, Your

25  Honor.  It's actually my summation of my final point.

1        I know that as a matter of the grooming exemption,

2  I'm saying that none of my requests for accommodation at

3  SCI-Western were ever properly filed, that includes my

4  grooming exemption.

5        It was part of my original request for

6  accommodation because I was instructed by Deputy Everich to

7  include that, and I have documents here verifying that he

8  instructed me to do so, to include that.

9        And including that with my original request for

10  accommodation, it has been determined that there was a policy

11  and procedure that was in place that had to be followed for

12  this to be filed in Harrisburg.  It has been brought to my

13  attention that none of my requests -- I was under the

14  assumption that part of my requests had been submitted all the

15  way through and that part of it was approved.  I'm finding out

16  now that I was issued documents, and, in fact, none of my

17  requests for religious accommodation was ever approved, and

18  that includes the hair exemption that they gave me forms for.

19  So, I would like to bring that to the Court's attention.  I

20  don't know if I'm allowed to bring that up, but I would like

21  to since this was originally part of my religious request

22  accommodation, I would like to have that brought before the

23  Court because none of it was ever properly processed and since

24  none of it was ever properly processed, would it still fall

25  within the scope of my original claims, which is what I've

1   always said.  None of it was ever properly processed and that

2   was part of it.

3           I don't know if you're going to allow -- like, I

4   have submitted the paperwork that they issued me, but that

5   paperwork from what I understand now is not valid.

6           THE COURT:  I don't know what you mean, it's not

7   valid.

8           MR. SHARP:  In other words, Your Honor, we could

9   take a look at it, it says here --

10          THE COURT:  Wait.  Before you start to read to me

11  from documents, what time frame are we talking about?

12          MR. SHARP:  I requested a request for religious

13  accommodation to have a grooming exemption along with my other

14  paperwork.

15          THE COURT:  When?

16          MR. SHARP:  SCI-Western.

17          THE COURT:  When?  You were there for a number of

18  years.

19          MR. SHARP:  With everything else, I was instructed

file:///A|/sharp10-16-07(1).txt

20  with Inspector Chris Everich because I did not have a grooming

21  exemption that I would have to prove that.

22        THE COURT:  Your testimony is you made that

23  request?

24        MR. SHARP:  Right.  I made that request.  It was my

25  understanding that I was issued documents confirming that that

1  part of my accommodation request was granted.  I am finding

2  out now it was never filed at SCI-Camp Hill in accordance with

3  policy and procedure.  The paperwork I had was not valid.  And

4  I tried to bring this to your attention before and I don't

5  know what happened, why it was never brought to your attention

6  properly by my attorney, but I have been trying to mention

7  this to you for quite some time now.  What I'm saying is that

8  it has been determined that my grooming exemption that I was

9  supposed to be granted was never granted.  Even though I was

10  issued paperwork saying it was by two separate jails, they're

11  saying it's not.  And I would like to read from the paperwork

12  that we have here that says that that -- once it is granted,

13  it is not to be revoked until there was a change in religion.

14  Our religion never changed it.

15        THE COURT:  I don't know who you're asking the

16  question of.  There isn't anybody on the witness stand.

17        MR. SHARP:  My religion has never changed, but I'm

18  finding out what they issued me -- in other words, what I'm

19  saying, every accomodation I asked for at Western was never

20  processed properly.

21        THE COURT:  That's your claim.

22        MR. SHARP:  That's my claim and that includes my

23  grooming exemption request for religious accommodation that

24  was included with my request for religious accommodation.  It

25  was never processed properly.  They're saying it's not valid.

1  So, I mean, am I allowed to bring that up as part of my claim

2  or not?  That's what I'm pretty much asking you.

3        THE COURT:  I don't believe that was part of your

4  claim.

5        MR. SHARP:  My claim was that my religious

6  accommodation request, all of it was never validly processed.

7  The individual paperwork that I submitted was never processed.

8  This is what I'm arguing, Your Honor.  It was always in the

9  PIT-0997 grievance.  I clearly stated, you never processed any

10  of my paperwork.

11        THE COURT:  Let me hear from Mr. Bradley.

12        MR. BRADLEY:  Your Honor, what I think he's saying

13  is can he hold Department of Corrections officials at

14  SCI-Dallas accountable for the loss of his hair exemption, and

15  you've addressed that in an order that was issued several

16  months ago indicating that anything that occurred at

17  SCI-Dallas would not be a part of this case.

18        THE COURT:  Is that where we're going?

19        MR. SHARP:  We're not talking about SCI-Dallas, no,

20  ma'am.  That's incorrect.  He's wrong.

21          MR. BRADLEY:  The paperwork he has shown us

22  today --

23          MR. SHARP:  Is from Western --

24          THE COURT:  Just a second.  Mr. Bradley didn't

25  interrupt you.

1        MR. BRADLEY:  He was granted institutionally an

2   exception at Western, so he was accommodated there.  That was

3   followed, and it followed him to Greene where it was accepted

4   institutionally.  It was only when he showed up at SCI-Dallas

5   that there was a problem.  But there were no defendants in

6   this case from SCI-Dallas and that case was in another -- that

7   institution is in another jurisdiction.

8        THE COURT:  That matter is out.

9        MR. SHARP:  Can I rebut?

10        THE COURT:  That matter is out.

11        MR. SHARP:  I would like to rebut something.

12        THE COURT:  Your exception is on the record.  We

13   have been down this road not only here today but in prior

14   rulings.  The hair exemption and whatever happened at

15   Dallas --

16        MR. SHARP:  I'm not talking about Dallas.  He's

17   trying to bring up Dallas.

18        THE COURT:  Excuse me.  You testified this morning,

19   as Mr. Bradley just recounted, that you were granted the

20  exemption at SCI-Pittsburgh and you were granted it at Greene.

21  We're done.

22          MR. SHARP:  That's not correct.

23          THE COURT:  We're finished.

24          MR. SHARP:  That's not correct.

25          THE COURT:  We're finished.

1      Anything else?

2      MR. SHARP:  I would have to disagree with you.

3      THE COURT:  I understand that.  Your objection is

4  noted for the record.  We're not going to argue about it.

5      MR. SHARP:  I'm not arguing, but --

6      THE COURT:  I'm asking you if there is anything

7  else you want to present to the Court in connection with the

8  claims that are in your amended complaint?

9      MR. SHARP:  What I would like to add is am I

10  allowed to confirm what part of my accommodations were

11  granted?  In other words, is it possible for me to find out or

12  for us in this courtroom right now to find out if all of or

13  any of my requests for religious accommodation was ever filed

14  to Harrisburg and approved or denied by Harrisburg in

15  accordance with policy and procedure, because that's what I'm

16  asking and this is what I'm saying never happened.  What he's

17  saying is something different.  What I'm saying is that none

18  of my -- we're not talking about something that was approved

19  in Dallas or wherever else he's talking about, I'm talking

20  about what I filed at Pittsburgh, my request for accommodation

21  at Pittsburgh.  None of it, according to policy and procedure,

22  was ever sent to Harrisburg to be processed or responded to.

23        THE COURT:  I understand that is your argument

24  today.  That was not any part of your complaint that I'm aware

25  of.

1         MR. SHARP:  It has been part of my original

2  complaint.  I can pull that original complaint out and show it

3  to you.  That has always been my contention.  I have never

4  changed what I said.  If you recall, it has always been that

5  they never processed my request for religious accommodation in

6  an effort to obstruct me from having any type of religious

7  accommodation.  That's always been my argument.  My argument

8  has never changed.

