1              IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3    SHAWN C. SHARP,
              Plaintiff
4       vs.
                        Civil Action 00-2156
5    SUPERINTENDENT JOHNSON, et al.,
              Defendants.
6

7
        Transcript of Non-Jury Trial Proceedings on Wednesday,
8   October 17, 2007, United States District Court, Pittsburgh,
    Pennsylvania, before Amy Reynolds Hay, Magistrate Judge.
9

10   APPEARANCES:

11   For the Plaintiff:        Pro se

12

13

14

15   For the Defendants:        Scott A. Bradley, Esq.
                        Office of the Attorney General
16                    564 Forbes Avenue
                        6th Floor, Manor Complex
17                    Pittsburgh, PA  15219

18

19   Court Reporter:        Juliann A. Kienzle, RMR, CRR
                    Fifth Floor USPO & Courthouse

20                   700 Grant Street
                    Pittsburgh, PA 15219
21                   (412) 261-6122

22

23
         Proceedings recorded by mechanical stenography;
24   transcript produced by computer-aided transcription.

25

1  (Proceedings held in open court; Wednesday, October 17,  2007.)

2      THE COURT:  Good morning, everyone.

3      Mr. Bradley, you may call your next witness.

4      Mr. Sharp, do you have a question?

5      MR. SHARP:  I would like to bring to your

6  attention, the same problem we had yesterday we're having

7  again today.  I don't know if it's necessary to call for some

8  type of injunctive relief, but I haven't had any medication

9  again, that same problem that we had yesterday.  It's

10  exacerbated and I don't think it's fair for me to have to sit

11  here and try to go through process while I have this problem.

12      THE COURT:  I was told --

13      MR. SHARP:  I'm regurgitating constantly now.  I

14  have a severe earache.  The officers tried to call the medical

15  department, tried to get some medication for me, both officers

16  did.  They said they don't have it.  I don't know what can be

17  done about this.  I have been in their custody for over a

18  week.  They know I need this medication.  They continue to

19  deny me having it.

20          THE COURT:  It was my understanding, sir, that the

21  medical orders had come with you, but there was a little bit

22  of a lag time until they could fill your prescription, but

23  that it would have been accomplished by the time you returned

24  there last evening.  Apparently, that isn't the case.

25          I don't know if someone else might be able to shed

1  some light.

2        MR. BRADLEY:  Your Honor, Deputy Superintendent

3  Coleman is assigned to SCI-Greene he was the one I was talking

4  with.  He may have some additional information.

5        DEPUTY SUPERINTENDENT COLEMAN:  I talked to Deputy

6  Capolza at SCI-Greene about five o'clock on my way back home.

7  He assured me the food situation and the medication would be

8  taken care of.  There was a 48- or 72-hour lag time order in

9  the medication because it has to go through PHS service.  So

10  they assured me yesterday at five o'clock it would be taken

11  care of, he would get his meds last night.

12        MR. SHARP:  I didn't get anything last night.  I

13  didn't get anything.  Your Honor, I'm -- the officer can

14  verify, they both called, I'm a witness, I stood right there

15  while they both called and they said, look, we don't have

16  anything for him.  They can testify to that.  They did try to

17  get me medication and I did not get any medication last night.

18  I called the nurse and I tried to get the nurse's attention.

19  She said, you -- this is exactly what she said, I don't hear

20  that and she ran off the block.  I could not get any attention

21  from them.

22          THE COURT:  As you just heard, the matter was to be

23  taken care of; apparently, it wasn't.  Whose fault it is, why

24  it is, I don't know.

25          But the more immediate problem is, how do we get

4

1  you some instant relief without creating too much of a delay

2  here?  I know that this medication is available

3  over-the-counter.  I also know that I'm dealing with a

4  bureaucracy because I live in one, so I don't know -- if I

5  could go out and go across the street and purchase it, I

6  would, but I know that I can't do that.

7          I don't know if there is any assistance that can be

8  provided at this point.  So I'm going to look to Mr. Bradley

9  and perhaps some of the witnesses to see whether we can't

10  remedy this circumstance this morning.

11          MR. BRADLEY:  Your Honor, at a minimum, they're

12  attempting to confirm the prescription, then they will contact

13  SCI-Pittsburgh and have the medication delivered to the

14  courthouse here.  That's what they're in the process of

15  attempting to do right now.

16          THE COURT:  All right.  I don't know who you were

17  planning to call as your next witness.  Is it best to recess

18  until we see if we can get this accomplished?  I really don't

19  want to delay this too long.

20          And, Mr. Sharp, again, I can only say that you let

21  this go a week without notifying the Court it was an issue and

22  so I am sorry that this is circumstance has arisen.  If the

23  Court had known about it ahead of time, we could have avoided

24  that.

25          That being said, I don't know how long it might

1  take to accomplish this process, whether it might be

2  accomplished within the hour.

3        MR. SHARP:  Your Honor, I have no way of contacting

4  the Court.  I have no way whatsoever of contacting the Court,

5  none.  The letters that I sent to the Court as far as the

6  motions that I filed were already prepared before I left

7  SCI-Dallas.  I don't have envelopes in my cell, the

8  commissary, what I was allowed to purchase this week was

9  returned yesterday because they said that I was not allowed to

10  have them, for some strange reason.  So I have been trying to

11  get envelopes and things of that nature to contact the Court

12  about this.  And I didn't know that this was going to happen.

13  And also, I'm in the hole.  I'm on solitary confinement right

14  now.  Even though I was in population at my jail, I'm in the

15  hole now.  So my movement or my access to anything is

16  completely restricted.  So, I mean, it's not my fault.  You

17  can't hold me responsible for this.

18        THE COURT:  I find it hard to believe that if you

19  were suffering at the prison that you couldn't have --

20          MR. SHARP:  I couldn't even get a grievance.

21          THE COURT:  It's a moot point now.  It has come to

22  the Court's attention and I'm trying to resolve this matter as

23  expeditiously now as I can.

24          MR. SHARP:  You just said it was my fault and it's

25  not my fault.

1        THE COURT:  I said it would have been better if the

2   Court had been put on notice of this sooner than it was.  I

3   find it difficult to believe that that couldn't have happened.

4   But we're past that point now.  So, I guess the only thing we

5   can do for the moment because Mr. Sharp is indicating to the

6   Court he is unable to physically proceed, and since I cannot

7   gauge any better than what he's telling me that perhaps we

8   will recess, at least for another 20 minutes, and see if

9   within that time period we have any indication as to whether,

10  in fact, the medication prescription exists, what the dosage

11  is, whether it can be obtained from SCI-Pittsburgh and how

12  long that might take.  So we will briefly recess.

13        Mr. Bradley, when you know anything further, if you

14  would be so kind as to contact my chambers, I would appreciate

15  it.

16        MR. BRADLEY:  Certainly, Your Honor.

17     (Whereupon, there was a brief recess in the proceedings.)

18        THE COURT:  Mr. Bradley, you may call your next

19  witness.

20          MR. BRADLEY:  Defendants call Father George Moneck.

21      GEORGE J. MONECK, a witness having been duly sworn,

22  testified as follows:

23              DIRECT EXAMINATION

24  BY MR. BRADLEY:

25  Q.  State your name and spell it for the record, please.

1  A.  George J. Moneck, M-O-N-E-C-K.

2  Q.  What is your present occupation?

3  A.  Roman Catholic priest for the Diocese of Pittsburgh.

4  Q.  Were you briefly employed by the Pennsylvania Department

5  of Corrections?

6  A.  I was.

7  Q.  In what capacity?

8  A.  I was Chaplain and Director of Chaplaincy.

9  Q.  When and where did you begin your employment as a

10  chaplain?

11  A.  It was in August of 1995.

12  Q.  At what location?

13  A.  SCI-Greene.

14  Q.  Sometime thereafter you became the Facility Chaplaincy

15  Program Director?

16  A.  That's correct.

17  Q.  That was also at SCI-Greene?

18  A.  That is correct.

19  Q.  Do you recall when that was?

20  A.  I believe it was two years after.

21  Q.  Sometime in 1997?

22  A.  I believe so.

23  Q.  When did you leave the Department of Corrections?

24  A.   2004, December 2004.

25  Q.  Did you ever work anywhere other than SCI-Greene?

1  A.  As far as institutions?

2  Q.  Yes.

3  A.  Yes, I worked at the Allegheny County Jail and that was

4  prior to my going into the priesthood.

5  Q.  But in terms of as a chaplain or a chaplaincy program, did

6  you work anywhere --

7  A.  Strictly SCI-Greene.

8  Q.  You're going to have to wait until I complete my question

9  until you answer so the court reporter can get everything

10  down.

11        Briefly, could you explain the duties and

12  responsibilities you had as the Facility Chaplaincy Program

13  Director?

14  A.  I oversaw the chaplaincy department.  I managed the

15  various chaplains that were there, the salaried chaplains as

16  well as volunteer chaplains, contract chaplains.  I also

17  conducted the Catholic service for inmates who were Catholic.

18  Q.  Who did you report to?

19  A.  I reported directly to the CCPM, Jean Mears.

20  Q.  That was the Corrections Classification Program Manager?

21  A.  Program manager.

22  Q.  You said Jean Mears?

23  A.  Jean Mears.

24  Q.  Were there any other CCPMs while you were the Facility

25  Chaplaincy Program Director?

1  A.  Tom Jackson, and I believe Mr. Seiverling, Thomas

2  Seiverling.  And when I left it was Mark Capolza.

3  Q.  As part of your duties, were you responsible or did you

4  have any responsibility with inmate requests for

5  accommodation?

6  A.  I did.

7  Q.  Can you explain briefly your understanding of what the

8  policy for or the process was for an inmate who was seeking a

9  religious accommodation?

10  A.  Yes.  If it was a religion that wasn't currently being

11  accommodated in the institution, the inmate would have to

12  provide documentation and file a form for religious

13  accommodation.  The form would be reviewed by the

14  institutional staff and then forwarded to central office.

15  There was a religious accommodation committee there who would

16  meet and they would decide and vote on the requested

17  accommodation.

18  Q.  Is there a policy where this process is laid out?

19  A.  I believe so.

20  Q.  I have placed in front of you a document marked Exhibit A.

21  Do you recognize this document?

22  A.  I do.

23  Q.  What is it?

24  A.  Religious activities, DC administrative 819-02.

25  Q.  As you go through there's 02, the next page is 819-1 and

1  then the next page is DC-ADM 819.  Do you see that page?

2  A.  Yes, I do.

3  Q.  What is the effective date on that document?

4  A.  The effective date is July 15, 2002.

5  Q.  Does this appear to be the policy that was in effect at

6  some portion of the time you were at SCI-Greene?

7  A.  Yes.

8  Q.  You have just explained the process an inmate would follow

9  for seeking a religious accommodation.  Can you focus

10  specifically on what role you would play in that process.

11  A.  I would initiate the vote sheet to go around.  After I

12  compiled the information, I would make my recommendation,

13  forward it to the institution.  It would eventually end up

14  with the superintendent making his or her decision on the

15  accommodation and then it would be forwarded to central

16  office.

17  Q.  When it would come back from central office, either

18  approved or disapproved, would you have any further role?

19  A.  Yes.  I would have to notify the inmate that the

file:///A|/sharp10-17-07A.txt

20  accommodation was either approved or disapproved.

21  Q.  I think there's been some other testimony in this trial so

22  far about a DC-52 form.  I'd ask you to turn to the last page

23  of Exhibit A.  Can you tell me if that is in fact a DC-52

24  form?

25  A.  That is correct.

1  Q.  That's the form that you are familiar with in terms of

2  requests for accommodation?

3  A.  Yes.

4  Q.  In the course of serving as the Facility Chaplaincy

5  Program Director at SCI-Greene, did you have occasion to come

6  into contact with the plaintiff in this case, Shawn sharp?

7  A.  Yes, I did.

8  Q.  Can you explain to the Court what your interaction with

9  Mr. Sharp was?

10  A.  From what I can recall, Mr. Sharp and myself and Ms. Mears

11  had met one day concerning his participation in Ramadan.  As

12  far as the exact conversation, I don't recall exactly what we

13  talked about or what we accomplished.  I also responded to

14  Mr. Sharp via inmate request forms.

15  Q.  I would like to direct your attention now to what has been

16  placed in front of you as Exhibit B.  Do you recognize that

17  document?

18  A.  Yes, I do.

19  Q.  What is it?

20  A.  This document is a letter, it's a cover letter that goes

21  with the DC-52, the religious accommodation form to the Bureau

22  of Inmate Services, Camp Hill, indicating that the inmate is

23  requesting a service and attached please find the vote sheet.

24  And we'll just forward the response to the institution.

25  Q.  Within that exhibit is there a DC-52 form?

1  A.  Yes.

2  Q.  Can you describe that DC-52 form.  Have you ever seen that

3  DC-52 form before?

4  A.  Yes, I have.

5  Q.  Who prepared that form?

6  A.  This form was prepared by Mr. Sharp.

7  Q.  There are some additional materials that are appended to

8  that.  Did Mr. Sharp provide you with those materials as well?

9  A.  Yes, he did.

10  Q.  Can you tell us what you did -- did you receive that form,

11  the DC-52 form with the attachments from Mr. Sharp?

12  A.  I believe so.

13  Q.  Can you explain what you would have done after receiving

14  that form?

15  A.  Yes.  The last question on the DC-52 requests any

16  publications that explain religious significance of the

17  requested accommodation.  So what I did was I had forwarded

18  his request, along with this information and the vote sheet to

19  the staff that was listed on the vote sheet.

20  Q.  You referenced the vote sheet several times.  Is that this

21  document here?

22  A.  That's correct.

23  Q.  Again, what is the purpose of this vote sheet?

24  A.  The vote sheet is for the institution, for the various

25  staff members of the institution to review the information

1  that I had provided, that the inmate has provided and that I

2  had reviewed.  After I put my recommendation on there, the

3  rest of the voting staff would also make their

4  recommendations.

5        MR. SHARP:  Your Honor, what exhibit is he looking

6  at?

7        THE COURT:  I was going to ask the same question.

8        The vote sheet you're looking at, what is that?

9        THE WITNESS:  Exhibit B, the DC-52.

10        MR. SHARP:  You also had a DC-52.

11        THE WITNESS:  The DC-52 is the one that you

12  completed.

13        MR. SHARP:  Okay.  Got it.

14  BY MR. BRADLEY:

15  Q.  On the vote sheet that's part of Exhibit B, do your

16  initials appear on that document?

17  A.  They do.

18  Q.  Where do they appear?

19  A.  Facility Chaplain Program Director GM.

20  Q.  There is a date?

21  A.  10-21.

22          THE COURT:  I really hate to interrupt.  Can you

23  show me the document you're looking at.

24          I don't have that.  The second page that I have is

25  a blank page.

1  BY MR. BRADLEY:

2  Q.  Below the other initialed blocks on that form there's some

3  handwritten notation.

4  A.  Yes.

5  Q.  Is that your handwriting?

6  A.  Yes, it is.

7  Q.  Can you read what that says?

8  A.  It says:  Inmate can practice his religion privately.

9  Institution cannot accommodate another Muslim sect.  The

10  inmate is most welcome to join the Sunni or the Nation of

11  Islam communities.

12  Q.  That was your response to his request?

13  A.  That was my recommendation.

14  Q.  And just to be clear, the block that is initialed under

15  your position, that's marked as approved?

16  A.  That's correct.

17  Q.  And that was your recommendation?

18  A.  Yes.

19  Q.  Did you have the final say in Mr. Sharp's request for

20  religious accommodation?

21  A.  No, I didn't.

22  Q.  As you've indicated, yours was just a recommendation

23  passed along to the central office?

24  A.  That's correct.

25  Q.  As indicated by the cover letter of Exhibit B, you

1  collected all this information and you forwarded that to the

2  individual indicated in the letter.  That's the first page of

3  Exhibit B?

4  A.  That's correct.

5  Q.  Do you know the result of Mr. Sharp's request for a

6  religious accommodation?

7  A.  I believe it was denied.

8  Q.  If you look at Exhibit C?

9  A.  That is correct.

10  Q.  Is there documentation there, if you could look at all the

11  pages of that exhibit.

12  A.  The top page is the sheet that I sent to Mr. Sharp

13  indicating that the religious accommodation committee denied

14  his request.  The second page is the notification from central

15  office indicating that the request has been denied.  And the

16  third sheet is just the same denial from central office with

17  the deputy secretary's signature on that.

18  Q.  Pursuant to your understanding of the process, the deputy

19  secretary is the one who makes the final decision on the

20  religious accommodation request?

21  A.  Yes.

22  Q.  As you've just described to the Court, is that your

23  involvement, or does that detail your involvement with

24  Mr. Sharp's request for religious accommodation for his

25  religious sect while he was at SCI-Greene?

1  A.  Yes, sir.

2  Q.  Do you know if he -- to your knowledge, did he file any

3  other or did you receive any other requests for religious

4  accommodation to the extent he sought recognition of a

5  particular sect?

6  A.  I believe this was it.

7  Q.  There was some testimony in this case yesterday -- and you

8  were not present here yesterday?

9  A.  No, I wasn't.

10  Q.  There was some testimony yesterday about a videotape of a

11  sermon that was presented by Imam Muhammad at SCI-Greene.  Do

12  you know who Imam Muhammad is?

13  A.  I do.

14  Q.  Who is he?

15  A.  Imam was the Muslim Chaplain who worked for me at

16  SCI-Greene that I supervised.

17  Q.  Did it ever come to your attention that Mr. Sharp was

18  complaining about some things that Imam Muhammad was saying

19  during his sermon during the religious ceremony for the

20  Muslims?

21  A.  Yes, it was brought to my attention.

22  Q.  Who brought it to your attention?

23  A.  I believe the CCPM, Ms. Mears, at the time brought it to

24  my attention.

25  Q.  And as a result did you do anything?

1  A.  Yes, I did.  We reviewed the tape.  All the religious

2  services were videotaped.  We reviewed the tape.  Ms. Mears

3  and I found nothing inflammatory that Imam Muhammad had

4  preached about, and that was it.

5  Q.  So you looked into the matter and found nothing --

6  A.  Absolutely.

7  Q.  At issue, and so --

8  A.  We responded to Mr. Sharp indicating that there was

9  nothing that we reviewed and there was nothing inflammatory

10  about the remarks that Imam made.  If I'm not mistaken, I

11  believe security as well reviewed the tapes because security

12  would become involved with all the religious services, not

13  only for content but also for the inmate's participation and

14  their behavior basically during the service, every group is

15  monitored.

16  Q.  If there had been a security issue or if there had been

17  something present on that tape that could have caused issues

18  or problems amongst the Muslim inmates at SCI-Greene, what

19  would you have done?

20  A.  We would have met -- I mean I would have met with Imam

21  Muhammad, I would have met with security and we would have

22  just taken it from there to see what steps could be remedies

23  to prevent any kind of --

24  Q.  After your review of the tape that was not required?

25  A.  No.

1  Q.  Can you recall any other interactions you had with

2  Mr. Sharp while he was at SCI-Greene, any discussions you had

3  concerning his request to have recognition of his religious

4  groups?

5  A.  Offhand, I can't recall.

6  Q.  Did you ever tell Mr. Sharp that he was not allowed or was

7  not permitted to believe or profess any particular religion?

8  A.  Absolutely not.

9  Q.  Did you ever exclude or prevent Mr. Sharp from

10  participating in any religious event?

11  A.  No, sir.

12        MR. BRADLEY:  That's all the questions for this

13  witness, Your Honor.

14        THE COURT:  Mr. Sharp, you may cross-examine.

15              CROSS-EXAMINATION

16  BY MR. SHARP:

17  Q.  How are you doing, Chaplain Moneck?

18  A.  I'm fine.  Thank you.

19  Q.  I was going back and I was looking at your statement.  I

20  don't know what it was marked as, I believe it was Exhibit B

21  at the DC-53, Evaluations for Religious Accommodations form,

22  I'll read it off that way --

23          THE COURT:  I'm sorry, Mr. Sharp, I couldn't hear

24  you and I'm not sure what you're looking at.

25          MR. SHARP:  The DC-53, I believe it was part of

1 Exhibit B, Evaluation For Religious Accommodations form.

2 BY MR. SHARP:

3 Q.  You state -- you did write the comments that are listed

4 here, could you read those comments again?

5 A.  The comments that I wrote:  The inmate can practice his

6 religion privately.  Institution cannot accommodate another

7 Muslim sect.  The inmate is most welcome to join the Sunni

8 Muslim or NOI communities.

9 Q.  I'd like to go to -- the DC-52 is the next thing that I'm

10 going to.

11        Could you read the -- describe in detail your

12 religion basic tenets, the first three lines?

13 A.  "I am a member an adherent of the Ash'ariy Madhaab of

14 belief."

15 Q.  What does that mean?

16 A.  You're describing what you believe.

17 Q.  What does that mean?

18 A.  That that's what you practice.

19 Q.  What does that entail?  What are the beliefs behind that?

20  A.  I don't know.

21  Q.  Did you do any investigation to find out what the

22  difference was between --

23  A.  No.

24  Q.  My beliefs and what I was claiming?

25  A.  No, sir.

1  Q.  You didn't.  So, you automatically assumed, I'm presuming,

2  right, that my beliefs would have been able to be accommodated

3  according to your comments, because in your comments, don't

4  you say that I should be able to be accommodated by the Sunni

5  or Nation of Islam community?

6  A.  Uh-huh.

7  Q.  So what you're saying is that, if I'm -- correct me if I'm

8  wrong, my faith, my particular beliefs are in conformity with

9  one of these two communities?

10  A.  No.  That's not what I said.

11  Q.  Stop there.  That's all I asked you.  You answered the

12  question.

13       Then the question becomes if the answer is no, what

14  would be done?

15       THE COURT:  I'm sorry, Mr. Sharp, if the answer is

16  no to what?

17  BY MR. SHARP:

18  Q.  If the answer is no that my beliefs are not in conformity

19  with these other two communities, right, then what were my

20 alternatives?

21 A.  You were able to practice privately your religious faith.

22 Q.  Thank you.

23      Okay.  Would I be separate and distinct as an

24 individual desiring to practice that would be any different

25 from the Sunni Muslim community that's already practicing or

1  the Nation of Islam?

