1

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

3    SHAWN C. SHARP,
             Plaintiff

4       vs.
                        Civil Action 00-2156

5    SUPERINTENDENT JOHNSON, et al.,
             Defendants.

6

7
        Transcript of Non-Jury Trial Proceedings on Thursday,

8    October 18, 2007, United States District Court, Pittsburgh,
     Pennsylvania, before Amy Reynolds Hay, Magistrate Judge.

9

10   APPEARANCES:

11    For the Plaintiff:        Pro se

12

13

14

15    For the Defendants:        Scott A. Bradley, Esq.
                        Office of the Attorney General

16                    564 Forbes Avenue
                     6th Floor, Manor Complex

17                    Pittsburgh, PA  15219

18

19   Court Reporter:        Juliann A. Kienzle, RMR, CRR
                     Fifth Floor USPO & Courthouse

20          700 Grant Street
         Pittsburgh, PA 15219
21          (412) 261-6122

22

23

         Proceedings recorded by mechanical stenography;
24   transcript produced by computer-aided transcription.

25

1  (Proceedings held in open court; Thursday, October 18,  2007.)

2        THE COURT:  I believe we were continuing with the

3  cross of Mr. Stickman.

4        Mr. Sharp, you may proceed.

5        MR. SHARP:  I need just a few minutes, Your Honor.

6  I was given some of my legal documents this morning and I'm --

7  they brought me from the hole.  Can I get maybe five minutes

8  to get this together real quick?

9        THE COURT:  Yes.

10       WILLIAM STICKMAN, having been previously sworn, testified

11  as follows:

12              CONTINUED CROSS-EXAMINATION

13  BY MR. SHARP:

14  Q.  I'm trying to remember exactly where we left off and I

15  can't remember exactly what we were discussing so I'll start

16  at this point.

17        You mentioned in your testimony yesterday, if I

18  remember correctly, that part of the reason for my

19  confinement -- we were discussing my confinement, if I

20  remember correctly --

21          THE COURT:  You're going to have to speak up a

22  little louder, Mr. Sharp.

23  BY MR. SHARP:

24  Q.  Part of the reason for my confinement, if I remember

25  correctly, we were discussing that right before we closed out

1  and you said that part of it was for my own safety.  And you

2  had made something, a statement prior to that, something to

3  the effect that I was engaging in exactly what I was accusing

4  them of doing and you referred to -- you were referring to

5  either Chaplain Abu Bakr or Chaplain Ibrahiym; is that

6  correct?

7  A.  No, that's not correct.  Actually, in order to clear it

8  up, you were confined both at Greene when I was at Greene and

9  at Pittsburgh.

10  Q.  So we're talking about SCI-Western?

11  A.  At Pittsburgh?

12  Q.  Right.  You had made that statement --

13  A.  I don't think I was the one that testified about you being

14  locked up for your safety.  That was another witness that

15  testified.

16      MR. BRADLEY:  I believe that was Superintendent

17  Krysevig's testimony.

18      THE COURT:  That's my recollection.

19      MR. SHARP:  Was it?  Okay.

20  BY MR. SHARP:

21  Q.  But you did make a statement that I was doing the same

22  thing, if I remember correctly, that I was accusing them of

23  doing?

24  A.  No.  I think what you're referring to is you tried to put

25  an example out that isn't it a fact that at times inmates do

1  things or say things for their own benefit and maybe puts

2  something on another, and I said yes, but I didn't say -- my

3  reply wasn't that you were doing the same thing you were

4  accusing them of, my reply was that your behavior was doing

5  what you said other inmates do.  In other words, putting

6  things out and stirring a pot for your own benefit because you

7  wanted to be the leader.  That's what I said.  I didn't say

8  anything about the Imams, I said that was --

9  Q.  That's what I was trying to get, clarification.

10  A.  I think that's what you were talking about.

11  Q.  You mentioned something to that effect.  I wanted to make

12  sure I understood clearly.

13  A.  That's what I meant.

14  Q.  Because if I remember, we were discussing -- I had asked

15  you about whether or not you filed the report to Major Lockett

16  concerning the information that you were receiving that I was,

17  quote/unquote, fomenting unrest at Deputy Dickson stated or

18  creating unrest in the institution.  I'll just use those

19  terms.

20  A.  First of all, you never asked me if I filed a report.

21  Second of all, Major Lockett worked at Greene, not at Western.

22  Q.  No, he was at Western?

23  A.  He wasn't a major at Western, though.

24  Q.  I'm discussing Western.  I want you to understand what I'm

25  saying.  It wasn't Lockett, it was Blakey.  You had said

1  something to the effect that -- you had mentioned something to

2  Blakey about the information that you were receiving from

3  these inmates, correct?

4  A.  What I said was that I was getting information when I was

5  walking through the institution, and I would have passed that

6  on to the security office because I frequently went to the

7  security office to discuss what was going on in the

8  institution.  So, I would say that I probably did mention what

9  I was hearing to Lieutenant Blakey.  He was a lieutenant by

10  the way, not a major.

11  Q.  Lieutenant Blakey.  It's a little confusing for me.  He

12  was a defendant and it's unfortunate he's not anymore.

13       However, the magnitude of what I was doing and the

14  reports that you were getting were of such a severe nature --

15  were they of a severe nature?  In other words, what were they

16  saying I was doing?

17  A.  I don't remember specifically, but, once again -- and I

18  think I testified to this yesterday -- when the information

19  was coming in, you were trying to point out examples and you

20  never got a misconduct.  Good correctional practice isn't to

21  wait for something to happen.  I think what happened in this

22  instance because of the information we were gathering,

23  Lieutenant Blakey being proactive sent the security team down

24  there, the security team down there to monitor the activities

25  because there was some word something may happen that evening.

1  Fortunately, nothing happened that evening.  And then after

2  that, the lieutenant -- I can't answer for the lieutenant

3  because I don't know what information he had drawn from other

4  people, but after that, you were placed in administrative

5  custody.

6  Q.  Right.

7  A.  And what I testified was that you can be placed in

8  administrative custody without a misconduct.  That's why there

9  is administrative custody.  That doesn't mean that there's

10  nothing wrong with the institution or anything like that, that

11  just means that in this case, the administration and the

12  lieutenant, we were proactive in stopping something that may

13  happen because, once again, I testified that when you came to

14  us, you came to us because of a major incident at Somerset

15  that you were pretty much responsible, according to the

16  reports, you were responsible for starting and instigating,

17  and it was the same thing that seemed -- the same pattern

18  seemed like it was rising in Pittsburgh, so rather than wait

19  for an incident where there were people assaulted with

20 weapons, like at Somerset where they had to declare a state of

21 emergency, Pittsburgh was proactive and locked you up.

22          MR. SHARP:  Can I move to strike because he's

23 talking about an incident that was prior to SCI-Western and

24 he's bringing in issues or history that he's going into that I

25 was accused of, but that now I'm going to have to end up

1  defending myself against and bring in rebuttal information

2  because he's making a statement that I was engaged in activity

3  that whatever he's saying that it was accused that I did.

4  Now, I'm saying if he's going to give that testimony, I would

5  like to be clear that I would like to refute that testimony or

6  to be able to rebut because now we're going outside of the

7  scope of what happened at SCI-Greene and he's laying history

8  now.  So if he's going to be laying history, do I have a

9  right -- I'm asking you now, I'm not saying I am, but I'm

10  asking, is it permissible for me to be able to now refute his

11  version or -- you understand what I'm saying?

12        THE COURT:  I understand what you're saying, but

13  what happens is that in the course of a trial, a bench trial

14  in particular, information comes in to the Court for

15  background purposes.

16        MR. SHARP:  Right.

17        THE COURT:  At issue before the Court is not

18  whether that information that this witness obtained was, in

19  fact, accurate or not, and so that's not anything that I'm

20  going to concern myself with, therefore, it's not anything you

21  need to rebut.

22          MR. SHARP:  Okay.  I just wanted to make sure.

23          THE COURT:  His testimony is what it is and I'm not

24  going to strike it, but it's not something that is for me to

25  judge.

1        MR. SHARP:  I wanted to make sure that that's not

2   going to have a bearing on the truth determining process.

3        THE COURT:  It doesn't.

4   BY MR. SHARP:

5   Q.  So, now, and you went into history of what I was accused

6   of and I understand that.  I'm not refuting what you're saying

7   I was accused of.  I would disagree with your version of the

8   facts, but I'm not here to argue that.

9        What I'm asking you specifically is you received

10  information from inmates who were saying that I was engaged in

11  activity that could create unrest and a security threat in the

12  institution; is that correct?

13  A.  Not specifically that information.  I can't verbatim

14  remember what they told me, but there was information received

15  that there were some problems in the Muslim sects and that you

16  were one of the people that was more or less rabble rousing,

17  yes, and there may be something going on, so I passed that

18  information on to Lieutenant Blakey.

19  Q.  That's exactly what I wanted, yes.

20          MR. SHARP:  Now, in the defense's exhibits -- the

21  exhibits that I used that I submitted, there was a pamphlet

22  called Al-Aqeeda At-Tawheed that I presented.

23          THE COURT:  Yes.

24          MR. SHARP:  Can I have that, please.

25          MR. BRADLEY:  No. 6, I believe.

1        THE COURT:  That's right.

2  BY MR. SHARP:

3  Q.  Were you present during the testimony that was issued

4  about Exhibit No. 6?

5  A.  I'm not sure.  I don't know what that is.

6  Q.  I'm going to give it to you.  I'm asking, do you recall

7  the testimony of I believe the inmate's name was Deloatch?  He

8  was one of the first inmates to testify via video conference?

9  A.  I was here for all the testimony, so I listened, but I'm

10  not sure what that is.

11  Q.  I'm setting up groundwork for why I'm giving this to you.

12  He acknowledged that this pamphlet was being used in the

13  chapel for what we refer to as Taleem, which I'm sure you're

14  familiar with the term -- and I questioned him about some of

15  the things that were actually being taught in this pamphlet

16  and I'm going to read a section of it for you.  This is just

17  one sentence.  It says:  There are many other deviant sects of

18  the past and present such as the Ar-Rafida (Shi'a), Habashi,

19  Nation of Kufr.

20      Do you know what kufr is?

21 A.  No.

22 Q.  Let me explain it to you.

23      THE COURT:  This is not the time for you to

24 testify, sir.

25      MR. SHARP:  Just so he understands where I'm going

1  with this.

2          THE COURT:  No.  You need to ask questions of him

3  and he will answer.  You are not permitted to testify.

4  BY MR. SHARP:

5  Q.  Is it okay for the chaplaincy department to teach that a

6  Habashi is a deviant?

7  A.  I'm not qualified.  I'm not Islamic.  I don't know what

8  that content means so I don't feel comfortable --

9  Q.  You know what deviant means?

10  A.  I know what my thing of deviant is, but I don't know -- I

11  don't have the dictionary here and being used in a religion,

12  especially one that I'm not familiar with, I can't testify to

13  that.

14  Q.  Again, I will read just a small part of this.  It says:

15  The group of deviants who used Tafweed were called the

16  Asha'irah (Ash'arite).

17          Again, are you aware of the fact that I was -- I'm

18  of the Ash'ari belief?

19  A.  Am I aware?

20  Q.  Were you aware?

21  A.  I wasn't aware, no.

22  Q.  So, in fact, would it be reasonable for me to infer that

23  this is a lesson that is being -- that was being taught and

24  that would be inflammatory to me?

25  A.  Once again, I don't feel like I can say that because I'm

1 not Muslim and I don't know what that means.  I'm not reading

2 the entire thing so I don't feel qualified to comment on that.

3 Q.  So, in other words, you could get a report from rumor,

4 bear in mind, that I am spreading unrest by speaking about my

5 beliefs, but when you have a chaplain and inmates in the

6 chapel who are teaching that I am a deviant and I speak about

7 it --

8         MR. BRADLEY:  Your Honor, I believe --

9         MR. SHARP:  I'm confined.  Do you think that's

10 fair.

11         MR. BRADLEY:  I believe there's not a proper

12 foundation for that question because it requires testimony

13 provided by Mr. Sharp.

14         MR. SHARP:  I'm asking him his opinion.

15         THE COURT:  You're asking him his opinion about

16 testimony you're offering.  This is not your opportunity to

17 testify.

18 BY MR. SHARP:

19 Q.  Do you think it's fair -- let me ask it this way -- do you

20  think it's fair, right, to allow this to be taught in the

21  chapel as standard curriculum --

22          THE COURT:  Again, Mr. Sharp, this witness has

23  answered that he is not qualified to address the teachings

24  that you are referencing.  He cannot answer that question.

25          MR. SHARP:  Okay.

1  BY MR. SHARP:

2  Q.  Can you tell me, do you feel that this is inflammatory?

3        THE COURT:  Again, Mr. Sharp, he's answered the

4  question.  He can't -- he cannot answer the question.  He's

5  told you that.  It has been asked and answered.

6  BY MR. SHARP:

7  Q.  Let me ask it this way.  Are you familiar with the United

8  States Constitution?

9        MR. BRADLEY:  Your Honor, I'm going to object.

10        THE COURT:  What is the relevance?  The objection

11  is sustained.

12        MR. SHARP:  I'm going to be very specific, Your

13  Honor, in what I'm asking.

14        THE COURT:  The objection is sustained.  I want to

15  know the basis upon which you want to ask this question.

16        MR. SHARP:  I want to know is he aware or at the

17  time he was working at the Department of Corrections at

18  SCI-Pittsburgh, was he aware of the establishment clause of

19  the Constitution.

20          THE COURT:  The relevance of this would be?

21          MR. SHARP:  Because the establishment clause

22   specifically states you cannot prefer one religion over

23   another.  This is what we're here about.

24          THE COURT:  Fine.  Ask him the question.

25   BY MR. SHARP:

file:///A|/sharp10-18-07.txt

13

1  Q.  Are you aware of the establishment clause of the United

2  States Constitution?

3  A.  No.

4  Q.  So you were not aware at the time that you were working

5  for the Department of Corrections that the government cannot

6  establish a religion or prevent a religion from being

7  practiced to some degree?  You weren't aware of that?

8  A.  I'm not aware of it under that, but I am aware somewhat on

9  the general knowledge of religion, and, like -- and I

10  previously testified that I in no way impeded you from

11  practicing your religion.  So if that's the question, I know

12  that there are certain policies that you have to follow but

13  that I personally had nothing to do with impeding you from

14  practicing your religion.

15  Q.  You didn't answer the question to me.  I'm asking you,

16  were you aware of the law that is in effect in the United

17  States of America that says that the government shall not

18  establish or impede a religious practice, one over the other,

19  preferences, et cetera, et cetera, et cetera?

20  A.  No, I'm not familiar with the specific law.

21  Q.  Do you think that it is permissible to prefer one -- to

22  give preference to one religious faith over another?