9         THE COURT:  I don't believe that's accurate, but

10  I'll hear from Mr. Bradley.

11         MR. BRADLEY:  On what?

12         THE COURT:  Whether that argument or whether that

13  position is part of the complaint in this matter against these

14  defendants, that they did not properly process his requests.

15         MR. BRADLEY:  I don't recall that.  I reviewed the

16  complaint within the past several days, I don't specifically

17  recall that being part --

18         THE COURT:  As did I, and I don't recall it as

19  being part as well, so that is out.

20            Anything further?

21            MR. SHARP:  So wait a minute.  So you're saying

22  that my argument that they never processed my complaint is not

23  part of the record?  Is that what you're saying?  That that

24  was never my contention from the outset?  Is that what you're

25  saying, Your Honor?

1          THE COURT:  What I'm saying is your complaint did

2  not allege that these defendants did not properly process.

3  Your complaint alleged that you were not granted the -- that

4  you were not granted the accommodations that you requested.

5          Anything further you want to address before we move

6  on?

7          MR. SHARP:  Just a second, Your Honor.

8          In the original statement of my claims --

9          THE COURT:  What are you reading from?

10          MR. SHARP:  I am reading from the original

11  complaint I filed at SCI-Western.

12          THE COURT:  We are not going there.  That has been

13  superseded by several amended complaints, including one you

14  filed pro se.

15          Next.

16          MR. SHARP:  What amended complaint?  I never filed

17  an amended complaint pro se.

18          THE COURT:  I believe you did.  My mistake then.

19  The first amended complaint came after you had counsel, but

20  that complaint no longer stands, your original complaint.

21          MR. SHARP:  But he also made the same argument and

22  I made sure that -- let me read it to you.

23          THE COURT:  Sir, I'm not going to hear you read

24  from your initial complaint.  It's part of the record.  I can

25  read it, but it is no longer the operative complaint in this

1  case.

2         MR. SHARP:  You said that I never made that claim.

3  That was your statement.  You said I never made that claim.

4         THE COURT:  It is not a claim that is before the

5  Court.  What is before the Court is your amended complaint and

6  you're not reading to me from your amended complaint.

7         MR. SHARP:  All right.  Give me just a moment.

8  I'll find the amended complaint because it's in there and I

9  know it's in there.

10         THE COURT:  Mr. Sharp, I'm going to let you have

11  time later on to search for this.

12         MR. SHARP:  All I'm looking for is a copy of my

13  amended complaint.

14         THE COURT:  I'll give you time to do that later.

15  We need to move forward.

16         MR. SHARP:  My contention is -- I have the second

17  amended complaint, but I'm trying to find the original

18  first --

19         THE COURT:  The second amended complaint is --

20        MR. SHARP:  I have that.

21        THE COURT:  That's the operative complaint in this

22  case.

23        MR. SHARP:  Okay.

24        THE COURT:  If you find it later, you can bring it

25  to my attention and we'll revisit then.  Right now we need to

1  move forward.  Do you have any further evidence to present to

2  the Court?

3        MR. SHARP:  I'm going to --

4        THE COURT:  Mr. Sharp, I would like you to answer

5  my question rather than continue reading.  Do you have any

6  further evidence you wish to present to the Court at this

7  point?

8        MR. SHARP:  Not at this time.  Not at this time.

9        THE COURT:  Well, before we proceed, you're going

10  to need to rest your case.  If you find something later, I

11  will hear you on reopening your case, but I need to know, is

12  there further evidence you're going to present either through

13  your own testimony or otherwise?

14         MR. SHARP:  Yeah.  I'm a little puzzled right now,

15  Your Honor, because I'm, like, it's like you're -- it's like

16  putting me in a Catch-22 situation here where in one instance

17  you're saying that I'm allowed to challenge the denial of my

18  request for religious accommodation, and what I've always

19  argued is that it was never processed.

20          THE COURT:  We're not going down that road,

21  Mr. Sharp.

22          MR. SHARP:  I'm trying to explain to you.

23          THE COURT:  I'm sorry.  We are not going down this

24  road.  We've discussed this ad nauseam.  Is there further

25  factual evidence you want to present to this Court concerning

134

1  your claims?

2       MR. SHARP:  I think the factual evidence that I

3  would like to present to this Court is that my complaint and

4  claim has always been the same.

5       THE COURT:  Well, your complaint is of record.

6  We're going to move forward.

7       Anything other -- any other evidence?  Do you have

8  any witnesses you want to present?

9       MR. SHARP:  I want to call the defendants.

10      THE COURT:  I told you you're going to have a

11  chance to cross-examine those witnesses.  Is there any other

12  documentary evidence you want to present to the Court?

13      MR. SHARP:  Not at this time.

14      THE COURT:  This is your last opportunity.  This is

15  the time when you have to put in your evidence in this case.

16      MR. SHARP:  You're not giving me a minute --

17      THE COURT:  I'm going to give you another two

18  minutes to collect your thoughts.

19      MR. SHARP:  I'm trying to put this -- I'm trying to

20  look this up.

21      At my second complaint, I would like to read into

22  evidence --

23      THE COURT:  It is of record and you're making an

24  argument and I'm not hearing arguments, sir.

25      MR. SHARP:  I'm reading -- I would like to read

1  something into the record.  I'm not making an argument, I'm

2  simply reading to you what it says.  I'm not making an

3  argument.

4          Are you permitting me to read this into the record?

5          THE COURT:  What are you reading?

6          MR. SHARP:  I'm reading my claims, what you said,

7  you said my claims --

8          THE COURT:  What document are you reading from?

9          MR. SHARP:  Plaintiff's second amended complaint.

10          THE COURT:  Where are you reading from so we can

11  follow along?

12          MR. SHARP:  Ten.  I am starting at 10.

13          THE COURT:  Ten what, Page 10 or Paragraph 10?

14          MR. SHARP:  Page 4, Paragraph No. 10.  Are you with

15  me?

16          It says:  Defendant Philip L. Johnson willfully and

17  unreasonably ignored plaintiff's request for religious

18  accommodation at SCI-Pittsburgh.

19          It says defendant --

20          THE COURT:  Mr. Sharp --

21          MR. SHARP:  I'm at No. 11.

22          THE COURT:  I understand.  I'm stopping you there

23  because that is part of your claim.  I understand that, but

24  that's entirely different from the other point that you wanted

25  to make, which is not part of your case.  That point is

1  closed.  We're not discussing it any further.

2       MR. SHARP:  I'm asking you --

3       THE COURT:  We're not discussing it any further,

4  Mr. Sharp.

5       MR. SHARP:  What other argument are you saying I'm

6  trying to make?

7       THE COURT:  We're not discussing it any further.

8  Do you have other evidence you want to present to the Court

9  this afternoon?

10      MR. SHARP:  I'm trying to understand what your

11  specific ruling is on this issue.  I don't understand what

12  you're doing.

13      THE COURT:  There is no issue.  This is no ruling.

14       I asked if there was other evidence you wanted to

15  present.

16      MR. SHARP:  I'm asking you what are you ruling on

17  because I'm trying to present you with evidence and you're

18  saying there is no issue here.  What are you talking about?

19      THE COURT:  The evidence of your amended complaint

file:///A|/sharp10-16-07(1).txt

20  is already in the record.  There's nothing to present.