2  A.  Repeat that, please.

3  Q.  Would I be, as an individual, any different as a human

4  being desiring to practice their religion than the Sunni

5  Muslim community that was currently practicing, or the Nation

6  of Islam?

7  A.  No, I would say not.

8  Q.  So, I wouldn't be any different?  Okay.

9         Then I'm kind of puzzled as to how I can be

10  accommodated if you're saying that or if you're saying that I

11  can be accommodated but that you don't know what my beliefs

12  are.  How could you come to that conclusion?

13  A.  What I said was the institution could not accommodate your

14  practice at the time.  That's why you needed to complete the

15  DC-52 and forward your information to central office.  We've

16  had groups that have requested accommodation, groups that were

17  accepted, groups that were denied.  If the central office said

18  that we would have to accommodate you, then we would have to

19  provide someone to lead the religious, the group, your

20  session, as the Imam leads the Jumah service, because as you

21  well know there are no inmate led services in our

22  institutions.

23  Q.  I have to disagree with that.

24        MR. SHARP:  I will have to object to that, Your

25  Honor, that's not true.

1        THE COURT:  You can't object to his testimony.

2   That's his testimony.  You can take issue with it, but you

3   can't object to it.

4        MR. SHARP:  Thank you.

5        Can I object to it on the basis of it being

6   speculative, that he's not at each institution, can I do that?

7        THE COURT:  You can ask him how he knows that.

8   BY MR. SHARP:

9   Q.  How would you know that?

10  A.  It was part of the DC-Administrative orders.  If there's

11  an inmate-led service, there has to be a staff member present.

12  Q.  Right.  That's correct.  I agree with that.

13  A.  But SCI-Greene was not in a position at that time to

14  afford another chaplain to sit through the services.

15  Q.  So, in other words, what you're saying is that no other

16  service was being provided other than that service led by

17  either Imam Abu Bakr or Chaplain Bakr, or I believe the

18  minister's name was Minister Hoffey -- I can't remember the

19  Nation of Islam's name.

20  A.  Anderson.

21  Q.  So those were the only two available options for me,

22  right?

23  A.  That's right, to practice in a group.

24  Q.  And I wanted that to be clear.

25          Could you read the next line for me?

1  A.  This is separate and distinct from all other so-called

2  Sunni groups such as the Salafi/Wahabi sect.

3  Q.  Salafi or Wahabi sect, correct?  What does Salafi or

4  Wahabi sect mean?

5  A.  I just surmise that it's a sect of the Muslim religion, a

6  different sect.

7  Q.  So you didn't do any other investigation other than to

8  come to the conclusion that you made here that I can practice

9  my religion privately and solely -- or be accommodated by the

10  Sunni or Nation of Islam, however, you have here a stack of

11  information, am I correct?  Where did this information come

12  from?

13  A.  I assume that you provided it, Mr. Sharp.

14  Q.  Okay.  If I provided this information, did you read it?

15  A.  We read it.  The entire committee read it.

16  Q.  Did you understand it?

17  A.  Well, it's not for me to understand, is it?

18  Q.  I'm glad you brought that point up.  I wanted you to say

19  you didn't understand it and I'm glad you said that.  So if

20  you can't understand what you read in all of this stuff here,

21  how would you understand what would offend me about what Imam

22  Abu Bakr's speech was?

23  A.  What you accused the Imam of saying we did not hear.  You

24  accused him of slandering you and we did not hear him pick

25  anyone out, we didn't hear him accuse anyone and that's where

1  we came out -- that's what we looked for and we found nothing.

2  Q.  Did you hear him say Wahabi?

3  A.  I can't recall, Mr. Sharp.

4  Q.  Did you hear him say Ash'ari?

5  A.  I can't recall.

6  Q.  At the time you were reviewing the tape, did you have any

7  idea what a Habashi was?

8  A.  I was under the impression it was an unbeliever.  I don't

9  know.

10  Q.  Just for your information, that's what they called me and

11  I'm not an unbeliever.

12      MR. BRADLEY:  I'm going to object to him

13  testifying.

14      THE COURT:  It's not your opportunity to testify.

15  You must ask the witness questions.

16  BY MR. SHARP:

17  Q.  To your knowledge, it was an unbelief?

18  A.  Yes.

19  Q.  Were you aware of the fact that that was the name of a

20  religious group of which I'm a part of?

21  A.  No, sir.

22  Q.  You were not?

23  A.  No.

24  Q.  So you compiled all this information and you were able to

25  review a tape to determine whether or not he said something to

1  offend me, but you didn't even know what I was?

2  A.  You accused the Imam of defaming your character and we

3  heard nothing -- your name was not mentioned at all.

4  Q.  Okay.  Could you read the next line.

5  A.  We are also sometimes called by these group Habashi and an

6  entire three-week sermon was given by the current Chaplain Abu

7  Bakr claiming our deviance from his/their belief.

8  Q.  Stop right there.  So, in my religious accommodation that

9  I wrote to you, nowhere does it say -- did I mention him by

10  name, does it?  Does it say that?

11  A.  On the religious accommodation form?

12  Q.  Right.  On my religious accommodation form, does it say

13  anywhere or in any grievance that I filed, does it say he

14  specifically mentioned me by name is what you just said?

15  A.  No.  You stated he claimed our deviance from our beliefs.

16  Q.  Right, that we are deviants, that's what a Habashi is,

17  isn't that what I said?

18  A.  Yes, it is.

19  Q.  So when you were reviewing the tape, if you had no idea

20  that what I was saying was that he was speaking about the

21  Habashi community, how could you determine whether or not that

22  tape contained derogatory statements toward our community?

23  A.  Because he did not slander you personally, Mr. Sharp.

24  Q.  So, in other words, you're saying because he did not

25  mention me by name, that meant that he did not say anything

1  that was defaming to my faith?

2  A.  That's what we derived.

3        MR. SHARP:  No further questions, Your Honor.

4        MR. BRADLEY:  Nothing further, Your Honor.

5        THE COURT:  Thank you.  You may step down.

6        MR. BRADLEY:  Your Honor, may the witness be

7  excused?

8        THE COURT:  Yes.

9        MR. BRADLEY:  I next call Imam Ibrahiym.

10       TANKO IBRAHIYM, a witness having affirmed, testified as

11  follows:

12                DIRECT EXAMINATION

13  BY MR. BRADLEY:

14  Q.  Good morning, sir.  Could you state your name.

15  A.  My name is Tanko Ibrahiym.  T-A-N-K-O, I-B-R-A-H-I-Y-M.

16  Q.  What is your present occupation?

17  A.  Islamic chaplain.

18  Q.  Who are you employed by?

19  A.  Institution SCI-Fayette now.

20  Q.  State Correctional Institution at Fayette?

21  A.  Yes.

22  Q.  As part of the Pennsylvania Department of Corrections?

23  A.  Yes.

24  Q.  How long have you been employed by the Pennsylvania

25  Department of Corrections?

1  A.  Eleven years now.

2  Q.  Were you ever assigned to the State Correctional

3  Institution at Pittsburgh?

4  A.  I was.

5  Q.  Do you recall what years you were there?

6  A.  1998 to 2004 when it was closed.

7  Q.  And you were employed as a chaplain?

8  A.  Islamic chaplain.

9  Q.  Is there a particular religion or sect of Islam that you

10  follow or practice?

11  A.  Sunni Jama'ah, S-U-N-N-I, W-A-L J-A-M-A-A-H, Sunni wal

12  Jama'ah.

13  Q.  What are your duties -- let me take you back to the time

14  you were at SCI-Pittsburgh.  What were your duties as the

15  Islamic chaplain there?

16  A.  Provide Islamic services to inmates, Muslim inmates and

17  spiritual counseling.

18  Q.  Did you also provide or lead study groups for Muslim

19  inmates?

20  A.  Yes.  We provide study groups, Islamic study groups,

21  teaching.

22  Q.  You'll have to wait until I finish my question so that she

23  can take down everything.

24  A.  Okay.

25  Q.  I'll try to keep it straight.

1    Other than the study services, and those are called

2 Taleem?

3 A.  Taleem, yes, study cycle.

4 Q.  The services are called the Jumah?

5 A.  Jumah which takes place on Friday Islamic service.

6 Q.  Other than the Jumah and the Taleem, what else was offered

7 for the Muslim inmates by the Department of Corrections at

8 SCI-Pittsburgh?

9 A.  We provided them with Islamic literature, books and

10 pamphlets.

11 Q.  And are those provided upon request by the individual

12 inmates?

13 A.  Individual inmates, yes.

14 Q.  Is there anything else?  Did you offer anything else to

15 the Muslim inmates while you were the Islamic chaplain at

16 SCI-Pittsburgh?

17 A.  Like what do you mean?

18 Q.  Other than the Jumah and the Taleem and the availability

19 of literature, and you would provide spiritual counseling if,

20  again, requested by an individual?

21  A.  If the inmate requests, yes.

22  Q.  Does that pretty much cover what you offered to the Muslim

23  inmates?

24  A.  Then we make rounds also to RHU, restricted housing units

25  to visit Islamic Muslims in the RHU.

1  Q.  While you were at SCI-Pittsburgh, did you come into

2  contact -- did you come to know Mr. Shawn Sharp?

3  A.  Yes.

4  Q.  Do you recall the first time you met with him or talked

5  with him?

6  A.  Yes, when he came to Jumah, when I came in 1998.

7  Q.  While you were the Islamic chaplain at SCI-Pittsburgh, did

8  Mr. Sharp attend the Jumah services?

9  A.  Yes.  He attended the Jumah services.

10  Q.  He attended them regularly?

11  A.  Regularly.

12  Q.  Did he also attend the Taleem studies?

13  A.  Yes, he attended Taleem studies regularly.

14  Q.  At some point, did Mr. Sharp indicate to you that he

15  wanted a religious accommodation for a group of Muslims he was

16  involved with?

17  A.  Yes, he did.

18  Q.  What do you recall about that?

19  A.  He told me that he wants to have his group to get dates

20  and the time to practice religion.

21  Q.  I'm handing you a document that's previously been marked

22  as Exhibit 1.  Do you recognize this?

23  A.  Yes.

24  Q.  Did this come from Mr. Sharp?

25  A.  Mr. Sharp, yes.

1    MR. SHARP:  What exhibit?

2    THE WITNESS:  Exhibit 1.

3    THE COURT:  It's your exhibit.

4    MR. SHARP:  I just wanted to know which one he's

5  talking about.

6  BY MR. BRADLEY:

7  Q.  On the subject line, can you read what that says?

8  A.  Religious accomodation request for Ahlus Sunnati wal

9  Jama'ah.

10  Q.  So the request he's making is for the same religion that

11  you are?

12  A.  Yes.  Ahlus Sunni.

13  Q.  When Mr. Sharp gave you that document, did he give you any

14  other books or literature with that?

15  A.  I cannot recall, just this.

16  Q.  Just the paper?

17  A.  Yes.

18  Q.  What did you do when you received that paper from

19  Mr. Sharp?

20  A.  As soon as I received this paper, I read it and take it to

21  my supervisor, Father William Terza.

22  Q.  Did you have any discussions with Father Terza about that

23  request?

24  A.  He asked me what is the difference between this and the

25  group, Jama'ah.  By the name, they're the same.  Jama'ah Sunni

1  means Muslims who only attach themselves to Qur'an and

2  authentic ideas, hadrth, H-A-D-R-T-H, of the Prophet Muhammad.

3  Q.  Did you have any other discussion with Father Terza about

4  that request?

5  A.  That's what we discussed.

6  Q.  So based on the name of the group he was seeking

7  accommodation for, that group was already being provided

8  accommodation at SCI-Pittsburgh?

9  A.  Basically, by the name, yes.  What he said here, we have

10  that services, Sunni wal Jama'ah.

11  Q.  So individuals identifying themselves as

12  Sunni wal Jama'ah were able to participate in the Jumahs and

13  the Taleems that you were conducting?

14  A.  Yes.

15  Q.  As part of the Muslim faith, a group or congregation

16  worship service, is that a fundamental requirement of the

17  religion?

18  A.  Jumah is a fundamental requirement which is a group

19  service which comes only once a week, on Friday.

20  Q.  If an adherent isn't able to attend a Jumah, can he still

21  practice his religion?

22  A.  Yes.

23  Q.  How will he do that?

24  A.  He can pray zuhr, Z-U-H-R, prayer.

25  Q.  You had indicated that Mr. Sharp attended regularly,

1  attended your Jumah services and your Taleem studies?

2  A.  Yes.

3  Q.  There came a time when he was placed in the restricted

4  housing unit.  Did you visit with Mr. Sharp in the restricted

5  housing unit?

6  A.  Many times.  All the time if I visited, do my rounds, I

7  visited him.

8  Q.  Did you provide him with literature, if he requested it?

9  A.  If he requested it, yes.

10  Q.  Did you ever tell Mr. Sharp that he could not attend your

11  Jumah services?

12  A.  No, not at all.

13  Q.  Did you ever tell Mr. Sharp he could not attend your

14  Taleem studies?

15  A.  No.

16  Q.  Mr. Sharp has testified that you are of the Wahabi sect;

17  is that true?

18  A.  No, not really.

19  Q.  Can you explain?

20  A.  Well, the Sunni was Wahabi, but Sunni, as I say is a

21  Muslim who believe in the Qur'an.  Sunni are those who believe

22  in the book called Qur'an, the prophet.  And they follow the

23  hadrths of the Prophet Muhammad, authentic hadrths.

24  Q.  So you are not Wahabi?

25  A.  No.

1  Q.  Exhibit No. 1 in front of you, is that the only document

2  you recall ever receiving from Mr. Sharp requesting a

3  religious accommodation?

4  A.  Yes.

5  Q.  Are you familiar with the DC-52 form request for religious

6  accomodation?

7  A.  Yes.

8  Q.  Did you ever receive a form like that from Mr. Sharp?

9  A.  No.

10  Q.  Do you recall ever receiving a group of 40 DC-52s from

11  other inmates?

12  A.  Not really I don't.  I can't recall.

13      MR. BRADLEY:  That's all the questions I have, Your

14  Honor.

15      THE COURT:  You may cross-examine, Mr. Sharp.

16          CROSS-EXAMINATION

17  BY MR. SHARP:

18  Q.  Brother Ibrahiym, you said I attended on a regular basis

19  the Jumah and the Taleem, correct?

20  A.  Yes.

21  Q.  Did you lead the prayer?

22  A.  Yes, I lead the prayers and we also led inmates.  I lead

23  the prayer.  I also let inmate lead the prayer.

24  Q.  When you're -- have you ever seen me personally, with your

25  two eyes -- let me ask you this.  Is it possible for you to

1  stand leading the prayer and see where I'm at?

2  A.  If somebody is leading the prayer, he should not turn his

3  back to see who is behind him.

4  Q.  So would you -- if you're leading the prayer, would you be

5  able to determine if I'm praying with you?

6  A.  When I finish prayer I see you in the position, I would

7  tell him, yeah, you pray behind me.

8  Q.  So when you turn around, you would assume that I would be

9  praying with you?

10  A.  When we finish the prayer, it's completed, the Imam turns

11  around and see who is behind him.

12  Q.  And they would -- whoever is praying would be praying with

13  you?

14  A.  He would be praying with me, yes.

15  Q.  You said you are Ahlus Sunnati wal Jama'ah.  You said you

16  do not personally call yourself a Wahabi, right?

17  A.  I do not call myself personally a Wahabi, no.

18  Q.  Do you accept the teachings of Muhammad Ibn Abdul Wahab?

19  A.  Same name talk about Tauhid, T-A-U-H-I-D.  Tauhid --

20          THE COURT:  He's answering your question.

21          MR. SHARP:  I asked him did he follow the teachings

22  and he's going into telling me who he is.  I asked him

23  specifically do you follow the teachings of Muhammad Ibn Abdul

24  Wahab?

25          THE WITNESS:  We follow the teaching of Muhammad,

1  Prophet Muhammad, so peace be upon him.  That's an explanation

2  of what I say.

3  BY MR. SHARP:

4  Q.  So are you saying that you reject Muhammad Ibn Abdul

5  Wahab's teachings?

6  A.  I'm not saying I reject.  I'm not saying I reject his

7  teaching.

8  Q.  Do you believe that his teachings are consistent with the

9  teachings of Muhammad the Prophet?

10  A.  He teaches, his teachings are consistent with the Prophet

11  Muhammad.

12  Q.  Do you believe that Ibn Taymiyyah's teachings are

13  consistent with the teachings of the Prophet?

14  A.  I believe Ibn Taymiyyah's teachings are consistent with

15  Muhammad's teachings.

16  Q.  So if a person rejected either one of their particular

17  teachings on belief, would they be considered a Sunni Muslim

18  to you?

19  A.  They could be considered a Sunni Muslim.

20  Q.  I didn't ask you if they could be, I said, are they

21  considered to be a Sunni Muslim to you?

22  A.  Yes.

23  Q.  They are a Sunni Muslim to you?

24  A.  Yes.

25  Q.  Do you follow the Ash'ari methodology of belief?

1  A.  I do not follow a particular belief.  I follow what the

2  prophets Sallahu, Wasalam teach.  S-A-L-L-A-H-U.

3  W-A-S-A-L-A-M.

4  Q.  So you do not ascribe to the Ash'ari methodology?

5  A.  I don't ascribe to Ash'ari methodology.

6  Q.  Do you follow a particular madhaab, M-A-D-H-A-A-B,

7  madhaab, do you follow a particular madhaab?

8  A.  I do not follow a particular madhaab.

9  Q.  Let me ask you this.  Around the world, globally, how many

10  people claim to follow the Sunni methodology?

11  A.  Around the world?  I don't know.  You say around the

12  world?

13  Q.  Just guessing, just --

14  A.  Really, don't know.

15        THE COURT:  This is calling for speculation.  He's

16  not going to be allowed to do that.  He says he doesn't know.

17  BY MR. SHARP:

18  Q.  Are there numerous groups who claim to be Sunni?

19  A.  There are.

20  Q.  So do they all have the same belief?

21  A.  I don't know.  I don't know.

22  Q.  You don't know?

23  A.  No.  Like you claim to be Sunni, but you say you are

24  Ash'ari, so you can claim Sunni but you are somebody else.

25  Q.  So who is Imam Ash'ari?

1  A.  I don't know who he is.

2  Q.  You don't know anything about him?

3  A.  No.

4  Q.  Let me ask you something.  Where is your Islamic education

5  from?  Could you tell me your background, your history, your

6  education, your qualifications to be an Islamic chaplain?

7  A.  I was born and raised in Nigeria and I studied at the

8  Islamic university called Benson University.  This is an

9  Islamic university recognized by all Islamic institutions in

10  the world.  I have BA, Bachelor of Islamic Education and

11  English Studies.

12  Q.  And English?

13  A.  Islamic studies and English studies.

14  Q.  So are you telling me that you would have no idea who Imam

15  Ash'ari is?  You went to school but you never heard of this

16  scholar?

17  A.  No.

18  Q.  You never heard of him?  You've never heard of Imam

19  Maturidi?

20  A.  No.

21  Q.  You've never heard of Abu Hanifah, A-B-U, H-A-N-I-F-A-H;

22  Imam Ashari, A-S-H-A-R-I; Imam Maturidi, M-A-T-U-R-I-D-I?  You

23  never heard of Abu Hanifah?

24  A.  I heard of Abu Hanifah.

25  Q.  Have you ever heard of any of the four schools or

1  madhaabs?

2  A.  I have heard about all the four madhaabs.

3  Q.  What do you know about them?

4  A.  The four madhaabs were Sunni Jama'ah, all of them.

5  Q.  So do you follow that madhaab?

6      MR. BRADLEY:  Asked and answered, Your Honor.

7      THE COURT:  Sustained.

8      MR. SHARP:  Did I ask him?

9      THE COURT:  You did.

10      MR. SHARP:  I completely forgot that I asked him.

11  BY MR. SHARP:

12  Q.  You do not follow madhaab.  So I'm curious to know what is

13  the distinction between what these four schools who you say

14  were Ahlus Sunni is and what you practice.

15  A.  In what sense?  I don't understand your question.

16  Q.  In other words, you say that these four schools are called

17  Ahlus Sunnati, right?

18  A.  Yes.

19  Q.  But when it comes to you being a Sunni Muslim, why don't

20  you practice from these four schools then if that is an Ahlus

21  Sunni teaching?

22        MR. BRADLEY:  Your Honor, I'm going to object to

23  that question because I think it's asking his personal belief

24  and it doesn't really have any impact on what he was providing

25  for the inmate at SCI-Pittsburgh.

1          THE COURT:  The objection is sustained.

2          MR. SHARP:  I'm going to add that, Your Honor, the

3   reason why I'm asking this is because if he is a person with a

4   different belief than me, right, and he's saying that he is

5   Sunni and I'm saying that I am Sunni, and we're establishing

6   that there is a difference in our beliefs, a dramatic -- I

7   would say a dramatic difference, then I would like to lay the

8   groundwork to establish what those differences are.

9          THE COURT:  The objection is sustained.

10          MR. SHARP:  Thank you.  I'll move on.

11  BY MR. SHARP:

12  Q.  You said that you received paperwork from me as an

13  individual?

14  A.  This is what you gave me, yes, what's in my hand.

15  Q.  Do you recall actually getting that?  Can you read the top

16  heading of that paper for me, please.

17  A.  To Superintendent J. Price, Deputy Superintendent

18  Stickman, Deputy Superintendent Dickson, Deputy Superintendent

19  C. Blaine, Program Manager, R. Winstead and Islamic Chaplain.

20  Q.  So is that something that I personally put in your hand?

21  A.  Yes.

22  Q.  When did I do that?

23  A.  When you started asking for services, different services

24  from Sunni wal Jama'ah.

25  Q.  And how long after you arrived at SCI-Western did I start

1  asking for that?  Was it immediate?

2  A.  No, it wasn't immediate because you attended the Jumah and

3  the Taleem.

4  Q.  Was it a week?

5  A.  It's more than that.

6  Q.  Two weeks?

7  A.  It's more than that.

8  Q.  Are you aware of the fact that I was only in population

9  for one month?

10  A.  I'm not aware of that.  I know you come into the services

11  regularly.