23          MR. BRADLEY:  Your Honor, I would object.  His

24  opinion isn't relevant in this.

25          THE COURT:  Sustained.  His opinion is not

1  relevant.

2        MR. SHARP:  I'll move on.

3  BY MR. SHARP:

4  Q.  You stated that you received information and you mentioned

5  that this information was of a nature that you passed on.  Can

6  you tell me, in your time of sitting on the PRC as a

7  Department of Corrections staff member, is there such thing as

8  a confidential source of information?

9  A.  Yes.

10  Q.  When a confidential source of information is being used to

11  accuse an inmate of something, what is the procedure for that?

12  A.  I'm not sure I know what you're asking.

13  Q.  In other words, if a confidential source of information

14  came to you and he said, I saw Mr. Sharp engaging in such and

15  such activity, which happened to be at Somerset so we'll use

16  that as an example, there were seven CSIs on a report --

17        MR. BRADLEY:  Your Honor, this goes -- we object.

18  He objected to this exact line of questioning, which he

19  initiated, but now he's coming forward talking about seven

20  CSIs at Somerset.

21          THE COURT:  The objection is sustained.

22  BY MR. SHARP:

23  Q.  What is the procedure?  The only reason I did it, I would

24  like to add --

25          THE COURT:  I don't want to hear your testimony,

1  Mr. Sharp.  We've heard your testimony.  The witness is on the

2  stand to answer your questions.  Please ask him questions.

3  BY MR. SHARP:

4  Q.  What is the procedure for utilizing a confidential source

5  of information as a basis for confinement?

6  A.  Once again, it's been a while since I was in the security

7  office, but to my recollection, confidential sources of

8  information have to be -- had to have been reliable in the

9  past or had to corroborate testimony of another source, or had

10  direct knowledge or opportunity to see the infraction or

11  incident as it happened.  Confidential sources of information

12  are predominantly used in misconduct hearings.

13  Q.  Is that the only time they're ever used?

14  A.  No.  I said predominantly used.  To my knowledge, in the

15  administrative custody procedure, obviously, there are

16  confidential sources of information used, but by policy, they

17  don't have to be documented or listed as they do in a

18  misconduct proceeding.

19  Q.  Could you tell me what you -- you said by policy, what

20  policy would that fall under?

21  A.  The misconduct policy.  I forget which one it is now.  I

22  have been retired and out of the loop now so I don't

23  specifically remember which one it is.

24  Q.  Would it be DC-Admin 802?

25  A.  No.  I believe that's administrative custody.  I'm

1  speaking of the misconduct policy, disciplinary policy.  CSI

2  is at --

3  Q.  So, you're saying that an administrative policy or

4  administrative custody policy, they don't have the same

5  strictures, is that what you said, is that what you're saying,

6  as a misconduct hearing?  In other words -- I'm trying to

7  understand what you're saying, that it's different in a

8  misconduct hearing than it is in an administrative custody

9  setting because you don't have the same --

10  A.  They are two different things.

11  Q.  You don't have the same regulations that apply to a

12  misconduct hearing as you do to an administrative custody

13  hearing?

14  A.  Correct.

15  Q.  Right.  That's what I was trying to get to.

16       However, each confidential source of information,

17  are they to be recorded?

18       MR. BRADLEY:  Your Honor, he just answered that.

19       THE COURT:  He did and I fail to see the relevance

20  of this because there wasn't --

21        MR. SHARP:  I --

22        THE COURT:  Excuse me, Mr. Sharp, I didn't finish

23  my statement to you.  I don't see the relevance of this since

24  there was not a misconduct hearing in your circumstance, so

25  what is the relevance?

1    MR. SHARP:  No.  I have here where they say I

2    was -- I don't know what you call another report, another

3    report, this is what I was confined on.  I was confined on a

4    report based off of a report or a threat or something that was

5    initiated by security stating, as he said, look, we heard such

6    and such, different people were saying that they heard these

7    things about me, or that I was engaging in such and such

8    activity, they deemed it to be a threat, and I was confined

9    based on that information.  What I'm saying is that the policy

10   and procedure is that if a confidential source of information

11   comes to you, the policy and procedure is that they are to be

12   assigned a number, and they have to have this information

13   recorded.  I'm trying to get to the point where we're going to

14   determine did any of that ever happen in my situation since it

15   has been -- the testimony, to me, is that he's saying

16   confidential sources of information were going to staff about

17   me.  So was this documented?  Or was this some fictitious

18   person who was coming to staff and saying this.  There has to

19   be some proof, some factual basis.  Where is it at?  What

20  evidence?  You understand what I'm saying, Your Honor?

21         THE COURT:  I understand what you're saying, but

22  the witness has testified that there was not a misconduct.

23         MR. SHARP:  You can use a confidential source of

24  information to confine a person on administrative confinement.

25  What they're saying is that I was a threat to someone, or

1  someone was a threat to me because of my conduct and they

2  understood and knew that because, as he said, we were hearing

3  things from confidential -- obviously, it had to be from

4  confidential sources of information, if not, then it's just

5  hearsay.  Are you just going off of a rumor?  I'm trying to

6  get to the heart of this.  Was it just a rumor?  Was this just

7  something that was said in passing?  Did you file a memo about

8  it?  Did you file a security report?  Was there anything filed

9  to substantiate me being this spreader of this proverbial hate

10  that they are making me out to be?

11        THE COURT:  Well, again, my question is, what is

12  the relevance?

13        MR. SHARP:  The relevance is, Your Honor, when --

14  what I've always argued, Your Honor, and what the relevance is

15  is that I'm saying that this is in violation --

16        THE COURT:  Let me pose the question just so that I

17  can be clear.  Let me ask the question and then I think we may

18  get this cleared up.

19        Is it your position and is it the gist of what you

20  want to inquire of this witness, or anybody else who is going

21  to testify, that you were placed in the RHU or you were placed

22  in administrative custody on the basis of false reports that

23  somehow falsely allege that you were fomenting this activity

24  and that you want to explore that and then ultimately offer

25  some evidence in that regard?  I need you to answer the

1  question.  Is that --

2        MR. SHARP:  It's partially right, but that's not

3  really where I want to go with this.

4        THE COURT:  If that's partially right, that goes to

5  a claim of, quote/unquote, retaliation, which is not part of

6  the case and not before me.

7        MR. SHARP:  But that's not the primary thing that

8  I'm trying to get to.  This is what I'm trying to explain to

9  you.  It's related, but that's not the point I'm making.  The

10  point I'm making is that I am saying that the government,

11  these particular people acting in the government capacity or

12  as functionaries of the government locked me up because of my

13  practice of a particular faith which they -- let me finish so

14  you understand where I'm going.

15        THE COURT:  That's the question that I was asking.

16        MR. SHARP:  I'm going to explain why -- what the

17  point I'm making is.  I am saying that this is violative of

18  the establishment clause because you will allow one individual

19  to do what you say I am doing because they worked -- actually,

20  I'm saying two individuals, both of these individuals who

21  Tanko Ibrahiym, who is the defendant, and Abu Bakr, who was on

22  TV saying the same things that you're saying I said and why

23  I'm trying to figure out if I was fomenting hate and you had

24  to take preemptive actions, why aren't any preemptive actions

25  being taken against them to remove them when it was brought to

1   your attention they were saying the same things about me,

2   unless you were violating the establishment clause, which

3   means that you were giving preference to one religious

4   ideology and allowing it to be spread while suppressing mine

5   to get me out of the way because, as he said, the point he

6   made so clear was once we got rid of you, we didn't have a

7   problem.

8         THE COURT:  I'm not going to allow you to continue

9   to characterize anybody's testimony.

10        MR. SHARP:  I apologize for that, Your Honor.  I'm

11  sorry.  You're right.  That's not fair.  You're right.  I

12  apologize.

13        My point is -- this is where I'm going.  I'm

14  sticking straight to what you said I was allowed to raise and

15  that was the First and Fourteenth Amendments.  You cannot make

16  any law or implement anything that is restrictive or in

17  furtherance of giving preference to one religion over the

18  other.  We have heard testimony after testimony that these

19  people have been teaching that I'm a deviant, but when I spoke

20  about it, I was confined.  That's the thing and that was

21  only -- that was not the least restrictive burden that they

22  could have taken if they felt that I was a threat.  They could

23  have given us accommodation, but, instead, they took the tact

24  of saying, well, what we'll do is we're saying, well, you can

25  be accommodated.  How can I be accommodated and sit in the

1  presence of these people teaching that I am a deviant when I

2  can't speak out against it?

3        THE COURT:  You're getting too far afield.  But now

4  that you've made some argument, in fairness, I'm going to see

5  if the Commonwealth wants to have any response to that.

6        MR. BRADLEY:  Well, the only thing I would say is

7  the witness has already testified that for administrative

8  custody purposes, they are not required to track the

9  confidential sources of information.  I think that was the

10  question that was posed to him, and my objection was going to

11  be that it was asked and answered.

12        With respect to the other matters, I think this

13  witness has clearly testified, as many of the others have,

14  that it was the security issues that caused his confinement

15  and it had nothing to do with his preference of religion, and,

16  specifically, with each individual, they have indicated that

17  they have not taken any action with respect to his religion,

18  their concerns were security concerns.

19        THE COURT:  What is the question you want to pose

20  to the witness now?

21        MR. SHARP:  Okay.

22  BY MR. SHARP:

23  Q.  You said there are not the same strictures, correct?

24  A.  Correct.

25  Q.  We can move on from there.

1        MR. SHARP:  Thank you, Your Honor, for allowing me

2  to deal with that situation.

3        So I would like to enter an exhibit into -- I don't

4  know what number we're on, but this is --

5        THE COURT:  What is it?

6        MR. SHARP:  This is from SCI-Pittsburgh to

7  SCI-Greene.

8        THE COURT:  What is it?

9        MR. SHARP:  It is the transfer petition.

10       MR. BRADLEY:  21.

11  BY MR. SHARP:

12  Q.  Are you familiar with that particular piece of paper

13  there?

14  A.  It's a transfer petition system, transfer petition form

15  saying that it was approved.

16  Q.  At the bottom portion of the transfer petition, it says

17  CSI, right?

18  A.  I believe you're referring to confidential information.

19  Q.  Right.

20  A.  Yes.

21  Q.  What does it say?

22  A.  No.

23  Q.  It says there is no confidential information?

24        MR. BRADLEY:  Excuse me, Your Honor, I think he was

25  testifying there.  If he wants to ask the witness what that

1  means, that would be appropriate.

2  THE COURT:  Sustained.

3  MR. SHARP:  Okay.  Strike whatever I said.  I

4  agree.

5  BY MR. SHARP:

6  Q.  It says no, correct?

7  A.  It says no.

8  Q.  That's all I wanted to know.

9  We'll move on.

10  When I got to SCI-Greene and we discussed my

11  situation, right, and if I remember right, you spoke about the

12  discrepancy and some security reports that were in my jacket

13  that I had gotten caught up with something that happened prior

14  to that, right, in Pittsburgh, and there was some confusion

15  about what was in my jacket.  Could you explain that --

16  THE COURT:  Mr. Sharp, I don't understand your

17  question so I need you to rephrase it.

18  MR. SHARP:  I'll explain it.  What happened --

19  THE COURT:  I don't want you to testify.  I want

20  you to phrase the question so that it's understandable.

21  BY MR. SHARP:

22  Q.  What was the discrepancy in my jacket that we were

23  discussing when you first got to SCI-Greene?

24         MR. BRADLEY:  Your Honor, I'm going to object.  He

25  covered this yesterday.

1        MR. SHARP:  That's what I was trying to say to

2   begin with.

3        THE COURT:  The objection is sustained.  It's been

4   asked and answered.

5        Where are we going.

6        MR. SHARP:  I was trying to -- Your Honor, can I

7   just say I understand that I'm a little weird in how I do

8   things because you're used to being in a courtroom, but bear

9   with me here.

10        THE COURT:  I am trying.

11        MR. SHARP:  I'm trying to get to what you want me

12   to get to.

13        THE COURT:  I'm trying to give you some latitude,

14   but --

15        MR. SHARP:  I am not a lawyer.

16        THE COURT:  That is absolutely true, but that does

17   not mean that all the rules of procedure and evidence are

18   suspended because you're not a lawyer.  You still must follow

19   the procedure and the rules of evidence.

20        MR. SHARP:  I don't know what those rules are.

21        THE COURT:  The objection has been explained to

22  you.  This was asked and answered.  That objection is

23  sustained, meaning this was testimony you elicited yesterday.

24  It's been answered.  We're not going to rehash it.

25        MR. SHARP:  I can't even --

1        THE COURT:  What is the next area you want to

2  inquire about?

3        MR. SHARP:  I'm trying to get to --

4        THE COURT:  Ask a question.

5        MR. SHARP:  Okay.

6  BY MR. SHARP:

7  Q.  Was the discrepancy, if I remember correctly because I'm

8  trying to remember, was the discrepancy you indicated that it

9  was something about weapons, correct?

10        MR. BRADLEY:  Again, Your Honor, he answered the

11  question yesterday.

12        THE COURT:  Asked and answered.

13        MR. SHARP:  Okay.

14  BY MR. SHARP:

15  Q.  Wow.  Okay.

16        Am I supposed to remember -- am I allowed a

17  transcript of what was spoken about yesterday because I can't

18  remember exactly every detail of what I asked him, so I'm

19  trying to lay the groundwork for -- to lead up to what I want

20 to ask him.

21          THE COURT:  Forget the lead up, ask what you want

22 to ask.

23          MR. SHARP:  I'm trying to get to that.  I'm saying

24 I don't remember what questions I asked him five minutes ago

25 or three seconds ago.  I'm trying to lead up to the questions

1  that I want to ask him.

2         THE COURT:  Ask him a question.

3         MR. SHARP:  I'm trying to lay a foundation so he

4  knows what I'm trying to ask him.

5         THE COURT:  Ask the question you want to ask.

6         MR. SHARP:  You just said that was asked and

7  answered, so, obviously, we have a problem with where we're

8  going and how we're understanding each other.

9         THE COURT:  Mr. Sharp, let me stop you right there.

10  There was an objection to the question that you posed that

11  this was a question that was asked yesterday and answered

12  yesterday.  That is a proper objection.  I have sustained it.

13          It's regrettable that you don't recall it, but,

14  apparently, it was a point you wanted to make and you've

15  already made that point and we're not going to reiterate it,

16  rehash it, revisit it because the Court is not going to hear

17  cumulative testimony.  Now, that area has been covered.

18          What other areas of inquiry do you want to ask this

19  witness about?  You said that was some sort of foundational

20  area.  That foundation has been laid.  What is the other

21  question you want to get to?  You're permitted to ask that

22  question, unless it has already been asked and answered.