21          Is there something else, some other document that

22  you want to present to the Court on this point?  That's the

23  question.

24          MR. SHARP:  On the point that we're dealing with

25  right now?

1        THE COURT:  Yes.

2        MR. SHARP:  I just tried to do that.  You said I

3  can't.

4        THE COURT:  Because it's part of the record.  We

5  don't need to repeat this.  We're wasting time.

6        MR. SHARP:  You just sat here and said I did not

7  make an argument in my amended complaint.  I told you I did.

8  I just read it for you.  Now you're saying it's part of the

9  record.  What are you saying?  I'm confused.

10        THE COURT:  We're having a difference in semantics

11  which I don't think I can clear up for you.  What you want to

12  say is that you have argued and complained and put in your

13  legal papers that your requests were never processed.

14        MR. SHARP:  They were ignored.  That's literally.

15        THE COURT:  To you, that's the same thing.  To me,

16  it's not.  So now I understand where you're coming from.  Your

17  complaint is of record.  It's of record.  There is nothing

18  else you need to do.  We're not going to read it into the

19  record, it's part of the record.

20          So I'm back to the question I need to ask and need

21  you to answer.  Is there anything further as to all of the

22  claims you have set forth in your amended complaint?  Is there

23  any further evidence you want to present to the Court this

24  afternoon on those claims, other than what you'll be able to

25  ask the defendants on cross-examination?

1        MR. SHARP:  I'm puzzled here.

2        THE COURT:  I'm sorry.  Then I'm going to assume

3  that you rest.  Do you or do you not have any further

4  evidence?   That's a very simple question.

5        MR. SHARP:  I don't have a clue.  I'll be honest

6  with you.

7        THE COURT:  I'm going to take it that the defendant

8  rests since the defendant has not offered any additional

9  witnesses and does not seem to have any additional exhibits

10  that he wishes to place into evidence.

11        MR. SHARP:  You just told me that I didn't say

12  something that I just sat here and said, now you're saying

13  it's part of the record.  I'm trying to understand where

14  you're coming from here.  You have me lost here.

15        THE COURT:  I just explained it to you.  You

16  indicated to me something that I thought was two different

17  things.  You just now clarified it for me.  To you, it's one

18  and the same, and I understand what you're saying.  There is

19  no issue.  There's no question.

20          The question is, is there further evidence

21  concerning all of your claims that you want to present to the

22  Court?  That's an easy question for you to answer.  Have you

23  given me all of the documents that you think I need to have in

24  order to address your claims?

25          MR. SHARP:  Wow.

1         THE COURT:  Have you?

2         MR. SHARP:  I don't know if you want this religious

3  accommodation request.  I don't know if I entered this

4  grievance in or not.  I would like -- I definitely want to

5  have this entered in, grievance 29776.

6         THE COURT:  What does it concern?

7         MR. SHARP:  It concerns the forms for fasting that

8  I have been bringing up repeatedly that I questioned witnesses

9  about.  I would like to have that entered into the record,

10  along with the response from Chaplain Moneck that I received.

11        THE COURT:  That will be Exhibit 14.

12        MR. SHARP:  Your Honor, was grievance

13  No. PIT 0997-99, which is --

14        THE COURT:  Yes.

15        MR. SHARP:  The attorney general used as exhibit.

16        THE COURT:  Yes.  That was Exhibit No. 4.  That has

17  been received, along with the responses to it.  It's all

18  contained in Exhibit 4.

19        MR. SHARP:  I would bring to the Court's

20  attention -- well, no, you said it's already part of the

21  record.

22          I don't think I have anything else further.

23          THE COURT:  I think Mr. Bradley may have a question

24  about Exhibit 14.

25          MR. BRADLEY:  There's a grievance and a response

1  and then there's a separate inmate request to staff.

2          THE COURT:  So we should do the inmate request to

3  staff as No. 14.

4          MR. BRADLEY:  Time-wise, the grievance goes first.

5          THE COURT:  No. 14 is the grievance.  Exhibit 15

6  will be the inmate request to staff.

7          MR. SHARP:  There is one other document that I

8  located here where I have written to Deputy Superintendent

9  Krysevig pertaining to the contract that I mentioned in my

10  testimony where he asked me to write a contract stating that I

11  would not engage in any religious activity.

12          THE COURT:  Yes.

13          MR. SHARP:  I had written him and I have a response

14  issued by him.  I would like to enter that into the record as

15  well.

16          MR. BRADLEY:  I have no objections to those

17  exhibits, Your Honor.

18          THE COURT:  Thank you.

19          MR. SHARP:  With that, I will rest.

20          THE COURT:  Exhibits 14, 15 and 16 are admitted.

21          Plaintiff rests.

22          Mr. Bradley, do you need a moment?

23          MR. BRADLEY:  In light of the manner in which we're

24  proceeding, am I to assume that a Rule 50 motion would be

25  inappropriate at this time?

1          THE COURT:  I would think so.

2          MR. BRADLEY:  One other procedural question, Your

3    Honor.  Back when Mr. Sanchez was still representing

4    Mr. Sharp, we had prepared joint statements of stipulated

5    facts for the Court.  I was wondering if those were admissible

6    in this matter, or would I need to establish those items

7    independently?

8          THE COURT:  I think they should be.  I don't think

9    I have a copy of them with me.  I think they should be

10   considered.  Out of an abundance of caution, however, what we

11   will do is if you show them to Mr. Sharp so we know what we're

12   talking about, I will go get a copy for myself.

13          I also see that we're going to have to move some of

14   this equipment out of the way before we can get a witness into

15   the witness box.  Let us take a brief break and perhaps during

16   the break Mr. Sharp can review the statement of facts, which

17   it was my understanding he had previously reviewed and

18   approved.

19          MR. SHARP:  For the record, I had not, Your Honor.

20          THE COURT:  Well, I'm going to give you the

21  opportunity now to review that material.  We'll take about ten

22  minutes.  We'll see if we can get the IT people up to move the

23  screen out of the way.

24      (Whereupon, there was a brief recess in the proceedings.)

25          THE COURT:  Mr. Sharp, did you have an opportunity

1  to review the facts that previously had been agreed upon?

2       MR. SHARP:  Yes.

3       THE COURT:  Are any of those facts that you can

4  agree upon?

5       MR. SHARP:  There is one of them that I would

6  stipulate to which he agreed to.  The rest of them have no

7  relevance.

8       THE COURT:  All right.

9       Mr. Bradley, you may proceed with the defense of

10  your case.

11       MR. BRADLEY:  Defendants call Father William Terza.

12   FR. WILLIAM TERZA, a witness having been duly sworn,

13  testified as follows:

14       MR. BRADLEY:  Your Honor, are Exhibits 1 and 2

15  available for the witness?

16              DIRECT EXAMINATION

17  BY MR. BRADLEY:

18  Q.  Father Terza, what is your present occupation?

19  A.  I'm a Catholic priest for the Diocese of Pittsburgh.

20  Q.  Were you previously employed by the Pennsylvania

21  Department of Corrections?

22  A.  Yes.

23  Q.  In what capacity?

24  A.  I was facility chaplain program director at Pittsburgh

25  SCI-Pittsburgh and then at SCI-Fayette.

1  Q.  Do you recall when you began at SCI-Pittsburgh?

2  A.  March of '98.

3  Q.  Can you briefly explain what the duties and

4  responsibilities of the facility chaplaincy program are,

5  specifically focusing on your time at SCI-Pittsburgh.