12  Q.  If I'm not mistaken, I'm just curious as to whether or not

13  that was -- you were aware of that.  But nevertheless, you

14  also stated that I never gave you any other form other than

15  that form; is that true?

16  A.  That's right.

17  Q.  We never compiled the list together of approximately 40

18  inmates at your instruction that were written requests for

19  religious accommodation?

20  A.  You submitted the names of inmates by your own

21  handwriting.

22  Q.  Excuse me.  Say that again.

23  A.  By your own handwriting.

24  Q.  By my own handwriting?

25  A.  Yes.

1  Q.  So you got 40 requests that were written by my hand?

2  A.  It's not 40 requests, it's a list of names with their

3  numbers with your own handwriting telling me these are the

4  people who were at the prayer service.

5  Q.  You're saying you never instructed me to fill out -- that

6  we each had to individually fill out a religious accommodation

7  request, you never said that?

8  A.  That's what I advised you to do, not to give me the

9  names --

10        THE COURT:  Mr. Sharp, excuse me.  You asked a

11  question.  The witness will be permitted to answer it.  Do not

12  interrupt.

13        MR. SHARP:  Okay.  All right.  Fine.

14        THE COURT:  You may answer.

15        THE WITNESS:  That's what I advised you to do, let

16  each individual inmate make out a request and then submit it

17  to me.

18  BY MR. SHARP:

19  Q.  You're saying that no inmates ever submitted any request

20  to you for religious accomodation from our faithful?

21  A.  Inmates submitted to me through you.  You collected --

22  again, you collected the request and give it to me, not

23  individual inmate.

24  Q.  Wait.  Wait.  Wait.  Wait.  I'm trying to understand.  You

25  have me puzzled.  You're saying 40 inmates gave me requests to

1  give to you?

2  A.  It's not that number.  It was 15 inmates.

3  Q.  Fifteen inmates gave me requests to give to you?

4  A.  And then you give it to me, yes.

5  Q.  So there were handwritten requests that were given to you?

6  A.  The first one was handwritten with those names, you give

7  it to me and I advise you and told you, go back and tell the

8  inmates that they should write individual -- their own

9  request.

10  Q.  Okay.

11  A.  Then you went back, you collected the request and bring it

12  to me.

13  Q.  Mine wasn't part of it?

14  A.  Yours was part of it.

15  Q.  So I did submit a written request to you?

16  A.  You did.

17  Q.  What did you do with that request that I submitted to you?

18  A.  As soon as I get it, I took it to my supervisor, Father

19  William Terza.

20  Q.  What did he do with it?

21  A.  I don't know what he did with it, but I gave it to him.

22  Q.  So you're saying that the requested -- handwritten request

23  we did give you or that I did give you, you submitted to

24  Chaplain William Terza?

25  A.  That's the general communication I have to follow.

1 Q.  So I did fill out a written request for religious

2 accommodation by hand and give it to you to be handed in to

3 Chaplain Terza?

4 A.  Which I did.

5         MR. SHARP:  No further questions.

6         MR. BRADLEY:  Nothing further, Your Honor.

7         THE COURT:  Thank you, sir.  You may step down.

8         MR. BRADLEY:  Defendants call Rhoda Winstead to the

9 stand.

10       RHODA WINSTEAD, a witness having been duly sworn,

11 testified as follows:

12                DIRECT EXAMINATION

13 BY MR. BRADLEY:

14 Q.  Could you please state your name for the record and spell

15 it?

16 A.  Rhoda, R-H-O-D-A, A. Winstead, W-I-N-S-T-E-A-D.

17 Q.  What is your present occupation?

18 A.  I am a superintendent at SCI Cambridge Springs.

19 Q.  That's with the Pennsylvania Department of Corrections?

20  A.  Yes, it is.

21  Q.  When did you begin your employment with the Pennsylvania

22  Department of Corrections?

23  A.  In 1979.

24  Q.  What was your position when you first started?

25  A.  I was a teacher.

1  Q.  Was there a time when you became the corrections

2  classification program manager at SCI-Pittsburgh?

3  A.  Yes.

4  Q.  Do you recall what years you served in that position?

5  A.  I believe that was 1997 to about 1999.

6  Q.  Briefly, what were the duties of the corrections

7  classification program manager?

8  A.  As a program manager, I supervised the various treatment

9  programs within the institution, of which chaplaincy was one

10  of them, psychology, inmate employment, inmate records,

11  education activities, volunteer programs.

12  Q.  You indicated that the chaplaincy department was under

13  your supervision?

14  A.  Yes.

15  Q.  When you were at SCI-Pittsburgh, who was the Facility

16  Chaplaincy Program Director?

17  A.  Oh, let's see, we started out with Father Salzburg.

18  Father Salzburg went on leave.  And the next one was Father

19  McKenna, who was there briefly, and then Father Terza followed

20  Father McKenna.

21  Q.  And Father Terza was here yesterday and testified?

22  A.  That's correct.

23  Q.  You've heard testimony about the DC-ADM 819 policy for

24  religious accomodation?

25  A.  Yes.

1  Q.  Are you familiar with that policy?

2  A.  Yes.

3  Q.  Do you have a role to play when an inmate makes a request

4  for a religious accomodation?

5  A.  Presently, the form, and I don't know the exact number of

6  it is -- did I then or do I now?

7  Q.  I'm sorry, when you were the program manager at

8  SCI-Pittsburgh.

9  A.  The program manager, on the form that I believe we use

10  now, I do.  The form that you're referring to before -- do you

11  have a copy of it because I don't sort of recall that form at

12  that time that I think he filled out.

13  Q.  The --

14  A.  One that was Exhibit 1 or 2.

15  Q.  Is that the form you were discussing?

16  A.  There's no place for my signature, so I assume I didn't

17  take a part in this at that time.

18  Q.  As the program manager at SCI-Pittsburgh, do you recall

19  ever being involved in requests for religious accommodations

20  in terms of making a recommendation?

21  A.  No.

22  Q.  I've also placed up there what has been previously marked

23  as Exhibit 1.  Have you ever seen that document?

24  A.  I may have.  I can't say unequivocally yes and that I read

25  everything in it, no, I can't say that I did that.

1  Q.  While you were at SCI-Pittsburgh, did you ever come into

2  contact or did you ever come to know the plaintiff in this

3  case, Shawn Sharp?

4  A.  I believe I attended a meeting that he was present at that

5  I can recall at Pittsburgh.

6  Q.  Prior to that meeting, did you ever have any discussions

7  with him about religious accommodation that you recall?

8  A.  Not that I recall, no.  Prior to that meeting in

9  Pittsburgh?

10  Q.  In Pittsburgh.

11  A.  Not that I recall.

12  Q.  Now, that meeting that you do recall, can you tell us what

13  you do recall about that?

14  A.  Well, as I recall, we were getting ready for Ramadan and

15  there was a lot of planning that would be involved because we

16  had a large number of inmates who practiced Islam at

17  Pittsburgh and to get some order and some structure to the

18  process, we had a meeting with some of the inmate

19  representatives that represented the various groups or sects

20  that participated, and I do believe vaguely that Mr. Sharp was

21  at that meeting.

22  Q.  If I can stop you there.  I don't know that we have any

23  detailed testimony about this to this point, at least to your

24  understanding -- let me ask you this first.  Are you a Muslim?

25  A.  No, I am not.

1  Q.  So you do not practice the Islamic faith?

2  A.  No, I do not.

3  Q.  What is your understanding of what or at least what was

4  provided institutionally for the inmates during Ramadan?

5  A.  Well, that was a time of the year where the Islamics would

6  fast and pray, and I think that they didn't -- I know they

7  didn't eat after sunrise and did not eat until after sundown a

8  meal, so they fasted all during that period for -- I don't

9  want to say 40 days because I don't know the exact number of

10  days, but during that period they would practice their -- the

11  fasting.  And at the end of that period, there was a feast and

12  every evening before having their dinner meal, they would

13  break the fast with raisins or whatever before having their

14  meal.  But it was a holy period for them during that time, a

15  high holy period with the religion.

16  Q.  A lot of those things that you just discussed would run

17  counter to the normal institutional food service hours and

18  things of that nature?

19  A.  Yes, because we would, for instance, have to give them

20  breakfast bags so they could eat their breakfast prior to the

21  meal being served in the dietary department and serve their

22  dinner later than the normal population or the population that

23  did not celebrate Ramadan.

24  Q.  And this was for an extended period of days?

25  A.  Yes.

1  Q.  And that's why it was necessary to conduct some

2  preliminary planning so you could accommodate everybody?

3  A.  Yes.  And along with the breaking of the fast, there was a

4  prayer before the meal, a group prayer.

5  Q.  And that was also accommodated?

6  A.  Yes.

7  Q.  Specifically with this meeting with Mr. Sharp, do you

8  recall anything about that meeting other than that you engaged

9  in planning to accommodate the Muslims for that Ramadan?

10  A.  No, I don't recall.

11  Q.  Did Mr. Sharp ever indicate to you or make a request to

12  you to review or make a recommendation on his request to have

13  his specific religious group recognized by the Department of

14  Corrections?

15  A.  At Pittsburgh?

16  Q.  At Pittsburgh.

17  A.  Not personally that I recall.  I mean he could have sent a

18  request slip, I don't recall whether I ever got one or

19  answered it or whatever, that I recall.

20  Q.  As the program manager, would it have been your decision

21  to approve a request for recognition of a religious group?

22  A.  At that time with the form that you're showing me and this

23  policy, apparently not.  I don't think so.

24  Q.  Do you recall at that time ever being the person that made

25  the decision about whether to approve or disapprove the

1  religious accommodation?

2  A.  Do I recall?

3  Q.  Do you recall?

4  A.  I recall that I was not the person.

5  Q.  That's what I'm trying to establish.  You were not the

6  person.  As the program manager, it was not your

7  responsibility to decide whether or not a religious

8  accommodation was to be approved or disapproved?

9  A.  That's correct.  I was not the person.

10  Q.  At this point, you don't recall even being asked to make a

11  recommendation?

12  A.  The only thing that I recall after seven years and

13  thousands of inmates is that I was at the meeting and sort of

14  vaguely what happened and what the purpose of the meeting was,

15  but the specifics, it's not clear.

16  Q.  And, again, you said the purpose of that meeting was to

17  plan for the scheduling of the events for Ramadan for the

18  Muslim inmates at SCI-Pittsburgh for that year?

19  A.  That's correct.

20  Q.  Do you recall after that meeting, did you have any

21  interaction or conversations with Mr. Sharp about his

22  religion?

23  A.  No.

24        MR. BRADLEY:  That's all the questions I have for

25  this witness, Your Honor.

1       THE COURT:  You may cross-examine.

2              CROSS-EXAMINATION

3  BY MR. SHARP:

4  Q.  How are you doing, Ms. Winstead?

5  A.  Fine.

6  Q.  Do you recall a grievance, I believe the grievance number

7  we filed it as an exhibit PIT 099 -- something to that

8  effect -- 99, something to that effect.  Do we have that

9  exhibit?

10       THE COURT:  That would be Exhibit 4.

11       THE WITNESS:  Not until I saw it a few days ago,

12  weeks ago.

13  BY MR. SHARP:

14  Q.  Did you respond to that?

15  A.  Yes, I did.

16  Q.  What was your response, your personal response?  Could you

17  read it out loud so we could hear it because I don't have it

18  in front of me.

19  A.  "At the meeting you mentioned on November 28, 1999, it was

20  verified that all staff mentioned received a copy of your

21  proposal.

22          In accordance with DC-ADM 819-3 for religious

23  accommodations, you were to submit the proper form requesting

24  such an accommodation for you as an individual.  Any other

25  inmates requesting an accommodation must be filed

1  individually.  Your form should be forwarded to the chaplaincy

2  coordinator.  Your form was improperly filed.

3        "Your concern regarding to attend Taleem has been

4  addressed.  All inmates requesting to attend are supplied with

5  a pass."

6  Q.  Could you read the beginning of -- well, I'll just

7  summarize because you don't want to have to have her read the

8  whole entire original agreement.

9        THE COURT:  You have to ask her a question.  You're

10  not testifying.

11        MR. SHARP:  That's what I'm saying, I didn't want

12  to ask her to read the front.

13  BY MR. SHARP:

14  Q.  Do you recall in my grievance that I argued that I as an

15  individual submitted a request for religious accommodation

16  form?

17  A.  It says:  I filed a group request for religious

18  accomodation.

19        That's what this says that I'm holding.

20  Q.  What else does it say?

21  A.  You go on to talk about who was at the meeting.

22  Q.  And then in that grievance, am I making you aware of the

23  fact that I also filed another request asking that that be

24  filed and processed?  Does that go on to say that in there?

25  A.  It says at that time, the request for religious

1  accomodation was brought up since it had not been responded

2  to, although each of you, of the above staff members received

3  a copy.

4  Q.  And it says -- it doesn't say group request, it says

5  request for religious accomodation, doesn't it?

6  A.  Well, I would assume that -- and I shouldn't assume, but

7  as an educator, when you initially stated that you filed a

8  group request, that the rest of it would be under the group

9  request also.  It doesn't -- half of this is scratched up, I

10  can barely see it.  I'm sure I answered the grievance as it

11  was stated and addressed the points that were filed in the

12  grievance which was that you filed a group request, because

13  that's what it says in the first sentence, which is your

14  introduction of whatever you're going to discuss, and it was

15  addressed as you had filed it for a group as opposed to an

16  individual.

17  Q.  At the top of that form that he gave you for religious

18  accomodation requests, does it instruct you that if there is

19  more than one individual filing, that certain information must

20  be provided to the chaplain?

21  A.  Which form is that?

22  Q.  I believe it's the DC-52, that religious accomodation

23  request form.  It should be the same form you said you didn't

24  recognize.  It says if more that one inmate is filing

25  requests, each inmate must submit a form.

1  A.  Go on.

2  Q.  If this is a group request, information must be submitted

3  to the Facility Chaplaincy Program Director who will compile

4  information about the group request.

5       Did you have -- did you just hear the testimony of

6  Mr. Ibrahiym that I submitted an individual request?  Did you

7  hear that?

8  A.  Yes.

9  Q.  Did you ever see a copy?

10  A.  No.  Not that I recall.

11  Q.  Did Chaplain Terza ever mention to you that I presented a

12  copy?

13  A.  No, not that I recall.

14  Q.  I never mentioned -- do you recall me mentioning to you in

15  our meeting that I as an individual had submitted not only the

16  group request, but that I had submitted my own form?

17  A.  The only thing that I recall is the fact that we discussed

18  the upcoming Ramadan.

19  Q.  Right.  But after that, didn't we have a discussion about

20  the requests?

21  A.  I don't recall.

22  Q.  And the paperwork that I filed to you?

23  A.  I don't recall.

24          THE COURT:  The witness has answered.

25          MR. SHARP:  I'm not arguing.  I agree she did.

1 BY MR. SHARP:

2 Q.  And what would have been the proper policy or procedure

3 once it has been received by the chaplaincy department that an

4 individual has submitted a request for religious accomodation,

5 what does that policy there say is supposed to be the

6 procedure followed?

7 A.  It says -- this is 819-3.  It says:  The form shall be

8 completed by the requesting inmate and submitted to the

9 Facility Chaplaincy Program Director for review by appropriate

10 staff.

11 Q.  Does it say who the appropriate staff is?

12 A.  No, it doesn't.

13 Q.  So let me ask you this.  In the top of the form it says

14 that if there is a group requesting, right, does that mean

15 that it would be permissible not only for an individual to

16 file, but also for a group to submit a request as well stating

17 that we're all doing this at the same time?  Would that be a

18 reasonable assumption?

19 A.  No, it isn't.  It says:  If this is a group request,

20  information must be submitted to the facility program director

21  who will compile information about the group request.

22  Q.  So how would he go about doing that?

23        THE COURT:  If you know.

24        THE WITNESS:  I can only surmise what I would do.

25  I can't say because it's not really that specific.

1       Do you want to hear that?

2       THE COURT:  I don't know if this was part of her

3  responsibility.

4       MR. SHARP:  She runs all programs.

5  BY MR. SHARP:

6  Q.  You were program director, correct?

7  A.  But I had nothing, according to policy, to do with

8  approving any religious accomodation.

9  Q.  What I'm trying to find out, was there a policy?  This is

10  what I'm asking you, was there a policy to handle that type of

11  situation?

12  A.  819-3 and 4 and whatever it is today.

13  Q.  So my question to you is, you said it doesn't say anything

14  about how they would go about implementing or applying that it

15  is a group request.  Does it specifically state a policy of

16  how this information is to be gathered?

17  A.  On the cover page, 819-3, it says:  Request to engage in

18  religious practices or diets which are not being accommodated

19  by the department must be initiated by the inmate via an

20  inmate religious accommodations request form.  See attachment.

21  The form should be completed by the requesting inmate and

22  submitted to the Facility Chaplaincy Program Director for

23  review by appropriate staff.

24  Q.  Right.  I got that.

25  A.  That's what it says.

1  Q.  We're talking about the second part of what it says at the

2  top of that request.  Is there a policy for when there is a

3  group of individuals who are asking for the same thing, along

4  with them having to -- I want you to hear the whole

5  question -- along with them having to file their individual

6  requests, what other policy would apply for them to be asking

7  for this as a group?  Is there a policy there?

8  A.  The policy is when the request is submitted, it's turned

9  in to the Facility Chaplaincy Program Director for review by

10  appropriate staff.  That is the policy.

11  Q.  So who is the appropriate staff?

12  A.  It doesn't say in the policy.  It doesn't designate

13  specific people.

14  Q.  Was that done in my particular case?

15  A.  I don't recall that it was this form or whatever so I

16  don't know if it was done or not.  I can't say.  I'm

17  assuming -- I can't assume, I'm sorry.

18  Q.  The reason why I'm asking -- so, in other words -- what

19  I'm saying is, what I'm asking you is, if we have determined

20  or we can determine by the testimony of Mr. Ibrahiym that this

21  paperwork was submitted, right, an individual request, as well

22  as your acknowledgement that you received that group request?

23  A.  No, I didn't say I got a group request.

24  Q.  Isn't it in your grievance response that you said that?

25  A.  It says at the meeting you mentioned it.  It verified that

1  all staff received a copy of your proposal.  It doesn't say

2  anything in the proposal.  I assume -- is this to whom it may

3  concern, I'm, I guess, appealing the denial -- or whatever

4  your proposal was at the time.  It doesn't say anything about

5  a group request, it says your proposal.  I'm not using them in

6  the same term then.

7  Q.  Okay.  Let me see if I can put it this way.

8         Once you were made aware of the fact that I was

9  making a claim that I had submitted this paperwork and you

10  responded to the grievance, did you question the staff members

11  who would have been responsible for handling that -- those

12  particular documents, did you request them to say, I'm getting

13  this grievance from this guy that is saying that he submitted

14  a request for religious accomodation and he submitted a group

15  request and don't you -- did you handle that?  Did you take

16  care of it?  Did you file it?

17  A.  The request and the grievance that you filed was a group

18  grievance, and that's how it was responded to, that you could

19  not submit it as -- it was a proper form for that.  It says in

20  accordance with 819, for religious accommodation, you were to

21  submit the proper form requesting such an accommodation for

22  you as an individual.  And this grievance did not address you

23  submitting it as such.  You submitted the grievance as a

24  group.

25  Q.  Didn't we just read another section down there where I

1  said, where I specifically said, doesn't that say, my

2  individual request for accommodation?

3        MR. BRADLEY:  Your Honor, I believe we covered

4  that.

5        THE COURT:  This has been asked and answered, sir.

6        MR. SHARP:  Okay.

7  BY MR. SHARP:

8  Q.  So, in other words, what you're saying is that your

9  response to the grievance, if I'm correct, was, because you

10  presumed or assumed that I was referring only to the group

11  request, that's all you had knowledge of, am I correct in that

12  that's what you're saying?

13  A.  That's correct.

14  Q.  I'm asking you, as a person assigned to investigate a

15  grievance, did you go beyond that and inquire as to --

16  because, remember, we also had a conversation about this you

17  said and you acknowledged that in a meeting, you discussed

18  this, correct?

19  A.  Discussed what?  We discussed Ramadan, I said that's what

20  I recall.

21  Q.  Is that the only thing we discussed?

22  A.  I don't recall anything any different.  You're saying -- I

23  don't recall this discussion about you and wanting an

24  accommodation.  I recall the Ramadan discussion.

25          MR. SHARP:  Thank you.  No further questions.

1       THE COURT:  Any redirect?

2       MR. BRADLEY:  Just briefly, Your Honor.

3               REDIRECT EXAMINATION

4  BY MR. BRADLEY:

5  Q.  Looking at your grievance response, that's your signature

6  that appears on the grievance response?

7  A.  Yes, it is.

8  Q.  That's dated December 20, 1999?

9  A.  Uh-huh.

10  Q.  And at that point you indicated to Mr. Sharp that if he

11  wished to obtain a review of this request for religious

12  accomodation, at that point, he needed to file a specific form

13  for him as an individual.  Is that what this document

14  indicates?

15  A.  Yes.  I answered that he had to fill one out individually

16  and that the form had to be forwarded to the chaplaincy

17  director.

18  Q.  So, as of December 20, 1999, he was informed that at least

19  whatever he had done up to that point was not sufficient and

20  that he needed to file an individual request?

21  A.  That's correct.

22       MR. SHARP:  Can I recross?

23       THE COURT:  I don't believe he's finished,

24  Mr. Sharp.

25  BY MR. BRADLEY:

1 Q. On the two lines on the grievance response there,

2 Mr. Sharp's quarters there, do you see where that says A2-220?

3 A. Where is that?

4 Q. On your grievance response, on the line where it starts

5 Shawn Sharp, BQ-8429, then it says:  Institution -

6 SCI-Pittsburgh.  Then it says Quarters - A2-220.  Those

7 quarters, does that refer to his housing location?

8 A. Yes, it is.

9 Q. Do you know what A2-220 is?

10 A. I believe it was RHU at the time.

11 Q. That would be restricted housing unit at the time?

12 A. Yes.

13 Q. Again, the final block on that grievance date, 12-20-99?

14 A. Yes.

15        MR. BRADLEY:  That's all.

16        MR. SHARP:  I'm going to object as to relevance.

17        THE COURT:  Overruled.

18        MR. SHARP:  I'd like to recross.

19        THE COURT:  Only on matters that were just

20  addressed.  You may not go back into other matters.