23          MR. SHARP:  You have taken me totally out of where

24  I wanted to be at with this and mentally -- can I have a

25  recess?  I mean, like, you're totally throwing me off this

1  morning with what you're doing and what he's doing.  First of

2  all, I have to sit behind him, peek over his shoulder to get

3  to you, so I'm saying, like, this is -- can I take a recess?

4      THE COURT:  No.

5      MR. SHARP:  Because right now it seems like

6  everything I'm saying I can't remember -- I'm telling you, as

7  an individual, I can't remember every exact thing that I asked

8  him yesterday, so now if he's objecting to that, okay, fine,

9  he's objecting, asked and answered.  But then you're going

10  into a whole diatribe and sermon here about evidence and

11  procedure.  I'm not a lawyer.  We understand that.

12      THE COURT:  I understand that.

13      MR. SHARP:  So it's kind of getting offensive to me

14  that you're talking to me like I'm a moron.

15      THE COURT:  I think the record will reflect that I

16  I am not speaking to you as a moron, but you are not going to

17  get a recess because we need to get this witness's testimony

18  in.  There are other witnesses who are here and I'm not sure

19  what a recess would accomplice since you're telling me you

20  have trouble remembering.

21          MR. SHARP:  I'm going to lose my temper and I'm

22  trying to control myself from saying something that is going

23  to hurt me, so that's why I'm asking you, can I have a recess?

24          THE COURT:  You must control yourself, so I suggest

25  you ask a question of the witness on another area and we'll

1  proceed.

2  BY MR. SHARP:

3  Q.  When we got to SCI-Greene and you were able to straighten

4  out the problems that I was having because they said there was

5  some stuff in my jacket that was falsified, is it true that I

6  was released into population and filed some complaints about

7  Imam Ibrahiym, were you aware of that?

8  A.  I know that you were released to population.  I'm not

9  aware of any complaints you filed.

10      MR. SHARP:  Can I have the exhibits, please.

11  BY MR. SHARP:

12  Q.  Were you the deputy superintendent or the superintendent

13  around the time of 11-8-02 at SCI-Greene?

14  A.  Yes, I was.

15  Q.  I have here a grievance that I believe we were in the

16  process of discussing and you said that Deputy Jackson had

17  signed this response for you?

18      MR. BRADLEY:  Your Honor, can we have the exhibit

19  identified?

20          THE COURT:  Can you identify it for the record,

21  please.

22          MR. SHARP:  Exhibit 8.

23  BY MR. SHARP:

24  Q.  We were discussing, if I remember when we left off -- now,

25  it's starting to come to me, we were talking about the fact

1 that you were not present in the institution at the particular

2 time that this particular grievance was responded to but that

3 you do recall reviewing the grievance; is that correct?

4 A.  No.  I did testify to that.  That wasn't at the closing of

5 the day yesterday.  What I did verify when I saw -- if that's

6 the one because I don't know, I saw several, so I don't know

7 if that's -- can I see that to make sure that's the one

8 because there were several yesterday --

9 Q.  We left off on No. 8.

10      THE COURT:  Actually my notes would say

11 differently.

12      MR. SHARP:  It wasn't No. 8?

13      THE COURT:  No, it was not.  No. 8 was covered,

14 then Exhibit 10, then Exhibit 4.

15      MR. SHARP:  I'm getting to Exhibit 8 and 10.

16      THE COURT:  We have done Exhibit 8 and 10.  You

17 talked to him about Exhibits 8 and 10 yesterday and Exhibit 4

18 and Exhibit 3.

19      MR. SHARP:  Right.  And I specifically asked him --

20  I'm trying to remember correctly, he said he hadn't signed, he

21  hadn't signed off, but he was made aware that he reviewed

22  them.  Wasn't that his testimony yesterday, that he usually,

23  if someone did sign for him, that he reviewed --

24  BY MR. SHARP:

25  Q.  Didn't you say something to that effect?

1  A.  No.  What I said was -- what I would do -- my procedure

2  was that the misconducts would be reviewed, answered by my

3  administrative assistant.  When I would get the stacks of

4  grievances, I would review them and then I would sign off on

5  them, or if I had a question, I would refer it back to the

6  administrative assistant.  In this case, I said I must have

7  been out of the institution and I believe it was Deputy

8  Jackson, if I'm not mistaken, was the acting superintendent

9  and he would have reviewed and signed off.  So I probably

10  didn't see that particular grievance reply.  That would have

11  been handled by Deputy Jackson.

12  Q.  Is it your testimony then that you were never aware of any

13  conflicts that Chaplain Abu Bakr and myself had pertaining to

14  his teachings?

15  A.  That's correct, I don't recollect any.

16  Q.  Do you respond to mail that is directed toward you,

17  Superintendent Stickman?

18  A.  Do I respond to mail?

19  Q.  Yes.

20  A.  If I'm there, I try to.  If not, then I would cc it to the

21  individual or department that would have a better opportunity

22  to reply to it more fully.

23  Q.  So if I sent you something and I was informing you about a

24  complication that I was having, and even if it was pertaining

25  to a grievance, if it's addressed as a letter, would you

1  review that?

2  A.  I would probably review it and see what department you

3  were having a problem with and forward it there.

4  Q.  Even after it was responded to by someone else, would you

5  do --

6  A.  I can't answer that because I don't know.  If you would

7  tell me it was responded to or not responded to.  I wouldn't

8  know that.  I'm just telling you generally how I would handle

9  situations.

10        MR. SHARP:  I think I have no further questions,

11  Your Honor.

12              REDIRECT EXAMINATION

13  BY MR. BRADLEY:

14  Q.  The Exhibit 21, is that still in front of you?

15  A.  Yes, sir.

16  Q.  Mr. Sharp directed you to that line on confidential

17  information?

18  A.  Yes.

19  Q.  Do you know what that means?

20  A.  Yes.

21  Q.  Can you explain what that means.

22  A.  What that means is any confidential information pertaining

23  to staff, outside agencies, anything of that nature, it would

24  put him -- that the security office would need to know to be

25  kept confidential down there, that's what that would mean.

1        MR. BRADLEY:  Thank you.  Nothing further.

2        THE COURT:  Anything you want to ask him about that

3   point, Mr. Sharp.

4        MR. SHARP:  No.

5        THE COURT:  Thank you, sir.  You may step down.

6        MR. BRADLEY:  Defendants call Imam Abu Bakr

7   Muhammad.

8      IMAM ABU BAKR Muhammad, a witness having duly affirmed,

9   testified as follows:

10              DIRECT EXAMINATION

11   BY MR. BRADLEY:

12   Q.  Could you state your name and spell it for the record.

13   A.  My name is Imam, I-M-A-M, Abu Bakr, A-B-U B-A-K-R,

14   Muhammad, M-U-H-A-M-M-A-D.

15   Q.  What is your present occupation?

16   A.  I'm a Muslim chaplain at SCI-Greene.

17   Q.  How long have you held that position?

18   A.  I started April 3, 1995.

19   Q.  Have you been the Islamic chaplain at SCI-Greene since

file:///A|/sharp10-18-07.txt

20  that time?

21  A.  Yes, sir.

22  Q.  All the way up until today?

23  A.  Yes, sir.

24  Q.  What are your duties and responsibilities as the Islamic

25  chaplain at SCI-Greene?

1 A.  I'm in charge of all Islamic programs, specifically for

2 the Sunni Muslims.  That includes, among other things, study

3 groups, teaching them Islam, Qur'an, Arabic and other related

4 issues with the Islamic teachings.  I also conduct the Jumah

5 service, which is held every Friday.  I'm also involved with

6 special events like Ramadan programs, Islamic festivals.  I

7 also visit the restricted housing units basically as a

8 chaplain, but specifically to also take some Islamic

9 literature to Muslims in general.  I am also a spiritual

10 advisor, so to speak, for the Muslim group.

11 Q.  You indicated that you provide services for the programs

12 for the Sunni Muslims?

13 A.  In particular, yes.

14 Q.  If someone was identified to you as an Ahlus Sunnati wal

15 Jama'ah individual, would that person be accommodated by the

16 programs that you offered at SCI-Greene?

17 A.  Yes, sir.

18 Q.  Are you familiar with the plaintiff in this case, Shawn

19 Sharp?

20  A.  I know him.

21  Q.  Did you ever tell anybody that you didn't want him

22  participating in your services or your study groups?

23  A.  Never.

24  Q.  Did you prohibit Mr. Sharp from attending your services or

25  study groups?

1  A.  I couldn't have done that.

2  Q.  Did you ever have discussions with Mr. Sharp about his

3  religion?

4  A.  One occasion my supervisor, Father Moneck, invited me to

5  his office and Mr. Sharp was in his office and was dealing

6  with the issue of Ramadan, basically.  Father Moneck basically

7  took the position to have a group who claimed they are Ahlus

8  Sunnati wal Jama'ah, they are Sunni Muslims, but would rather

9  have a list -- their own group to deal with the Ramadan issue,

10  they would not want to go through chapel to participate in the

11  sundown prayers with us and Father Moneck had no objection to

12  that.  I have no objection to that.  So they were listed as a

13  group within the larger Sunni Muslim group.

14  Q.  Is that the extent of your interaction with Mr. Sharp?

15  A.  That is the extent of my communication with him.

16  Q.  I believe you've heard testimony about a videotape of a

17  sermon that you have given?

18  A.  Yes, sir.

19  Q.  In this sermon, Mr. Sharp has indicated that you were

20  slandering or attacking his group.  Can you describe to the

21  Court what the nature of your sermon was?

22  A.  Well, I thought he was Ahlus Sunnati wal Jama'ah.  I am an

23  Imam of the Ahlus Sunnati wal Jama'ah, so I am kind of

24  confused how I could be attacking him if he's Ahlus Sunnati

25  wal Jama'ah.

1  Q.  Were the things that you were saying in your sermon, were

2  those ideas and beliefs held by the Ahlus Sunnati wal Jama'ah?

3  A.  Yes, sir, fundamental beliefs.

4  Q.  Did you ever identify Mr. Sharp personally in any of your

5  sermons?

6  A.  Couldn't have done that, no.

7  Q.  And when you were making those comments, were you talking

8  about inmates and prisoners, or were you talking generally

9  about Muslims?

10  A.  I was talking about the fundamentals of Islam throughout

11  the world.  It happened to be I was giving sermon at Greene.

12  Q.  There was also some discussion about a contract for

13  Ramadan.  Did you have such a thing?

14  A.  That very year we had -- we used to have -- allow inmates

15  to write requests to participate in Ramadan, and we discovered

16  over the years many, many inmates would not fulfill the

17  obligation to write the request and send them in time before

18  the deadline, so we thought an easier way and more profitable

19  way to do it, to get everybody accommodated before the

20  deadline was we created an agreement form and asked each

21  individual who is a Muslim, not just necessarily a Sunni

22  Muslim, to fill out that form whether they want to

23  participate.  And if they want to participate, whether they

24  would like to come to the chapel to pray at sundown before

25  they go to eat.  They had that option.  If they don't, if they

1  choose not to come to chapel whether they are Ahlus Sunni wal

2  Jama'ah or other Muslim, no questions asked, they could go

3  from their cells to the dietary and to the dining hall,

4  including Nation of Islam.  So everybody was included in that

5  agreement and choices were given as to what you wanted to do.

6  Q.  Did this pass or document, did it say anything about not

7  going to commissary or not eating outside food?

8  A.  The very first year we had said because we are Muslims,

9  and if we are going to fast, then we are going to follow the

10  authentic teaching of the Prophet Muhammad.  The obligation of

11  fasting, which is 29 or 30 days of fasting, and we had said

12  you cannot go -- you cannot be seen going to the dining hall

13  during the afternoon, nor should you be seen going to the

14  commissary again during the afternoon because it was in our

15  own message that maybe you aren't fasting.  You could be

16  removed if you are caught eating.  Some little rules of

17  conduct, basically.  And that was what I recall that first

18  year.

19          The second year we tried to, you know, flush out

20 some of the issues that inmates came later on to say we had

21 problem with that, and we have this agreement since then.

22 Q. You talked about the first year. Would that have been the

23 first year you were there?

24 A. I believe so. I mean other Muslims brought that complaint

25 to our attention, not just --

1  Q.  So that would have been back in 1995?

2  A.  I believe we instituted the new policy I think -- I can't

3  exactly remember.  I think it was 1999, 2000.  I could be

4  wrong.

5        MR. BRADLEY:  I believe that's all the questions I

6  have, Your Honor.

7        THE COURT:  Mr. Sharp?

8        MR. SHARP:  Yes.

9             CROSS-EXAMINATION

10 BY MR. SHARP:

11 Q.  You say you are Ahlus Sunnati wal Jama'ah, that is your

12 ideological affiliation.  Are there other what you would call

13 deviant groups who would make that claim?

14 A.  In the history of Islam, there have been deviant groups.

15 God has warned us in the Qur'an not to be divided as authentic

16 Muslims, to stick to the teachings of Prophet Muhammad, peace

17 be upon him.  Prophet Muhammad himself had made predictions

18 that time will come when the Islamic faith will be divided

19 into 73 different sects and he told us only one of them will

20  be authenticated sect.  His companions asked him, and what is

21  that, what will be that saved sect which will be religion to

22  the authentic teachings as in the Qur'an, the holy book, and

23  teachings of the messenger of God, Prophet Muhammad.  He said,

24  it is going to be the sect that I am on and the one that my

25  companions are upon.  So he has told, there have been

1  predictions by Prophet Muhammad, the sole teacher of Islam,

2  the most authentic teacher of Islam, that there will be 73

3  different sects.  And historically, there are deviant groups

4  in Islam and as a Muslim leader and an authentic Imam where I

5  work and teach, I cannot fail in my responsibility to teach

6  and inform the Muslim group, the Sunni Muslim group about

7  deviant groups.  It would be failing in my duty not to do

8  that.  It is like saying you have people into the football

9  field, go play, we aren't going to issue the rules of the

10  game.

11  Q.  So, again, my question is, because I don't think he

12  answered it, Your Honor -- are there other individual groups

13  besides the group that you followed who claim to be Ahlus

14  Sunnati wal Jama'ah?

15  A.  There are, yeah.

16  Q.  Are you familiar with the Habashi group?

17  A.  Habashi group, yes.

18  Q.  Tell me some of the differences you have between the

19  Habashi and what you say you are.

file:///A|/sharp10-18-07.txt

20  A.  The Habashi are the offspring of the Al-Ashari.  The

21  Al-Ashari were included among the deviant groups.  They have

22  problem with some of the attributes of God.  They either deny

23  them or they distort their meanings, and that is not within

24  the authentic teachings of the prophet of God, Prophet

25  Muhammad.  Habashi, as I said, is an offspring of the

1  Al-Ashari.

2  Q.  The scholar who founded the Al-Ashari community, do you

3  know when he lived?