6  A.  The facility chaplaincy program director is responsible

7  for the entire chaplaincy program of the institution.  Even

8  though I was a Catholic chaplain, I was responsible for

9  overseeing the entire chaplaincy program at the institution.

10  Q.  What did the chaplaincy program provide for at

11  SCI-Pittsburgh?

12  A.  Religious practice for a number of faiths that were

13  recognized by the Department of Corrections.

14  Q.  Do you recall what faiths were recognized at

15  SCI-Pittsburgh when you were there?

16  A.  We had Muslim, Jewish, Protestant, Catholic, Jehovah

17  Witness.  I think that was it.

18  Q.  Was there more than one Muslim group recognized?

19  A.  We had the Nation of Islam, the Moorish Science Temple and

20  the regular Muslim group.

21  Q.  If an inmate were seeking a religious accommodation, what

22  process would he have to follow?

23  A.  He would have to submit a religious accommodation form to

24  myself and I would interview him, look at the reasoning for

25  it, and ask him even to provide more information as to why he

1  wanted the religious accommodation.  I would make a

2  recommendation and it would be sent to the other members of

3  the institution, the superintendent, the deputies, the program

4  director, the facility program director was my immediate

5  superior, and they would all give a recommendation as to

6  whether this should proceed or not.

7  Q.  Is this all spelled out in a written policy?

8  A.  Yes, it is.

9  Q.  Is that reflected in the DC-819 as has been marked as

10  Exhibit 2 in this matter?

11  A.  Yes.

12  Q.  Is that in front of you?

13  A.  Yes.

14  Q.  Now, if you could explain, I believe the first page on

15  that indicates policy No. DC-ADM 819-4?

16  A.  Yes.

17  Q.  Do you know what the significance of the "-4" there is?

18  A.  Not --

19  Q.  Are you familiar with the idea that the policy has been

20  supplemented over the years?

21  A.  Oh, yes.  Yes.

22  Q.  So that the actual policy starts about midway back in the

23  document?

24  A.  Yes.

25  Q.  At DC-ADM 819?

1  A.  Yes.

2  Q.  That had an effective date April 19, 1984?

3  A.  Yes.

4  Q.  And an issue date of September 14, 1994?

5  A.  Yes.

6  Q.  In addition to that is the two pages immediately preceding

7  that that are contained in DC-ADM 819-1, then one page of

8  819-2, then another page of 819-3 and another page of 819-4?

9  A.  Yes.

10  Q.  All the supplements have successive effective dates?

11  A.  Yes.

12  Q.  I'd ask you to look at DC-ADM 819-1.

13  A.  Yes.

14  Q.  In the page immediately following that, is that what's

15  been referred to previously as a DC-52?

16  A.  I guess this is the form that was used before the actual

17  DC-52 came into existence.  I don't even remember this form

18  myself here.

19  Q.  Can you read into the record the effective date of the

file:///A|/sharp10-16-07(1).txt

20  DC-ADM 819-1?

21  A.  Effective date was February 3, 1995.

22  Q.  So this would have been in effect at the time you were at

23  SCI-Pittsburgh?

24  A.  Yes.

25  Q.  In the course of processing an inmate's religious

1  accommodation request form, would you be a final

2  decision-maker?

3  A.  No, not at all.

4  Q.  I know you touched on it briefly, what role would you play

5  in terms of the decision?

6  A.  All I would do would be to determine whether it was

7  something that had merit and should be submitted.  And each

8  one who did give some type of approval or nonapproval would

9  just be doing that in the sense of saying whether it should be

10  submitted or not.  Even if we all decided that it was

11  something that should not be submitted, the central office

12  always had the final say in whether it was something to be

13  considered or not.

14  Q.  In the course of serving as the director of the facility

15  chaplaincy program in Pittsburgh, did you encounter the

16  plaintiff, Shawn Sharp?

17  A.  Yes.

18  Q.  What do you recall about your interaction with Mr. Sharp?

19  Perhaps, if you could, to the best of your recollection, tell

20  the Court about the first time you encountered Mr. Sharp.

21  A.  I'm trying to think whether the first time I encountered

22  him was when he submitted the -- he came to me to speak about

23  submitting a religious accommodation form and I asked him why

24  he wanted to do that.  And he explained to me why he wanted to

25  do that, that he felt that he was not being able to practice

1  with the regular group of Muslims and that he would want to

2  submit an accommodation to have a separate group and to meet

3  and have a separate service and have separate Taleem.

4  Q.  Did he give you any document at that time making a formal

5  request?

6  A.  Not the regular form, but he gave me some information as

7  to why and that would be the -- I think that's this

8  information here.  It was an explanation of why he wants to --

9  Q.  Did he give you that specific document?

10  A.  He gave this to Tanko Ibrahiym, our Muslim chaplain, and I

11  think I had a copy of it at the time.  I can't remember for

12  sure, but I think I had a copy of it.

13        THE COURT:  We're referring to Exhibit 1 now?

14        THE WITNESS:  Exhibit 1, yes.

15  BY MR. BRADLEY:

16  Q.  Just referring to Exhibit 1, in the paragraph at the top,

17  and in the CC on the last page, are you identified in any of

18  those?

19  A.  No.

20  Q.  At that time Mr. Sharp was having this discussion with

21  you, did you indicate anything to him?

22  A.  I told him that he would have to submit the proper form,

23  and once it was submitted to me, then I would submit it to the

24  rest of the institution for their recommendation, and then we

25  would send it on to central office for approval.

1  Q.  Did Mr. Sharp ever provide you with that form that you

2  requested?

3  A.  I did not get that form.

4  Q.  You don't recall ever seeing a DC-52 filled out by Shawn

5  Sharp requesting religious accommodation for his particular

6  religious sect?

7  A.  No.

8  Q.  Did you understand that there were problems at

9  SCI-Pittsburgh with the way Muslims were being accommodated?

10  A.  Not so much in the way they were being accommodated, but

11  there were some differences of opinion as to how they would

12  practice together let's say.  We provided the service for

13  them.  We had a full time Muslim chaplain, but there were some

14  differences as to ideology between some of the members of the

15  community who are saying that they would not practice

16  together.

17  Q.  How would you resolve those issues at SCI-Pittsburgh?

18  A.  Well, we would discuss it with the institution chaplain to

19  see if he could provide a service that would handle all of the

20  Muslims within the community.  He said that he was able to do

21  that, there was no need to have separate either a religious

22  celebration or even the class for the Taleem.

23  Q.  Do you know whether a number of different Muslim groups

24  were thereafter accommodated within that single service?

25  A.  As far as I knew, they were being accommodated for what

1  was necessary for them to practice their faith.

2  Q.  If any inmate had a concern or a question about that,

3  would you indicate to them that they would need to fill out a

4  request for an accusation?

5  A.  If they wanted anything other than their regular Friday

6  Jumah or attendance at Taleem, they would have to fill out a

7  religious accommodation information.

8  Q.  Did you have any other discussions, that you can recall,

9  with Mr. Sharp about his religious exercise?

10  A.  I think there were a few times when he was in the RHU that

11  he discussed these things with me.  I tried to tell him why

12  the situation was that we were asking him to file a religious

13  accommodation because it was the policy of the DOC that we had

14  one religious service for each of the major faiths and they

15  weren't going to deviate from that policy.