21          RECROSS-EXAMINATION

22  BY MR. SHARP:

23  Q.  Is there any other response to the grievance that I wrote

24  specifically in that exhibit?

25  A.  I don't understand what you mean.

1  Q.  In other words, I wrote a grievance, correct?

2  A.  Uh-huh.

3  Q.  Then you wrote a response?

4  A.  That's correct.

5  Q.  And then did I appeal that grievance?

6  A.  Yes, you did.

7        THE COURT:  Mr. Sharp, this is going beyond the

8  scope of the questions that were asked on redirect and you may

9  not do that.  You may only inquire about the matters that were

10  inquired of on redirect which included the date, what her

11  response was.

12        MR. SHARP:  And where I was housed.

13        THE COURT:  Correct.

14  BY MR. SHARP:

15  Q.  Do you know why I was housed at A2-220?

16  A.  No, I don't.

17  Q.  Did you have any involvement in why I was housed at

18  A2-220?

19  A.  I don't believe I did.  I don't think.

20          MR. SHARP:  Thank you.  No further questions.

21          MR. BRADLEY:  Nothing further, Your Honor.

22          THE COURT:  Thank you.

23          MR. BRADLEY:  I don't know how long the next

24  witness might be.

25          MR. BRADLEY:  Lengthy.

62

1          THE COURT:  I also know that we have the -- is

2 today the day for the video conference?

3          MR. BRADLEY:  Two o'clock.

4          THE COURT:  Well then it's -- if we could maybe

5 start with about a few minutes.

6          MR. BRADLEY:  I can probably reorder some

7 witnesses.

8          THE COURT:  I'm thinking if we could do another 15

9 or 20 minutes, then we'll break for an hour and 15 minutes

10 until two o'clock for the videotape.

11          MR. BRADLEY:  Defendants would call Philip Johnson.

12          PHILIP JOHNSON, a witness having been duly sworn,

13 testified as follows:

14                    DIRECT EXAMINATION

15 BY MR. BRADLEY:

16 Q.  Could you state and spell your name for the record.

17 A.  Philip L. Johnson, P-H-I-L-I-P. L. J-O-H-N-S-O-N.

18 Q.  What is your present occupation?

19 A.  I'm retired.  I worked for --

20  Q.  Are you retired from the Pennsylvania Department of

21  Corrections?

22  A.  That's correct.

23  Q.  What was the highest position you held with the

24  Pennsylvania Department of Corrections?

25  A.  Superintendent.

1  Q.  When did you begin your career with the Department of

2  Corrections?

3  A.  December of 1973.

4  Q.  When did you retire?

5  A.  February 2003.

6  Q.  Did you retire as a superintendent?

7  A.  Yes, I did.

8  Q.  Of what institution?

9  A.  I was kind of splitting duties between SCI-Pittsburgh and

10  SCI-Fayette.

11  Q.  Was there a time you were the full time superintendent at

12  SCI-Pittsburgh?

13  A.  That's correct.

14  Q.  When did that begin?

15  A.  January of 1999 until late 2002.  I don't remember the

16  exact month when I was transferred.

17  Q.  Prior to January of 1999, what position did you hold?

18  A.  Superintendent.

19  Q.  At which institution?

20  A.  SCI-Greene.

21  Q.  How long were you the superintendent of SCI-Greene?

22  A.  Approximately, one year.

23  Q.  Can you briefly describe your duties and responsibilities

24  as a superintendent?  And I want you to focus on the time you

25  were at SCI-Pittsburgh from January of 1999 through 2002.

1  A.  I oversaw the daily operation of the entire facility, all

2  department heads who ultimately were responsible to answer to

3  me.

4  Q.  You have been present for the testimony throughout this

5  case?

6  A.  Yes, I have.

7  Q.  Are you familiar with the inmate -- with the plaintiff in

8  this case, Shawn Sharp?

9  A.  Vaguely.

10  Q.  Did you have any personal dealings with Mr. Sharp with

11  respect to the testimony you've heard about his request for

12  religious accommodation?

13  A.  None that I can recall.

14  Q.  Were you ever presented with or asked to review a request

15  for religious accomodation submitted by Mr. Sharp?

16  A.  No, I was not.

17  Q.  Do you recall any specific conversation or request

18  Mr. Sharp made specifically to you either verbally or orally

19  requesting a religious accomodation?

20  A.  I do not recall any such.

21  Q.  Did you ever personally interfere with Mr. Sharp's ability

22  to practice his chosen religion?

23  A.  No, I did not.

24  Q.  Did you ever instruct anybody under your supervision to

25  take any action with respect to Mr. Sharp based on his

1  religious preference?

2  A.  No, I did not.

3  Q.  As the superintendent at SCI-Pittsburgh, would you have a

4  role to play in the grievance process?

5  A.  Yes.  If an inmate was not satisfied with the response of

6  the grievance coordinator, he could appeal it to me.

7  Q.  I believe in front of you is Exhibit 4, the grievance

8  PIT-0997-99.

9  A.  Yes.

10  Q.  If you could look through that packet.  Do you see a memo

11  with your signature with the subject line Appeal Grievance No.

12  PIT-0997-99?

13  A.  Yes, I do.

14  Q.  I'd like you to take a minute, just take a minute to

15  review that document.

16  A.  Okay.

17  Q.  As you sit here today, do you have any specific

18  recollection of -- let me ask you this.  Is that your

19  signature that appears on that document?

20  A.  Yes, it is.

21  Q.  As you sit here today, do you have any specific

22  recollection of signing this document?

23  A.  The appeal?

24  Q.  Yes.

25  A.  Yes.

1  Q.  You do recall signing this document?

2  A.  I believe I did.  That's my signature.

3  Q.  I understand it's your signature.  As you sit here today,

4  do you recall addressing this specific grievance?

5  A.  No.  Because I signed many, many hundreds of them.

6  Q.  Can you explain for the record based on that memo what the

7  basis or what the result of your response to the appeal was?

8  A.  Yes.  The appeal was filed untimely and, therefore, it was

9  being returned without action.

10       MR. BRADLEY:  Your Honor, that's all the questions

11  I have of this witness.

12       THE COURT:  Do you have any questions, Mr. Sharp?

13       MR. SHARP:  Yes.  I don't have a copy of the

14  exhibit that he's holding.

15       THE COURT:  I don't either.

16       What do you need to ask?

17       MR. SHARP:  I would like to see the exhibit that

18  he's holding so that I can look at it, what he was just

19  referring to.

20          THE COURT:  For the record, Mr. Bradley has

21  provided Mr. Sharp with a copy.

22              CROSS-EXAMINATION

23  BY MR. SHARP:

24  Q.  There are two responses here.  Is that normal?  Is that

25  normal?

1 A.  I don't understand your question.

2 Q.  There are two responses here.  You have one dated January

3 5th, I believe, and one dated December 31st, '99?

4      MR. BRADLEY:  Your Honor, if I can review the

5 exhibit, what I gave him may contain more than -- I believe

6 this was Mr. Sharp's exhibit initially.

7      THE COURT:  It was.

8      MR. BRADLEY:  The page he's referring to was not

9 part of the original exhibit.

10      THE COURT:  Which is the extraneous page, the later

11 date?

12      MR. BRADLEY:  The earlier date.

13      I can provide the witness with a copy.

14      THE COURT:  Well, it's not part of that exhibit.

15      It's not part of your exhibit, sir.

16      MR. SHARP:  I'm kind of confused.  Can we make that

17 part of the exhibit?

18      THE COURT:  The exhibit is already in.  The exhibit

19 is what it is.

20          MR. SHARP:  So I'm not seeing what part is the

21  exhibit and what part isn't.

22          THE COURT:  Mr. Bradley has indicated that the

23  December portion of what you have in front of you was

24  extraneously or erroneously included as a packet representing

25  Exhibit 4.

1          MR. SHARP:  So the December 1st response is not

2   applicable?  Is what you're saying?

3          THE COURT:  I don't have the document in front of

4   me, but that's what I'm surmising from what Mr. Bradley has

5   indicated.

6          MR. BRADLEY:  The December 31st memo is part of the

7   documents regarding the PIT-0997-99 grievance that I have in

8   my possession.  It was not part of the exhibit that was

9   presented by Mr. Sharp and has been marked as Exhibit 4.  It

10  does reference the same grievance.

11         THE COURT:  All right.

12         Then if you would like to admit that as a separate

13  document.

14         MR. SHARP:  Please.

15         THE COURT:  I can't undo what is already in the

16  record.  We can make it wherever we left off.

17         MR. BRADLEY:  Eighteen.

18         MR. SHARP:  Has it been noted?

19         THE COURT:  We're working on it.

20          The witness has been provided with a copy of

21  Exhibit 18.

22          Mr. Sharp, would you please re-ask your question.

23  BY MR. SHARP:

24  Q.  Is that -- I believe I was asking, is it normal for you to

25  submit two separate responses?

1  A.  It could possibly happen if there was a separate request

2  slip inquiring about the same issue.

3  Q.  So, in other words, if a person hadn't heard anything back

4  from a particular grievance response, then it would be a

5  normal procedure for them to submit a request requesting what

6  happened to my grievance?

7  A.  That may happen whether you received a response or not.

8  Q.  At SCI-Western, SCI-Pittsburgh, have you ever encountered

9  situations with the mail, complaints about the mail?

10  A.  I don't recall specifically.  I received complaints about

11  just about every aspect of the institution.

12  Q.  So, if a person submitted a grievance or submitted an

13  appeal and there was a delay in the appeal, could that be

14  because of the mail delay, or the actual delay at it being

15  sent through the mail?

16  A.  It could.  There could be any number of reasons.

17  Q.  The most important thing is that you got the response,

18  correct?

19  A.  That I got the response?

20  Q.  Right, or the appeal that the person was filing, that's

21  the most important thing, right?

22  A.  I'm sure it would be that important to the person that

23  filed it, yes.

24  Q.  Could you read or is this part of the exhibit to

25  Superintendent Johnson, what I originally wrote to him?

1        THE COURT:  I don't have the exhibit in front of

2  me; I don't know what you're referring to.

3  BY MR. SHARP:

4  Q.  It says date, 12-29-99.  Do you have that in front of you?

5  You have January 4, it's time stamped.

6  A.  What about 4 now?

7        MR. BRADLEY:  It's not part of it.

8        MR. SHARP:  It isn't part of it.

9        THE COURT:  It is not.

10       MR. SHARP:  I would like to make that Exhibit 19, I

11  believe.  We were just on 18.

12       THE COURT:  I need to know what it is.

13       MR. SHARP:  It is my appeal to Superintendent

14  Johnson which we have just entered the response to from

15  grievance PIT-0997-99.

16  BY MR. SHARP:

17  Q.  Could you read No. 1 for me, if you're ready?

18  A.  It says:  ADM Policy 819 and supplements 1-3 clearly allow

19  group requests for religious accommodations.  The lack of the

20  respondents having read said policy clearly manifests why this

21  request laid unanswered.  Furthermore, I was instructed by

22  Chaplain Tanko Ibrahiym to inform each person of our Islamic

23  denomination to file an individual request slip, which was

24  done by 40 individuals of our faith.  Thus, compliance both

25  ways had clearly been met.

1  Q.  Did you read this?

2  A.  Yes, I did.

3  Q.  No, I mean when you responded to the grievance itself, did

4  you read what I wrote?

5  A.  Yes, I did.

6  Q.  So you were made aware of the fact by this writing that a

7  request for religious accommodation by me as an individual and

8  in conformity with what I understood the policy to be, a group

9  request, had been filed with the chaplaincy department,

10  correct?

11        THE COURT:  That's asked and answered.  He

12  indicated he read this.  That's what it says.

13  BY MR. SHARP:

14  Q.  How long -- according to the grievance policy, how many --

15  how long do you have to file a response to a grievance?

16  A.  I don't recall.

17  Q.  You don't recall?

18  A.  No.  I'd have to have a copy of the policy.

19  Q.  Well, just out of curiosity, could we look at the dates on

20  my appeal which, correct me if I'm wrong, is the 29th?

21        THE COURT:  Is this Exhibit 19 we're looking at?

22        MR. SHARP:  Yes.

23  BY MR. SHARP:

24  Q.  Correct me if I'm wrong.

25  A.  You have the date of 12-29-99.

1  Q.  If we could look at the response of Defendant Winstead,

2  which was prior to that, what is the date on that?

3  A.  The one I have with Ms. Winstead's signature is 12-20-99.

4  Q.  12-20-99.  There's a signature underneath as well as it

5  being received on December 21, 1999, correct?

6  A.  The signature below Ms. Winstead's?

7  Q.  Right.  It says 12-21-99?

8  A.  That's correct.

9  Q.  In your recollection, would eight days exceed the time in

10  which one could appeal as a superintendent?

11  A.  I don't recall what the specific time frame was according

12  to the policy.

13  Q.  So you don't recall if it was more than eight days --

14       THE COURT:  Mr. Sharp, you've asked this question

15  three times.

16       MR. SHARP:  No further questions.

17       MR. BRADLEY:  Nothing further.

18       THE COURT:  Thank you.

19       With that, we will recess until two o'clock.

20        (Whereupon, there was a brief recess in the proceedings.)

21        THE COURT:  Good afternoon, Ms. Mears.  This is

22   Judge Hay.  Can you hear me?

23        THE WITNESS:  Yes, ma'am.

24        THE COURT:  I'm going to ask to have my courtroom

25   deputy swear you and then we'll begin testimony.

1    JEAN MEARS, a witness having been duly sworn, testified

2  as follows:

3        THE COURT:  Mr. Bradley, you may proceed.

4        MR. BRADLEY:  Thank you, Your Honor.

5             DIRECT EXAMINATION

6  BY MR. BRADLEY:

7  Q.  Good afternoon.  Can you state your name and spell it for

8  the record, please?

9  A.  Should I state my name when this was filed?

10  Q.  How about both.

11  A.  When the grievance was filed, my name was Jean, J-E-A-N,

12  Mears, M-E-A-R-S.  Now I'm legally Jean, J-E-A-N, Blaine,

13  B-L-A-I-N-E.

14  Q.  At what point were you employed by the Pennsylvania

15  Department of Corrections?

16  A.  At what point?

17  Q.  At one point, at one point were you employed by the

18  Pennsylvania Department of Corrections?

19  A.  Yes, I was.

20  Q.  When did you start with the Department of Corrections?

21  A.  November of 1976.

22  Q.  What position did you hold then?

23  A.  In 1976 I was a Clerk/Typist 1.

24  Q.  When you left the Department of Corrections, what position

25  did you hold?

1  A.  I held the position of corrections classification program

2  manager.

3  Q.  When and where did you hold that position?

4  A.  That was at State Correctional Institution at Greene and

5  that was from the time frame of I believe June of '02 until

6  December of '03.

7  Q.  Again, December of '03 is when you left the Department of

8  Corrections?

9  A.  Yes.

10  Q.  Can you describe briefly what your duties and

11  responsibilities as a program manager at SCI-Greene during

12  that time frame were?

13  A.  Yes.  I think I may have messed up with my dates.  No, I'm

14  okay, December '03.

15        My duties were overseeing the various treatment

16  programs that were offered at the State Correctional

17  Institution at Greene, which would have included activities,

18  religion, inmate employment, record keeping.  I know there's

19  one other one I can't recall at this point in time.  And then

20  I had clerical support.

21  Q.  Did you oversee the chaplaincy department?

22  A.  Yes, I did.

23  Q.  Who was the Facility Chaplaincy Program Director at

24  SCI-Greene when you were the program manager?

25  A.  That would have been Father George Moneck.

1  Q.  Do you know the inmate in this case -- the plaintiff in

2  this case, Shawn Sharp?

3  A.  I am vaguely familiar with Mr. Sharp.

4  Q.  Ms. Mears -- Ms. Blaine, you have some documents in front

5  of you?

6  A.  Yes, I do.

7  Q.  Is one of those documents grievance No. 39662?

8  A.  Yes.  Yes, it is.

9  Q.  That document has been previously marked in this case as

10  Exhibit No. 10.  If I could just ask you to make sure that you

11  have these pages.  There are two pages of the inmate

12  grievance?

13  A.  Yes.

14  Q.  Then there is one page which is the initial review

15  response?

16  A.  Yes.

17  Q.  Then there are two handwritten pages, which is the appeal

18  of the grievance?

19  A.  I only have one handwritten page.  I have the first page.

20  Q.  And then there is a response from Superintendent Stickman

21  dated January 24, 2003, to that appeal?

22  A.  It's dated I believe January 29th.  Is that a 9 or is that

23  a 4?

24  Q.  The document I have is a 4.  Is that a first level appeal

25  to grievance 39662?

1  A.  I have that.  You're talking about this.  Can you see

2  that?

3  Q.  It appears to be.

4       Then the other document, the only thing I want you

5  to pull out is what has been termed the vote sheet.

6       Are you familiar with that?

7  A.  Yes.

8  Q.  That's part of the document that has been previously

9  marked in this matter as Exhibit B.

10       MR. SHARP:  Your Honor, the document that he's

11  referring to, do you have copies of them?

12       THE COURT:  I do not.

13       MR. BRADLEY:  I can provide those, Your Honor.

14       THE COURT:  Mr. Bradley has a copy for you.

15  BY MR. BRADLEY:

16  Q.  Ms. Blaine, are you familiar with the department's policy

17  with respect to inmate requests for religious accomodation, or

18  were you at that time?

19  A.  Yes.

20  Q.  As the program manager, or the position of program

21  manager, would that person have a role in the process by which

22  an inmate's request is reviewed pursuant to 819 policy?

23  A.  I would have had a vote on whether or not I concurred with

24  what was being requested.

25  Q.  You as the program manager would have had a vote?

1 A.  Yes.

2 Q.  Do you recall ever being asked to vote on an inmate

3 request for religious accomodation submitted by Shawn Sharp?

4 A.  No.

5 Q.  The vote sheet that I have or that you have in front of

6 you that I have indicated was marked as Exhibit B, are you

7 looking at that?

8 A.  Yes, I am.

9 Q.  Under the block marked corrections classification program

10 manager, do you see that?

11 A.  Yes, I do.

12 Q.  Now, the corrections classification program manager, is

13 that the position that you held on October of 2002?

14 A.  Yes, I did.

15 Q.  There are initials in the box next to that designation of

16 corrections classification program manager, are there not?

17 A.  That's correct.

18 Q.  Can you read those initials?

19 A.  It's MPB.

20  Q.  Is there a date that follows that?

21  A.  10-21-02.

22  Q.  Are those your initials?

23  A.  No, they are not.

24  Q.  Do you know whose initials they are?

25  A.  Yes, I do.

1  Q.  Whose would they be?

2  A.  It is Michael P. Bruno, B-R-U-N-O.

3  Q.  Was he the corrections classification program manager in

4  October of 2002?

5  A.  No, but he may have been in the acting capacity if I had

6  been out of the institution.

7  Q.  Apart from that document in front of you, do you have any

8  recollection of being asked to review an inmate request for

9  religious accomodation submitted by Shawn Sharp in October of

10  2002?

11  A.  No, I do not.

12  Q.  The other document that was marked as Exhibit 10, have you

13  had a chance to review that?

14  A.  Yes, I did.

15  Q.  That appears to be the grievance Mr. Sharp filed after his

16  request for religious accommodation was denied?

17  A.  That's correct, yes.

18  Q.  Did you complete the initial review response to that

19  grievance?

20  A.  Yes, I did.

21  Q.  And you would have done that in your position as

22  corrections classification program manager?

23  A.  That's correct.

24  Q.  Is that your signature that appears on that document or

25  your signature as it was then?

1  A.  Yes, it is.

2  Q.  For the record, can you indicate what your response to

3  Mr. Sharp's grievance was?

4  A.  May I read it, or do I have to just -- may I read my

5  response?

6  Q.  Sure.

7  A.  "Your grievance dated December 27, 2002, was reviewed and

8  investigated.

9        "You received a memo from Father Moneck dated

10  December 18th, 2002, and he provided you with the information

11  as to why the central office accommodations committee denied

12  your request.

13        "You were not denied the right to practice your

14  faith as you imply in your grievance and you were not

15  prohibited from maintaining your beliefs and praying in your

16  cell since you have difficulty in following the teachings of

17  the Imam.  Your constitutional rights and due process are not

18  being denied as you claim.

19        "You do not need to have a material structure or be

20  with a group of others to pray to exercise your First

21  Amendment right.  Should an individual be so devote in his

22  beliefs, he would realize that his inner faith is his strength

23  in believing and performing his prayers.

24       "Based upon the above information, your grievance

25  is denied."

1  Q.  That was the response you provided to Shawn Sharp back in

2  December of 2002?

3  A.  Yes, it is.

4  Q.  Or January of 2003?

5  A.  Yes, January 2003.

6  Q.  During your time as program manager at SCI-Greene, did you

7  have any discussions or interaction with Shawn Sharp?

8  A.  At one point in time I believe I did, in the very

9  beginning of my position as corrections classification program

10  manager, and it was over Ramadan and I believe his bag, his

11  meal bag.

12  Q.  Beyond that, do you have any recollection of what that

13  discussion entails?

14  A.  Not really.  I just know we resolved his issue at the

15  time.

16  Q.  Did it ever come to your attention either through

17  Mr. Sharp or through Father Moneck or any other source that

18  Mr. Sharp had complained about a -- one of the sermons Imam

19  Muhammad had given at SCI-Greene?

20  A.  The only thing I really remember with Mr. Sharp is when I

21  started getting the documentation that we have in front of us

22  right now.

23  Q.  Do you recall ever reviewing a videotape of a sermon given

24  by Imam Muhammad to determine if he was saying inflammatory or

25  slanderous things about other inmates?

1  A.  I don't recall ever reviewing any tapes.

2  Q.  As you sit here testifying today, have you told us to the

3  best of your recollection the extent of your interactions with

4  Mr. Sharp while he was at SCI-Greene while you were the

5  program manager there?

6  A.  Yes, I have, to the best of my recollections, yes.

7        MR. BRADLEY:  Thank you.  I have no further

8  questions.

9        THE COURT:  Mr. Sharp, do you have any questions

10  for Ms. Blaine?