4  A.  Abu-Hasan Al-Ashari A-B-U-H-A-S-A-N, A-L, A-S-H-A-R-I,

5  Al-Ashari; he was a follower of the Mutalizilah,

6  M-U-T-A-L-I-Z-I-L-A-H.  He was follower of the Mutalizilah

7  group, and, therefore, he concurred with them regarding the

8  attributes of God.  Some of them, they rejected some of them,

9  distorted them and changed their meanings.  He was on that

10  train until toward some years before he died, he recanted all

11  those beliefs about the attributes of God that the

12  Mutalizilahs do not accept.  He recanted all those beliefs and

13  he wrote books regarding him being a kind of what do you say

14  newborn again, authentic Muslim, Sunni Muslim leader.  And he

15  died on that train.  So we regard Abu-Hasan Al-Ashari as an

16  authentic Imam of the Ahlus Sunnati wal Jama'ah before he

17  died.

18       MR. SHARP:  He never answered the question, Your

19  Honor.  I said when did he live?  That's what I asked, if I'm

20  not mistaken.

21        THE COURT:  I don't believe that was the question.

22        MR. SHARP:  I asked him --

23        THE COURT:  If you want to ask him when he lived,

24  you can ask him.

25  BY MR. SHARP:

1  Q.  When did he live?

2  A.  I know historically they said he was born 260, some say he

3  was born 270 of the Hijra, H-I-J-R-A.  This is the Islamic

4  calendar.  That is I think a difference of something like 622

5  years between the Islamic calendar and the Christian calendar.

6  So that would be about 860, 870 of the Christian years when he

7  was born.

8  Q.  So the founders of his school or the followers of his

9  particular school have existed for the time that you're

10  saying, approximately, let's say 500 years?

11  A.  What school are you talking about?

12  Q.  Ashari.

13  A.  Maybe.  That's not my interest.

14  Q.  But the ideology has existed for 500 years, correct?

15  A.  I suppose.

16  Q.  Do you pray in a specific direction?

17  A.  All Muslim all over the world, all authentic Sunni Muslims

18  all over the world pray toward the Qiblah, Q-I-B-L-A-H.

19  That's the direction to the Kabah, the holy shrine in Mecca,

20  K-A-B-A-H.  All Muslims, wherever they are, in the world,

21  following the teachings of the Qur'an and Prophet Muhammad

22  will have to pray toward the direction of that holy shrine in

23  Mecca.  Where they live in different worlds differ, depending

24  on the direction that they -- their areas face toward the holy

25  shrine.

1        In the United States, it has been well known,

2  majority, I will say, in fact, 99.9 perhaps percent of Muslims

3  pray toward the holy shrine in Kabah, that direction being the

4  most authentic direction being northeast.

5  Q.  So if I was to pray with you and it is my belief that the

6  direction of prayer is southeast, would that create a problem?

7  A.  Are you Ahlus Sunnati wal Jama'ah?

8  Q.  I believe I am.

9  A.  Then you should have no problem praying toward the

10  northeast of the Kabah, if you are a Sunni like I am.

11        MR. SHARP:  In the exhibits that were issued, I

12  don't know what he marked this as, Your Honor, he's answering

13  the question --

14        THE COURT:  All the exhibits have been marked.  Are

15  you talking about a new one?

16        MR. SHARP:  There was a very large stack of papers

17  that he had here.

18        THE COURT:  Mr. Bradley's exhibit?

19        MR. SHARP:  Right.

20          THE COURT:  That would be Exhibit B.

21          MR. SHARP:  There is a section in here called the

22  Habashis.  There's a pamphlet in here that --

23          THE COURT:  Could you hold it up.

24          MR. SHARP:  It's called the Habashis.

25          THE COURT:  I think the witness has it.  Now I have

1  it and Mr. Bradley has it.

2  BY MR. SHARP:

3  Q.  Have you ever read that pamphlet?

4  A.  I'm familiar with this pamphlet.

5  Q.  Does it say in there that the Habashis pray and believe

6  that prayer is directed toward the southeast?

7  A.  I'm familiar with the content, yes.

8  Q.  So then you are aware that the teachings that I say that I

9  follow that necessitate me praying in totally different

10  direction, correct?

11  A.  If you are Habashi.

12  Q.  Right.  It would necessitate me praying -- would it

13  necessitate me praying in a totally different direction?

14          THE COURT:  He has answered the question.  It's

15  asked and answered.

16  BY MR. SHARP:

17  Q.  Would that be able to be accomplished in your service if

18  we were performing the prayer together?  Would that be

19  permissible?

20  A.  If you are a Habashi, no.  But you don't have to pray with

21  me, you can pray on your own.

22  Q.  So you would allow another congregational prayer to be

23  held with those of my faith if we were to attend your service

24  after you gave sermon, the Qiblah.

25  A.  After you have congregational prayer, there is only one

1  congregational prayer in Islam.

2  Q.  There is only one congregational prayer in Islam?

3  A.  As a group of Muslims are concerned, you can't have two

4  different Jumahs in the same place.

5  Q.  What if one is not considered valid?

6  A.  Then you don't have to come to attend to pray behind me.

7  You can pray on your own in your own cell and the prayer is

8  valid.

9  Q.  Let me ask you this.  Then why do you attend Jumah?

10  A.  I attend Jumah because I am the Imam.

11  Q.  Is it an obligation?

12  A.  It's an obligation because there is opportunity given to

13  Muslims at Greene to pray, and, yes, so they show up.  Still,

14  we have many who do not show up.  We have no problem with

15  that.

16        MR. SHARP:  Your Honor, I would like to enter this

17  as an exhibit.

18        THE COURT:  What is it?

19        MR. SHARP:  It is a book called the Substantiation

20  of the People of Truth That the Direction of Al-Qiblah, which

21  is he's talking about the direction of prayer in the United

22  States and Canada is to the southeast.  It is from the

23  organization I requested to witness and I have the pamphlet

24  that they publish and I would like -- I'm not going to read

25  anything, read the whole thing out of here, but I would like

1  to enter this into evidence to substantiate that it has been a

2  long standing belief -- he's saying, he is saying that, you

3  know, it is his understanding that 99.9 percent of the Muslims

4  in America pray to the northeast.  I am contradicting that and

5  I would like this -- to file this in support of contradicting

6  what he's saying or refuting what he has alleged.

7        THE COURT:  Well, we can do that.  I'm not sure

8  that there's relevance to that since I think the point has

9  been made.  I think this is cumulative, but I need to tell

10  you, if you offer that into evidence, it doesn't come back to

11  you for a very long time, or you'll have to make a copy of it

12  or pay to have a copy of it made because if you enter

13  something into evidence you cannot take it with you when you

14  leave.

15        MR. SHARP:  Can I have a copy of it made.  I'm

16  willing to pay for it but I don't -- I'm in the hole.  I don't

17  have access to a copier.

18        THE COURT:  We will have a copy made, but you will

19  be charged for it.  This is part of your responsibility for

20  coming to trial.

21       MR. SHARP:  No problem, Your Honor.  Thank you.

22       I'd like to have that entered.

23  BY MR. SHARP:

24  Q.  Are you familiar with Shaykh Kabbani?

25  A.  Shaykh Kabbani?

1  Q.  Right.

2  A.  He is one of the authentic Muslim scholars.  He passed.

3  May God forgive him his sins.

4  Q.  Have you ever heard of this book?  I'm holding it up.

5  Islamic Beliefs and Doctrine According to Ahl al-Sunna, a

6  Repudiation of Salafi Innovations.  You're familiar with this

7  book and it being published by him?  Are we talking about the

8  same Shaykh Kabbani?

9  A.  Couldn't have been made by Kabbani.

10  Q.  You see the name?

11  A.  Yes.

12  Q.  It is doctrine according to Ahl al-Sunna.  Are you

13  familiar with this individual?

14  A.  I am not familiar with the individual, but he's making the

15  claim he's Ahlus Sunnati wal Jama'ah.  He is writing a

16  critique against an authenticated Islamic leader, so he

17  couldn't be a true Ahlus Sunnati wal Jama'ah writer.

18  Q.  Now, I will be using the names of the scholars that I

19  wrote down for you.

20        The individuals Ibn Qayyim, Ibn Taymiyyah and Ibn

21  Abdul Wahhab, Muhammad Ibn Abdul Wahhab, do you teach from

22  their books and things of that nature?

23  A.  I teach the pure authenticated Islamic teachings as

24  derived from the message of God, from Muhammad, peace be upon

25  him, through today's scholar who follow the same trend, the

46

1  same path.  So if a scholar teaches the same trend and same

2  path, yes, I will use that information.

3  Q.  So you have used Ibn Taymiyyah and these three scholars?

4       THE COURT:  I can't hear you.  Repeat the question.

5  BY MR. SHARP:

6  Q.  So you do use these particular three scholars' works in

7  your teachings?

8  A.  Ibn Taymiyyah, Abdul Wahhab, Muhammad Abdul Wahhab -- did

9  you mention Kabbani?

10  Q.  No, I didn't.

11  A.  These two are tremendous great scholars of Ahlus Sunnati

12  wal Jama'ah may dedicated purely on pure religion of Islam as

13  taught by Prophet Muhammad.  Peace be upon you.

14       MR. SHARP:  He still didn't answer the question.

15       THE COURT:  Do you have a question for him?

16  BY MR. SHARP:

17  Q.  I asked you specifically, do you use their teachings in

18  your classes and your sermons?

19  A.  I said if I find a scholar who follows the exact teachings

file:///A|/sharp10-18-07.txt

20  of the prophet of God, I will use that information.  I

21  mentioned two exactly that, yes, I will use their sources.

22        MR. SHARP:  That's what I was trying to ask.  Thank

23  you.

24  BY MR. SHARP:

25  Q.  So have you been referred to -- has your group or the

1  individuals that you say you follow or whose methodology you

2  assimilate yourself with, have they been called Wahabi?

3  A.  I am Ahlus Sunnati Jama'ah.  The terminology Wahabi is

4  used by a deviant group, like your group, to discredit the

5  authentic scholars in Saudi Arabia, including among them,

6  Muhammad Abdul Wahhab and Shaykh Kabbani.

7  Q.  Are you also interchangeably called the Salafi sect?

8  A.  The Salafi sect, the Prophet Muhammad told us that the

9  best three groups of Muslims, he told his companions that

10  three best generations of Muslims are he said, my generation,

11  and then those who follow them and then those who follow them.

12  So these are the best, the most authentic, pious Muslim groups

13  over the years.  Prophet Muhammad said so.  Those are what are

14  called Salafi, S-A-L-A-F-I.  Salafi means predecessors of

15  Prophet Muhammad.  Yes, I am with them.  I don't teach

16  anything outside what they teach.

17  Q.  So outside of the Salafi methodology -- so if I believed

18  something that was not in agreement with the Salafi

19  methodology and I was attending your class, what would I have

20  to do?

21  A.  Well, you aren't Ahlus Sunnati wal Jama'ah if you disagree

22  with what the three generations of Prophet Muhammad said.  You

23  have problem with that?

24  Q.  No.  You're not answering what I'm saying.

25          MR. SHARP:  He's not answering --

1       THE COURT:  Do not make your arguments.  Ask him a

2  question.

3  BY MR. SHARP:

4  Q.  Again, I'm going to ask you again, if I have a problem

5  with what you teach about my beliefs, what would I be left to

6  do?

7  A.  I don't teach anything about your belief.  I teach about

8  my belief.

9  Q.  And your belief is that Habashis are deviants, correct?

10  A.  Habashis is an offshoot of the Al-Ashari, Al-Asharis are

11  and offset of Mutalizilahs, Mutalizilahs are deviant group in

12  Islam.

13  Q.  You're saying in your class that would be your obligation

14  to do?

15  A.  I have a responsibility to inform my class about who is a

16  deviant group, yes.

17  Q.  And if I stood up in your class and I began to speak about

18  my belief about you being a deviant, what would happen?

19  A.  Well, it happened.  Your group had called me kufr, an

20 unbeliever.

21 Q.  And --

22          THE COURT:  Excuse me.  Mr. Sharp, you have asked

23 him a question, he's answering it, do not interrupt.

24          THE WITNESS:  So, it had happened at Greene.  I had

25 members of your group call me an unbeliever.  I had some

1  members of your group who attend my class also regardless of

2  the difference.

3  BY MR. SHARP:

4  Q.  Did I ever attend your class?

5  A.  No.

6  Q.  Did I ever call you such a thing?

7  A.  I don't know if you did.  Not to my face.

8  Q.  I'm talking about to your face, in your class.

9  A.  No.

10  Q.  Okay.  So, again, is it possible for us sitting in the

11  same room, trying to have accommodations at SCI-Greene for my

12  religious beliefs to be maintained and me to be permitted to

13  practice as I believe and for you to hold the beliefs that you

14  believe, could I be accommodated by any other means other than

15  sitting and accepting what you teach?

16  A.  Members of your group attend my classes.  You, no.  But

17  members of your group did attend my classes.  You have

18  different beliefs than members of your group.

19  Q.  Did they pray with you?

20  A.  Yes.

21  Q.  They prayed with you?

22  A.  Yes.

23  Q.  And they aren't Habashi?

24  A.  Yes.

25  Q.  So that's your opinion?

1  A.  It's not an opinion.  Regis Seski, S-E-S-K-I, is a

2  Habashi.  He was a Habashi.  He was one of my students until

3  he left the prison.

4        MR. SHARP:  I don't even know who he's talking

5  about.

6        THE COURT:  Mr. Sharp, you asked him the question,

7  you may not argue with his answer.  Do you have another

8  question to follow up on that?

9  BY MR. SHARP:

10  Q.  Did you ever see me with this individual?

11  A.  Why that relevant to me?

12  Q.  I'm asking you.

13  A.  It's irrelevant.

14  Q.  You said I knew him, I'm asking you.

15  A.  I didn't say you know him, but he's Habashi.

16  Q.  That's what he claimed.  Has he ever told you that?

17  A.  He is Habashi.

18  Q.  Did he tell you that?

19  A.  Oh, yes.

20  Q.  And he prayed with you?

21  A.  Prayed, and he was my student also.

22  Q.  But the question is did I ever do it?

23  A.  That's irrelevant to me, no.

24  Q.  I haven't, have I?

25  A.  No, you haven't.  You wanted to be a leader.

1  Q.  So you don't deny that you have given repeated sermons

2  speaking about our community or my community or speaking about

3  my beliefs?

4  A.  I give sermons, I gave one I believe regarding the deviant

5  groups, all of them, not just Habashi.  And that's my

6  responsibility to inform my students the authentic Ahlus

7  Sunnati wal Jama'ah in prison about the true Islam and deviant

8  groups.  I would be failing in my duty as an Imam not to do

9  that.