16  Q.  You were present here for Mr. Sharp's testimony this

17  morning?

18  A.  Yes.

19  Q.  Did you hear him say that he was a Sunni Muslim?

file:///A|/sharp10-16-07(1).txt

20  A.  Yes.

21  Q.  Were you aware that Imam Ibrahiym was a Sunni Muslim?

22  A.  Yes.

23  Q.  Based on that information, did you have any reason to

24  believe that Mr. Sharp's religious faith could not be

25  accommodated at SCI-Pittsburgh under the circumstances that

1  prevailed?

2  A.  That's what puzzled me more.  I thought if he were a Sunni

3  Muslim and Tanko Ibrahiym was Sunni Muslim and he was the

4  leader of the community, I didn't understand why there would

5  be a discrepancy in him being able to attend that service and

6  become a part of it.

7  Q.  Did you ever tell Mr. Sharp that he could not attend a

8  Jumah service or a Taleem service?

9  A.  No, I didn't.

10  Q.  Did you ever tell Mr. Sharp that he could not profess a

11  certain belief or believe a certain way?

12  A.  No, I did not.

13  Q.  Did you ever exclude Mr. Sharp from participating in any

14  religious activity because of his professed faith?

15  A.  No, I did not.

16  Q.  Did you ever become involved in any discussions about

17  accommodating the different Muslim groups during Ramadan?

18  A.  Yes.  That was always a discussion among us.  If there

19  were questions as to how they could participate together, we

20 had to discuss that among the deputies and the program

21 director and so on, so we would have a smooth running at

22 Ramadan.

23 Q. Do you recall participating in any of these discussions

24 with Mr. Sharp or other inmates or other religious leaders?

25 A. I think at one point we did have a discussion with some of

1  the inmate population and I think Mr. Sharp was a part of

2  that.  I'm not really sure at the time.  I know there were

3  discussions with inmates and the administration about the

4  proper running of Ramadan.

5  Q.  In an effort to make sure that all the inmates who wished

6  to participate in Ramadan were able to?

7  A.  Right.

8  Q.  Beyond what you just testified to, do you have any

9  specific recollection of that conversation or that meeting and

10  whether there was some issue as to whether Mr. Sharp could or

11  could not participate in Ramadan?

12  A.  No, I didn't.

13  Q.  Were you ever aware of an instance where corrections

14  officers came to the Taleem service and inquired about

15  membership of religious affiliations of various inmates?

16  A.  I was not aware that there was inquiry of the membership

17  affiliation of the members there, but Wednesdays was always my

18  day off and I did hear afterwards that they did have a

19  presence there.

20 Q. Were those concerns of a security nature?

21 A. Yes.

22 Q. Do you recall anything more specific about those concerns?

23 A. They just felt that it would be necessary, it would be

24 better if there were more officers present in case there were

25 any problems between any of the inmates.  That was as far as

1  my knowledge of that was concerned.

2        MR. BRADLEY:  I believe that's all the questions I

3  have.  Thank you.

4        THE COURT:  Mr. Sharp, do you have any questions?

5        MR. SHARP:  Yes.

6              CROSS-EXAMINATION

7  BY MR. SHARP:

8  Q.  I'd like to go back to when you first started speaking

9  about Exhibit No. 1.  You mentioned that there was -- if I'm

10  not mistaken, Exhibit No. 1, would you hold up No. 1 first.

11  There were some forms that I gave you, but you could not

12  specifically remember at that time the particular form, the

13  one which -- we eventually got a copy of that particular form.

14  Are you 100 percent sure that form is the one I gave you?

15  A.  I only got a copy of this later on.  You did not give me a

16  copy of this.

17  Q.  Right.  But I did give you a copy of something else prior

18  to that, correct?

19  A.  I don't remember you giving me any other copy.  You said

20  you gave something to Ibrahiym, but I did not get a formal

21  request for an accomodation.

22  Q.  You also mentioned in Exhibit 2, you said the DC-52 they

23  had in that pile you didn't recognize, correct?

24  A.  This is just a form that asks for -- this is a different

25  type of form.  This might have been just originally when I

1  first came on board, but there was a form that had the

2  inmate's name, the DOC number, what the original accommodation

3  was or what the request was, and on the back then there was a

4  place where everyone could make their recommendation or

5  approval or disapproval of sending this in to central office.

6  This does not have --

7  Q.  Can I see the form you have in your hand?

8  A.  It's just some lines.

9  Q.  That is something that was originally present in the

10  inmate handbook and you're saying you weren't aware of that

11  form?

12  A.  I did not use this form for religious accommodations.  I

13  don't know when the change came in.

14  Q.  Could you go to the date of the policy that he had you

15  reading?

16  A.  No. 1 was 1995.

17        THE COURT:  Where that form is at?  It would tell

18  you the date that that policy was in play.

19        THE WITNESS:  February 1995.

file:///A|/sharp10-16-07(1).txt

20  BY MR. SHARP:

21  Q.  Then that form was effectively included to inmates to be

22  used in a request for religious accommodation in the handbook,

23  correct?

24  A.  I would assume so.

25  Q.  I would like to go to your affidavit.

1        MR. SHARP:  Am I permitted to use his affidavit

2  that he submitted as an exhibit?

3        THE COURT:  Well, it depends.  You could if he has

4  testified differently than what is in that affidavit, you can

5  impeach him on that.  I'm not sure what you want to do, so I'm

6  not sure I can give you an appropriate answer.

7  BY MR. SHARP:

8  Q.  You said that your responsibilities and duties included

9  gathering information pertaining to various religious groups

10  that may request religious accommodation, right?

11  A.  Yes.

12  Q.  I would like to review something from your affidavit at

13  No. 5.

14        MR. SHARP:  Is that permitted?

15        THE COURT:  You're going to have to tell me.  What

16  I'm reading is he's stating what his job is, what his job

17  description is, what his responsibility is.  He's stating it

18  in an affidavit.  You need to formulate this into a question.

19  BY MR. SHARP:

20  Q.  In your affidavit, is it correct that you are saying that

21  you have to gain knowledge and understanding about various

22  Muslim religious leaders, the principles and tenets of their

23  particular faith.  As the facility director and supervisor,

24  you would have to have an understanding of the difference in

25  the Islamic faith?

1  A.  If there were an issue that came up, it would be a

2  necessity to delve further into it other than just what I can

3  glean from the Imam chaplain.

4  Q.  So, in other words, you have an opportunity outside of

5  what you may be told by the Islamic chaplain, you may

6  investigate and ascertain what is being claimed by a

7  particular group, correct?

8  A.  Yes.

9  Q.  In our discussions and the meetings that we had pertaining

10  to Ramadan, do you recall me giving you the parable of our

11  faithful being led by someone else?  It's out of our faithful

12  as being equivalent to a Catholic leading a Protestant.  Do

13  you recall that?

14  A.  Yes.

15  Q.  What was your response to that?

16  A.  My response?  I don't remember what I responded exactly at

17  the time.  But even in a situation like that, there would be

18  certain things that we could do together and certain things

19  that we couldn't do together.

20  Q.  But you would all be generally termed what faith?

21  A.  Well, we would be all Christians because we follow Jesus

22  Christ.

23  Q.  So you understand the parable that I made.  Do you recall

24  me saying that that sounds like a legal matter?  Do you recall

25  me saying that?