11              CROSS-EXAMINATION

12  BY MR. SHARP:

13  Q.  Good afternoon, Ms. Blaine.  How are you?

14  A.  Pretty good.  How about yourself?

15  Q.  Oh, could be better, but I'll trudge through.

16        I would like to start with I guess -- I'm not sure

17  what elicited this grievance No. 39662, the grievance --

18        THE COURT:  That was your Exhibit No. 10.  It's

19  your grievance 39662.

20          MR. SHARP:  I wanted to make sure I knew what the

21  exhibit was so I would know.

22  BY MR. SHARP:

23  Q.  Grievance No. 39662 is a grievance which I filed appealing

24  my request for religious accomodation, correct?  Is that

25  correct?

1  A.  You bleeped out, but I would say, yes.  You said it was an

2  appeal to what central office sent you, correct?

3  Q.  Right.  Is that the standard procedure if you are denied,

4  submit an appeal through the grievance process?

5  A.  That you would submit an appeal through the grievance

6  process?

7  Q.  Can you hear me?

8  A.  You keep going in and out on me.

9  Q.  Can you hear me now?

10  A.  Yes.

11  Q.  So the standard procedure if you are denied a request for

12  religious accomodation is to file a grievance; am I correct?

13  A.  Correct.

14  Q.  If you were appealing, it would be required of you to

15  state your reasons why you would be appealing a grievance,

16  correct?

17  A.  Why you would be appealing it, correct.

18  Q.  Or appealing the denial, excuse me.

19        Let me say that again because I kind of confused

20  myself.

21        It would be required of you to state in the

22  grievance why you are appealing the denial, correct?

23  A.  You, as the inmate, yes, you would state that in it, yes.

24  Q.  Could you tell me what my reasons were, according to what

25  you deduced from this grievance?

1        MR. BRADLEY:  Your Honor, the grievance speaks for

2   itself.  I'm not sure what her understanding of what his

3   reasons were is relevant.

4        THE COURT:  I will sustain that objection.

5        MR. SHARP:  Okay.

6   BY MR. SHARP:

7   Q.  You stated that you investigated, correct, in your

8   response to grievance No. 39662?

9   A.  Correct.

10  Q.  What investigation did you carry out?

11  A.  Well, since probably at that time -- you have to

12  understand, Mr. Sharp, this is the first I've seen some of

13  these documents in a long time, but what I would have done,

14  and you know I would have done this back then, I would have

15  met with Father Moneck and talked to him about the issue.  I

16  probably would have contacted someone in central office to

17  find out what was going on with everything to make sure that

18  I'm giving you the most appropriate response I could, to the

19  best of my knowledge at that time.

20  Q.  So, in other words, in your investigation that you state

21  in your response that you undertook, you're saying the only

22  person you spoke to was Father Moneck and who else?

23  A.  And I would have talked to a staff member probably in the

24  religious department with the central office at that time.

25  Q.  In central office.  Okay.  And that is how you would have

1  gotten your determination of how you would respond to my

2  appeal?

3  A.  At that time, yes.

4  Q.  Would it be standard procedure for you to inquire about

5  the differences in beliefs?

6  A.  Not really because we already provide Muslim services.

7  All Muslims basically have that core faith following to begin

8  with.  So I probably -- I probably would not have questioned

9  that.  I would have questioned more about the accommodation

10  portion of it and what was feasible for the department and for

11  our institution to do.

12  Q.  So you're saying that according to your knowledge, what

13  you understand of Islam is that there's always one consistent

14  belief?

15        THE COURT:  Mr. Sharp, I believe you're

16  mischaracterizing her testimony.

17        MR. SHARP:  I'm asking --

18        THE COURT:  You're not asking, you're

19  mischaracterizing her testimony.

20 BY MR. SHARP:

21 Q.  Tell me what your understanding is about the Islamic

22 belief?

23        MR. BRADLEY:  I'm going to object to that in terms

24 of relevance.

25        THE COURT:  Sustained.

1        MR. SHARP:  You said sustained?

2        THE COURT:  Sustained.  You can't ask the question.

3  BY MR. SHARP:

4  Q.  Were there other Islamic services provided in the

5  Department of Corrections and specifically at SCI-Greene for

6  Muslims?

7  A.  Yes, there were.

8  Q.  Is there a reason why?

9  A.  Is there a reason why we had other services?

10  Q.  Right.

11  A.  I don't know the reason why.  I didn't make that decision.

12  Q.  Is there any policy written in the Department of

13  Corrections handbook, et cetera, that says that there is only

14  to be one Muslim religion recognized in the Department of

15  Corrections?

16  A.  I don't -- to the best of my recollection, I can't respond

17  to that.  I don't know.  I have been away for a while,

18  Mr. Sharp.

19  Q.  Well, while you were a staff member there, was the policy,

20   whether it was written down or unwritten, that there was only

21   one Islamic community in every institution?

22   A.  Well, we had more than that at SCI-Greene, so I would be

23   wrong in saying that.

24   Q.  As the corrections classification program manager, could

25   you describe for me, because I don't think I caught it, what

1  would some of your responsibilities be again?

2  A.  I was over all the treatment-based programs provided at

3  that institution.

4  Q.  And that would include any religious issues, correct?

5  A.  That included -- correct, some of the religious issues.

6  Q.  So if the issue was being brought up about whether or not

7  there were differences of belief, would it be your

8  responsibility once you have been informed about it to

9  investigate what those differences are to provide information

10  to the Department of Corrections?

11  A.  That information would have been passed on through my

12  chain of command for the superintendent or my deputy to make

13  those decisions as to how far that needs to be taken.

14  Q.  Did you ever request any of the information?

15  A.  I don't believe I really ever needed to request that

16  information.  When that accommodations request came back to

17  you, central office had already made their decision, and I

18  don't have the authority to change a decision made by central

19  office.

20  Q.  But you did have -- someone voted in your stead?

21  A.  That is correct.

22  Q.  So what would be the merit of a vote at all?  What would

23  be the purpose, could you explain to me what would be the

24  purpose of this vote sheet?

25  A.  That vote sheet would determine what staff at that

1  institution approved or disapproved what you were requesting

2  for the information to be submitted to central office for

3  their final determination.

4  Q.  So what information would they base their vote off of,

5  personal opinion, information that's provided, what would be

6  the criteria for approving or disapproving --

7  A.  I can't speak on behalf of them, Mr. Sharp, because I was

8  not in their capacity.  I don't know.

9  Q.  In other words, I'm saying overall do they give the

10  Department of Corrections staff, I'm sure you voted before on

11  these evaluations, correct?

12  A.  Correct.

13  Q.  What would be the criteria for approving or disapproving?

14      THE COURT:  Approving or disapproving what,

15  Mr. Sharp?

16      MR. SHARP:  Whatever the item that is requesting,

17  in other words, there has to be a criteria, is there something

18  that must be met in order for you to say, yes, I would assume

19  this, or is that something that must be met or that hasn't

20  been met that would make you say, no -- in other words, I'm

21  just asking was there a criteria?

22        THE COURT:  Is the question in general to anybody's

23  request?

24        MR. SHARP:  I would like to know to mine, if I

25  could ask that.

1        THE COURT:  That question you've asked and she has

2    answered.

3        MR. SHARP:  Can I ask in general?

4        THE COURT:  I don't see the relevance of it.  Can

5    you tell me what the relevance would be?  The criteria would

6    be for someone else's, correct?

7        MR. SHARP:  The point I'm trying to get to, I'll be

8    point blank, there was an unreasonable policy from what I was

9    told by Ms. Mears, and I'm trying to see if she was willing to

10   admit that they would not acknowledge any of the religious

11   organizations.

12        Is that true, Ms. Blaine?

13        THE COURT:  You can ask her that question.

14        THE WITNESS:  I never recall making that statement

15   to you, Mr. Sharp.

16   BY MR. SHARP:

17   Q.  Have you ever heard such a thing?

18   A.  No, not until I read some of the stuff you were talking

19   about, no.

20 Q.  A few other questions on another subject.

21          You said that we got to know each other through

22  problems that I was facing pertaining to Ramadan, correct?

23 A.  Correct.

24          MR. BRADLEY:  I'm going to object to the

25  characterization.  I think she said she dealt with him on an

1  issue involving Ramadan.

2       THE COURT:  All right.

3       MR. SHARP:  Issue or problem, I don't understand.

4       THE COURT:  The record is what the record is.  What

5  is your question about what her testimony was?

6       MR. SHARP:  I was trying to ask her, did she say

7  that, because it's hard for me --

8       THE COURT:  Ask her the question.

9  BY MR. SHARP:

10  Q.  Could you repeat for me what exactly you said you had

11  interactions with me about during Ramadan or pertaining to

12  Ramadan?

13  A.  You, myself and Father Moneck met concerning, I believe,

14  it was the meal, the bag, the meal for Ramadan, and we brought

15  you, and I believe you were in Father Moneck's office at the

16  time, and we discussed the procedure for that and then we

17  ended up getting you your meal bag because there had been some

18  issue where there was a confusion or mix up with that.

19  Q.  Was Chaplain Abu Bakr there?

20  A.  I don't recall him -- I don't recall the Imam being there.

21  I believe it was Father Moneck, myself and you.

22  Q.  The following year, do you recall me writing to you and

23  requesting to participate in Ramadan again?

24  A.  I don't have the documentation so I don't recall.

25      MR. SHARP:  Your Honor, I entered into evidence

1  exhibits request slips directed to Mrs. Mears yesterday and

2  I'd like to review them, if possible.  I know that one of them

3  was highlighted in red, she had written in red explaining to

4  me about the situation with the Ramadan and how I would be

5  able to participate in it.

6         THE COURT:  I'll look at the exhibits and see if I

7  can ascertain which one you're speaking of.

8         MR. SHARP:  There were a couple of them, they were

9  all grouped together.

10        THE COURT:  You wrote in red ink?  I'm asking.  The

11  first thing I came to that had red ink was yours.

12        MR. SHARP:  They should all be together.

13        MR. BRADLEY:  I have 7, 11, Your Honor, as inmate

14  requests to Ms. Mears.

15        THE COURT:  I believe of all the exhibits that are

16  here, that would be it, Exhibit 7 and 11.

17  BY MR. SHARP:

18  Q.  I have here two inmate requests to staff, Exhibit No. 7

19  and 11.  I'm aware that because of the way this is structured,

20  you do not have a copy of these exhibits.

21        MR. SHARP:  Should I read them to her?

22        THE COURT:  What is your question?

23        MR. SHARP:  Well, she stated that she did not

24  recall ever dealing with a situation pertaining to videotapes

25  and we had testimony earlier that Chaplain Moneck and myself

1 reviewed videotapes, this is pertaining to statements of

2 Chaplain Bakr that she was supposed to have investigated.

3        THE COURT:  Ask her a question, Mr. Sharp.  You

4 have the document, you know what it says.

5        MR. SHARP:  That's fine.

6        THE COURT:  You don't need the read the entire

7 document.  You can ask her a question by paraphrasing what's

8 in there.

9 BY MR. SHARP:

10 Q.  Ms. Mears, I have a request DC-135A dated 11-5-02.  In it,

11 I mention to you or brought to your attention a major problem

12 concerning Chaplain Ibrahiym's sermons in which I expressed

13 that he said that certain individuals of my particular faith

14 are not Muslims and I explained that this was inciting

15 dislike.

16        Do you by any chance recall ever responding to this

17 request slip?

18 A.  No, I don't.  But if you have it in your hand, I am

19 surmising I responded.  I apologize, I don't remember.

20  Q.  You have here CC Captain Coleman file.  What does that

21  mean?

22  A.  I have down where I have CC'd Captain Coleman?

23  Q.  Right.

24  A.  I would have copied at the time Captain Coleman, who is

25  now a deputy, I would have copied him on that request.

1  Q.  But you personally never reviewed any tapes to

2  substantiate the claims that I made in this request, though?

3  A.  I truly don't remember, Mr. Sharp.  To the best of my

4  recollection, I do not remember.

5  Q.  I'm going to switch over to a request slip on 10-28-02

6  pertaining to my request for religious accomodation.  If I

7  remember correctly, we had discussed something about the

8  problem of contracts being drafted by Chaplain Ibrahiym in

9  order to participate in the fast.

10        Do you recall that?

11  A.  No, I do not.

12  Q.  You don't recall there ever being a contract required to

13  be timed in order to participate in the fasting of Ramadan?

14  A.  Oh, okay.  Are you talking about the form you would have

15  filled out to provide to Imam?

16  Q.  Right.

17  A.  Yes, I have them.

18  Q.  If I recall correctly, we dealt with that situation two

19  years in a row, correct, you and I specifically?

20  A.  I know we met that one time, and if you had problems the

21  next, I don't recall meeting with you, but if you're saying I

22  did, maybe I did.

23  Q.  Do you recall me ever bringing to your attention that to

24  sign the contract that he had presented would pose a violation

25  of my beliefs?

1  A.  Mr. Sharp, I really don't recall that.

2        MR. SHARP:  Thank you for your testimony,

3  Ms. Mears.

4        THE COURT:  Any further questions, Mr. Bradley?

5        MR. BRADLEY:  Just briefly.

6              REDIRECT EXAMINATION

7  BY MR. BRADLEY:

8  Q.  In those situations you met with Mr. Sharp, were the

9  issues around him resolved so he was able to participate in

10  Ramadan?

11  A.  Yes.

12        MR. BRADLEY:  That's all I have.

13        THE COURT:  Thank you, Ms. Blaine, for your time

14  this afternoon, and my thanks to whoever is there who allowed

15  the videotaping to take place.  We appreciate that.

16        THE WITNESS:  I appreciate the lack of travel.

17        THE COURT:  What we're going to do right now is

18  take a brief recess so that we can take care of getting the

19  video equipment moved out of the way for the next witnesses.

20          And my question for you, Mr. Sharp, is I understand

21  that there was some delay downstairs.  I don't know whether

22  it's your intention to have your lunch now or is it that you

23  prefer to have it later, I don't know what your preference is.

24          MR. SHARP:  Whatever is convenient for you, Your

25  Honor.  Now that I got this medication, I'm on top of the

1 world.  Like, whatever is convenient for you, I'm cool.  I

2 mean, like, I can make it if they just give me a few minutes

3 to eat when we're done.  If you want me to scarf it down now,

4 I can do it.

5        THE COURT:  We'll just take a brief recess, I don't

6 imagine it's going to take more than five or six minutes and

7 I'll make sure that you get your lunch when we finish, we're

8 going to conclude here around four-fifteen, you're fine until

9 then.

10        MR. SHARP:  I'm good now.

11    (Whereupon, there was a brief recess in the proceedings.)

12        MR. BRADLEY:  Defendants call Joel Dickson.

13     JOEL DICKSON, a witness having been duly sworn, testified

14 as follows:

15              DIRECT EXAMINATION

16 BY MR. BRADLEY:

17 Q.  State your name and spell it for the record, please.

18 A.  Joel, J-O-E-L, Dickson, D-I-C-K-S-O-N.

19 Q.  What is your present occupation?

20  A.  I'm the superintendent at SCI-Pittsburgh.

21  Q.  How long have you been employed by the Department of

22  Corrections?

23  A.  Since July of 1998.

24  Q.  What position did you take in July of 1998 with the

25  Department of Corrections?

1  A.  I was the deputy superintendent for internal security of

2  SCI-Pittsburgh.

3  Q.  When did you leave that position?

4  A.  It was approximately March of 2002.

5  Q.  What were your duties and responsibilities as the deputy

6  for institutional security at SCI-Pittsburgh?

7  A.  Primarily the supervision of the security office.  We were

8  concerned with any internal investigations conducted involving

9  inmates and/or staff, contraband control, entering into the

10  institution either through visiting room or whatever,

11  telephone monitoring, monitoring of security threat groups, et

12  cetera.

13  Q.  Did you have any role in the approval or disapproval of

14  inmate requests for religious accomodation?

15  A.  I did not.

16  Q.  During your time as the deputy for institutional security

17  at SCI-Pittsburgh, did you have occasion to encounter the

18  plaintiff in this case, Shawn Sharp?

19  A.  I did.

20  Q.  What were the nature of those encounters or interactions?

21  A.  As a deputy superintendent, I served as a member of the

22  program review committee and we would meet periodically with

23  inmates that were confined in Custody Level Five housing, the

24  restrictive housing unit.

25  Q.  So at the time Mr. Sharp was in the restricted housing

1  unit, you would sit on the review committees?

2  A.  That's correct.

3  Q.  And what would the purpose of the review committees be?

4  A.  Basically to review the rationale, reason for the inmates

5  to be housed in Custody Level Five housing, to check on their

6  housing status, and to basically discuss with them whether

7  there were any issues with their confinement in restricted

8  housing unit.

9  Q.  I want to direct your attention to what has previously

10  been marked in this matter as Exhibit No. 5.  Can you see that

11  in front of you?

12  A.  Yes, I do.

13  Q.  Can you identify that document?

14  A.  This is a DC-141 Part III which is used to record the

15  program review committee's review with the inmate.  In this

16  case, back at that time, we did this on a 90-day, every 90-day

17  basis with each inmate.

18  Q.  Does your name and signature appear on this document?

19  A.  It does.

file:///A|/sharp10-17-07A.txt

20  Q.  That would be as part of the PRC or the program review

21  committee?

22  A.  That's correct.

23  Q.  Mr. Sharp -- I don't know, I believe you were present for

24  the testimony of Mr. Sharp and he introduced this document and

25  made reference in the PRC comments to the reference to the

1  opportunity to go back to population after he signs a

2  contract.

3        Do you see that in there?

4  A.  I do.

5  Q.  Now, I believe Mr. Sharp testified that the contract

6  stated that he was not to engage in religious activity.  Would

7  such a contract have been offered to him or would he have been

8  required to sign such a contract to be removed from the

9  restricted housing unit?

10  A.  No, he would not.

11  Q.  What would be the nature of the contract that is referred

12  to in the PRC comments in Exhibit No. 5?

13  A.  In many cases where an inmate has some significant issues

14  with regard to safety and security while living in the general

15  population, we would as a behavioral modification technique

16  have the inmates sign a contract basically agreeing that they

17  would not engage in the kind of behavior or activity that

18  resulted in them being placed in Custody Level Five housing to

19  begin with.

20  Q.  In your understanding of the reasons why Mr. Sharp was

21  placed in administrative custody at SCI-Pittsburgh during this

22  time frame, was his administrative custody placement based on

23  his exercise of his religious rights?

24  A.  It was not.

25  Q.  Do you know the reason he was placed there?

1  A.  In essence, he was fomenting unrest in group activity that

2  was not in keeping with the guidance and rules of the

3  institution.

4  Q.  Other than serving on the PRC committee that reviewed

5  Mr. Sharp's administrative custody placement, did you make any

6  other decisions or take any acts that would have affected

7  Mr. Sharp's placement within the institution, or other

8  circumstances he faced in the prison?

9  A.  I'm not sure I understand your question.

10  Q.  It wasn't a good question.

11         Other than serving on the PRC committee, do you

12  recall at this point any other interaction you would have had

13  with Mr. Sharp?

14  A.  I do not.

15  Q.  Did you ever take any steps to prevent Mr. Sharp from

16  practicing his professed religion?

17  A.  I did not.

18  Q.  Did you ever tell Mr. Sharp that he was not allowed to

19  practice any particular religion?

20  A.  I did not.

21  Q.  Did you take any action or make any decision regarding

22  Mr. Sharp while you were the deputy for institutional security

23  at SCI-Pittsburgh based on his expressed religious preference?

24  A.  I did not.

25        MR. BRADLEY:  That's all the questions I have, Your

1  Honor.

2          THE COURT:  Mr. Sharp, do you have questions for

3  Mr. Dickson?

4          MR. SHARP:  Yes.

5                  CROSS-EXAMINATION

6  BY MR. SHARP:

7  Q.  You said that you would use contracts as a mode of

8  behavior modification, correct?

9  A.  I did.

10  Q.  Can you tell me where in the Department of Corrections

11  policies and procedures it mandates for you to come up with

12  the contract of behavior that regards religion?

13  A.  There is no mandate.

14  Q.  So what would give you --

15  A.  Nor did I say that any issue of your religious conduct was

16  included in that.

17          THE COURT:  Excuse me.  He is answering your

18  question.  Let him finish.

19          MR. SHARP:  He's going beyond what I asked him.

file:///A|/sharp10-17-07A.txt

20          THE COURT:  Let him finish.

21          THE WITNESS:  My point being that there was no

22  intent that that be part of your contract.

23          MR. SHARP:  Can I say something?

24          THE COURT:  You may ask him a question.

25  BY MR. SHARP:

100

1  Q.  So you're saying that it was never your intention for me

2  to stipulate what religious conduct I would engage in in

3  writing that contract, is that what you're saying?

4  A.  The manner in which you practice your religion was not an

5  issue.  The issue, as I recall it, was the method in which you

6  were attempting to include others in this practice.

7  Q.  Specifically, what actions did I engage in that would

8  mandate you to come to such a conclusion?

9  A.  Your actions were outside the parameters of --

10  Q.  What specific action?

11  A.  In the effort to gain your permission or whatever to

12  practice your religion.

13  Q.  What specific action?

14  A.  Group activity.

15  Q.  In other words, when did this incident take place?  Would

16  there be an incident report?

17  A.  As I recall, there was -- you were confined under

18  administrative custody and there was an investigation

19  conducted.

20  Q.  Okay.  Was there an incident report that started this

21  entire security process?

22  A.  I do not recall.

23  Q.  So what evidence would you use to support your allegation

24  of group activity?  Did you receive CSI reports?

25          MR. BRADLEY:  Your Honor, I don't believe that was

1  his allegation.  I don't believe he's testified to that.

2          THE COURT:  I think Mr. Bradley's point is well

3  taken, so the objection is sustained.

4          You can ask him --

5          MR. SHARP:  I'm trying to understand what he's

6  objecting to.

7          THE COURT:  He's made his objection.  I've

8  sustained the objection.

9  BY MR. SHARP:

10  Q.  Okay.  What -- on what evidence or what evidence did you

11  have in front of you that made you conclude that I was

12  engaging in group activity?

13  A.  I do not recall.

14  Q.  You do not recall?

15  A.  No.

16  Q.  Was there any evidence?

17  A.  I do not recall.

18  Q.  Who would have the evidence?

19  A.  Should be a matter of record, but I do not have that

20  record in front of me, before me.