10  Q.  I'm holding Exhibit 8 here.  I would like for you to have

11  him read that second line.

12       THE COURT:  What is it?

13       MR. SHARP:  It's Exhibit 8.

14       MR. BRADLEY:  The initial review response.

15       THE COURT:  What is the question for the witness?

16       MR. SHARP:  I want him to read the second line.

17       THE WITNESS:  I could not find where Imam blatantly

18  slandered or accused any sects in this institution of

19  anything, nor did he belittle anyone because of prayer posture

20  or non-attendance.

21  BY MR. SHARP:

22  Q.  So you've just testified that you have spoken about the

23  direction of prayer being different and you've spoken about

24  deviant groups as being deviant.  Let me ask you this.  Is

25  another word for deviant kufr?

1  A.  I'm sorry.

2  Q.  Is another word for deviant also kufr?

3  A.  No.

4  Q.  No?

5  A.  No.  The 72 different sects the prophet said they are not

6  titled kufrs, they are deviant groups.  They are Muslims by

7  all consensus of the most authentic scholars of Islam.  God

8  will deal with them the way he wishes.  If he wishes, he will

9  forgive them and grant them paradise.  If not, he punishes

10  them and throw them in the hell fire.  But no authentic

11  scholar in Islam has told -- has called those 72 sects as

12  kufrs, but I know it is your methodology to call the Ahlus

13  Sunnati wal Jama'ah, including my authentic scholars, to call

14  them kufrs.  And, as I said, members of your group have called

15  me kufrs several times.  It is your ideology, Mr. Sharp.

16  Q.  It is my ideology?  Xx

17  A.  It the ideology of your group to call us Ahlus Sunnati wal

18  Jama'ah as unbelievers and you have yesterday or day before

19  yesterday one inmate, the first one who came to the screen,

20  you -- he asked you insult scholars, oh, yes, we the insult

21  the main scholars calling them kufrs.  That's your ideology is

22  Habashi.  It's not our ideology to call anybody an unbeliever.

23  We don't do that.  Authentic scholars Ahlus Sunnati wal

24  Jama'ah don't do that.  You may takfeer on us, T-A-K-F-E-E-R,

25  which is to call a believer an unbeliever because of

1  difference of ideology.

2  Q.  So you're saying that you've heard me call people kufrs?

3  A.  I didn't say that.  Your group called us as kufrs, your

4  group.

5  Q.  So when -- but we're talking about me and I'm asking you

6  about me.  Have I ever called you a kufr?

7  A.  No.

8  Q.  You said it is my methodology?

9  A.  Your group.

10  Q.  No.  No?

11      THE COURT:  Excuse me, Mr. Sharp.  There will be no

12  arguing with the witness and you must remain civil.  He said

13  your group.

14      MR. SHARP:  But we're not -- I'm not asking about

15  my group, I'm asking about me.

16      THE COURT:  Ask him about you, don't argue with his

17  answer.

18  BY MR. SHARP:

19  Q.  I'm asking you about me, have I ever -- you said I have

20  never called you a kufr.  You said that is part of my

21  methodology.  You said that specifically, he said that is your

22  methodology.

23          THE COURT:  I don't want to hear argument.  I want

24  a question posed to the witness and I want it posed civilly.

25  BY MR. SHARP:

1  Q.  You're saying that it is my methodology.  When you say

2  your methodology, and I'm trying to understand, are you saying

3  that it is my methodology that I call you an unbeliever?

4  A.  It is the methodology of the Habashi group to call Ahlus

5  Sunnati wal Jama'ah Sunni Muslim kufrs and to call us scholars

6  kufrs as well.

7  Q.  So, in other words, for all intents and purposes, we

8  aren't even upon the same religion, are we, according to you?

9  A.  The problem is you claim you are Ahlus Sunnati wal

10  Jama'ah, but then you refer to say you are Habashi.

11  Q.  What does Habashi mean?

12  A.  Habashi is the group claimed those who follow the

13  so-called teachings of Abdul Bari Muhammad Habashi.  He was an

14  Ethiopian.  He was thrown out of Ethiopia because of religious

15  tension he was causing, came to Lebanon, was thrown out also

16  of Lebanon, I believe, came over to eventually to live

17  somewhere in Canada, and he had -- since then had his

18  followers spreading this Habashi ideology.  That's the little

19  I know about him.  I don't need to know more about him.

20  Q.  So then what you're saying is Habashi literally means

21  Ethiopia?

22  A.  Habashi is Habasha.  Don't you know that?

23  Q.  That's why I'm asking.

24  A.  You don't know it?

25  Q.  I know it.  I'm asking you specifically, what does it mean

1  specifically?

2  A.  Habashi means somebody who is from Habasha.  Habasha is

3  Ethiopia, in Africa.  That's my country, my continent.

4  Q.  Do you believe in all the books that are revealed, all of

5  the reveal books?

6  A.  Reveal books of what?

7  Q.  Divinely inspired books.

8  A.  I believe in all the revealed books that God has mentioned

9  in the Qur'an.

10  Q.  So that would include the Torah?

11  A.  Yes, sir.

12       THE COURT:  We're going to take a break for the

13  benefit of our court reporter.

14       Mr. Sharp, I don't know how much more testimony you

15  have, but I do think that the court reporter needs a little

16  relief here so we're going to take a ten-minute break.

17       (Whereupon, there was a brief recess in the proceedings.)

18       THE COURT:  Mr. Sharp, you may continue.

19  BY MR. SHARP:

20  Q.  I believe I was asking you, could you believe in the

21  veiled book, the last question was I believe, do you believe

22  in the Torah?

23          MR. BRADLEY:  Your Honor, to the extent he's asking

24  personal opinions and beliefs, I don't believe it's relevant.

25  But if it's a broader question about his faith, I guess that

1  would be acceptable.

2          THE COURT:  The objection is sustained to that

3  point.  If you're asking what his personal opinion is, it's

4  not relevant.

5          MR. SHARP:  I'm asking what he believes in.  I'm

6  asking him specifically does he believe in a particular book,

7  the Torah, which is part of the Bible.

8          THE COURT:  I understand what the Torah is, sir.

9          Ask the question.

10  BY MR. SHARP:

11  Q.  Do you believe in the Torah?

12  A.  I believe in the revealed books as mentioned in the Qur'an

13  and Torah is one of them.

14  Q.  So if I was to give you something out of this book, would

15  you follow it?

16  A.  I'm not a student of Torah.  I don't follow Torah.  I

17  follow the Qur'an.

18  Q.  The Qur'an says if we should believe in all the books --

19  A.  I do so.

20  Q.  So just believing in it is sufficient?

21  A.  Believing in it is sufficient in Islam.  You don't have to

22  follow it.  I follow the teachings of the Qur'an, not Torah.

23  Q.  Do you believe in making vows?

24       THE COURT:  Mr. Sharp, I'm going to give you about

25  five more minutes on this because I don't see the relevance.

1   You've already indicated that there are differences.

2           MR. SHARP:  Okay.

3           THE COURT:  I don't know that we have a day to

4   devote to what might be, I don't know, a day's worth of

5   differences.

6           MR. SHARP:  Let me ask you because I need to be

7   clear on this and I want to understand this.  Do I have to go

8   through the process of establishing all of our differences as

9   far as our beliefs?  We have an understanding, a general

10  understanding that our beliefs are different, okay.  And I

11  don't -- because I brought all this literature not knowing

12  whether or not I was going to have to sit here and go through

13  with these chaplains each detail of what my belief is as

14  opposed to their belief.  I don't know if I have to present

15  that before the Court to justify me saying that I should have

16  my religious accommodation.  This is part of what I'm arguing

17  for, correct?

18           THE COURT:  I understand that.  I think you've

19  established that there are differences.

20          MR. SHARP:  Right.

21          THE COURT:  I don't think that it is necessary for

22   your case to establish that there are 500 differences.  I

23   think what you need to establish is, and you have made some

24   claims concerning this particular witness and I think you've

25   covered those points, and I certainly do not want to gag you

1  and preclude you from presenting what you think you need to

2  present, but since I do not know how many differences there

3  might be, I don't know --

4        MR. SHARP:  If you're saying that it's just enough

5  for me to be able to present that there are differences and

6  maybe even extreme differences, as we are hearing --

7        THE COURT:  That's what I could surmise from the

8  testimony.

9  BY MR. SHARP:

10  Q.  Then my questions to you then --

11        MR. SHARP:  Thank you, Your Honor.

12  BY MR. SHARP:

13  Q.  My question to you is, as a citizen in this country, do I

14  have a right to practice my religion?

15        MR. BRADLEY:  Your Honor, I'm going to object to

16  that question.

17        THE COURT:  Sustained.

18        MR. SHARP:  I'm trying to see how I can formulate

19  the point I want to make here.

20          Do you have the grievances up there that I raised

21 in the affidavit?  I just want to touch on one other point.

22 BY MR. SHARP:

23 Q.  In your understanding as a general belief of Muslims, you

24 said that it would be obligatory to pray the congregational

25 prayers; is that correct?

1 A. I didn't say that.

2 Q. Would it be obligatory to pray the congregational prayer

3 for a Muslim, just generally speaking?

4 A. Well, generally, our differences or opinion, some scholars

5 say it is obligatory to attend to congressional prayers, other

6 scholars disagree, say, no, it's not an obligation, but he can

7 pray on his own, so they are differences in opinion.

8 Q. But the Jumah prayer is an obligation, is obligatory?

9 A. The Jumah prayer is an obligation, but there are also

10 conditions when it is -- the obligation is the removed.  If

11 you are sick, if you are traveller, woman who is in her

12 menstruation, if a person knows when he goes there he's going

13 to have some hardship, like storm coming in, so there are some

14 exemptions to the obligation of the Jumah prayer.

15 Q. As far as Taleem, is that obligatory?

16 A. Taleem is not an obligation.  It is a requirement that you

17 should have understanding of the basics of Islam, but Taleem,

18 which is really a study group, is not an obligation to attend

19 Taleem.

20  Q.  So what can you tell me -- can you tell me what type of

21  classes are offered at SCI-Greene?

22  A.  Why is it relevant?

23          THE COURT:  I'll decide what is relevant.  If you

24  would be so kind as to answer the question.  It is a relevant

25  question.

1    THE WITNESS:  Okay.

2    Can you repeat the question?

3 BY MR. SHARP:

4 Q.  What type of classes are offered Islamically at

5 SCI-Greene?

6 A.  I teach Arabic, Arabic language; I teach history of Islam,

7 Seerah, S-E-E-R-A-H; I teach Qur'anic sciences; I teach

8 Al-Aqeeda, A-Q-E-E-D-A; I teach Hadeeth, H-A-D-E-E-T-H; and

9 sometimes we change.  I mean we finish this course and we go

10 on to other courses, but these are some of the courses.

11 Q.  And you teach all of those classes, correct?

12 A.  That's my duty.

13 Q.  So there are no other classes to be taught, Islamically

14 for the general population except for those classes that you

15 teach?

16 A.  I mentioned some of the classes.  Over years I took many,

17 many different classes.

18 Q.  But it's always you teach the classes?

19 A.  That's my duty.

20  Q.  Could you tell me what other religious services are held

21  at SCI-Greene?  You work in the chaplaincy department?

22  A.  There is Jumah service and other faith groups.

23  Q.  Besides that?

24        MR. SHARP:  I don't mean to be cutting him off --

25  BY MR. SHARP:

1  Q.  But I'm talking about you named the ones for the Islamic

2  community, that's the only one -- just the classes you teach

3  are the only Islamic classes that are available at all,

4  period?

5  A.  Oh, there's a lot.  There's a lot.  I can tell you that

6  because I am the teacher.

7         THE COURT:  I think he does not quite understand

8  your question.

9         MR. SHARP:  Right.

10  BY MR. SHARP:

11  Q.  In other words, what I'm saying, okay, you have your

12  community and you teach for all the classes for your

13  community, I understand that.

14         Are there any other Islamic classes that are being

15  taught in the institution besides what you teach?

16  A.  Nation of Islam has their program, I believe.

17  Q.  Who would teach those classes?

18  A.  Minister Anderson.

19  Q.  How often do they meet?

20 A.  Once a week.

21 Q.  They meet once a week.  Are there any other religious

22 services provided at SCI-Greene?

23 A.  Islamic.

24 Q.  Any, just generally speaking?

25 A.  Protestants, Catholics, Jewish, Jehovah, Yoke Fellowship,

1  Native Americans.

2  Q.  You named about four different, I think it was it four,

3  Yoke Fellowship, Jehovah Witnesses, Catholics, Protestants,

4  are they all Christian, to you?

5  A.  I don't like to characterize anybody.

6  Q.  Are they considered Christians?

7  A.  I don't know.  I know Catholics are Christians,

8  Protestants are Christians, that I know for sure.  Jewish are

9  not.

10  Q.  I didn't mention Jew.

11      MR. SHARP:  No further questions, Your Honor.

12  Thank you.

13      MR. BRADLEY:  Nothing, Your Honor.

14      THE COURT:  Thank you, sir, you may step down.

15      MR. BRADLEY:  Defendants calls Mr. Coleman to the

16  stand.

17      BRIAN V. COLEMAN, a witness having been duly sworn,

18  testified as follows:

19          DIRECT EXAMINATION

20  BY MR. BRADLEY:

21  Q.  Would you state your name and spell it for the record.

22  A.  Brian, B-R-I-A-N, V. Coleman, C-O-L-E-M-A-N.

23  Q.  What is your present occupation?

24  A.  Deputy Superintendent For Facility Management at

25  SCI-Greene.

1  Q.  How long have you held that position?

2  A.  Since April of '05.

3  Q.  Prior to April of '05, what position did you hold?

4  A.  At SCI-Greene?

5  Q.  Anywhere within the Department of Corrections?

6  A.  I might as well start from the beginning, it will be

7  easier that way.  1989 to 1993 I was CO1 at Pittsburgh,

8  SCI-Pittsburgh.  1993 to 1999 I was a sergeant -- or 1995 I

9  was a sergeant at SCI-Albion.  From the middle of '95 to '99 I

10  was lieutenant at SCI-Albion.  From January 1999 until

11  approximately April of 2000, I was a lieutenant with the

12  Office of Professional Responsibility which is OPR.  In the

13  year 2000 I was promoted to captain at SCI-Greene and I was a

14  shift manager on the daylight shift and night shift.  Then

15  approximately late 2000 I was moved into the security office

16  at SCI-Greene.  That was until October of '03.  I was promoted

17  to major at SCI-Pittsburgh and in the middle of '04 I went

18  back to SCI-Greene as a major for 30 days and was reassigned

19  SCI-Fayette for a year and a half.  Then in April of '05, I

20  moved back to SCI-Greene as a Deputy Superintendent For

21  Facility Management.  That's my current position.

22  Q.  So from sometime in 2000 until October of 2003, you were

23  in the security department -- you were a captain and at one

24  point a security department captain at SCI-Greene?