1  A.  No, I don't remember that.

2  Q.  You used the term in your affidavit at No. 11 and I will

3  read this to you.  If an individual sect for a splinter

4  faction of any religious community or denomination were

5  allowed to establish their own group identity for group

6  worship services and religious education, this would lead to

7  requests for similar recognition and accomodation from other

8  religious communities within the institution which would lead

9  to additional strain on institutional resources and personnel.

10        Is that your belief?

11  A.  Yes.  Because it would not be possible for every single

12  religious group to have their own ceremony, their own

13  religious service, their own religious teaching, their own

14  chaplain.  We would be going into hundreds and hundreds of

15  different services and chaplains, but it would be impossible

16  to do.

17  Q.  Okay.  I can understand that.  Let me ask you this, how

18  would you know what a splinter faction is?  How could you

19  determine in a group since you use the term -- you don't deny

20  using the term, do you?

21  A.  No.

22  Q.  How can you determine about another religion, what is or

23  isn't a splinter faction because -- well, I'll let you answer

24  that first.

25  A.  There is a certain basic grouping of a particular faith

1  that would be considered the main branch, as you might say, of

2  that faith.  Then there would be other groups that would be

3  splintered off from that that might have a few different

4  ideologies here and there that would not allow them to be part

5  of the main group or would not allow them to participate in

6  the same exact way as the major body let's say.

7  Q.  So would you consider my faith a splinter faction?

8  A.  It could be considered that.  I don't know enough about

9  the Muslim faith to see what would be the main body of the

10  Muslim faith and what would be splintered groups from it.

11  Q.  Do you recall in our meetings where I tried to express to

12  Deputy Chris Everich that Chaplain Ibrahiym was not our Imam.

13  Do you remember me mentioning that?

14  A.  That was your terminology.

15  Q.  Do you remember him stating he's your Imam and we hired

16  him.  He runs this and it will ease the chaplains that we

17  hired.  Do you recall me arguing with them very vehemently

18  about the fact that they called him my Imam?

19  A.  Okay.

20  Q.  What is the position of Imam in the Islamic community?

21  A.  As far as I know, he's a faith leader who leads the

22  community in prayer and study and their understanding of their

23  faith.

24  Q.  Under Islamic law, how he is appointed?

25  A.  I'm not sure.

1  Q.  So you would have no idea of whether or not anyone could

2  just be qualified to be talking, correct?

3  A.  From what I have understood, that it comes more maybe from

4  the community than it does from above, like ours would.  We

5  have a bishop and a hierarchy and so on and they have been

6  appointed.

7  Q.  When you first started, if I remember correctly, when you

8  first started at SCI-Western, you were not present in the

9  institution a great deal; am I correct?

10  A.  I was there six days a week.

11  Q.  I distinctly -- when did you start again?

12  A.  In March of 1998.

13  Q.  In March of 1998, you said you were off on Wednesdays.

14  A.  Wednesday, that was my full day off.  Rather than have two

15  days off, I took Wednesday as a full day and a half day

16  Saturday and Sunday.

17  Q.  So you were also in your office on any of those other

18  dates?

19  A.  Yes.

20  Q.  So on Wednesdays -- what services were usually held on

21  Wednesdays?

22  A.  I think the Islamic study group was on Wednesday -- no, we

23  had it on Monday evening, Nation of Islam was on Wednesday

24  evening.

25  Q.  You were present on Monday evenings in this institution?

1   A.  No, I worked until 4:30 every day.

2   Q.  During the time that you generally had Taleem services

3   within the institution, you were never present, generally

4   speaking?

5   A.  Generally speaking, yes.

6   Q.  You were never present in the chapel during that time,

7   correct?

8   A.  I was a few times, but not generally speaking.

9   Q.  I remember us speaking.  You weren't there at that

10  particular time, and the times that you were there, do you

11  remember me coming in and speaking to you and trying to find

12  out what needed to be done?

13  A.  I explained to you what had to be done.

14        MR. SHARP:  I think I have no further questions.

15  Thank you for your honesty.

16        THE COURT:  Anything further?

17        MR. BRADLEY:  Just briefly, Your Honor.

18              REDIRECT EXAMINATION

19  BY MR. BRADLEY:

20  Q.  Father Terza, Mr. Sharp, he referred to it as a parable

21  about the Protestants and Catholics.  Mr. Sharp is a Sunni and

22  Imam Ibrahiym is a Sunni.  Is that comparable, in your mind,

23  comparing his faith and Protestants and Catholics?

24  A.  If they were both considered Sunni, I would consider

25  something like maybe two different churches, Presbyterians,

1  Methodists or Episcopalians, I would think that especially two

2  people who are listed as Sunnis would be able to practice as

3  well.

4        MR. BRADLEY:  That's all I have.

5        MR. SHARP:  Can I ask another question which I

6  forgot.

7              RECROSS-EXAMINATION

8  BY MR. SHARP:

9  Q.  At any time did Imam Ibrahiym ever give you any religious

10  accomodation requests from myself?  Particularly, did he ever

11  mention to you that he had collected any religious

12  accommodation forms?

13  A.  If he would have collected them, he would have given them

14  to me, but I don't remember.  If someone would turn one in, he

15  would send it on to me.

16  Q.  Did you ever process any religious accommodation from us?

17  A.  From you personally?  There was never one from any other

18  members of the -- I remember one.  You had sent in something

19  that had a list of members.  We are not able to send in an

20  accommodation for a list of people.  It had to come --

21  Q.  Do you still have that document?

22  A.  I don't have any of those documents.  They would all be in

23  the files of the institution.  I didn't take anything with me

24  when I left the institution.

25  Q.  You're saying that you in point of fact actually did

1  receive an accommodation from me as an individual.  Did you

2  process it?  That's the question.

3  A.  I'm trying to think now whether you actually sent in the

4  DC-52 with the proper form, you know.

5  Q.  I did it.  That's why I'm asking you, did you process it?

6  A.  If you sent it in, I processed it because I was very

7  conscientious about doing that.

8  Q.  The chaplain, did he ever come to you regarding --

9  including my grooming exemption in there?

10  A.  Your grooming exemption was presented at Pittsburgh before

11  the new policy came in.  At that time, each institution was

12  able to handle a grooming policy on its own, it didn't have to

13  go the central office.

14  Q.  When did they -- when did that start?

15  A.  I don't know the exact date, but it would have been

16  somewhere around 2002, 2003, somewhere around there when all

17  requests for hair exemptions would have to go through central

18  office.

19  Q.  Could you find out that specific date?

20  A.  Oh, it would be possible to look into the history in the

21  department to see exactly when it was.

22  Q.  Can you find that out for us?

23        THE COURT:  He's here to testify now.  Unless he

24  knows that from his memory --

25        MR. SHARP:  Is it possible he could bring that

1  information with him tomorrow?

2        THE COURT:  No.  He's here on the witness stand.

3  BY MR. SHARP:

4  Q.  You're saying it didn't happen until -- what year?

5  A.  I'm guessing when I say that because I don't know for sure

6  the exact time they changed the policy.

7        MR. SHARP:  I submitted exhibits, Your Honor --

8  BY MR. SHARP:

9  Q.  And you said it happened in 2002?

10  A.  I said I think it did.  I don't know what number the

11  exhibit was, but I gave you photocopies of two exemptions that

12  have dates on them, the one that we issued.