21  Q.  So you can remember me enflaming the Muslim community, as

22  you said, I believe those were your words, and causing unrest,

23  but you can't remember one specific incident that I was

24  supposed to have been found guilty of?

25  A.  I don't believe there was ever any guilt issue involved

1  here.  I think there was a matter of record as far as your

2  misconduct history and the behavior you were engaged in at

3  SCI-Pittsburgh.

4  Q.  So, again, I'm asking you, what specific behavior?

5  A.  I do not have that before me.

6  Q.  Okay.  If a person is engaging in unauthorized group

7  activity, as you stated, is there a misconduct charge for

8  that?

9  A.  Generally, yes.

10  Q.  So there would have been a misconduct -- if a person was

11  seen engaging in such activity, then a misconduct would have

12  been written?

13  A.  Again, in most cases, I would assume so, yes.

14  Q.  Okay.  Was there a misconduct issued against me for

15  engaging in unauthorized group activity?

16  A.  I do not recall.

17        MR. SHARP:  Give me a second, Your Honor, I want to

18  find this particular document.

19        Mr. Bradley, do you have your original response to

20  the complaint?

21          THE COURT:  What are you asking for?

22          MR. SHARP:  Does he have the original response to

23  the complaint?

24          THE COURT:  Response to what?

25          MR. SHARP:  To the original complaint that he

1 filed.  I may have what I'm looking for.  I'm trying to find

2 something.

3      I'll start with this.

4      Can I enter this as an exhibit, Your Honor?

5      THE COURT:  Yes.

6      MR. SHARP:  This is from the defendant's exhibits.

7 I believe it was out of Exhibit 8, but it is specifically

8 misconduct charges.  I'd like to have this -- it has all of

9 the charges that one would be found guilty of for a misconduct

10 violation.  I would like to have that entered as a plaintiff's

11 exhibit.

12      MR. BRADLEY:  I believe that's No. 20.

13      THE COURT:  I assume you want the witness to be

14 looking at it when you ask a question?

15      MR. SHARP:  Yes.

16 BY MR. SHARP:

17 Q.  Do you have the document?

18 A.  I do.

19 Q.  Could you read off anywhere on there any charge that I was

20  ever found guilty of on a disciplinary custody transaction, or

21  are you aware of any -- let me say it this way.  Strike that.

22          Are you aware of any misconduct charge on that list

23  that I was ever found guilty of?

24  A.  I am not.

25  Q.  Okay.

1        MR. BRADLEY:  Your Honor, could we specify the time

2  period?

3        THE COURT:  Yes.

4  BY MR. SHARP:

5  Q.  At any time at SCI-Western?

6  A.  At SCI-Western, I know of no time in which you were found

7  guilty of an offense that resulted in disciplinary custody

8  time.

9        If I might add, there is a category called

10  administrative custody --

11        MR. SHARP:  Your Honor --

12        THE COURT:  Excuse me.  Let the witness answer.

13        MR. SHARP:  He's giving more information than I

14  asked for.

15        THE COURT:  Mr. Sharp, I don't want to have to keep

16  telling you that.  You asked the question, the witness is

17  answering.  You may not interrupt the witness.  If you have a

18  follow-up question, you may follow-up, but please let the

19  witness answer.

20          THE WITNESS:  Under these circumstances, Mr. Sharp

21  was placed in administrative custody during the conduct of the

22  investigation, as I recall it.  At the conclusion of the

23  investigation, it was determined that he needed to be

24  segregated from the general population, not just for his own

25  protection but for the protection of others.  Under those

105

1  circumstances, he was to remain on administrative custody, not

2  disciplinary custody.

3  BY MR. SHARP:

4  Q.  So, in other words, what you're saying is that there was

5  never an incident report -- strike that.

6        So what you're saying is that I was never found

7  guilty of a disciplinary custody violation, however, according

8  to -- I'm trying to find out where you got this information or

9  what presented this belief to you that I was fomenting unrest

10  in the Muslim population.  What evidence did you have to find

11  me guilty of a DC charge?

12        MR. BRADLEY:  Your Honor, again, the testimony is

13  that he was not found guilty of a disciplinary custody charge.

14        THE COURT:  Sustained.

15        MR. SHARP:  Okay, sustained.  You sustained it.

16        MR. BRADLEY:  As well as, Your Honor --

17        THE COURT:  Mr. Bradley wasn't finished.

18        MR. BRADLEY:  I don't believe it's been established

19  that this witness was the one responsible for the

20   investigation or the other reports that would have initiated

21   the administrative custody placement.

22          THE COURT:  The objection is sustained.

23          You may ask him foundational questions to see

24   whether he had any hand in that.

25   BY MR. SHARP:

1  Q.  Did you or did you not testify that you were responsible

2  for security?

3  A.  I did.

4  Q.  Does that mean you would have read every security report

5  that would have been issued by anyone in the Department of

6  Corrections at SCI-Western?

7  A.  Generally, yes.

8  Q.  You would have had to evaluate whether or not that

9  security threat was valid or not?

10  A.  And I would.  If I might read from your exhibit.

11        THE WITNESS:  Is that permissible, Judge?

12        THE COURT:  If it's in response to his question.

13        THE WITNESS:  Yes, it is.  The initial reason for

14  confinement is placed on this document, and then there's a

15  continuation as to why confinement is continued.  This is all

16  part of the record.

17        If I might read this.

18        On 11-30-99, Mr. Sharp was placed on administrative

19  custody per order of Lieutenant Blakey.  This is being done in

20  accordance with DC-ADM 802, Article VI, Section A, Subsection

21  1.f.  He has been charged with or is under investigation for a

22  violation of institutional rules and there is a need for

23  increased control pending disposition of charges or completion

24  of the investigation.

25          That was the first placement on administrative

1  custody.

2       The paragraph goes on to read:  On 12-2-99, he was

3  placed on administrative custody per order of Captain Yurich,

4  who was the security captain at the time.  This is being done

5  in accordance with DC-ADM 802, Article VI, Section A,

6  Subsection 1.a.  He is a danger to some person or persons in

7  the institution who cannot be protected by alternate measures.

8  He is being placed under AC due to his efforts to organize

9  inmate activity outside the guidelines of the Department of

10  Corrections.  He will remain on AC status permanently or he is

11  transferred.

12  BY MR. SHARP:

13  Q.  So, again, I'm going to ask you, well, I'm going to ask

14  you, you're over Captain Yurich?

15  A.  I was at the time, yes.

16  Q.  You were over Captain Yurich.  Did Captain Yurich ever

17  present you with any security report in which I was engaged in

18  any unauthorized group activity?

19  A.  I do not recall.

20  Q.  You do not recall.  Okay.

21         Were there any incidents that you could recall that

22  I was alleged to have been engaged in?

23  A.  At SCI-Pittsburgh?

24  Q.  At SCI-Pittsburgh, that I was allegedly engaged in that

25  was a violation of Department of Corrections regulations?

1  A.  It has been seven -- six or seven years, I do not recall

2  the result of that investigation specifically.

3  Q.  And it is your contention that the request for me to

4  provide a religious contract was used specifically as a form

5  of behavior modification, is that your testimony?

6       MR. BRADLEY:  I'm going to object to that question.

7       THE COURT:  The objection is sustained.  That is a

8  mischaracterization of his testimony.

9       MR. SHARP:  No problem, Your Honor.

10  BY MR. SHARP:

11  Q.  What was your intent in using the contract?

12  A.  Basically, as I stated earlier, it's a document that an

13  inmate would actually identify his own behaviors, partially,

14  and that they would adhere to, and, in essence, as a behavior

15  modification technique prior to release from Custody Level

16  Five housing and returned to general population.

17  Q.  So, in other words, you're saying you were using a

18  behavior modification technique?

19  A.  We were using that as a behavior modification technique,

20  yes.

21  Q.  What happened, did I provide a contract to you?

22  A.  I don't recall.

23  Q.  I believe I did.  But, nevertheless, what did you want in

24  the contract besides or what specific things did you want me

25  to write in the contract?

1  A.  I do not recall.

2  Q.  Have you ever in your history of -- I don't know how many

3  years you have been in the Department of Corrections, have you

4  ever asked anyone to write a contract about what specific

5  religious activities they would be engaging in as part of

6  their release from confinement?

7  A.  Again, that was not part of any mandate or contract that

8  I'm familiar with.

9  Q.  So historically you have never done that before?

10  A.  I'm not sure I understand your question.  We would never

11  direct that an inmate write a contract as to what religious

12  beliefs they would follow.

13  Q.  So you -- what were you specifically requesting in the

14  contract?

15  A.  Again, I do not recall.  I can speculate.

16      MR. SHARP:  Is he allowed to speculate?

17      THE COURT:  No.

18  BY MR. SHARP:

19  Q.  So, in other words, you're saying you can't recall.  Okay.

20          And, again, I'm going to ask you, I don't know

21  if -- maybe you didn't understand the question.  In your

22  history of being a deputy superintendent, have you ever asked

23  anyone to specifically write out a contract pertaining to

24  their religious activities?

25  A.  No.

1  Q.  Have you ever done that?

2  A.  No.

3  Q.  So this was the first time?

4        MR. BRADLEY:  Objection, Your Honor.

5        THE COURT:  Sustained.

6  BY MR. SHARP:

7  Q.  Not long after that incident, do you recall also

8  submitting a security report for a transfer for Mr. Sharp, or

9  for myself?

10  A.  I do not recall the specific timing.  I do remember that a

11  transfer recommendation was submitted.

12  Q.  And it was your obligation that during that time you would

13  oversee all security reports; am I correct?

14  A.  That's true.

15  Q.  Are you aware of a security report that was in my file

16  that stated that I was caught in possession of two weapons?

17  A.  I am not.

18  Q.  If that report was in my file, would it be your

19  responsibility to be aware of its origin and where it came

20  from?

21      MR. BRADLEY:  Your Honor, I'm going to object.  I

22  believe this goes to a claim that has been dismissed in this

23  matter.

24      THE COURT:  Sustained.

25      MR. SHARP:  I'll ask it this way.

1  BY MR. SHARP:

2  Q.  Any security reports that were put into my jacket, was it

3  your responsibility to review?

4       MR. BRADLEY:  Asked and answered, Your Honor.

5       THE COURT:  Sustained.

6       MR. SHARP:  No further questions, Your Honor.

7       THE COURT:  Any redirect?

8       MR. BRADLEY:  Nothing, Your Honor.

9       May this witness and the others that have already

10  testified be excused?

11       THE COURT:  Yes, they may.

12       MR. SHARP:  Your Honor, I have a question for you.

13       THE COURT:  Yes, Mr. Sharp.

14       MR. SHARP:  You brought up the fact that it was not

15  permissible for me to mention my confinement in the RHU or my

16  administrative confinement.

17       THE COURT:  I'm sorry.

18       MR. SHARP:  In the beginning of this trial, you

19  specifically explained to me that no testimony would be

20  permitted pertaining to my administrative confinement in the

21  RHU.  Wasn't that the order that you gave me?

22          THE COURT:  I don't believe that's the precise

23  order, but what is your question?

24          MR. SHARP:  I would like to object to the testimony

25  that was presented because you're allowing him to bring up the

112

1  fact that I was confined when the entire time you've mandated

2  that I stay away from the fact that I was confined, and I feel

3  that that's prejudicial because the entire time I have been

4  preparing my case understanding that I can't bring up what

5  happened and why I was administratively confined, but you just

6  allowed him to open that door.

7         THE COURT:  Excuse me?

8         MR. SHARP:  So I should be allowed to rebut that,

9  if at all possible.

10        THE COURT:  Let me remind you, Mr. Sharp, Exhibit

11 No. 5 was, in fact, your exhibit.

12        MR. SHARP:  True, it was.

13        THE COURT:  So there is already --

14        MR. SHARP:  Your Honor --

15        THE COURT:  Excuse me.  I haven't finished.  There

16 is already in the record evidence of this fact.  What you're

17 not allowed to do is assume that you may relitigate that claim

18 because this Court has already ruled upon it.

19        Now, do you have a question?

20         MR. SHARP:  I would like to object.  I'm going to

21  say this again.  I would like to object because you limited me

22  specifically -- I recall this, when I entered that particular

23  document in, you said, I'm not going to allow you to discuss

24  that.  Now, Your Honor, the one thing that I specifically want

25  to address is the contract itself and them requesting me to

1  write out specifically a contract stating what religious

2  activity that I would engage in if released from the RHU, and

3  I remember that very vividly.

4          THE COURT:  You asked this witness those questions.

5          MR. SHARP:  Right.  But you allowed him to go into

6  why I was confined, to read off what the entire basis was, and

7  I should be allowed to rebut that and challenge that and

8  you're not letting me do that.

9          THE COURT:  You entered it into the record, sir.

10          MR. SHARP:  Again, I'm going to say this again.

11  You allowed me a limited avenue --

12          THE COURT:  There was no limiting instruction.

13  When you admitted that document --

14          MR. SHARP:  So you're saying you never ordered me?

15          THE COURT:  What is it you want to do?

16          MR. SHARP:  I'm trying to tell you.

17          THE COURT:  You're putting on the record some

18  objection.

19          MR. SHARP:  I would like to have that stricken from

20  the record, or either that or I would like to have an

21  opportunity to bring evidence and re --

22          THE COURT:  What is the evidence?

23          MR. SHARP:  I would like to bring security reports

24  that were filed in front of him that were falsified, that were

25  removed from my jacket, that he reviewed, upon which what he

1  just said was the reason for my administrative confinement was

2  refuted -- I would like to refute that.  I would like to rebut

3  that.

4       THE COURT:  That has already been ruled upon by the

5  Court and your request --

6       MR. SHARP:  So, in other words, you're going one

7  way, that's what you're saying, you're allowing him to bring

8  up my administrative confinement and I can't challenge or

9  rebut the falsification of the documents he submitted.  These

10  documents he had in my security file were falsified and I

11  should be allowed to present that if he's going to present the

12  fact that he's saying he went off certain security reports

13  that said I was fomenting hate and deception among Muslim

14  inmates and the population at SCI-Western.  I should be

15  allowed to refute that.  That's bias.

16       THE COURT:  It is not.  Your objection is noted.

17       MR. SHARP:  Wow.

18       THE COURT:  We're going to move on to the next

19  witness.

20        MR. BRADLEY:  Defendants call Mark Krysevig.

21        MARK KRYSEVIG, a witness having been duly sworn,

22  testified as follows:

23              DIRECT EXAMINATION

24  BY MR. BRADLEY:

25  Q.  State your name and spell it for the record.

1  A.  Mark Krysevig, K-R-Y-S-E-V-I-G.

2  Q.  What is your current position?

3  A.  I'm a superintendent at SCI-Crescent.

4  Q.  How long have you been so employed?

5  A.  Approximately 26 years.

6  Q.  What was your first position with the Department of

7  Corrections?

8  A.  Corrections officer.

9  Q.  At some point did you become the deputy superintendent for

10  centralized services of SCI-Pittsburgh?

11  A.  Yes.

12  Q.  When was that?

13  A.  I believe was July of 1999.

14  Q.  Approximately how long did you hold that position?

15  A.  Approximately two and a half years.

16  Q.  You just heard deputy superintendent -- Former Deputy

17  Superintendent Dickson testify about the contract that was

18  discussed with Mr. Sharp with respect to the PRC and his

19  administrative custody placement?

20  A.  Yes.

21  Q.  Were you a part of that PRC?

22  A.  Yes.

23  Q.  Looking at Exhibit No. 5, does your name and signature

24  appear on that document?

25  A.  Yes, it does.

1  Q.  Could you explain to the Court what your understanding of

2  the use of the term "contract" in that PRC comments was?

3  A.  Pretty much the same as what Superintendent Dickson

4  stated.  It's a contract that we can hold, that we would hold

5  the inmate to upon his release to population.  In fact, if he

6  would violate any aspect of that contract, we would return him

7  to the RHU.  It's basically an informal agreement, by the way.

8  Q.  Within that -- it does not appear that a contract was --

9  strike that.

10      Do you recall if a contract was ever reached with

11  Mr. Sharp?

12  A.  I don't believe it was ever finalized.

13  Q.  Was there any condition regarding his professed religious

14  preference made as part of that contract, or would that have

15  been made part of that contract?

16  A.  I believe he was asked to give us his idea of what he

17  would do in general population in regards to his religious

18  activities.  And this was based on the complexity of his

19  religious preferences, so we were not schooled in those

20  aspects of the religion, so we asked him to give us some

21  baseline things that he was going to do and things that he

22  would not do.

23  Q.  Was it a requirement from the PRC that he not practice a

24  particular form of religion?

25  A.  No.

file:///A|/sharp10-17-07A.txt

117

1  Q.  I believe you indicated that no contract was ever agreed

2  upon between the PRC and Mr. Sharp?

3  A.  I don't believe so.

4  Q.  Do you know if Mr. Sharp was ever released from his

5  administrative custody during this time frame at

6  SCI-Pittsburgh?

7  A.  Only upon his release or transfer to SCI-Greene.

8  Q.  So while at SCI-Pittsburgh, he remained in the restricted

9  housing unit?

10  A.  Yes.

11  Q.  While at SCI-Pittsburgh, did you ever have the opportunity

12  to review an inmate request for religious accommodation

13  submitted by Mr. Sharp?

14  A.  I don't recall doing so.

15  Q.  I'm giving you a document that was previously marked as

16  Exhibit No. 1.  Have you ever seen that document before?

17  A.  Only in court over the last day or so.

18  Q.  Do you recall seeing that document in 1999?

19  A.  No.

20  Q.  Are you one of the persons to whom that document is

21  addressed?

22  A.  No, I'm not.

23  Q.  Other than your interaction with Mr. Sharp as a member of

24  the PRC committee, did you have any interaction with Mr. Sharp

25  with regard to his religious issues?

1  A.  I had some discussion with Mr. Sharp during a meeting that

2  took place in the institution's chapel regarding Ramadan.

3  Q.  In your recollection, is this consistent with the

4  testimony of Ms. Winstead who testified about a similar

5  meeting?  Is this the same meeting we're talking about?

6  A.  I believe so.

7  Q.  Do you know when that meeting was held?

8  A.  It would have been sometime in November of 1999.  I don't

9  have a specific date.

10  Q.  To the best of your recollection, what was the purpose of

11  that meeting?

12  A.  The purpose of the meeting was to sit down and speak to

13  the representatives of the three Muslim groups within the

14  institution, that would have been the Nation of Islam, the

15  regular Muslim group and the Moorish Americans to basically

16  get some understanding of how Ramadan was to work this

17  particular year.  One of the problems we ran into was the

18  Nation of Islam had a separate Ramadan which usually ran from

19  December 1st to December 31st.  The Moorish Americans

file:///A|/sharp10-17-07A.txt

20  participated somewhat in Ramadan, but not completely in

21  Ramadan, and we actually got an agreement from the Nation of

22  Islam inmates to pray in their cells and only attend the

23  feast.  The Moorish Americans did the same, so, basically, our

24  Ramadan only involved the one major group of inmates as far as

25  breaking the fast and the services that were associated with

1  it.

2  Q.  Was that meeting largely successful in planning the

3  Ramadan accommodation for that year?

4  A.  Yes.

5  Q.  Mr. Sharp has indicated at various points in this meeting

6  he also expressed concerns about his request for religious

7  accommodation of his group.

8        Do you recall any of those discussions?

9  A.  I recall Mr. Sharp being at the meeting.  I also recall

10  questioning why he was at the meeting since he was not a

11  representative of one of the three Muslim groups that we had

12  at the institution.  And the meeting did digress somewhat due

13  to Mr. Sharp's presence and his insistence on the religious

14  accommodation.

15  Q.  Do you recall if any resolution of his concerns was

16  achieved at that meeting?

17  A.  No.

18  Q.  No, you don't recall?

19  A.  No, I don't recall.

file:///A|/sharp10-17-07A.txt

20 Q.  Do you recall having any other discussions or

21 conversations with Mr. Sharp about his religious concerns at

22 SCI-Pittsburgh?

23 A.  I'm sure that I did, but I don't recall them specifically,

24 only because I was aware of his concerns when we had the

25 meeting about the Ramadan.  But I don't remember any specific

1  dates or anything, but I'm sure I did speak to him.

2  Q.  Did you ever tell Mr. Sharp that he could not pursue his

3  professed religion?

4  A.  No.

5  Q.  Did you ever exclude Mr. Sharp or ensure that he was

6  excluded from participating in any religious activity because

7  of his chosen religion at SCI-Pittsburgh?

8  A.  No.

9        MR. BRADLEY:  Your Honor, that's all the questions

10  I have for this witness.

11        THE COURT:  Mr. Sharp, you may cross-examine.

12        MR. SHARP:  Yes.

13        I need to see the exhibits that I filed so far

14  because if I remember correctly --

15        THE COURT:  I can't hear you.

16        MR. SHARP:  I need to see the exhibits that I filed

17  because I believe there are request slips that were addressed

18  to Mr. Krysevig and he responded.

19        THE COURT:  We'll give you the exhibits.

20          CROSS-EXAMINATION

21  BY MR. SHARP:

22  Q.  Who were the other deputies that were present at

23  SCI-Western while you were there?

24  A.  It would have been Deputy Dickson and Deputy Stickman.

25  Q.  Did you replace Deputy Blaine?

1  A.  Yes, I did.

2  Q.  So on Exhibit No. 1, it says Deputy Superintendent

3  C. Blaine.  So anything that would have gone to Blaine, would

4  that have gone to you instead being as though you were the

5  deputy?

6  A.  It's possible.

7  Q.  Are you familiar with the DC-ADM 819?

8  A.  I'm familiar with it, yes.

9  Q.  This is Exhibit 2.

10      Would you read the second sentence for me, please.

11  A.  Describe in detail your religion's basic tenets or belief

12  which require that you be provided with the requested

13  accommodation.

14      Is that what you're looking at?

15  Q.  It should be right over top --

16  A.  Why don't you read it and ask me the question.

17  Q.  I don't have two copies.  Right at the very, very top

18  there's a sentence, then it gives you some instructions.

19  A.  If this is a group request --

20  Q.  Right there.

21  A.  -- information must be submitted to the Facility

22  Chaplaincy Program Director who will compile information about

23  the group request.