25  A.  Yes, for approximately three years I was security captain.

1  Q.  At that time, and again focusing on your time at Greene

2  from 2000 to 2003, were you involved in any way in inmate

3  requests for religious accomodation?

4  A.  No, I was not.

5  Q.  You didn't have any role in the processing or the approval

6  or disapproval of those requests?

7  A.  Not at all.

8  Q.  Do you know the plaintiff in this case, Shawn Sharp?

9  A.  Yes, I do.

10  Q.  Do you know him from your time at SCI-Greene?

11  A.  Yes.

12  Q.  Did you know him prior to that?

13  A.  No, I did not.

14  Q.  Do you recall Mr. Sharp testifying that he discussed with

15  you an issue he had with the videotape of the Imam sermon?

16  A.  Very vaguely I do recall a conversation with me and him,

17  and I don't even know what year it was, but I do recall him

18  bringing up something about a tape to my attention one time

19  when I was making rounds.

20  Q.  Can you describe to the Court what you recall about that

21  conversation and about anything you did in response to that

22  conversation.

23  A.  He brought to my attention and I got with Mrs. Mears, who

24  was now Mrs. Blaine, and I told her, I said to review it with

25  the chaplain department and bring the Imam in and talk to him

1  because I said, I don't understand the Muslim faith enough or

2  Arabic to pick up what was said, if there was, in fact,

3  anything said that was inflammatory.

4  Q.  Did anybody other than Mr. Sharp bring to your attention

5  this issue about the Imam's comments during the sermon?

6  A.  No, sir.

7  Q.  Mr. Sharp was the only one that raised these concerns with

8  you?

9  A.  Yes.

10  Q.  And you passed them on to the program manager?

11  A.  Yes.

12  Q.  Did you hear anything back from them about this issue?

13  A.  Just from listening to the testimony this week and I do --

14  I think Mrs. Mears copied me on a grievance at that time or

15  just sent it to my office, and they said they reviewed the

16  tape and there was nothing derogatory in it.

17  Q.  Do you recall having any further involvement in addressing

18  this issue?

19  A.  Not at all with the tape, no.

20  Q.  Do you know if you ever went back to Mr. Sharp and

21  discussed it with him?

22  A.  No, I didn't.

23        MR. BRADLEY:  I'd like to have this marked as

24  Exhibit D.

25        THE COURT:  It will be so marked.

1  BY MR. BRADLEY:

2  Q.  I've provided you with a document that has been marked as

3  Defendant's Exhibit D.  Can you describe what this document

4  is?

5  A.  Yes.  It's generated from the DOCNET.  What it does is it

6  has custody level and cell status, where he lived and what

7  institution he was housed at.

8  Q.  This document, the housing status security level and

9  custody level have all been redacted?

10  A.  Correct.

11  Q.  Have you seen this document or one similar to it before?

12  A.  Daily.

13  Q.  Specifically with reference to this inmate?

14  A.  No.  I mean I knew part of his history, but as long as you

15  go under an inmate's number, you can pull this up, but prior

16  to the last two weeks I didn't look at this.

17  Q.  Who is this inmate?

18  A.  It's Inmate Sharp.

19  Q.  Is the inmate number identified as BQ8429?

20  A.  Correct.

21  Q.  Does this document tell us what Mr. Sharp's permanent

22  location is?

23  A.  At this time you're asking?

24  Q.  Yes.

25  A.  At this time, he's shows temporary location SCI-Greene.

1  Q.  I direct you to the upper right-hand corner.  Is there a

2  space for permanent location and temporary location?

3  A.  Yes, permanent location is SCI-Dallas and temporary

4  location due to federal court case is SCI-Greene.

5  Q.  Does this document indicate when Mr. Sharp was transferred

6  from SCI-Somerset to SCI-Pittsburgh?

7  A.  Yes.

8  Q.  What date was that?

9  A.  9-18-98.

10  Q.  Does it indicate what date he was transferred from

11  SCI-Pittsburgh to SCI-Greene?

12  A.  Yes.

13  Q.  What date was that?

14  A.  5-23-01.

15  Q.  Does it indicate what date he was transferred from

16  SCI-Greene to SCI-Dallas?

17  A.  Yes.  6-13-2006.

18  Q.  And, again, it also shows -- does this document also show

19  he was transferred from SCI-Dallas to his current temporary

file:///A|/sharp10-18-07.txt

20  housing at SCI-Greene?

21  A.  Correct.

22  Q.  Did you ever have any specific conversations, other than

23  the conversation about the videotape, did you ever have any

24  conversations with Mr. Sharp about his religious preferences

25  or religious activities?

1  A.  Not at all.

2  Q.  Did you ever tell Mr. Sharp that he could not pursue a

3  specific religion?

4  A.  Not at all.

5  Q.  Did you ever take any action or make any decision

6  regarding Mr. Sharp based on his expressed religious

7  preference?

8  A.  No, sir.

9         MR. BRADLEY:  No further questions of this witness,

10  Your Honor.

11         THE COURT:  Mr. Sharp, you may inquire.

12              CROSS-EXAMINATION

13  BY MR. SHARP:

14  Q.  I want to say Captain Coleman so bad because I know you as

15  Captain Coleman.

16         Deputy Coleman, if I recall correctly, when we had

17  the discussion about the problem that I saw on the tape, I was

18  in the process of explaining it to Mr. Mahlmeister.

19         Do you recall that?

20  A.  No, not at all.  Just from your testimony this week.

21  Q.  Now, I believe we were on D block at the time and you were

22  making your rounds and it just so happened I was fortunate

23  that you walked on the block at the time that I was

24  explaining --

25          THE COURT:  Mr. Sharp, again, you're testifying.

1  You need to ask the witness a question.

2  BY MR. SHARP:

3  Q.  And you're saying that you don't recall Mr. Mahlmeister

4  being present there, but you do recall me mentioning to you

5  that there were some slanderous statements made on that

6  particular videotape?

7  A.  I do recall vaguely me and you talking about it.

8  Q.  And did you tell -- do you recall once we had that

9  discussion, do you recall mentioning to Mr. Mahlmeister that

10  you would get back to him and let him know what you found out?

11  A.  No, I don't recall that at all.

12  Q.  And you said that you appointed Ms. Mears and Chaplain

13  Moneck to review the tape?

14  A.  I didn't say I appointed them, I contacted them.  They

15  didn't work for me directly.

16  Q.  So when I approached you and I said, look, I feel this is

17  a threat to security, right, and you're the security captain,

18  did you file a memo, a note, did you file any reports?  You

19  didn't feel it was your duty as a security captain personally

20  to investigate this matter?

21  A.  Not at all.  The program manager was Mrs. Mears.

22  Q.  Also, you are in charge of cell searches, things of that

23  nature.  You would be the one to determine as head of security

24  if a cell needs to be searched or something to that effect.

25  Would you have anything to do with that?

1  A.  The possibility, yes, any shift commander can make that

2  call.  I was there from eight to four Monday through Friday at

3  the time, so I don't know what day you're talking about.

4  Q.  Are you familiar with the policy of confiscating security

5  threat group material as the security captain?

6  A.  Are you asking me about it now or back then?

7  Q.  Well, it would be back around I would say 1-28-03.  That's

8  the year '03.  Were you familiar with the policy as the

9  security captain with security threat group material?

10  A.  I was aware that we had to review certain things.

11  Q.  Did you ever have the opportunity to review material

12  confiscated from me?

13  A.  Absolutely not.

14  Q.  Did you ever order an Officer Mega to search my cell and

15  confiscate religious literature?

16  A.  I can't recall exactly if I would have or not.

17  Q.  But it is possible?

18  A.  I have no idea.

19  Q.  What is done with the security threat group material once

20 it's confiscated?

21 A.  It would have been forwarded to central office if it's a

22 legit threat, or returned to you.

23 Q.  So if it's not returned, then it would be a legitimate

24 threat?

25 A.  I don't know that.  I don't recall your stuff being

1  confiscated at all.

2  Q.  I have the grievance here.  This is Exhibit No. 13.  Could

3  you review this.

4        THE COURT:  Do you have questions on that exhibit?

5        MR. SHARP:  Yes.

6  BY MR. SHARP:

7  Q.  Does any of that -- has any of that material ever come

8  across your desk, or do you recall having anything to do with

9  any of that information?

10  A.  Not at all.

11  Q.  So what would be the process for you if you got security

12  threat group material?  You said it would be to send it to

13  central office.  Would there be any type of report that you

14  would have to include with that?

15  A.  If it went.  I mean I have no idea if it went to central

16  office or not because I don't even know what was confiscated,

17  other than what I'm looking at right here.

18  Q.  Where it says file folder religious, I believe it says in

19  the confiscation slip, does it say STG?

20  A.  It says possible STG.

21  Q.  Right.  That's what I'm talking about, possible STG.  What

22  does that stand for?

23  A.  Could have been security threat group stuff, that's what

24  you're asking me, but I don't recall it at all.

25  Q.  That's what I wanted -- I'm just trying to refresh your

1 memory here.

2        I want to bring something to your attention here on

3 Exhibit No. 9.

4        On Exhibit No. 9, it spells out that any incoming

5 publications, right, are reviewed by the program review

6 committee.  So, if the publication, the only publication we're

7 allowed to have is what would come through the publication

8 review committee, correct, can you explain to me why there

9 would be -- as a security captain, could you explain to me why

10 it would be necessary to take religious books as possible

11 security threat group material if it has been approved through

12 the incoming publication review committee?

13        MR. BRADLEY:  Your Honor, I don't know that there's

14 a sufficient foundation.  The document he referred to as

15 Exhibit 13, it did not say religious material, it said one

16 folder possible STG and there's a parenthesis and I can't

17 tell, looks like plus one inside the parenthesis or maybe an

18 H, it doesn't say anything about religious material.

19        MR. SHARP:  That is attached.

20          THE COURT:  Sustained then if it doesn't say

21  anything about religious materials.

22          MR. SHARP:  Okay.  Well, it is my contention that

23  it was religious materials.

24          THE COURT:  It may well be, Mr. Sharp, but you need

25  to present evidence to that effect.

1         MR. SHARP:  I was trying to.

2  BY MR. SHARP:

3  Q.  In the grievance that confiscation is attached to, could

4  you --

5  A.  Where are we at now?

6  Q.  He just changed the channel for me.

7  A.  We're not using this form?

8  Q.  We're done with that.  We're going back to the original --

9         THE COURT:  Are we going to Exhibit 13?

10         MR. SHARP:  Right.

11  BY MR. SHARP:

12  Q.  Does that grievance specifically state that I had received

13  religious material from the Islamic Supreme Council and copies

14  of things that were sent to the institution regarding my

15  request for religious accomodation and that that material was

16  confiscated, and does it have that information in there?  Is

17  that in there?

18  A.  That's not what the officer wrote.  That's what you may

19  have wrote.

20  Q.  No, that's what I'm writing -- this is what I'm

21  contending.

22  A.  That's what you got in there.

23  Q.  Is that in there?

24  A.  Correct, in your writing.

25  Q.  We see a confiscation slip at that same time that I'm

1  alleging that this happened, we see possible STG material,

2  correct?

3  A.  Correct.  For the third time, correct.

4  Q.  Now what I'm asking you is, specifically, if mail comes

5  in, is it reviewed by the incoming -- if it's like, say, for

6  example, if it's a publication, let's say it's a folder with

7  certain copies of certain material, like the way this stuff

8  is, see how this is, and it's part of a book but it's

9  photocopied and it's sent to me, would that be reviewed before

10  I would get it?

11  A.  Magazines are reviewed.  I don't know about everything.

12  There is stuff that comes into that institution a hundred

13  different ways, so we aren't going to catch every little

14  thing, legal paperwork or anything else.

15  Q.  That's understandable.  Thank you.

16        MR. SHARP:  No further questions, Your Honor.

17  Thank you.

18        MR. BRADLEY:  Just briefly, Your Honor.

19              REDIRECT EXAMINATION

20  BY MR. BRADLEY:

21  Q.  I just want to make this clear.  Would you have ever

22  ordered a search of an inmate's cell specifically to retrieve

23  religious materials?

24  A.  Absolutely not.

25          MR. BRADLEY:  I believe the other matter has

1  been addressed, so I have no further questions.

2  MR. SHARP:  Can I follow that up?

3  THE COURT:  Yes.

4  RECROSS-EXAMINATION

5  BY MR. SHARP:

6  Q.  If you feel that an inmate is a threat to security or he

7  has literature in his possession that is a threat to security,

8  whether it be of a religious nature or any other nature, would

9  you order that material to be confiscated and reviewed?

10  A.  I wouldn't be talking to you.  If I thought you were that

11  big of a threat within SCI-Greene, you would have been out in

12  front of me in my office and I would have addressed it

13  man-to-man, like we had numerous conversations about a lot of

14  stuff other than religion.

15  Q.  Have you ever -- I'm going to ask this again -- have you

16  ever or is it possible -- I mean, has it ever been done -- no,

17  I'm not going to ask --

18  A.  I can't answer that one.

19  MR. SHARP:  I know what the Judge is going to do.

20          THE COURT:  Right.

21  BY MR. SHARP:

22  Q.  Would an officer or could an officer -- I'm not saying

23  it's necessarily you, but I'm saying, if an officer comes in

24  and searches the cell, right, and he finds religious material

25  and he feels that this person has this religious material and

1  he feels it's a threat, can he take that material?

2  A.  Could he?  Yes.  Myself, no, I haven't, but could it

3  happen?  I'm sure it could.

4  Q.  If you say, look, I need you to check this guy out and

5  search this cell, you know, and he's known in his jacket, for

6  example, in my case, to be as they say a religious rabble

7  rouser and they find some religious material, is it possible

8  or could that material have been taken for that reason?

9         THE COURT:  For what reason?  As a security threat?

10        MR. SHARP:  Yes.

11        THE WITNESS:  Would we presume it's a security

12  threat?  My answer was possibly.  He's putting me in a

13  hypothetical and I'm saying it could possibly happen.

14        THE COURT:  Thank you, sir.

15        Were you the individual who was responsible

16  yesterday for getting the medication to Mr. Sharp?  If you

17  were, I just wanted to personally say thank you for making

18  that happen so that we could continue on with the trial

19  without an inordinate delay.

20          THE WITNESS:  I made sure I got it this morning.

21          MR. SHARP:  I wanted to thank you myself and to

22  thank Deputy Capolza as well.

23          MR. BRADLEY:  Mr. Coleman also had made

24  arrangements to have it provided earlier and apparently those

25  weren't followed through.

1        THE COURT:  That was my understanding as well, so I

2  appreciate your efforts in that regard.  I didn't want it to

3  go unnoticed.