13        MR. SHARP:  Well, the one I do have has the date,

14  and it says --

15        THE COURT:  What is it in reference to?

16        MR. SHARP:  It says the date I was granted the

17  exemption, March 29, 2002.

18  BY MR. SHARP:

19  Q.  So you've said the policy was implemented in 2002?

20  A.  I said possibly 2002.

21  Q.  I just wanted it in the record that you did mention 2002

22  and 2003.  I agree with you, but I wanted to make sure.  So

23  you're saying that that particular time, that was included in

24  my accommodation requests.

25  A.  No, I didn't say that.

1        THE COURT:  You're mischaracterizing his testimony.

2        THE WITNESS:  If you asked me for a hair exemption,

3  I granted that separately.  That was not matter of my

4  accomodation.

5  BY MR. SHARP:

6  Q.  So, in other words, what you're saying is you did not

7  include that as part of my request for religious

8  accommodation?

9  A.  It wouldn't have to be included as part of a religious

10  accommodation.  That's something that was determined

11  separately.  Anyone who asks for a hair exemption, that would

12  be granted separately.  It's not a part of a religious

13  accommodation.  A religious accommodation is to establish a

14  separate religion or separate service or something like that.

15  The hair exemption is just a part of -- separate from that.

16        MR. SHARP:  Can I reserve to call him back?

17        THE COURT:  No.  He's here now to testify and it's

18  your turn to cross-examine him.

19        What is it that you don't have?

20          MR. SHARP:  I have the paperwork, but I wanted -- I

21  don't want to take up a lot of the Court's time trying to dig

22  for it, but I'm refuting what he's saying.  I want to rebut

23  what he's saying.

24          THE COURT:  It's not your job at this point to

25  rebut.  It's your job -- you can impeach him.

1 BY MR. SHARP:

2 Q.  I don't know what the terminology is.  In the grooming

3 policy itself, which is part of the Department of Corrections

4 Inmate Handbook, doesn't it say that you must submit a

5 religious accommodation request in order to get a grooming

6 exemption?

7 A.  No, it doesn't, not that I recall.

8        Maybe just let me answer that and say a Native

9 American who is asking for a hair exemption does not have to

10  submit to me a religious accommodation form establishing his

11  faith in order to get that hair exemption.

12  Q.  I'm reading from -- I don't know if I entered this, I

13  believe I entered this into the record as part of the exhibits

14  for the DC Administrative 819-4 -- it was right after 4.

15        THE COURT:  What is it you're looking for?

16        MR. SHARP:  DC-Administrative 807.

17        THE COURT:  That's not part of the record.  What is

18  it?

19        MR. SHARP:  It's the grooming policy and it

20  stipulates to obtain a religious exemption, it has under this

21  section of exceptions -- I don't know if you want me to put it

22  into the record as a separate exhibit.

23          THE COURT:  What is the question?

24  BY MR. SHARP:

25  Q.  Exceptions to the provisions of this directive may be

1  granted for legitimate religious reasons on a case-by-case

2  basis.  The following procedures are to be followed to

3  request, obtain a religious exemption.  Right?  The inmate

4  must submit and do you agree that that's correct, that I have

5  to file for a religious exemption?

6         MR. BRADLEY:  Your Honor, there are different dates

7  involved here.  If he could identify the date of the policy.

8         THE COURT:  What is the date of the policy?

9         MR. SHARP:  December 16, 1997.  It was in effect at

10  the time that I requested the exemption.

11         THE COURT:  Can you show it to counsel.

12         MR. SHARP:  The following procedures are to be

13  followed to obtain a religious exemption --

14         THE WITNESS:  Must submit a written request for a

15  haircut exemption to the chaplain.

16         THE COURT:  That's what he says.

17  BY MR. SHARP:

18  Q.  Now, at No. 5 it says, the facility chaplain program

19  director shall notify the superintendent or designee of the

file:///A|/sharp10-16-07(1).txt

20  determination and recommendation.  The superintendent or

21  designee shall issue the approval or disapproval.

22          Is that correct?

23  A.  Yes.

24  Q.  Were you the designee that issued this particular

25  document?

1       THE COURT:  I don't know what you're talking about,

2   neither does the court reporter, or neither does the witness.

3   You're holding up something?

4       MR. SHARP:  An exhibit I entered into evidence

5   which was his issuance of a grooming exemption.  One was from

6   Greene and one was from Western signed by Chaplain Terza.

7       THE COURT:  That would be Exhibit 12.  I don't know

8   if we have that here.  It is out here on the bench?

9       If you have a copy, I think in fairness, you need

10  to let Mr. Bradley see it.  Then, secondly, let the witness

11  see it so everybody knows what you're talking about.

12      MR. BRADLEY:  I believe these adequately reflect

13  Exhibit 12.

14      THE COURT:  Now, what is the question?

15  BY MR. SHARP:

16  Q.  Were those issued?  Is that your signature?

17  A.  Yes, it is.  It's dated '01.

18  Q.  It's dated '01?

19  A.  4-02-01 when the exception was issued, which is before the

20  policy was changed that it had to go to central office.

21  Q.  Now, I would like for you to read --

22        MR. SHARP:  What number did you make this,

23  Administrative 807?

24        THE COURT:  Document 12.

25        MR. BRADLEY:  I believe he's now talking about the

1  DC-ADM grooming policy, which has not been marked.

2       THE COURT:  It hasn't been marked or identified.

3  We can mark it as an Exhibit 17.

4  BY MR. SHARP:

5  Q.  Exhibit 17, could you read No. 8?

6       THE COURT:  Ask him a question.

7  BY MR. SHARP:

8  Q.  I'll do it this way, simplify things.

9       MR. BRADLEY:  Your Honor, if I could interject.  I

10  think what Mr. Sharp is trying to do is somehow validate the

11  exception that Father Terza granted him back in 2001.

12       MR. SHARP:  I'm trying --

13       THE COURT:  Don't interrupt.

14       MR. BRADLEY:  So he can somehow convince DOC that

15  he has a valid hair exemption.  I think that has gone well

16  beyond the scope of my direct examination and certainly well

17  beyond the scope of my redirect.

18       THE COURT:  And your objection is sustained.

19       Next question.

20          MR. SHARP:  Next question.  So are you saying that

21  I can't question him about this policy now?

22          THE COURT:  Correct.

23  BY MR. SHARP:

24  Q.  Let me ask you this.  How many requests for religious

25  accommodation do you receive?  Oh, roughly, just give me an

1  idea?

2        THE COURT:  Mr. Sharp, this is beyond the scope of

3  this witness' examination and as the matter pertains to you.

4  It's irrelevant how many requests he received when he was

5  there from inmates for anything.

6        MR. SHARP:  I'm asking him for this reason, Your

7  Honor, because the question becomes -- their argument is that

8  everybody -- he made the statement that everybody -- if we

9  gave religious accommodation to everybody, then everybody

10  would be asking for it.  Isn't that what he said?

11        THE COURT:  I'm not a witness.  The record will

12  reflect what his testimony is.  You're asking -- you're going

13  into an area which I believe to be inappropriate.

14        MR. SHARP:  You said I couldn't talk, I'm past the

15  grooming part, you said don't question him about that.

16        THE COURT:  The question you asked, you posed to

17  the Father is how many requests for religious accommodation

18  did he receive?  It's irrelevant.