24  Q.  So, if it says that and it says that it is the

25  responsibility of the group request, would that -- would this

1  Exhibit 1 meet that requirement?

2  A.  I don't know.

3  Q.  Is there a policy set forth of how that is supposed to be?

4  A.  This is the policy.

5  Q.  In other words, what I'm saying is, how would I go about

6  carrying out that policy?

7  A.  I don't work with this on a day-to-day basis and never

8  have, so I really can't answer your question.

9  Q.  So you would have no knowledge of how that would be done?

10  A.  No.  I've only ever dealt with this in a review aspect.

11  Q.  In our meetings, did I ever bring up my individual

12  request?  You did testify I brought up my individual request

13  and I also brought up this request, correct?  Is that what you

14  testified to?

15  A.  I testified I had not seen that request.

16  Q.  But do you recall -- okay.  Well, do you recall me

17  bringing to your attention my individual request for religious

18  accomodation?

19  A.  I remember discussing it with you, but I don't recall

20  specifically if we were talking about your group as you

21  claimed to have or your individual request.

22  Q.  Well, if I remember correctly, we were having a discussion

23  and one of the things that -- correct me if I'm wrong -- I

24  brought up in the Ramadan discussion was the fact that all

25  Muslims were not being accommodated in the institution.  Do

1  you recall me mentioning that?

2       THE COURT:  I'm sorry, I couldn't hear you.

3  Mr. Sharp would not be accommodated?

4  BY MR. SHARP:

5  Q.  I said all Muslims who were in the institution who wanted

6  to participate in Ramadan according to what was done

7  previously were not being accommodated.

8       Do you recall me mentioning that?

9  A.  I can't recall the verbatim text of the meeting from that

10  long ago.

11  Q.  I want to bring your attention to Exhibit No. 3, the very

12  first page.  Read the first line of your response, please.

13  A.  Although your request may have been valid, your methods

14  certainly are not.

15  Q.  In your reference to methods, could you explain to me

16  exactly what methods were violative of any of the misconduct

17  charges on Exhibit 20?

18  A.  I believe you used threats and intimidation through

19  institution officials to have your group recognized.  That's

20  what I'm referring to.

21  Q.  Was there a misconduct ever issued for that?

22  A.  No, there wasn't, but that was explained.  That is what

23  I'm talking about with your methods.  You literally were

24  threatening the institution with a disturbance if your group

25  wasn't recognized.

1  Q. What staff member?

2  A. Not a staff member, in general.

3  Q. You just said I was threatening --

4  A. Yes.

5  Q. And using intimidation toward what individual?

6  A. You weren't threatening an individual, you were

7  threatening the security of the institution.

8  Q. By requesting a religious accomodation?

9  A. No. No. By not letting the process follow through. You

10  wanted your group to be recognized immediately, okay, and

11  there may have been some glitch in your religious

12  accommodation request, but you were not willing to wait for

13  the process to go through. I do recall that.

14  Q. I recall you making that allegation. I definitely recall

15  that.

16        But I want to ask you something. While we were

17  standing there and you made that statement, do you recall me

18  turning to Chaplain Ibrahiym and telling you that I have never

19  at any time done anything other than what Chaplain Ibrahiym

20  had instructed me to do.  Do you remember me saying that?

21  A.  No.

22  Q.  Did Chaplain Ibrahiym ever come to you and say that I had

23  done anything that was not what he specifically instructed?

24  A.  No, not that I recall.

25  Q.  Did you get a report from any other staff member saying

1  that I was disruptive in any religious services or anything?

2  A.  Not in any religious services, but subsequently there were

3  reports from staff members that you were creating disruption

4  within the institution.

5  Q.  Do you recall what staff member made that statement?

6  A.  Lieutenant Blakey.

7  Q.  Lieutenant Blakey made that statement?

8  A.  Yes.

9  Q.  And you never ordered Lieutenant Blakey to lock me up?

10  A.  No.

11  Q.  In the course of your request for a contract, if I

12  remember correctly, you were the one who initiated mentioning

13  of a contract, correct?

14  A.  I don't recall.

15  Q.  What specifically did you want in that contract?

16  A.  I don't even know if I can answer at this point.  But I

17  would think that what I would want is that you wouldn't

18  participate in any group activity, negative group activity.  I

19  believe that's probably what I wanted.

20  Q.  So your belief was that I was engaged in negative group

21  activity?

22  A.  Yes, that's exactly what I believed.

23  Q.  How many other inmates were locked up with me?

24  A.  I don't recall.

25  Q.  Were there any other inmates locked up with me?

1  A.  I don't recall.

2  Q.  Do you recall us having a meeting after you requested that

3  contract?

4  A.  Not specifically.

5  Q.  Up in the RHU, you came back up.  I do have a copy of the

6  request slip -- I may have submitted it as an exhibit -- in

7  which I asked you, was it possible for us to meet and to

8  discuss what you required in the contract because I wasn't

9  really understanding if you were asking me to give up certain

10  constitutional rights.

11       Do you recall me saying anything like that?

12  A.  Vaguely, I do.

13  Q.  You do remember that?

14  A.  Yes.

15  Q.  Then we sat down and we had a discussion about what you

16  wanted in the contract; am I correct?

17  A.  I don't know.  I do vaguely remember something like that,

18  though.

19  Q.  And you expressed at that time, if I'm not mistaken, that

20  you wanted to make sure that I understood or -- and I'm

21  paraphrasing what I heard you say, you can correct me if I'm

22  wrong, that you specifically wanted me to stay away from all

23  religious issues.  Do you recall saying that?

24  A.  I don't recall saying that and I don't believe I ever

25  would say that.

127

1  Q.  Do you recall saying that, look, your problem is you're

2  wanting to deal with this religious stuff.

3        Do you recall saying that?

4  A.  I may have said that.

5  Q.  Okay.  So, what specifically was the problem that I was

6  having in requesting religious accommodation?

7  A.  It wasn't your request for religious accommodation.  Quite

8  honestly, I don't believe religious accomodation was your

9  issue.  I believe you wanted to lead the Muslim group.  You

10  wanted to be in control.  I don't think you were as devout as

11  you led people to believe and it is my opinion that your

12  whole -- your whole thing was to be the leader of the Muslim

13  group.  That was the assumption that I got through the

14  conversations and the -- my interaction with you.

15  Q.  Through that, you assumed that I was intimidating other

16  Muslims?

17  A.  I didn't say that, no.

18  Q.  Did you believe that?

19  A.  I believed that you were.  In fact, I think it's a matter

20  of record that you may not have been intimidating them, but

21  you were inciting them.

22  Q.  To what particular activity?

23  A.  Because the other Muslims didn't want you around.

24  Q.  I'm asking you a question, inciting them to what

25  particular activity?

1  A.  To retaliate against you.

2  Q.  So you're saying that I was a threat -- or that they were

3  a threat to me?

4  A.  Yes.

5  Q.  And you got reports stating that?  You have reports from

6  other inmates stating that I was a threat to them?

7  A.  I had conversations with other inmates basically saying

8  that you were a problem because the same thing that you

9  claimed yesterday in court was disrespectful to your religion

10  you were doing to them.  When you wouldn't -- you know, you

11  wouldn't pray behind a certain person, those inmates also

12  didn't want you around, so you became a problematic issue

13  within that community, the Muslims as a whole in the

14  institution.  And we're talking about a big number of inmates,

15  probably about 400 inmates which could have led to really

16  large potential problem within the facility.

17  Q.  So what you're saying is that you received information

18  that there was a major problem in beliefs between those of my

19  faith and those of another faith?

20 A.  No.  There was a major problem with how you were dealing

21 with the difference of beliefs.

22 Q.  So, in other words, what you're saying is that

23 specifically me as an individual, I was creating all this

24 chaos by asking to practice my religion?

25 A.  No.  You were creating the chaos by how you were going

1  about getting your accommodation and by how you were being

2  disrespectful to the other Muslims within the facility to

3  possibly prove your point.  This is the information that I was

4  getting.

5  Q.  So if you got that information and you knew that I was a

6  threat to security, did you ever file a security incident

7  report or any report, anything along that line?

8  A.  No.

9  Q.  So then it was just merely hearsay?

10  A.  Yeah, it was hearsay, but it was things that -- it was

11  pretty prevalent during that time frame.

12  Q.  Would you as the superintendent in the Department of

13  Corrections, working with I believe a Mr. Dickson, you're

14  telling me that if you knew that I was a disruptive factor in

15  the Department of Corrections or in any jail and you were

16  receiving reports that I was inciting other inmates and

17  fomenting hate to other inmates, you would not be required to

18  file an incident report?

19  A.  In my position at that time, I would have asked somebody

20  out of the security office to investigate it.

21  Q.  Did you do that?

22  A.  Yes.

23  Q.  And what was the result of that?

24  A.  I don't know.  You ended up being locked up by Lieutenant

25  Blakey who was, in fact, assigned to the security office, so I

1  would have to assume that that was part of that inquiry.

2  Q.  And in your process of reviewing the program review

3  causation, if I'm not mistaken, did you sit on the board that

4  initially determined that I would be placed on administrative

5  confinement?

6  A.  I don't know.  I don't recall.

7  Q.  Is it possible that you did?

8  A.  It's a possibility.

9  Q.  So if you initiated my lockdown --

10  A.  I already told you that I did not.

11  Q.  You just said that you contacted Lieutenant Blakey and

12  told Lieutenant Blakey to investigate whether or not I was a

13  threat to security and Lieutenant Blakey in turn confined me,

14  is that what you just said?

15  A.  That is not what I just said.

16  Q.  Then explain to me what did you do.

17  A.  The only thing that I would have done is inform the

18  security office that you were someone that beared watching.

19  Q.  Did you do that?

20 A.  Yes.

21 Q.  So, in other words, you contacted Lieutenant Blakey?

22 A.  No, not necessarily.  I may have contacted Deputy Dickson

23 or Captain Yurich, I don't recall, or I may have contacted

24 Deputy Stickman because he did have oversight of the security

25 office.  That's probably what happened.  But your activity

1  certainly put you on the radar screen.

2      MR. SHARP:  Can I have the exhibits that he has.

3  BY MR. SHARP:

4  Q.  Let me ask you something.  At our meeting, do you recall

5  me bringing to your attention Chaplain Ibrahiym's offer for us

6  to attend Taleem?

7  A.  No.

8  Q.  You don't recall that?

9  A.  No, I don't.

10  Q.  Let me ask you this.  Is every Muslim or every person who

11  would like to participate in religious services at SCI-Western

12  during the time that you were deputy superintendent, are they

13  allowed to attend openly?

14  A.  Every person?

15  Q.  In other words, like any person who is saying he is a

16  person of the Islamic faith, is it permissible when they call

17  Taleem for them to have a pass or to be put on a list to get a

18  pass to go to the chapel?

19  A.  I believe so.

20  Q.  So you believe that would be.  And if the entire jail is

21  being accommodated as far as the Islamic services are

22  concerned, within one community, right, when that service is

23  open, is it permissible for a person to get a pass if they

24  wanted to attend that service?

25  A.  I believe you had to request it prior to the date and be

1  issued a pass.

2  Q.  Right.  So you could get on the list.  Would it be

3  permissible for a person to order an inmate to tell other

4  individuals not to attend the religious service?

5  A.  No.

6  Q.  Did you ever do that?

7  A.  No.

8  Q.  You never told me to tell my brothers not to go to Taleem?

9  A.  I believe I may have told you to tell your brothers not to

10  be disruptive.

11  Q.  But you never told me to tell my brothers not to go to

12  Taleem?

13  A.  I don't recall doing that.

14  Q.  Did you ever -- during the meeting that we had, did you

15  ever tell me that Mr. Ibrahiym was my Imam?

16  A.  I may have.

17  Q.  And that you were specifically telling me that he is my

18  Imam?

19  A.  I may have said that.

20  Q.  What is the qualification for an Imam?

21  A.  I don't know.

22  Q.  So when you're telling me that this person is my religious

23  leader and you have no idea about what that entails or what

24  that requires, how could you make such a statement?

25  A.  Well, you don't have to recognize him as your Imam.  He

133

1  was the person that we employed to lead the Muslim community

2  at SCI-Pittsburgh.  Now, whether or not you accepted that was

3  totally up to you, but he was, in fact, the person that we

4  employed to do so.

5  Q.  But you used the specific term, and you just confirmed you

6  told me that he was my Imam.  What was my response to that?

7  A.  I don't recall.

8  Q.  Did I try to explain to you what Imam was and what that

9  entailed?

10  A.  I just said I don't recall.

11  Q.  What do you know about Islam?

12  A.  It's pretty open-ended question.

13  Q.  I mean --

14  A.  Very little.  Very little, obviously, from what I've heard

15  in the last couple of days.

16  Q.  So, if I presented to you the problem that my religious

17  accommodation request is not being processed properly, what

18  responsibility would you have as a supervisor of staff in the

19  Department of Corrections at SCI-Western?

20  A.  I'm not sure I understand your question.

21  Q.  In other words, if I come to you and I say, listen, policy

22  is being violated, right, you got people here who aren't doing

23  their job, all right, and have not been doing it for quite

24  some time, would that offend you?

25  A.  No.

1  Q.  If I told you that, what would it require you to do?

2  A.  It probably wouldn't require me to do anything.  I would

3  probably investigate it and find out if, in fact, some mistake

4  had been made or something was not being done that was

5  supposed to be done.

6  Q.  Did I bring that to your attention?

7  A.  I believe you did.

8  Q.  What was your response?

9  A.  I believe I admitted that we made a mistake with your

10  accommodation.

11  Q.  Did you use the term "we dropped the ball"?

12  A.  I read that in some of your request slips.  I don't recall

13  if I said that.  I could have used that terminology.

14  Q.  When you say you dropped the ball, what efforts did you

15  make to remedy the fact that you knew that this request for

16  accommodation had not been filed properly?

17  A.  Well, after the fact, after we would have found out that

18  there was a mistake, then we would have followed through with

19  the accommodation request.

20  Q.  Did you ever do that?

21  A.  It wasn't my responsibility to do that.

22  Q.  Did you ever ask anyone to do that?

23  A.  Yes, I believe we did.

24  Q.  What happened?  Who did you ask?

25  A.  I don't recall.

1  Q.  Did you hear the testimony of Chaplain Terza that he never

2  received my request for accommodation?

3  A.  Yes, I did.

4  Q.  And you're pretty sure you never asked him?

5  A.  Everything that we did about your accommodation would have

6  been talked about either right after that meeting that we had

7  about Ramadan, or you know, that same day.

8  Q.  So did you ever ask Chaplain Moneck to file my request for

9  accommodation?

10  A.  I didn't know Chaplain Moneck.  He worked in other

11  institutions.

12  Q.  I mean Chaplain Terza.

13  A.  I don't know that I followed up after the fact or not,

14  honestly.

15  Q.  In my request slip dated 12-1-99, I'm going to read

16  something to you.  It's the last line.

17        MR. BRADLEY:  Can we have the exhibit number?

18        MR. SHARP:  Exhibit No. 3.

19  BY MR. SHARP:

20  Q.  It says -- I'll just read this one line:  I request again

21  that you rectify this matter as expediently as possible.

22          And I basically am requesting in this request slip

23  that you look into the fact that my request for accommodation

24  had never been processed.

25          Did you do any investigation when you received this

1  request?

2  A.  I don't even know what you're talking about.  I don't have

3  it in front of me.

4  Q.  I'll give it to you.  It's Exhibit 3.

5        THE COURT:  Let him take a look at the exhibit.

6  You were asking him a question about it.  Let him take a

7  minute to review it.

8        THE WITNESS:  Okay.  Now I know what you mean.

9  BY MR. SHARP:

10  Q.  And in this I'm asking you to investigate and rectify the

11  issue of a religious request, correct?

12  A.  Yeah.

13  Q.  I had brought it to your attention on a prior occasion at

14  the meeting that it was not processed and so you knew that,

15  correct?

16  A.  (Indicates yes.)

17  Q.  You took no action in rectifying that.  I'm trying to find

18  out what action -- strike that?

19  A.  I can't answer that question.

20  Q.  Let me rephrase that.  Your testimony is that you cannot

21  recall what action you took to rectify the error?

22  A.  Right.

23         MR. SHARP:  No further questions, Your Honor.

24         THE COURT:  Mr. Bradley?

25         MR. BRADLEY:  Just briefly.

1              REDIRECT EXAMINATION

2  BY MR. BRADLEY:

3  Q.  On this last point, were you present for the testimony of

4  Rhoda Winstead this morning?

5  A.  Yes.

6  Q.  Do you recall her indicating that she sent a grievance

7  response to Mr. Sharp on December 20, 1999, indicating to him

8  that his request for accommodation had not been submitted on

9  the appropriate form and it needed to be submitted on the

10  appropriate form?

11  A.  Yes.

12  Q.  Is December 20th, 1999, subsequent to the date that you

13  had responded to that request?

14  A.  Yes, it is.

15          MR. BRADLEY:  Nothing further.

16          THE COURT:  Anything as a result of that question?

17              REDIRECT EXAMINATION

18  BY MR. SHARP:

19  Q.  Did you order Ms. Winstead to investigate my religious

20  request for accommodation?

21  A.  I may have.  I don't recall.

22  Q.  Again, were you aware of the fact that as an individual, I

23  filed a request for religious accomodation?  Was that brought

24  to your attention in that meeting?

25  A.  At that meeting you stated that.

1    MR. SHARP:  Thank you.

2    No further questions.

3    THE COURT:  Thank you, sir.

4    MR. BRADLEY:  Defendants call William Stickman.

5    WILLIAM STICKMAN, a witness having been duly sworn,

6 testified as follows:

7                DIRECT EXAMINATION

8 BY MR. BRADLEY:

9 Q.  Would you state your name and spell it for the record,

10 please.

11 A.  William S. Stickman, S-T-I-C-K-M-A-N.

12 Q.  What is your present occupation?

13 A.  I'm retired.

14 Q.  What was your former occupation?

15 A.  I retired as the Deputy Secretary of the Western Region

16 for the Department of Corrections.

17 Q.  When did you begin your service with the Pennsylvania

18 Department of Corrections?

19 A.  In 1978 I started as a CO1.

20  Q.  As a Corrections Officer 1?

21  A.  Yes, it is.

22  Q.  You just indicated that you retired as a deputy secretary?

23  A.  That's correct.

24  Q.  At some point, did you assume the position of deputy

25  superintendent for the facility management at SCI-Pittsburgh?

1  A.  I did.  It was January 1997.

2  Q.  How long did you hold that position?

3  A.  Five years, until March of 2002.

4  Q.  In March of 2002, where did you go?

5  A.  I was promoted to superintendent at SCI-Greene.

6  Q.  Could you previously describe the responsibilities of the

7  deputy superintendent for facility management?

8  A.  The responsibilities of facility management deputy are --

9  at Pittsburgh we had a unique situation because we had a

10  deputy of security, but it still overlapped for security, the

11  officer force, maintenance department and unit management was

12  the facility management's responsibility.

13  Q.  Did you have any role in inmate requests for religious

14  accommodation as deputy superintendent?

15  A.  I would have had a vote on the vote sheet that went

16  around.  That would have been the extent of it.

17  Q.  You've heard testimony in this case about a religious

18  accommodation request from Shawn Sharp while at

19  SCI-Pittsburgh.  Do you recall ever being asked to vote on a

20 religious accommodation requested by Mr. Sharp?

21 A. No, I don't.

22 Q. While at SCI-Pittsburgh, did you have any conversations

23 with Mr. Sharp regarding his religious activity concerns?

24 A. No. I don't believe -- I don't remember talking to

25 Mr. Sharp about anything to do with religion.

1 Q. Just so I'm clear, you don't recall having -- strike that.

2      Did you have any interaction with Mr. Sharp while

3 at SCI-Pittsburgh?

4 A. Yes. I did. I remember Mr. Sharp. I frequently got

5 inside the institution and I knew who Mr. Sharp was and we did

6 converse, but I don't specifically remember anything about

7 religion or anything like that. I did have an opportunity, I

8 believe, when he was locked up, I, like the other deputies,

9 sat on the program review committee where I would periodically

10 see inmates at the PRC, and I believe I saw him there mainly.

11 Q. Did you ever tell Mr. Sharp that he could not pursue any

12 specific religion?

13 A. Never.

14 Q. Did you ever take any action or make any decision

15 regarding Mr. Sharp based on his expressed religious

16 preference while he was at SCI-Pittsburgh?

17 A. No.

18 Q. As a result of any action you took or decision you made,

19 was Mr. Sharp ever excluded from participating in any

20  religious activity because of his chosen religion at

21  SCI-Pittsburgh?

22  A.  No.

23  Q.  You just testified that in March of 2002, you became a

24  superintendent of SCI-Greene?

25  A.  That's correct.

1 Q.  Can you briefly describe what your duties and

2 responsibilities would be as the superintendent at SCI-Greene?

3 A.  As a superintendent, it would have been my responsibility

4 to oversee the entire operation of the institution, which

5 would mean centralized service, facility management, business,

6 everything, you had oversight of the entire institution and

7 responsible for its running and operation.

8 Q.  As a superintendent, would you have involvement in the

9 process established by DC-ADM 819 for review of an inmate's

10 request for religious accomodation?

11 A.  Like I said previously, before, along with the other

12 deputies and staff, I would have a vote.

13      MR. BRADLEY:  May I approach the witness, Your

14 Honor?

15      THE COURT:  You may.

16 BY MR. BRADLEY:

17 Q.  I show you a document previously marked as Exhibit B.

18 It's the request for religious accomodation made by Mr. Sharp

19 while he was at SCI-Greene.

20          Do you recall seeing that document while you were

21  at SCI-Greene?

22  A.  Not really.  I don't recall it.

23  Q.  I'd ask you to look at the vote sheet.  In the space, is

24  there a space where the superintendent would make a

25  recommendation?

1  A.  There is.  It's facility manager.

2  Q.  Is that space filled out?

3  A.  It is.

4  Q.  Is that your signature?

5  A.  No, it's not.  It's then Deputy Stowitzky and it says

6  Stowitzky, Acting Superintendent.

7  Q.  I believe that was executed sometime in October of 2002?

8  A.  That's correct, 10-03-02, I believe.

9  Q.  That would have been the time when you were the

10  superintendent at SCI-Greene?