4        MR. BRADLEY:  Superintendent Dickson also played a

5  key roll.

6        THE COURT:  Please extend to Mr. Dickson the

7  Court's appreciation.

8        MR. BRADLEY:  At this point, I would move for

9  admission Exhibits A through D offered by the Commonwealth and

10  offered by the defendants and the defendants would rest.

11        THE COURT:  They will be admitted, unless Mr. Sharp

12  has any objections.

13        MR. SHARP:  He said what exhibits?

14        THE COURT:  He's moving in all of his exhibits.

15        There's no objection?

16        MR. SHARP:  No.

17        THE COURT:  Your Exhibits 18 through 22 that were

18  offered I believe today, you haven't moved those in.  Are you

19  moving the admission of those?

20          MR. SHARP:  Yes.

21          THE COURT:  Any objection?

22          MR. BRADLEY:  I believe just the one objection to

23  No. 17, which has already been addressed.

24          THE COURT:  18 through 22 will be admitted.  I

25  think 17 was the only one not admitted.

1      MR. BRADLEY:  I believe so.

2      MR. SHARP:  What was 17?

3      THE COURT:  It was the policy statement on inmate

4  hygiene and grooming.

5      MR. SHARP:  That was not admitted.

6      THE COURT:  You used it as an exhibit and you had a

7  witness testify about it or identified it.

8      MR. SHARP:  No problem.

9      THE COURT:  But it was not admitted.

10      There's one thing that I do want to clarify.  I

11  think we have somewhat clarified it this morning based on a

12  question I asked you earlier.

13      Yesterday there was some exchange with the Court

14  where you indicated that you felt you were not being able to

15  present some testimony or evidence, and I asked you this

16  morning whether it was your position that your placement in

17  administrative custody had to do with some false accusations

18  concerning whether you were or were not fomenting discord

19  amongst the Muslim community.  And I believe you indicated

20  that that was part of what you had wanted to do, and I believe

21  that's what you indicated to me yesterday, that you indicated

22  there was evidence or documents you wanted to present in that

23  regard.

24       Is that accurate?

25       MR. SHARP:  Yes.  Well, from my understanding of my

1  original claim, it has always been -- since my original claim,

2  that retaliation was an issue.  Hear me out now because I know

3  you're about to cut me off and tell me it's a no no.

4       THE COURT:  It is.  I don't want to spend any more

5  time on it because I believe that's where you were going with

6  that and I just want it to be clear because I'm not sure I was

7  clear yesterday in addressing that with you, that that issue

8  goes to the question of retaliation, which is not a claim

9  that's before the Court, which is why I said you could not go

10  into that arena.

11       MR. SHARP:  And it took me a minute to kind of

12  understand what you were saying, although I kind of have a

13  problem with why my -- hear me out.

14       THE COURT:  I was just about to say, you are

15  certainly free to and probably do disagree with my rulings on

16  portions of your complaint that I have already dealt with, and

17  that's certainly your prerogative, and there are certainly

18  higher authorities that you can take that up with, but we're

19  not going to revisit it here.  I just wanted to make sure that

20  you understood or that I understood what you wanted to do and

21  you understood why I wasn't going to let that happen.

22        MR. SHARP:  Because those claims had been

23  dismissed.  I understood.  It took me a minute to understand,

24  because like I said, this is new to me, but I kind of

25  understand what you're saying now.

1       I did have a question.  The issue of counsel -- and

2  I wanted to bring this up when we first started, I had filed a

3  motion to you to compel counsel to provide discovery.  This is

4  after the fact because I proceeded without ever having had

5  anything that he ever filed on my behalf or -- how could I put

6  it -- anything that he ever asked for, some of the motions

7  that he compiled, some of the paperwork I had given him I

8  never got back, so I want to have it in the record that when I

9  filed that motion to have him provide the discovery that he

10  filed for as well as the documents that I had given him, I

11  never got a response on that motion, Your Honor.  And I mean

12  you gave me like four or five other motions when I first came

13  in here, the very first day, but that particular motion was

14  never responded to.

15       THE COURT:  I don't believe that I ever received a

16  motion to compel Mr. Sanchez to turn anything over to you.

17       MR. SHARP:  I think it was a motion to compel

18  because all I was asking for, you said discovery had passed

19  and what I was asking for specifically was what he had already

20  filed for.  Could I have access to that, or could he send me a

21  copy of it?

22          THE COURT:  That's not even in anything the Court

23  has control over.  He was your previous counsel, you were

24  certainly free to correspond to him.

25          MR. SHARP:  I mean this was actually a motion to

1  compel him because once you said he was done, he was done.

2  You know what I mean?  I was asking the Court specifically for

3  those documents that were granted during discovery.  I'm doing

4  that for a reason.  That's to preserve certain appellate

5  issues.

6         THE COURT:  It's already preserved because I see

7  now that there was a motion for production of documents.  I

8  don't have the physical document in front of me to see exactly

9  what you were asking for, all I have is the docket sheet which

10  said you filed a motion for production of documents in July,

11  July 30, 2007, and that I ordered that motion dismissed as

12  improperly filed.

13         MR. SHARP:  That was a different one.  That's

14  something different.  This was much more recent.  This was,

15  like, within the past month or so.

16         THE COURT:  Well, within the past month what the

17  docket sheet reflects is that pretrial instructions were

18  issued by the Court to you September 7th; the order to have

19  you brought forth for trial was issued; the motion by you on

20  September 20th for me to produce my bond and oath of office;

21  also on the 20th a motion by you for appointment of counsel;

22  on the 20th also a motion by you to extend the time to prepare

23  for trial; a request for clarification on October 2nd; an

24  affidavit of bias or prejudice on October 3rd; a motion --

25  that wasn't yours -- that's it.

1          MR. SHARP:  I don't understand.  I filed more than

2  that.

3          THE COURT:  There is nothing of record that you

4  filed such a motion.

5          MR. SHARP:  Thank you.  I'll have to look into it.

6          THE COURT:  Well, I'm reading to you from the

7  docket sheet.

8          MR. SHARP:  How do I go about getting a copy of the

9  docket sheet?  I have written the clerk and explained to them

10  and I don't know how I'm to go about doing that.

11          THE COURT:  You have to talk to the clerk's office

12  about that, and I'm sure they will provide you with a copy, if

13  you pay for it.  They will not provide it for you as a matter

14  of course.

15          MR. SHARP:  One last question.  I know I've asked a

16  lot.  How do I get transcripts of this trial?

17          THE COURT:  We were just going to discuss that

18  because I'm assuming that you have no further testimony that

19  you want to offer in rebuttal?

20          MR. SHARP:  You mean I can call witnesses back?

21          THE COURT:  No.  Do you personally have any

22  evidence you want to present?

23          MR. SHARP:  In other words, I can't offer

24  testimony, but I can just -- no, no.

25          THE COURT:  You could offer testimony, if you want

1  to rebut some of this from yourself, but, no, the witnesses

2  that were here have been excused.  We're not calling them

3  back.

4        MR. SHARP:  Okay.  Well, yes, I would like to offer

5  some testimony, or is that part -- I'm -- is that like closing

6  arguments that you're asking me to do?

7        THE COURT:  No.  Do you have any facts that you

8  want to present to the Court to rebut anything that was

9  presented here previously that you haven't already rebutted or

10  attempted to rebut in your cross-examination?  In other words,

11  is there any other evidence or testimony concerning --

12        MR. SHARP:  I would like to offer testimony, but

13  the documents speak for themselves.  I think a lot of the

14  testimony speaks for itself.  I don't want to beat a dead

15  horse.

16        THE COURT:  We're not going -- I am not going to

17  have arguments.  What will happen is we will now close the

18  testimony and evidence and the record.

19        The court reporter I will instruct to prepare a

20   transcript of the proceedings and the cost will be divided

21   amongst the parties, but, because you are a pauper for

22   purposes of this proceeding, your cost will be borne by the

23   government.  I am told that it will take approximately a

24   month, or so, to have the transcript prepared and sent out to

25   you and to counsel.

1        Then what will happen is I will order that you all

2    prepare what are called proposed findings of fact and

3    conclusions of law.  What you do is you submit what you think

4    the evidence says concerning the facts that support your

5    claim, as well, Mr. Bradley will provide the facts he believes

6    support the defense, and then whatever conclusions of law you

7    want the Court to apply to those facts.  And you'll have

8    roughly about 30 days to do that.  And then I will issue an

9    opinion that will be in the form of making specific findings

10   of fact and conclusions of law.  And then once that opinion is

11   filed, then you have an appellate right from there.

12        MR. SHARP:  So is that like a verdict?  Is that

13   what you're handing down?

14        THE COURT:  Basically, what it will be is my

15   opinion, which would be equivalent to a jury rendering a

16   verdict, and then my entering a judgment order.  So, there

17   would be a right of appeal from that decision to the party who

18   disagrees with that decision.

19        Anything further we need to address?

20          MR. BRADLEY:  Your Honor, would the Court entertain

21  a Rule 50 motion from the defendants, and it would not be to

22  the entire case.

23          THE COURT:  Let's do it now.

24          MR. BRADLEY:  Basically, Your Honor, with respect

25  to the evidence that has been presented in this case, I

1  believe with respect to Defendant Johnson and Defendant

2  Dickson, their names were not mentioned at all in the

3  plaintiff's case in chief, and in their own testimony in the

4  defendants' case, they indicated that they were involved in

5  some administrative procedures involving Mr. Sharp's claims,

6  but they took no direct action with respect to Mr. Sharp, and

7  their only involvement in this case was involved in

8  administrative proceedings related to grievances he had filed.

9        Similarly, with respect to Defendant Stickman, I

10  did not hear any allegation regarding his actions toward the

11  plaintiff while he was at the State Correctional Institution

12  at Pittsburgh, and the only, again, in the plaintiff's case in

13  chief, the only reference I heard with respect to his conduct

14  at State Correctional Institution at Greene was that after

15  talking with Mr. Sharp in the restricted housing unit,

16  Mr. Sharp was released shortly thereafter.  I do not believe

17  there was any evidence indicating that Defendant Stickman

18  undertook any acts with respect to Mr. Sharp's religious

19  rights.

20        With respect to Defendant Coleman, the only

21   evidence that has been brought forward is that a complaint was

22   made by Mr. Sharp, who forwarded that complaint to who he

23   thought was the appropriate party for resolution, and it was

24   determined that the complaint, at least as determined by the

25   Department of Corrections was unfounded.  No other claim was

1 made with respect to Defendant Coleman in relation to any

2 abridgement of plaintiff's religious rights.

3      With respect to the claim at Count Two under the

4 Religious Land Use and Institutionalized Persons Act, the

5 evidence is that attempts by Mr. Sharp to seek religious

6 accommodation at SCI-Pittsburgh occurred in 1999. This act

7 was not enacted until sometime in 2000, therefore, was not

8 operative at the time of the events alleged in the complaint

9 and presented through the testimony in exhibits at trial.

10 There was no act in place at the time those events occurred

11 for which the defendants at SCI-Pittsburgh could be found

12 liable.

13      I don't believe that this has been addressed in the

14 prior documentation, but the evidence is that at least since

15 2006, Mr. Sharp has been transferred from both SCI-Pittsburgh

16 and SCI-Greene and is currently housed permanently at

17 SCI-Dallas, so I would ask for all claims of injunctive relief

18 related to Counts One and Two be dismissed.

19      MR. SHARP: So I know, what are Counts One and Two?

20          THE COURT:  One second.

21          MR. BRADLEY:  Count One being the First Amendment

22   claim through the Fourteenth Amendment, and Count Two being

23   the Religious Land Use and Institutionalized Persons Act

24   claim.  And that would be it for the Rule 50.

25          THE COURT:  Is there a response?

1       MR. SHARP:  Your Honor, I don't even know what

2  y'all are doing.

3       THE COURT:  What counsel is indicating at this

4  juncture, based on all the evidence that has been presented,

5  the evidence that you've presented and the evidence that has

6  been presented in the defense, he is making the motion and

7  argument that there has been no evidence presented as to

8  Defendants Johnson, Dickson, Stickman and Coleman that would

9  enable the Court to hold them in as defendants on either of

10  your claims, and so he's asking that the case be dismissed as

11  against those four defendants.

12       He's also asking that any claim under the RLUIPA

13  Act, which is Count Two of your complaint concerning your

14  attempt to seek religious accommodation at SCI-Pittsburgh, be

15  denied since the act was not promulgated and in place until

16  the year 2000.  So, whatever happened in 1999, that act

17  couldn't possibly pertain to it because it wasn't in existence

18  at the time.

19       Lastly, he's saying that in your complaint you have

20 asked for some injunctive relief, in other words, to restrain

21 the defendants from acting in a manner that would be in

22 conflict with your rights.  Because you're at Dallas now,

23 claims for injunctive relief should be dismissed because

24 Dallas isn't part of this case, That's not within the

25 jurisdiction of this Court and that's what he's asking.  So

1  I'm asking whether you have any response to that?

2      And if you would like, we can take a break for

3  lunch, you can think about it, take a look at any notes that

4  you might have made and we can come back after lunch and I'll

5  hear what you have to say about it.

6      MR. SHARP:  I think I would definitely like to sit

7  on that one.  I don't want to rush out there and just say

8  anything.  I can understand his injunctive relief because of

9  the Dallas -- because I have been transferred, but I don't

10  have that -- what the relief I was asking for is, you're

11  telling me it was an injunctive relief to restrain them from

12  interfering in my religion; is that correct?  Is that one of

13  the things that I was asking?

14      THE COURT:  That was the injunctive relief that you

15  asked for.  You also were asking for punitive damages, costs

16  of the action, and those kinds of things.  And what the

17  defendants are saying is that with regard to the injunctive

18  relief, that should be denied at this point because you are at

19  Dallas.

20          So you have a little bit of an opportunity to

21  digest this without belaboring this too long, we'll take a

22  recess until one-thirty, then I will hear from you, Mr. Sharp,

23  if there's anything, any argument that you want to make in

24  response, and we'll conclude after that.

25          MR. SHARP:  Is it permissible for me to take that,

1  whatever he's talking about and review it?  In other words,

2  can I read it while I'm sitting there eating?

3        THE COURT:  Read what?

4        MR. SHARP:  What he's talking about.

5        THE COURT:  That's one of the Rules of Civil

6  Procedure which says -- do you have a rule book?

7        MR. SHARP:  I was bringing it every day, I brought

8  it yesterday, the day before, I said, well, obviously, I'm not

9  going to need this.

10        THE COURT:  Primarily what Rule 50 is is that if a

11  party has been fully heard on an issue during trial and at the

12  conclusion of that evidence the defending party can make a

13  motion that as a matter of law, they're entitled to the

14  judgment in their favor.  That's primarily what the Rule 50

15  motion is.  They could make it at the close of their evidence,

16  or they could make it at the close of the entire evidence, and

17  that's what has been done here.  I will hear your response to

18  that after we come back from lunch.