19        MR. SHARP:  I'm moving on.

20  BY MR. SHARP:

21  Q.  My question to you is did you or did you not say that if

22  they started giving religious accommodations to various

23  groups, that everybody would be asking for them?  Is that what

24  your testimony was?

25  A.  I didn't say that.  You quoted from my affidavit saying

1  that there were a number of -- if we went to each individual

2  religious group and accommodated them, we would not be able to

3  handle the services or the -- it would make a strain on the

4  resources of the DOC.

5  Q.  So is it your contention that I am able as an individual

6  to be accommodated by -- or was able to be accommodated or to

7  practice my faith within the framework and structure of what

8  was existing at the time that I filed my religious accusation,

9  that's your contention?

10  A.  Yes.

11  Q.  And on what basis do you make that presumption?

12  A.  I made that presumption on the basis that we do it for the

13  Catholics, we do it for the Protestants, who have many

14  different groups involved, and if they're able to do it, I

15  think that the Muslim community should be able to do it also.

16  That was my assumption.

17  Q.  So, then what you're saying is that there was no need for

18  a Nation of Islam service?

19          THE COURT:  Mr. Sharp, we're getting way far afield

20  on what was asked on direct, what you were permitted to ask on

21  cross and what Mr. Bradley 's redirect was.  Your recross

22  cannot go into grounds that should have been asked before or

23  that were asked before.  You are straying into that area where

24  we have been or where it is broader than where you are

25  permitted to go.

1 BY MR. SHARP:

2 Q.  Have --

3        MR. SHARP:  Well, hey -- you won't let me question

4 him?  I'm done, Your Honor.

5        THE COURT:  You are free to question this witness

6 within the bounds of the rules.

7        MR. SHARP:  I mean -- I'm saying, bear in mind I am

8 not an attorney.  I am trying to ask certain questions and I

9 don't know how you want me to form those questions, so I have

10 to try to ask them the best way I know how.

11        THE COURT:  I'm telling you and trying to instruct

12 you when you can inquire into an area and when you cannot.

13        MR. SHARP:  I have respected that.

14        THE COURT:  I understand that.  I'm telling you now

15 simply that the question you last posed is inappropriate.

16        MR. SHARP:  Could you repeat the last question?

17        THE COURT:  No.

18        MR. SHARP:  I don't know what the last question

19 was.  I don't know.  I don't know if she can do that on the

20  spur of the moment.

21        Are you able to retrieve that question?

22        MR. BRADLEY:  The question was about how they

23  accommodated the Nation of Islam.

24        MR. SHARP:  That's not what I asked.

25    (Whereupon, the previous question was read back.)

1        THE COURT:  That is not relevant to your claim.

2        MR. SHARP:  Okay.  Now I know how to frame the

3  question.

4  BY MR. SHARP:

5  Q.  So now what you're saying is that you feel that there is

6  only the necessity to have one religious service, that's your

7  belief?

8  A.  That's my belief and that was the -- that's the general

9  policy of the DOC at the present time.

10  Q.  But you have confirmed, correct me if I'm wrong, that

11  there were other Islamic services?

12  A.  At SCI-Pittsburgh?

13  Q.  Right.  There were other religious services at

14  SCI-Pittsburgh?

15        THE COURT:  That's been asked and answered.

16        THE WITNESS:  Yes.

17        MR. SHARP:  I just wanted him to clarify.  I'm

18  done.

19        THE COURT:  Anything further?

20          MR. BRADLEY:  Just briefly, Your Honor.

21              FURTHER REDIRECT EXAMINATION

22 BY MR. BRADLEY:

23 Q.  To follow-up on something Mr. Sharp said, he asked you and

24 I think your response was if you submitted a request to me, I

25 processed it.  Do you have a specific recollection of

1  processing a DC-52 request for accommodation from Shawn Sharp

2  in 1999?

3  A.  No, I don't.

4       MR. BRADLEY:  Nothing further, Your Honor.

5       THE COURT:  All right.  Thank you, Father.  You may

6  step down.

7       MR. BRADLEY:  Could he be excused?

8       THE COURT:  Yes.

9       We are going to conclude.  The hour is now

10  four-thirty.  We are going to conclude the proceedings for

11  this afternoon.  We will start again in the morning at

12  nine-thirty.

13       MR. BRADLEY:  He was asking, he has the original

14  Exhibit 6 which he was showing to one of the inmate video

15  witnesses.

16       MR. SHARP:  No. 6, I don't know if you got a copy

17  of it or not.

18       THE COURT:  That is the copy for the record if it

19  has the exhibit sticker on it.

20        MR. SHARP:  I think that's the original.

21        THE COURT:  The original is the exhibit.

22        MR. SHARP:  Will I get copies of those exhibits

23  back for my own records?

24        THE COURT:  No.  These documents that have been

25  submitted become part of the Court record and they will remain

1  part of the Court record until the case is concluded.

2        MR. SHARP:  So I can't have copies of them?

3        THE COURT:  You have no copies of any of the

4  documents that you've submitted?

5        MR. SHARP:  I have been in the hole, Your Honor.

6        THE COURT:  This is highly irregular, Mr. Sharp.  I

7  don't know what the answer to that question is going to be

8  because generally speaking --

9        MR. SHARP:  I'm willing to pay for them.  I don't

10  have a problem.

11        THE COURT:  I understand.

12        MR. SHARP:  I'm confined to the RHU right now to go

13  to court.

14        THE COURT:  I understand that.  Right now the

15  documents are here.  You have access to them and so there's no

16  need for me to go to the expense and time of making copies.

17        As to what will happen and whether we will produce

18  them as part of the record that will be received by you and

19  Mr. Bradley for purposes of preparing findings of fact,

20  conclusions of law, I'll see if we can make that

21  accommodation.  But for now, they're here, part of the record

22  and you will have them for all the witnesses who will be

23  taking the stand from here until the conclusion of the trial,

24  so that shouldn't pose any problems.

25          MR. BRADLEY:  Your Honor, one brief housekeeping, I

1  don't believe that Exhibit 17 was ever turned in, the DC-ADM

2  policy.

3         THE COURT:  Right.  We don't have that.

4         MR. BRADLEY:  The only objection is to relevance.

5         THE COURT:  We'll mark it as an exhibit.  But the

6  objection is sustained as to the relevance.  And so we are not

7  going to admit that into evidence.

8         MR. SHARP:  So you said you aren't going to use

9  that?  I'm trying to follow what just happened.

10         THE COURT:  Correct.  It was marked as an exhibit,

11  you were free to inquire of the witness about it, but it has

12  no relevance to your claim in the matter, so we are not making

13  it part of the court record.

14         We are adjourned until nine-thirty tomorrow

15  morning.

16     (Court adjourned.)

17                I-N-D-E-X

18  WITNESS         Direct    Cross    Redirect    Recross

19  Shawn Sharp        7        55         --          --
    John Blount        79       94         --          --

20  Damian Brome        99        --        --        --

Troy Calhoun        104       107       107       --

21  Anthony Deloatch    109       --        --        --

London Linton       112       --        --        --

22

Fr. William Terza   142       152       159       160

23              --        --        171       --

24

25

1

2

3

4                C E R T I F I C A T E

5

          I, Juliann A. Kienzle, certify that the
6   foregoing is a correct transcript from the record of proceedings
    in the above-titled matter.
7

8   s/Juliann A. Kienzle

    _____
9   Juliann A. Kienzle, RMR, CRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25