11  A.  Yes, sir.  I would have been the superintendent, but in my

12  absence, one of the deputies would be acting superintendent

13  and at this case, it must have been Stowitzky.

14  Q.  The recommendation there was to disapprove?

15  A.  It was.

16  Q.  Are there any remarks by the superintendent made?

17  A.  Yes.  It says insufficient rationale for support

18  accommodation -- for special accommodation.

19  Q.  Again, you did not participate in that decision in any

file:///A|/sharp10-17-07A.txt

20  way?

21  A.  No.  Because I would have gotten this and I didn't receive

22  this, so, in my absence, Deputy Stowitzky signed it.

23  Q.  While at SCI-Greene, do you recall having any

24  conversations with Mr. Sharp about his religious activity?

25  A.  No.  Once again, I knew Mr. Sharp, I had several

1  conversations with him, but nothing specifically about his

2  religious beliefs or anything.

3  Q.  Again, while at SCI-Greene, while acting as the

4  superintendent, did you ever tell Mr. Sharp that he could not

5  pursue a specific religion?

6  A.  Never.

7  Q.  Did you take any action or make any decision regarding

8  Mr. Sharp based on his expressed religious preference?

9  A.  No.

10  Q.  And again as a result of any action you took or decision

11  you made, was Mr. Sharp ever excluded from participating in

12  any religious activity because of his chosen religion?

13  A.  No.

14      MR. BRADLEY:  I have no further questions, Your

15  Honor.

16      THE COURT:  Do you have questions, Mr. Sharp?

17      MR. SHARP:  Yes.

18          CROSS-EXAMINATION

19  BY MR. SHARP:

20  Q.  How are you doing, Mr. Stickman?

21  A.  Good.

22  Q.  I believe you and I met in the RHU, correct?  This is

23  years back, but we kind of met in the hole, didn't we?

24        THE COURT:  You're going to have to speak up,

25  No. 1.  And No. 2, I think we need a time period.

1  BY MR. SHARP:

2  Q.  Upon my arrival to SCI-Western, I believe we met in the

3  hole, correct?

4  A.  That's possible.  You would have been seen by PRC within a

5  week when you got there and it's very possible I would have

6  been the one to meet you.

7  Q.  Over the years that we've known each other, because we've

8  known each other off and on from Western to SCI-Greene, have

9  we had a good, respectable relationship?

10  A.  I think so.

11  Q.  I think so, too.

12        Have I been disruptive in any way that you could

13  ever see?

14  A.  Well, there was a time in Pittsburgh when I was facility

15  management and you got locked up and there was an

16  investigation and I was receiving word along with others that

17  you were starting to instigate some of the Muslims to do some

18  things.  So it never got to the point where you were

19  disruptive because we acted proactively and locked you up.

20          As far as after that, no, after that when you were

21  locked up and you were transferred to Greene, we discussed

22  your situation and we gave you an opportunity in Greene, like

23  we did in Pittsburgh, because you came to us from Pittsburgh,

24  and that's why I knew you, when you came to Pittsburgh, you

25  came with a rather lengthy history of being disruptive.  I was

1  aware of that and I believe I told you that.  And I believe I

2  told most inmates that come that you'll be given an

3  opportunity.  If you act correctly, you'll be okay.

4         However, at Pittsburgh you did have a stumbling

5  stone and I had heard testimony before and you had mentioned

6  it, about not receiving misconduct.  You didn't get a

7  misconduct, but that's only due to us being proactive and

8  taking care of something that maybe could have grown into

9  something before it happened.  So that doesn't necessarily

10  mean that -- nothing happened, it just means we were proactive

11  and able to stop something from happening, which is good

12  correction practice.  But as you got to Greene, no, at Greene

13  you were fine.  In fact, we got you in an artist program and

14  you ended up doing well.

15  Q.  Three questions.  You said that you received reports

16  from -- were these from other inmates?

17  A.  Are you speaking of your past before you got to

18  Pittsburgh?

19  Q.  No, I'm speaking -- you said that you were proactive in

20  curtailing whatever you felt was a threat to security?

21  A.  Right.

22  Q.  You would have gotten word from whom?  Who would have

23  given you word that there was a --

24  A.  I frequently got in the institution and I had a good

25  relationship with several inmates.  And Ramadan was always a

1  time where things were going on, so we were out there, there

2  were inmates that came to me and said, hey, things are going

3  on, blah, blah, keep an eye out, and your name came up.  Like

4  Deputy Krysevig said, that was passed on to the security

5  office.

6          And then later, I believe -- and you had also

7  testified about those, the officers being outside of the

8  service the one time, well, and I know that that did happen,

9  but that didn't happen for any religious purpose.  That

10  happened, once again, to be proactive because the information

11  we were receiving was that there may be a problem.  And rather

12  than ignore things like that, in corrections you have to be

13  proactive to present a problem and find out what is going on,

14  so that's why they were there.  They weren't there, to be

15  perfectly honest with you, corrections officers don't care,

16  they're used to everybody having a religious service, they

17  were there in order to maintain order and make sure nothing

18  did happen to disrupt the institution.

19  Q.  Did anything happen?

20  A.  No.  In fact, nothing happened.

21  Q.  Let me ask you this.  In the penitentiary, you got a good

22  long history in a penitentiary, is it the practice of an

23  envious individual to falsify information on anyone?

24  A.  It can be.  But like you said, I have a history and part

25  of my responsibility and part of the reason that I pretty much

1  establish what I did was because you can sort through that and

2  you know.  You also know by the number of people, people that

3  approach you and who they are.

4  Q.  So, in other words, and the reason why I'm asking this is,

5  say, for example -- no, I can't give you that hypothetical

6  question like that.

7       Have you ever seen an instance where a group of

8  individuals would try to remove the opposition, so to speak,

9  within the institution?

10  A.  Yes.

11  Q.  So that wasn't unheard of as far as you know as being part

12  of the correctional setting?

13  A.  Maybe explain that better.  You mean somebody giving

14  information on another inmate to try to get him out of the way

15  so he can do what he wants to do?

16  Q.  Have you ever run across a situation, a dude owes somebody

17  money, right, and he can't pay, so rather than him deal with

18  pain, he's got some dirt on this guy, or he makes up some dirt

19  on this guy to avoid pain.  Have you ever seen that happen?

20  A.  It happens, yes.

21        MR. BRADLEY:  Your Honor, I'm not sure where this

22  is headed, but it does not appear to be relevant.

23        THE COURT:  I'm going to give Mr. Sharp a little

24  latitude on this.

25        You need to make some connection.

1    MR. SHARP:  He answered the question, I'm not going

2  any further than that.

3  BY MR. SHARP:

4  Q.  So, again, is it possible, is it possible that, you know,

5  people wanting positions felt threatened by me?

6  A.  In this situation, I'd have to say no because before,

7  before you started on this mission or whatever you were on, we

8  had no problems, and then you started -- and I kind of concur

9  with Deputy Krysevig when he said that his belief was that you

10  wanted to be the leader and get your own way and I think

11  that -- once -- and to be quite honest with you, once you were

12  placed in administrative custody, we had no further problems.

13  So, to me, there wasn't any other power play, Imam Tanko never

14  came and said, we have this going on, we have that going on,

15  it didn't seem to be anything, it seemed like you might be

16  doing that.

17  Q.  Did I ever come to you and say I had a problem with any

18  inmate?

19  A.  No, you and I never talked about this --

20  Q.  Are you aware of me ever coming --

21        THE COURT:  Mr. Sharp, again, the witness hasn't

22  finished his answer.  You must let the witness finish.

23        You may finish your answer.

24        THE WITNESS:  No.  You never came to me

25  specifically about a problem with another inmate.

1 BY MR. SHARP:

2 Q. So while you were at SCI-Western, and you -- were you ever

3 made aware of the fact that a problem arose out of the

4 incorrect filing or improper handling of my request for

5 accommodation? Were you aware of that?

6 A. No.

7 Q. You were not aware of that?

8 A. No.

9 Q. You had no knowledge whatsoever about that?

10 A. No. That would not come under my jurisdiction as facility

11 management.

12 Q. When you got to SCI-Greene, do you remember bumping into

13 me in the RHU when you first got there?

14 A. I don't specifically remember it, but I don't doubt it

15 because I made rounds there.

16 Q. When we had a discussion in the RHU, I believe it was the

17 first day you walked in Greene, I was out there mopping the

18 floor, and do you recall asking me what the heck I was doing

19 there?

20  A.  I may have.

21  Q.  Do you remember what my explanation was?

22  A.  No.  Like you said, I made frequent rounds and I talked to

23  a lot of folks, a lot of inmates.

24  Q.  Do you recall me ever mentioning anything to you about

25  weapons being put in my jacket to bring me there?

1  A.  I vaguely remember that through the course of this trial,

2  and I do remember talking, I believe with Captain Coleman, to

3  verify, and then you were released from the RHU.

4  Q.  Right.  Do you remember if it was as a direct result of

5  finding out that those weapons were not in my -- were never

6  found in my possession?

7  A.  I don't remember specifically, but I think it had more to

8  do with there was an error in the reporting of an actual

9  incident and your name got thrown in with it, but it wasn't

10  you and we cleared that up when you brought it to our

11  attention.  I disagree that it was an intentional move to

12  discredit you or lock you up.  I think it was more a

13  misinterpretation -- or you got thrown into something where

14  there were weapons involved.  That's my belief.  That's my

15  understanding.  We cleared that up and you were subsequently

16  released to general population.

17  Q.  I pretty much concur with that.

18          Upon my release into population, did I submit

19  another request for religious accomodation that you were aware

20  of?

21  A.  No, not that I'm aware of.

22  Q.  Once I got into SCI-Greene, I never filed a request for

23  religious accomodation?

24  A.  Like I said, all religious accommodations would come up to

25  my office through the vote sheet, but in this case, one of the

1  exhibits shows when it got to my desk, I wasn't there and an

2  acting superintendent made the vote.  But other than that, the

3  day-to-day requests wouldn't come through the superintendent,

4  they would come through the facility chaplaincy director.

5  Q.  I would like for you to review, this is Exhibit 3,

6  12-1-99.

7          MR. BRADLEY:  Your Honor, before he asks the

8  question, the last question pertained to the request he made

9  at Greene, the exhibit he's given him was at least three years

10  earlier at SCI-Pittsburgh.

11          MR. SHARP:  I'm aware of that.

12          MR. BRADLEY:  If he's asking a whole new question,

13  then I have no objection.

14          THE COURT:  All right.

15          MR. SHARP:  I am asking a whole new question.

16          THE COURT:  Ask the question.

17  BY MR. SHARP:

18  Q.  Could you read your response to my -- better yet, in it

19  you state that there were some orders at SCI-Greene that I was

20  supposed to follow.  Is that what your --

21  A.  This is from SCI-Pittsburgh.

22  Q.  Excuse me, SCI-Pittsburgh.

23  A.  This isn't my reply.  This is written to me, but,

24  evidently, it was forwarded and it was replied to by Major

25  McFedrick.

1  Q.  So you never received that request then?

2  A.  I didn't get this one.  It must have been forwarded to

3  Major McFedrick for reply, but this isn't my signature.  This

4  says Major McFedrick.  This isn't my name.

5  Q.  When I got -- I backtracked for a reason because I wanted

6  to make sure that we were clear.

7        Now, when I got to SCI-Greene, being as though you

8  were the superintendent, once my request for religious

9  accomodation was denied at SCI-Greene, could you tell me,

10  would it be your responsibility to reply to any appeals that I

11  would have filed via the grievance process?

12  A.  Yes, it would have.  They would have came up through the

13  superintendent's office, yes.

14  Q.  Do you happen to remember any responses that you issued?

15  A.  I -- no, not specifically.  Grievances at SCI-Greene

16  numbered in the hundreds.

17  Q.  This is out of Exhibit No. 8, a response that you issued

18  on December 6, 2002.  Grievance No. 35877, I'll start with

19  that.

20          Would you like -- could you elucidate on your

21  response here?

22          THE COURT:  He's going to have to have it in front

23  of him.

24          MR. BRADLEY:  35877?

25          MR. SHARP:  Right.

1        THE WITNESS:  Once again, on this grievance, it's

2   replied to and it's signed by Tom Jackson who was acting

3   superintendent.  He was the deputy for centralized services,

4   so, if you notice, that's not my signature.

5   Q.  So people were just signing your name?

6   A.  Not really.  I don't know if I was lucky, but I didn't

7   miss work that much, so I don't know, this just fell that I

8   wasn't here for this day again.

9   Q.  So, you would not have gotten a copy because this says

10   from William S. Stickman?

11   A.  It does.  The procedure was that the administrative

12   assistant back then would get the grievances, like I said,

13   they were large in numbers, she would reply, they would come

14   to my desk and I would review them for accuracy.  If I a

15   problem, I would change them.  So she did this.  This one

16   here, I don't know where I was, but when I'm off, just to keep

17   up with the flow because there were time restrictions, then

18   whoever would be assigned as acting superintendent would do

19   the same thing.  And in this case, it was Deputy Jackson would

file:///A|/sharp10-17-07A.txt

20  have reviewed this, if he agreed with this and he concurred

21  with it, then he would have signed off on it and it would have

22  gotten back to you.

23  Q.  So this is not your response.  Thank you.

24          Going on to the next one.  Grievance No. 39662 in

25  Exhibit 10.  I have a letter addressed to I believe it is

1  Mr. Dickson, but it should have been Mr. Stickman.

2        THE COURT:  Mr. Bradley has given the witness a

3  copy.

4        What is the question?

5  BY MR. SHARP:

6  Q.  Is that your response there at grievance --

7  A.  Yes, this is my signature.

8  Q.  So it says you received the grievance and you were made

9  aware of the fact that I was again requesting religious

10  accommodation, it was brought to your attention there,

11  correct?

12  A.  Actually, with this appeal and what this says is that your

13  grievance was untimely and your first level will not be

14  reviewed due to your failing to reply with the 804.  It is the

15  responsibility of the inmate/grievant to monitor procedural

16  time frames as established in this policy.  Your appeal is

17  hereby dismissed.

18  Q.  So the date that you wrote that response was on January

19  24, 2003?

20  A.  Correct.

21  Q.  What is the time frame within which one would file an

22  appeal?

23  A.  If I'm not mistaken, I believe policy is 15 days.

24  Q.  If a person -- and I want to be clear on this, in the

25  prior page, Jean A. Mears' signature, she has a date under it

1  and Attachment B, do you see that, there's a date down there.

2  It says 1-7-03.  It's in that same packet.  At the top it

3  says --

4  A.  1-7-03, Jean Mears.

5  Q.  All right.  So then you have on the next page appeal filed

6  to you on what date?

7  A.  I can't -- is it -- it's very light, it looks like 12

8  something, 20 something.

9  Q.  I had 1-13-03 here.  It's a letter addressed, Dear

10  Mr. Dickson -- it should have been Stickman, but I made an

11  error.

12  A.  Dickson.

13  Q.  It was supposed to be Stickman and they actually corrected

14  me.

15  A.  It's dated 1-13-03.

16  Q.  Okay.  So would that have been in the time frame in which

17  one would have had to appeal?

18  A.  Let me see this grievance here to see if the numbers

19  coincide.  Yes, the numbers coincide.

20  Q.  Right.  So from the date that Ms. Mears signed it was

21  1-7-03?

22  A.  That's correct.

23  Q.  And the date that I filed my appeal was the 1-13-03,

24  correct?

25        MR. BRADLEY:  Your Honor, I'm going to object to

1  the extent he's testifying that he filed it on that date.  It

2  is dated 1-13-03.

3       MR. SHARP:  It's dated --

4       THE COURT:  Sustained.

5       MR. SHARP:  It's dated 1-13-03.

6       THE WITNESS:  That's when you say it's dated; is

7  that correct.

8  BY MR. SHARP:

9  Q.  Generally speaking, when an appeal is received, don't they

10  generally stamp the date that it is received?  Isn't that

11  usually like standard policy?

12  A.  It's not in policy that it's mandated.

13  Q.  For example, see how that's marked Received -

14  SCI-Pittsburgh, December 21, 1999, is that for regular

15  practice?

16  A.  To be honest with you --

17       MR. BRADLEY:  I'm not sure what we're talking

18  about.

19       THE COURT:  Neither am I.  You need to specify.

file:///A|/sharp10-17-07A.txt

20          MR. SHARP:  I was holding up PIT-O997, which was

21  one of the exhibits and just showing him how they mark it.

22          THE COURT:  I understand that, but for the record

23  it won't be clear what you're referring to, so we need to know

24  what it is you're referring to.

25          MR. SHARP:  And it has, I don't know what number it

1  is, but it was dated 12-29-99 and it has a stamp mark, a time

2  mark, what date it was originally received on.  It says

3  received and then it has posted.

4        THE COURT:  This document is part of what?

5        MR. SHARP:  It's part of the record, part of the

6  exhibits that we have used previously.

7        THE COURT:  Yes, but what exhibit?

8        MR. SHARP:  You have the exhibits in front of you,

9  I don't, so I can't help you out.

10        MR. BRADLEY:  It's No. 4, Your Honor.

11  BY MR. SHARP:

12  Q.  So wouldn't that be usually the proper procedure, or is

13  that -- was that a standard practice?

14  A.  I don't really recall.  I didn't do that.  If it was, it

15  wouldn't have been me to stamp it.  I don't believe it's in

16  policy.  And you're talking about agreeing and you're talking

17  about something that you're showing me that happened in

18  SCI-Greene.

19  Q.  Didn't you just use the example of Pittsburgh?

20  A.  I'm showing you postmarks.

21  Q.  I can show you ones from SCI-Greene, if need be, but what

22  I'm saying is has it been a practice --

23  A.  I don't know.  I was never an administrative assistant.

24  Q.  That's reasonable.  So how would you know on what date I

25  actually filed my grievance?

1  A.  I would have to rely on the administrative assistant, that

2  was one of their responsibilities.

3  Q.  So as an inmate filing the grievance, in order for us to

4  get our grievance appeals to you, what process would we have

5  to go through?

6  A.  You would put them in the block mailbox and they would be

7  picked up daily and they would be brought out and then they

8  would be delivered to the administrative assistant from the

9  mail room.

10  Q.  Right.  Have you ever had the mail be late from the mail

11  room?

12  A.  I'm sure I have had mail delayed.  The U.S. Mail is

13  delayed at times.

14  Q.  If, in fact, you dismissed this grievance as being

15  untimely, right, it is very well possible that I filed it in a

16  timely manner, would that be correct?  Is it possible?

17  A.  I didn't know that.  I didn't know that.  Like I said

18  before, the date you put on here is 1-13-03.  That's the date

19  you have on here.  I can't verify or know for a fact that

20  that's an accurate date.  Like I said, I didn't get this so I

21  wouldn't know that.  I would have to rely on the

22  administrative assistant, the superintendent's administrative

23  assistant whose responsibility it was and take their word for

24  it.

25  Q.  As to when they received it?

1  A.  Correct.

2  Q.  But it is possible, I'm asking you only --

3  A.  Anything is possible, sure, anything is possible.

4  Q.  That's all I wanted.  I understand things happen, but I

5  just want to make sure --

6  A.  Without a doubt, yes.

7  Q.  And you've known me for quite some time and is it true

8  that whenever I set my mind to doing something, I'm very

9  diligent about doing it?

10      MR. BRADLEY:  Objection, Your Honor.

11      THE COURT:  Mr. Sharp, the objection is sustained.

12  BY MR. SHARP:

13  Q.  So in reviewing and responding to this grievance, because

14  there was a time frame issue, would you be responsible for

15  still reviewing the record?

16  A.  Would I be responsible for reviewing it?  Probably.  What

17  I would do sitting at my desk, my practice was to review it

18  and look at it and review it just to see what it was.  If it

19  had something to do with the immediate security of the

20  institution or something like that, then I would do something,

21  but in this matter, I probably would have went with the

22  findings of the administrative assistant that it was untimely

23  and that would have been your responsibility, like she said,

24  so I probably wouldn't have went forward with it.

25  Q.  So you were aware, in other words, at SCI-Greene, through

1  this particular grievance or it is possible that you were

2  aware through this grievance that I did file a request for

3  religious accomodation and that was denied?

4  A.  I wouldn't say this would make me aware of it because like

5  I told you, I got a lot of correspondence during the course of

6  the day, during the course of the week.  I would glance over

7  to see what it was, so I wouldn't really thoroughly read each

8  word and try -- I would glance over and see what the crux of

9  it was.  Now, maybe during that -- at the time I knew, but to

10  say that I was aware of it and I knew everything behind it,

11  no, I couldn't say that, no, I would have to say that's not

12  accurate.

13  Q.  I would like to take you to Exhibit No. 13.

14          THE COURT:  I think we're going to have to stop for

15  the afternoon and pick this up in the morning.

16          MR. SHARP:  Can somebody mark that we stopped at

17  Exhibit 13 so that I will know where to pick up from?

18          THE COURT:  Well, it's your responsibility to do

19  your examination.  I am not going to make notes on that for

20  you.  I think you can make your own mental note and remember

21  that until tomorrow.

22         I need all of those exhibits.

23         MR. SHARP:  I'm making sure they are all here.

24         THE COURT:  We will adjourn until nine-thirty

25  tomorrow morning.

1        MR. BRADLEY:  Your Honor, the witnesses that have

2  already testified, including the defendant's, my understanding

3  is they're released so they do not have to come back?

4        THE COURT:  Yes.

5     (Court adjourned.)

6

7                I-N-D-E-X

8  WITNESS          Direct     Cross     Redirect     Recross

9  George Moneck       6        18        --         --
   Tanko Ibrahium     26        33        --         --
10 Rhoda Winstead     43        50        59         60
   Philip Johnson     62        66        --         --
11 Jean Blaine        73        81        93         --
   Joel Dickson       94        99        --         --
12 Mark Krysevig     114       120       137        137
   William Stickman  138       143        --         --
13

14

15           C E R T I F I C A T E

16

           I, Juliann A. Kienzle, certify that the

17  foregoing is a correct transcript from the record of proceedings
   in the above-titled matter.

18

19  s/Juliann A. Kienzle
   _____

20  Juliann A. Kienzle, RMR, CRR

21

22

23

24

25