19        MR. SHARP:  The only thing I would like to have

20  with me, I mean I understand the rule, I kind of caught that

21  I'm talking about the -- actually, what he's talking about is

22  the injunctive relief, the claims that I originally -- were

23  originally made.  Remember, I was explaining to you, I never

24  got the stuff that my attorney filed, this stuff was never

25  given to me, what you're reading from where I'm making claims.

1  This is what I was asking you earlier about, do you have a

2  copy of that?  I don't know what you're reading from to say

3  this is what I'm asking for.

4        THE COURT:  I am reading to you --

5        MR. SHARP:  Not that.  I'm not talking about that.

6  I'm talking about the suit itself.  You're saying --

7        THE COURT:  You don't have a copy of your

8  complaint?

9        MR. SHARP:  That's what I was trying to explain, I

10  was never given one.

11        THE COURT:  I find that difficult to believe,

12  Mr. Sharp.

13        That being said, I will go make a copy of it for

14  you, but that's it, because there were many, many, many, many

15  other pleadings, documents, et cetera, that have been filed in

16  this case which I cannot believe were not provided to you as

17  is the responsibility of your attorney and I believe and I am

18  on record as saying that Mr. Sanchez's representation of you

19  in this matter I thought was beyond stellar.  So, I will get

20  you a copy of this and then we're finished making copies of

21  documents.

22          MR. SHARP:  What are you reading from?

23          THE COURT:  I'm reading from your amended

24  complaint.

25          MR. SHARP:  I didn't know what you were reading

1  from.

2        THE COURT:  Do you have a copy?

3        MR. SHARP:  I believe I do.

4        THE COURT:  So your counsel did provide you with

5  documents.

6        MR. SHARP:  That's why I was asking you, I didn't

7  know what you were reading from.

8        THE COURT:  We're not going to make a copy.  Review

9  it.  We're back at one-thirty.

10        MR. SHARP:  Am I allowed to take this and sit and

11  read this?

12        THE COURT:  If it's not a --

13        MARSHAL:  We don't let them have paperwork in the

14  cells because they have a tendency to stuff the commodes.

15        MR. SHARP:  I want that second amended complaint.

16        THE COURT:  If you will give me your word that you

17  will review it and do nothing else with it.

18        MR. SHARP:  I'm just going to review it.  I want to

19  read what he's talking about.

20          THE COURT:  Then I'm going to order the marshals to

21  allow you to have that over the lunch break.

22      (Whereupon, there was a brief recess in the proceedings.)

23          THE COURT:  One housekeeping matter before I hear

24  from you, Mr. Sharp.

25          I have a couple of the exhibits here.  Do you have

1  some of the exhibits on your table, Mr. Sharp?

2          MR. SHARP:  No, I don't think so.

3          I have them.  Sorry.

4          I was reviewing and I couldn't quite get the

5  numbers that he wanted to dismiss, but I understand he was

6  talking about --

7          THE COURT:  You're going to have to speak up

8  because I can't hear you.

9          MR. SHARP:  If I'm not mistaken, he wanted to

10 dismiss the injunctive relief because I was no longer at

11 SCI-Greene or at SCI-Western.

12          If you will recall, Your Honor, many of the

13 defendants move from place to place within the Department of

14 Corrections and go to various different other institutions and

15 have interaction with other staff within the Department of

16 Corrections.  I'm currently facing a problem right now at

17 SCI-Dallas pertaining to Defendants Chaplain Terza and

18 Ibrahiym where I'm dealing with phone calls that were made and

19 responses that they gave pertaining to other things, so the

file:///A|/sharp10-18-07.txt

20  injunctive relief, if I remember correctly, was to prohibit

21  any form of retaliation or obstruction of my religious rights.

22  I don't know if that's what he's talking about.  I'm arguing

23  that that injunction should remain in effect because you have

24  defendants who can go anywhere or contact anyone within the

25  Department of Corrections with whom they may have worked in

1  the past and ask them to do certain things, you know.  I mean

2  that may not necessarily be in my favor and if it is

3  ascertained that these people have violated that injunction, I

4  mean that's like a protection for me when I haven't had any

5  protection and I have been left out there.  So I'm going to

6  ask that that injunctive relief remain.

7          As pertains to I think the second issue -- could

8  you correct me if I'm wrong -- was whether or not the claim

9  should be dismissed against Stickman and Coleman.

10         THE COURT:  We have Johnson, Dickson, Stickman and

11  Coleman.

12         MR. SHARP:  I'll start with Johnson.

13  Superintendent Johnson was not only the superintendent at

14  Western, I believe he was also briefly, very briefly the

15  superintendent at SCI-Greene when I first arrived there before

16  Deputy Stickman became Superintendent Stickman at Greene.  In

17  that capacity, I have had numerous occasions to speak with

18  Superintendent Johnson, and I believe I mentioned that in my

19  testimony.  As the superintendent of an institution, he has a

20  certain responsibility that if certain information is brought

21  to his attention about Constitution deprivations, he has a

22  responsibility to investigate that and he did not do that.

23  He, in fact, pretty much ignored it and allowed -- in my

24  opinion -- pretty much ignored that and allowed certain things

25  to be done without him doing -- intervening on any level other

1  than to sanction and co-sign what was done by other

2  defendants, so his awareness of what I'm saying my claims were

3  makes him culpable.

4       The next one was Dickson.  Deputy Dickson sat on

5  the program review committee board.  He was also informed of

6  my religious request and I issued him a copy.  He said he -- I

7  believe he gave testimony that he was aware of my religious

8  accomodation request and I repeatedly brought to his attention

9  that my constitutional rights were being violated.  He had a

10  duty to impartially review the information that I presented to

11  him, the repeated request slips and pleas for assistance to

12  stop the defendants from violating my constitutional rights to

13  equal protection and First Amendment claims, or just the

14  constitutional rights that I was afforded.  He did not do

15  that, so that makes him culpable as a deputy superintendent at

16  SCI-Greene.

17       Deputy Superintendent Stickman was the -- not only

18  the deputy superintendent at SCI-Greene, he was also the

19  superintendent -- I mean at Western, he was also the

20  superintendent at SCI-Greene, and, in both instances, was made

21  aware -- this was a continuation of my request for religion,

22  him being aware of the deprivations that I had faced at

23  SCI-Western, and he actually said, you know, I informed

24  certain other individuals to look into the fact that it was

25  rumored that you were doing this and doing that, but he never

1  bothered to investigate, to get to the heart of those matters,

2  so that makes him culpable because he was indifferent and, in

3  some instances, aiding and abetting in the violation of my

4  constitutional rights.  So he had a very -- I mean he had a

5  very good firsthand dip into the pot of those deprivations, so

6  to speak.

7          Finally, Captain Coleman.  Well, he was captain at

8  the time of the incident, which I mentioned.  He's the captain

9  of security.  One thing that is known -- I've got 18 years of

10  being incarcerated, one thing I know, if you're the captain of

11  security, you know everything that goes on in the jail.  I

12  informed him, listen, it's not fair for these individuals to

13  be permitted to slander my community, attack my community.

14  And I was just confined at another jail for you saying I was

15  doing the same thing, but you're allowing them to do it, then

16  you turn around and say I just charged that to someone else.

17  Then you send people into my cell, shake my cell down and take

18  my religious literature so that I can't even practice my own

19  individual religion.  You know, I'm saying, you had a

20  responsibility to be fair, to review the information that if

21  you're saying that my proselytizing, my religion is a threat

22  to security, then their proselytizing and talking about other

23  communities that are in contradiction to their particular

24  beliefs, then you got to say, hey, look, that's not fair.  Or

25  at least say, look, I'm aware of the fact that this guy is

1  requesting religious accommodation and according to what I'm

2  hearing from this guy here on this tape and what I'm hearing

3  from him, you can't put those two in the same room together

4  and expect it to be a safe environment.  So, therefore, I'm

5  saying he's culpable by his inaction because these are things

6  that he understood, he knew full well what was going on.  He's

7  the security captain.  That's his job and I went to him about

8  a matter of security.  He didn't do anything about it.  So

9  he's responsible for that.

10        Now, the last thing -- I think I covered all the

11  defendants that you wanted to dismiss.

12        THE COURT:  You have.

13        MR. SHARP:  The question becomes about the

14  religious land use issue is the last thing.

15        THE COURT:  RLUIPA.

16        MR. SHARP:  Your Honor, I'm not by any stretch of

17  the imagination very proficient at law.  I know some general

18  things about what my constitutional rights are as far as what

19  I understand the Constitution, as far as when things are

20  enacted and retroactivity, things of that nature.  I know that

21  I have encountered in criminal law, I don't know if this

22  applies to civil law where if an act was committed at one

23  particular time and you're found guilty or you are charged

24  with the crime and you're found guilty at another time, you

25  can be held accountable for that law that may not have been in

1  place at the time that you -- they said you committed the

2  crime, but you can be held -- I know I seen where that's been

3  experienced.  I don't know if that applies legally.  What I'm

4  saying is that, but I will say that I do know this was an

5  ongoing thing after 2000.  This wasn't something that was just

6  one incident and it's over.  No.  This started at this

7  particular time, but continued into 2000 after the passing of

8  this legislation where I was still confined and still making

9  the same complaints to the same defendants.  So, there's no

10  way that you can say, well, at the time that this started, you

11  know, this law wasn't in effect.  It was only in effect after

12  we started denying you your constitutional rights.  It just

13  don't sound like its rational to me or that it's even legal.

14  I don't know, you know, I mean that's for you to decide, but

15  I'm just saying from a common sense standpoint because I don't

16  know the law, I'm going to argue that this was an ongoing

17  thing that went beyond 2000 and went into 2001 and further

18  than that because I'm still not allowed to practice my

19  religion according to the Department of Corrections.

20          So those are my arguments, Your Honor.  That's the

21  best I can come up with, understanding what you presented to

22  me.

23          And in closing, and I want to just make this my

24  last statement, Your Honor, I said some things to you on the

25  telephone that were wrong.  I owe you an apology.  I couldn't

1  be a man of principle sitting here today talking about

2  principles and religion and things of that nature knowing that

3  I said some things to you that were not deserving to you and

4  were very vulgar and I have to apologize to you.  And I want

5  you to understand that the reason why that took place and --

6  and I'm not justifying what I said because it was wrong --

7  sometimes out of the 18 years that I have been incarcerated, I

8  have been treated very bad -- this goes beyond the 18 years

9  that I have been in jail, but in the 18 years that I have been

10  in jail and in my lifetime, I have been treated real bad, so I

11  tend to be on guard about people trying to take advantage of

12  me or think that I'm stupid or, you know, try to abuse me.

13  So, sometimes I jump the gun and put up a defense because of

14  where I have been at for all these years.  It's not -- it's

15  not right and I'm working on it, I'm not a saint by any

16  stretch of the imagination, but as a man who does believe in

17  God, I believe that if you are wrong, you have to acknowledge

18  you're wrong and then try to work toward that.  And in that

19  vein, it has been bothering me for the past couple days that

20   there are some things that I said to you that were very

21   offensive and I was wrong about that and it was not the proper

22   conduct as a man and I apologize to you.  I hope you accept my

23   apology.

24          THE COURT:  Your apology is accepted.

25          MR. SHARP:  With that, I'm done.  Thank you.

1          THE COURT:  All right.  I will take the Rule 50

2    motion under advisement and we'll render an opinion on it

3    forthwith.

4          We will await the filing of the transcript and once

5    I know that and see that it has been filed, because you won't

6    know that, Mr. Sharp, I'll get a notification because of the

7    electronic communication with the court system, I will issue

8    an order then setting the deadline -- providing you with a

9    copy of the transcript and the exhibits and setting a deadline

10   for when the findings of fact, conclusions of law will be due.

11   So that deadline will be somewhere around two months from now.

12          MR. SHARP:  The book that I gave you about the

13   exhibit you wanted me to pay for that, I want to know how can

14   I get payment to you?  What would be the procedure that I

15   would have to follow to get that copy for you?

16          THE COURT:  We will copy all of the exhibits and

17   the clerk's office will make a calculation as to what that

18   cost -- I don't know, that's their area of expertise, so to

19   speak, and they will submit a bill to you.

20          MR. SHARP:  Will they send the original item back

21  to me, the original book, in other words?

22          THE COURT:  I think generally speaking that

23  becomes -- ultimately, you would get it back, but I think,

24  I'll double check on this to see whether I have any discretion

25  in the matter to do anything about it, but generally speaking

1  when someone enters a document into evidence as an exhibit, it

2  must stay with the court.  You would get a copy of it to have

3  in the interim, and then once the case is totally concluded

4  through any appeal, if there is any, the exhibits would come

5  back to the court and then be returned to the parties.

6       MR. SHARP:  Mr. Bradley had mentioned something to

7  me and I was going to ask you the same thing.  Pretty much in

8  the prison I work for 42 cents an hour seven days a week and

9  my pay is the most important thing to sustaining me on a daily

10  basis.

11       THE COURT:  I understand that.

12       MR. SHARP:  The longer that I'm away from my home

13  jail, my pay is just going out the window.  I don't get paid

14  for being here now and all the money that I've already spent,

15  et cetera, et cetera.  Is it possible for me to be expedited

16  back to my jail as soon as possible?  He said he was going to

17  mention something about that to you as well.  I mean it's like

18  of utmost importance to me.

19       THE COURT:  I don't really have any control over

20  that, but maybe Mr. Bradley has some information.

21          MR. BRADLEY:  I will contact the institution.  I

22  wanted to check with you to make sure it would be okay to have

23  him return to his permanent location.

24          THE COURT:  Yes.

25          MR. BRADLEY:  I will contact his temporary location

1  and indicate that he is free to be returned and that he should

2  be returned as soon as possible.

3          THE COURT:  Thank you.

4          MR. SHARP:  Thank you, Your Honor.

5          Thank you, Mr. Bradley.  You have been respectful

6  and patient, I know you had to run back and forth across the

7  table.

8          MR. BRADLEY:  You're welcome.

9          THE COURT:  And the Court thanks you as well for

10  that service you have provided.

11          Anything further?

12          Then we are adjourned.

13      (Court adjourned.)

14                  -----

15                  I-N-D-E-X

16  WITNESS          Direct    Cross    Redirect    Recross

17  William Stickman    --        2        31          --
     Imam Abu Bakr      32       37        --          --
18  Brian Coleman       62       68        74          75

19

20                C E R T I F I C A T E

21

                I, Juliann A. Kienzle, certify that the
22   foregoing is a correct transcript from the record of proceedings
     in the above-titled matter.

23

24   s/Juliann A. Kienzle
     _____
25   Juliann A. Kienzle, RMR, CRR

102

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25