**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

SHAWN C. SHARP,                    }
                                   }
        Plaintiff,                 }
                                   }    No. 00-2156
        vs.                        }
                                   }    Magistrate Judge Hay
SUPERINTENDENT PHILLIP L.          }
JOHNSON, et al.,                   }
                                   }    *Electronically Filed.*
        Defendants.                }

**PRPOSED FINDINGS OF FACT AND CONCLUSIONS**
**OF LAW  ON BEHALF OF CORRECTIONS DEFENDANTS**

The Plaintiff, Shawn Sharp (BQ-8429), an inmate in the custody of the Pennsylvania

Department of Corrections ("DOC"), initiated this civil rights action in 2000.   After the

disposition of various pretrial motions, Sharp has two claims remaining: first, Sharp alleges a

violation of his First Amendment Free Exercise rights (as applied to the States through the

Fourteenth Amendment) pursuant to Section 1983 (42 U.S.C. § 1983) and, second, Sharp

submits a related claim under the Religious Land Use and Institutionalized Persons Act, 42

U.S.C. §§ 2000cc & 2000cc-1 ("RLUIPA").  *See, e.g.*, Pretrial Instructions for Pro Se Plaintiff

(Doc. # 122), at 1 *and* NT–10/16/07, at 7-8.

This action arises out of Sharp's confinement at the State Correctional Institution at

Pittsburgh (SCI-Pittsburgh) and the State Correctional Institution at Greene (SCI-Greene).  *See*

Second Amended Complaint, at *passim*.   The specific claims, identified as Count 1, First

Amendment, and Count 2, RLUIPA, are brought against eleven defendants remaining in this

action: Johnson, Stickman, Dickson, Krysevig, Winstead, Terza, Ibrahiym, Coleman, Mears,

Moneck and Muhammad ("the Corrections Defendants).  At the times relevant to the respective

allegations made by Sharp in this action, Corrections Defendants Johnson, Stickman, Dickson,

Krysevig, Winstead, Terza and Ibrahiym were assigned at SCI-Pittsburgh and Corrections Defendants Stickman, Coleman, Mears, Moneck and Muhammad were assigned at SCI-Greene.

The Corrections Defendants now respectfully submit the following Proposed Findings of Fact and Conclusions of Law:

<u>**FINDINGS OF FACT**</u>

**A.    <u>THE CORRECTIONS DEFENDANTS</u>**

1.    Philip J. Johnson, defendant herein ("Johnson"), served as the Superintendent at SCI-Pittsburgh from "January of 1999 until late 2002." *See* NT–10/17/07, at 63.    As Superintendent, Johnson "oversaw the daily operation of the entire facility, [and] all department heads who ultimately were responsible to answer to [him]." *See* NT–10/17/07, at 64.

2.    Mark Krysevig, defendant herein ("Krysevig"), served as the Deputy Superintendent for Centralized Services at SCI-Pittsburgh for approximately two and a half years, beginning in July of 1999.  S*ee* NT–10/17/07, at 115.

3.    Joel Dickson, defendant herein ("Dickson"), served as the Deputy Superintendent for Internal Security at SCI-Pittsburgh from July of 1998 until "approximately March of 2002." *See* NT–10/17/07, at 94-95.  As Deputy Superintendent for Internal Security, Dickson supervised the Security Office and was "concerned with any internal investigations conducted involving inmates and/or staff, contraband control, entering into the institution either through visiting room or whatever, telephone monitoring, monitoring of security threat groups, et cetera."  *See* NT–10/17/07, at 95.

4.    William S. Stickman, defendant herein ("Stickman"), served as the Deputy Superintendent for Facility Management at SCI-Pittsburgh from January of 1997 until March of 2002, when he was promoted to Superintendent at SCI-Greene. S*ee* NT–10/17/07, at 138-139. As Deputy Superintendent for Facility Management at SCI-Pittsburgh, Stickman had

responsibility for "security, the [corrections] officer force, maintenance department and unit management." *See* NT–10/17/07, at 139.

5.    Rhoda Winstead, defendant herein ("Winstead"), served as the Corrections Classification Program Manager at SCI-Pittsburgh from "1997 to about 1999." *See* NT–10/17/07, at 44.  As Corrections Classification Program Manager, Winstead "supervised the various treatment programs within the institution, of which chaplaincy was one of them, [also] psychology, inmate employment, inmate records, education activities, volunteer programs." *See* NT–10/17/07, at 44.

6.    Father William Terza, defendant herein ("Father Terza"), a Catholic priest, served as the Facility Chaplain Program Director at SCI-Pittsburgh beginning in March of 1998.  S*ee* NT–10/16/07, at 143.  As such, Father Terza was "responsible for the entire chaplaincy program of the institution" which provided inmates with "[r]eligious practice for a number of faiths that were recognized by the Department of Corrections." *See* NT–10/16/07, at 143.

7.    Imam Tanko Ibrahiym, defendant herein ("Imam Ibrahiym"), is an Imam of the Sunni –or Sunni wal Jamaah– faith; he was employed by the DOC as the Islamic Chaplain at SCI-Pittsburgh from 1998 to 2004 when it closed."  *See* NT–10/17/07, at 26-27.  His duties included providing "Islamic services to inmates, Muslim inmates, and spiritual counseling… study groups, Islamic study groups, teaching…  Islamic literature, books and pamphlets." *See* NT–10/17/07, at 27-28.  He would also "visit Islamic Muslims in the RHU."  *Id.*

8.    Brian V. Coleman, defendant herein ("Coleman"), served as the Security Captain at SCI-Greene from "late 2000 … until October of '03." *See* NT–10/18/07, at 63.

9.      Jean Mears,[1] defendant herein ("Mears"), served as the Corrections Classification Program Manager at SCI-Greene from June of 2002 until she left the DOC in December of 2003. S*ee* NT–10/17/07, at 74.  As the Corrections Classification Program Manager at SCI-Greene, Mears supervised the Chaplaincy Department.  *See* NT–10/17/07, at 74, 76-77.

10.     Father George J. Moneck, defendant herein ("Father Moneck"), a Roman Catholic priest, served as the Facility Chaplain Program Director at SCI-Greene beginning in 1997 and ending when he left the DOC in December of 2004.  *See* NT–10/17/07, at 7-8.

11.     Imam Abu Bakr Muhammad, defendant herein ("Imam Muhammad"), has been employed by the DOC since April 3, 1995, as the Islamic Chaplain at SCI-Greene.  *See* NT–10/18/07, at 32.  At SCI-Greene, Imam Muhammad was "in charge of all Islamic programs, specifically for the Sunni Muslims.  That includes, among other things, teaching them Islam, Qur'an, Arabic and other related issues with the Islamic teachings.  [He] also conduct[ed] the Jumah service, which is held every Friday.  [He was] also involved with special events like Ramadam programs, Islamic festivals.  [He] also visit[s] the restricted housing units basically as a chaplain, but specifically to also take some Islamic literature to Muslims in general.  [He is] also a spiritual advisor, so to speak, for the Muslim group."  *See* NT–10/17/07, at 33.

**B.    THE DOC'S RELIGIOUS ACCOMMODATION POLICY**

12.     The DOC has implemented and maintains a religious accommodation policy, which is codified at DC-ADM 819.  *See* Plaintiff's Exhibit 2; NT–10/16/07, at 16-18.  *See also* Defendants' Exhibit A.  Included in this policy are procedures for initiating requests for recognition of a religion or religious group.  *Id.*

---

[1] At the time of trial, this witness' name had been legally changed to Jean Blaine.  *See* NT–10/17/07, at 73.  However, the Corrections Defendants will identify her by the name she used at the time of the events in question.

13.    Under DOC policy, an inmate seeking a religious accommodation would first submit the request in written form to the Facility Chaplain Program Director.  *See* NT–10/16/07, at 143.  The Facility Chaplain Program Director would then

> interview [the inmate], look at the reasoning for it, and ask [the inmate] even to provide more information as to why he wanted the religious accommodation.  [The Facility Chaplain Program Director] would make a recommendation and [the request] would be sent to the other members of the institution, the superintendent, the deputies, the program director … and they would all give a recommendation as to whether this should proceed or not.

NT–10/16/07, at 144.  *See also* NT–10/17/07, at 9-11.

## C.    THE PLAINTIFF

14.    In 1998, Sharp was confined at SCI-Somerset.  *See* Defendants' Exhibit D.  On September 18, 1998, Sharp was transferred to SCI-Pittsburgh from SCI-Somerset.  *See* NT–10/18/07, at 67; Defendants' Exhibit D.  *See also* Plaintiff's Exhibit 21.  Sharp was initially placed in the Restricted Housing Unit ("RHU") at SCI-Pittsburgh because he had incurred "90 days of D[isciplinary] C[ustody] time" as a result of "an altercation that had transpired at [SCI-]Somerset."  *See* NT–10/16/07, at 10.  Sharp completed his DC time and was released to a general population housing unit.  *Id.*

## D.    REQUEST FOR RELIGIOUS ACCOMMODATION (SCI-PITTSBURGH)

15.    At SCI-Pittsburgh, the DOC provided religious accommodation for several religious communities within the inmate population, including "Muslim, Jewish, Protestant, Catholic, [and] Jehovah Witness."  *See* NT–10/16/07, at 143.  *See also* NT–10/16/07, at 66-68.  Among the Muslims, three groups were recognized at SCI-Pittsburgh: "the Nation of Islam, the Moorish Science Temple and the regular Muslim group."  *Id.*

16.    Imam Ibrahiym, the Islamic Chaplain at SCI-Pittsburgh, provided weekly religious instruction ("Taleem") and lead weekly prayer services ("Jumah") for Muslim inmates. Imam Ibrahiym identified himself as Sunni or Sunni wal Jamaah.  *See* NT–10/17/07, at 27-28.

17.    Sharp regularly attended the Jumah services and the Taleem studies offered by Imam Ibrahiym at SCI-Pittsburgh.[2]  *See* NT–10/17/07, at 29, 31-32.  Moreover, Sharp was never excluded or told he was not welcome at these Muslim services and study groups.  *See* NT–10/16/07, at 150; NT–10/17/07, at 32.

18.    However, sometime after his release from the RHU at SCI-Pittsburgh in September of 1998, Sharp had discussions with Imam Ibrahiym about the accommodations being offered to Muslim inmates; Sharp indicated that there were ideological differences between his group and the Sunni group at SCI-Pittsburgh, and inquired about what could be done to accommodate his group.  *See* NT–10/16/07, at 11; NT–10/17/07, at 29.

19.    Although Imam Ibrahiym and Sharp both considered themselves as Sunni Muslim, *see* NT–10/16/07, at 12-13, NT–10/17/07, at 30-31, Sharp believed that he could not be accommodated within the Sunni Muslim community at SCI-Pittsburgh because of differences in beliefs and practices.  *See* NT–10/16/07, at 11-13.  *See also* NT–10/17/07, at 29.  However, Imam Ibrahiym believed that if Sharp was Sunni wal Jamaah, as he claimed, then there was no reason he could not be accommodated with the services and programs he was offering to the Muslim inmates at SCI-Pittsburgh.  *See* NT–10/17/07, at 30-31.

20.    Sharp submitted a written document which was entitled "Religious Accommodation Request for Ahlus Sunnati wal Jama'ah" and dated October 14, 1999.  *See* NT– 10/16/07, at 17-19.  *See also* Plaintiff's Exhibit 1.  In this document, Sharp requested

_____

[2] Imam Ibrayhim would also visit Sharp while he was in the RHU and, if requested by Sharp, would bring him literature.  *See* NT–10/17/07, at 32.

accommodation and recognition for a Muslim sect while at SCI-Pittsburgh, identified as "Ahlus Sunnati wal Jama'ah," the same religion as Imam Ibrahiym. *Id. See also* NT–10/17/07, at 30.

21.    Imam Ibrahiym and Father Terza discussed this request. *See also* NT–10/17/07, at 30; NT–10/16/07, at146-147.

22.    Father Terza also had discussions with Sharp about his request for religious accommodation. *See* NT–10/16/07, at 146-147. Father Terza believed that as a Sunni Muslim, Sharp could be accommodated by the programs and services offered by Imam Ibrahiym, who was also a Sunni Muslim. *See* NT–10/16/07, at 148-150, 159-160. Nevertheless, Sharp was eventually informed that his request was not properly submitted and would have to be submitted on the proper form in order to be processed pursuant to the DOC's policy on religious accommodation set forth in DC-ADM 819. Particularly, Sharp was informed that he needed to submit his request as an individual, not as a group. However, Sharp never presented an individual request form.[3] *See* NT–10/16/07, at 146-147.

23.    On or about November 28, 1999, a meeting was held between Krysevig, Winstead, Imam Ibrahiym and Father Terza and several inmates, including Sharp, to discuss Ramadam. Specifically, discussions were held to determine how Ramadam, a Muslim holy day, would be accommodated amongst the various Muslim groups and inmates that wished to participate in the required prayer and fasting. *See* NT–10/16/07, at 20-22; NT–10/16/07, at 150-151; NT–10/17/07, at 46-49; NT–10/17/07, at 118-119.

24.    After this discussion, Sharp brought up his request for accommodation; however, no resolution of his request was achieved at this meeting. *See* NT–10/16/07, at 22-25. *See also* NT–10/17/07, at 48; NT–10/17/07, at 119

---

[3] Sharp was also unable to produce a copy of such a request at trial. *See* NT–10/16/07, at 64-66.

25.    Soon thereafter, it came to be believed that Sharp's efforts to organize a separate Sunni Muslim group at SCI-Pittsburgh created a threat to institutional security because Sharp was attempting to establish himself as the leader of this group of inmates and this group had threatened disruption and violence if they were not recognized. *See* NT–10/17/07, at 97-98, 100-107; NT–10/17/07, at 123-131. *See also* Plaintiff's Exhibits 3, 5.

26.    Sharp was therefore placed in the Restricted Housing Unit on Administrative Custody ("AC") status. *Id.*

27.    After Sharp was placed on AC status in the RHU, he filed Grievance No. PIT-0997-99. *See* NT–10/16/07, at 25, 27-28. *See also* Plaintiff's Exhibit 4. In this grievance, filed on or about December 1, 1999, Sharp questioned why his group request for accommodation had not been acted upon. *See* NT–10/16/07, at 27-28. Sharp had also made similar requests in Inmate's Request to Staff Member forms submitted previously to filing this grievance. *See* NT–10/16/07, at 25-27. *See also* Plaintiff's Exhibit 3. All of these documents referenced only his group request and did not identify or mention an individual request. *Id.*

28.    In the Initial Review Response to Grievance No. PIT-0997-99 prepared by Winstead and posted on December 21, 1999, Sharp was informed that his request for accommodation had not been properly prepared and that he would need to submit a new request in the proper form if he wanted his request to be reviewed. *See* NT–10/17/07, at 50-51, 59. *See also* Plaintiff's Exhibit 4. Specifically, Winstead wrote in pertinent part as follows:

> In accordance with DC-ADM 819-3 for religious accommodations, you were to submit the proper form requesting such accommodation for you as an individual. Any other inmates requesting an accommodation must be filed individually. Your form should be forwarded to the chaplaincy coordinator. Your form was improperly filed.

Plaintiff's Exhibit 4.

8

29.    After receiving the grievance response from Winstead, Sharp never submitted a new request for religious accommodation in the proper form while he was at SCI-Pittsburgh. *See* NT–10/16/07, at 147-148, 152, 171-172. *See also* NT–10/17/07, at 33; NT–10/17/07, at 48-49. Accordingly, no further action was ever taken on Sharp's request.

E.    **THE PRC CONTRACT**

30.    Dickson and Krysevig served together on at least one Program Review Committee ("PRC") that reviewed Sharp's Administrative Custody placement at SCI-Pittsburgh.[4] *See* NT–10/17/07, at 96-98; NT–10/17/07, at 115.

31.    In that PRC review, conducted on February 28, 2001, Sharp was afforded an opportunity to return to General Population if he would sign an agreement indicating that he would not continue or persist in the behaviors that caused his Administrative Custody placement; such contracts were used by prison officials "as a behavioral modification technique." *See* NT–10/17/07, at 97, 108; NT–10/17/07, at 116. *See* Plaintiff's Exhibit 5. It was Sharp's obligation "to comprise a list of stipulations he must adhere to. PRC w[ould] then review the contract and w[ould] determine if it is feasible." *See* Plaintiff's Exhibit 5. Sharp never entered into such an agreement with his PRC. *See* NT–10/17/07, at 115-116.

32.    Sharp was not and would not have been requested or required to sign a contract that would have predicated his release from the RHU on his agreement not to engage in religious activity or to not practice a particular religion. S*ee* NT–10/17/07, at 97; NT–10/17/07, at 116.

F.    **SHARP'S TRANSFER TO SCI-GREENE**

33.    An attempt was made to transfer Sharp to a Special Management Unit; however, it was ultimately decided that such a transfer was inappropriate. *See* NT–10/17/07, at 35-36.

---

[4] Sharp was not placed on Administrative Custody because of the exercise of his religious rights; rather, "[i]n essence, [Sharp] was fomenting unrest in group activity that was not in keeping with the guidance and rules of the institution." *See* NT–10/17/07, at 97-98; 99-107.

34.    On May 23, 2001, Sharp was given an Administrative Transfer from SCI-Pittsburgh to SCI-Greene.  *See* NT–10/16/07, at 35-37; NT–10/17/07, at 110; NT–10/18/07, at 67.  *See also* Plaintiff's Exhibit 21, Defendants' Exhibit D.

**Defendant Johnson**

35.    While serving as the Superintendent at SCI-Pittsburgh, Johnson did not have any personal dealings with Sharp regarding Sharp's efforts to obtain a religious accommodation, and Johnson was never presented with or asked to review a request for religious accommodation submitted by Sharp.  S*ee* NT–10/17/07, at 64.

36.    Johnson never personally interfered with Sharp's ability to practice his chosen religion and he never directed or ordered any of his subordinates to take any action against Sharp based on Sharp's expressed religious preferences.  *See* NT–10/17/07, at 64-65.

37.    Johnson signed off on Sharp's appeal of Grievance No. PIT-0997-99 to the Facility Manager, but has no specific recollection of doing so.  S*ee* NT–10/17/07, at 65-66.  The appeal was returned to Sharp without action because it was untimely.  *See* NT–10/17/07, at 66.

**Defendant Stickman**

38.    With respect to inmate requests for religious accommodation, the Deputy Superintendent for Facility Management "would have had a vote on the vote sheet that went around.  That would have been the extent of it."  *See* NT–10/17/07, at 139.  However, while Deputy Superintendent for Facility Management at SCI-Pittsburgh, Stickman did not vote on any religious accommodation requested by Sharp while Sharp was confined at SCI-Pittsburgh.  *See* NT–10/17/07, at 139.  Nor did Stickman participate in any discussions with Sharp regarding Sharp's religion, religious exercise or any religious accommodation at SCI-Pittsburgh.  *See* NT–10/17/07, at 139.

**Defendant Dickson**

39.    As Deputy Superintendent for Internal Security, Dickson played no role in the review or approval of inmate requests for religious accommodation. *See* NT–10/17/07, at 95.

40.    Dickson did serve on the Program Review Committee at SCI-Pittsburgh which had responsibility, *inter alia*, for reviewing Administrative Custody placements in the RHU. *See* NT–10/17/07, at 95.

41.    Dickson never told Sharp that he could not exercise his chosen religion, nor did Dickson ever take any steps to prevent Sharp from practicing his chosen religion. *See* NT–10/17/07, at 98. Dickson never took any action against Sharp based on Sharp's expressed religious preferences.  See NT–10/17/07, at 98.

**Defendant Krysevig**

42.    Krysevig did not recall seeing the group request for religious accommodation submitted by Sharp at SCI-Pittsburgh. *See* NT–10/17/07, at 117.  The document was not addressed to Krysevig, although it was addressed to his predecessor. *See* NT–10/17/07, at 117, 120-121.

43.    Krysevig participated in at least the one meeting in November of 1999 where Sharp was present which involved the accommodation of the various Muslim groups at SCI-Pittsburgh for the upcoming Ramadam holiday. *See* NT–10/17/07, at 118-119.

44.    Krysevig never told Sharp that he could not exercise his chosen religion, nor did Krysevig ever exclude Sharp or direct that Sharp be excluded from participating in any religious activity at SCI-Pittsburgh based on Sharp's expressed religious preferences. *See* NT–10/17/07, at 120.

**Defendant Winstead**

45.     As Corrections Classification Program Manager, it was not Winstead's responsibility to approve or disapprove an inmate's request for religious accommodation. *See* NT–10/17/07, at 48-49. Winstead does not recall ever making a recommendation on an inmate's request for religious accommodation as Corrections Classification Program Manager at SCI-Pittsburgh, but may have seen the group request submitted by Sharp sometime in 1999. *See* NT–10/17/07, at 45-46.

46.     The only interaction Winstead had with Sharp was at the meeting on November 28, 1999, to discuss how Ramadam would be handled that year. *See* NT–10/17/07, at 46-49.

47.     Winstead did submit the Initial Review Response to the grievance filed by Sharp –Grievance No. PIT-0997-99– after he was placed in the RHU on AC status, directing Sharp to file his individual request in the proper form. *See* NT–10/17/07, at 50-51, 59. *See also* Plaintiff's Exhibit 4.

**Defendant Terza**

48.     As Facility Chaplain Program Director, it was not Father Terza's responsibility to approve or disapprove an inmate's request for religious accommodation. *See* NT–10/16/07, at 145-146.

49.     Father Terza spoke with Sharp about his request for group accommodation after receiving a copy of the request from Imam Ibrahiym, the Muslim Chaplain employed by DOC at SCI-Pittsburgh. *See* NT–10/16/07, at 146-147. During this discussion, Father Terza told Sharp "that he have to submit the proper form, and once it was submitted to [Father Terza], then [he] would submit it to the rest of the institution for their recommendation, and then we would send it on to central office for approval." *See* NT–10/16/07, at 147.

50.    Sharp Father Terza was never provided with Sharp's individual request for religious accommodation on the proper form.  *See* NT–10/16/07, at 148, 152.

***Defendant Ibrahiym***

51.    Sharp regularly attended Taleem and Jumah while in general population at SCI-Pittsburgh; Imam Ibrahiym never excluded Sharp from any religious programs or services, and continued to meet and visit with Sharp even after he was placed in the RHU.  *See* NT–10/17/07, at 29, 31-32.

**G.    REQUEST FOR RELIGIOUS ACCOMMODATION (SCI-GREENE)**

52.    At SCI-Greene, the DOC provided religious accommodation for several religious communities within the inmate population, including "Protestants, Catholics, Jewish, Jehovah, Yoke Fellowship, Native Americans."  *See* NT–10/18/07, at 61-62.  *See also* NT–10/16/07, at 68.    Among the Muslims, at least two groups were recognized at SCI-Greene: Imam Muhammad's Sunni group and Nation of Islam.  *Id.*

53.    Imam Muhammad, the Islamic Chaplain at SCI-Greene, provided weekly religious instruction through the Taleem and led the weekly Jumah prayer services for Muslim inmates.  Imam Muhammad identified himself as Sunni or Ahlas Sunnati wal Jamaah.  *See* NT–10/18/07, at 33, 34.

54.    Upon Sharp's arrival at SCI-Greene on May 23, 2001, he was placed in the Restricted Housing Unit at SCI-Greene.  *See* NT–10/16/07, at 35.

55.    After speaking with Stickman one day in the RHU, Sharp was released from the RHU and assigned to a General Population housing block.  Thereafter, Sharp remained in General Population while he was housed at SCI-Greene.  *See* NT–10/16/07, at 37-38; NT–10/17/07, at 150.

56.    While at SCI-Greene, Sharp submitted a request for religious accommodation pursuant to SC-ADM 819, which was dated September 30, 2002.  *See* NT–10/16/07, at 38.  *See also* Defendants' Exhibit B.  This request sought accommodation of Sharp's religion, identified as [t]he Ashariy Comm[unity] of Ahlus Sunnah wal Jama'ah."  *Id.*

57.    This request was received by the Chaplaincy Department at SCI-Greene on October 21, 2002, where it was initially reviewed by the Facility Chaplaincy Program Director, Father Moneck.  *See* NT–10/17/07, at 12.  After reviewing the request, Father Moneck initialed the corresponding Vote Sheet under the "Disapprove" column along with the date "10-21."  *See* NT–10/17/07, at 13.  Father Moneck also wrote on the form as part of his recommendation that "Inmate can practice his religion privately.  Institution cannot accommodate another Muslim sect.  The inmate is most welcome to join the Sunni or the Nation of Islam communities."  *See* NT–10/17/07, at 14.

58.    Father Moneck circulated the Vote Sheet to other staff at SCI-Greene; all other staff voting also recommended that the requested accommodation be denied.  *See* NT–10/17/07, at 12-15; Exhibit C.  Father Moneck then forwarded the packet to DOC's Central Office.  *Id.*

59.    Father Moneck was subsequently informed that Sharp's request for religious accommodation had been denied by the deputy secretary; Father Moneck, in turn, notified Sharp that the request had been denied.  *See* NT–10/17/07, at 15.  *See also* Exhibit C.

60.    As mandated by DC-ADM 819, Sharp then submitted Grievance No. 39662, which challenged the denial of his request for accommodation.  *See* Plaintiff's Exhibit 10.

61.    In her capacity as Corrections Classification Program Manager, Mears provided the Initial Review Response to Grievance No. 39662, filed by Sharp after his request for

religious accommodation was denied. *See* NT–10/17/07, at 78-79. *See also* Plaintiff's Exhibit

10. In her response, Mears wrote:

> Your grievance dated December 27, 2002, was reviewed and investigated.
> You received a memo from Father Moneck dated December 18th, 2002, and he provided you with the information as to why the central office accommodations committee denied your request.
> You were not denied the right to practice your faith as you imply in your grievance and you were not prohibited from maintaining your beliefs and praying in your cell since you have difficulty following the teachings of the Imam. Your constitutional rights and due process are not being denied as you claim.
> You do not need to have a material structure or be with a group of others to pray to exercise your First Amendment right. Should an individual be so [devout] in his beliefs, he would realize that his inner faith is his strength in believing and performing his prayers.
> Based upon the above information, your grievance is denied.

Plaintiff's Exhibit 10. *See also* NT–10/17/07, at 79.

62.    Sharp appealed the Initial Review Response to the Superintendent; however, the

initial response was upheld. *See* Plaintiff's Exhibit 10.

63.    Sharp did not submit any other requests for religious accommodation while he

was confined at SCI-Greene. *See* NT–10/16/07, at 57-58; NT–10/17/07, at 16.

**Defendant Stickman**

64.    After being promoted to Superintendent at SCI-Greene in 2002, Stickman would

participate in reviewing an inmate request for religious accommodation by entering a vote on the

vote sheet. *See* NT–10/17/07, at 141. However, Stickman did not participate in the review of

the request for religious accommodation submitted by Sharp in October of 2002 when Sharp was

confined at SCI-Greene. *See* NT–10/17/07, at 141-142; Exhibit B.

65.    The Vote Sheet for Sharp's request reflects that Deputy Stowitzky as "Acting Superintendent" made the recommendation (to disapprove) on behalf of the Facility Manager on Sharp's request submitted at SCI-Greene.  *See* NT–10/17/07, at 142; Exhibit B.

66.    While employed as the Superintendent at SCI-Greene, Stickman never took any action to prevent Sharp from practicing his chosen religion or to exclude Sharp from participating in any religious activity; nor did Stickman ever tell Sharp he could not believe in or practice his chosen religion.  *See* NT–10/17/07, at  139-140, 142-143.

***Defendant Mears***

67.    Mears did not participate in the request for religious accommodation submitted by Sharp while he was at SCI-Greene.  *See* NT–10/17/07, at 77.   Although Mears was the Corrections Classification Program Manager at SCI-Greene in October of 2002, the Vote Sheet for Sharp's request reflects the initials "MPB" and the date "10-21-02" in the space provided for the Corrections Classification Program Manager.   These are the initials of Michael P. Bruno, who would "have been in the acting capacity [of Corrections Classification Program Manager] if [Mears] had been out of the institution." *See* NT–10/17/07, at 77-78; Exhibit B.

***Defendant Moneck***

68.    Father Moneck initiated the review of Sharp's request for accommodation at SCI-Greene, entered his recommendation to disapprove the request and circulated the vote sheet to the other reviewing officials.  Father Moneck then forwarded the request to Central Office and subsequently advised Sharp of the negative decision on his request.  *See* NT–10/17/07, at 13-15. However, Father Moneck was not the final decision maker on this request.  *See* NT–10/17/07, at 14-15.

69.     Father Moneck was told by Mears that Sharp was complaining about the content of Imam Muhammad's sermons that were being broadcast over the prison network; particularly, that Sharp was contending that Imam Muhammad was slandering him. *See* NT–10/17/07, at 16-17. Father Moneck reviewed the videotape of Imam Muhammad's sermon with Mears and "found nothing inflammatory that Imam Muhammad had preached about…" *Id.*

**Defendant Muhammad**

70.     Imam Muhammad did not participate in the review of or decision on Sharp's request for accommodation at SCI-Greene. *See* Defendants' Exhibit C. Imam Muhammad provided religious services and programs for the Muslim inmates at SCI-Greene, *see* NT–10/18/07, at 32-33; however, Imam Muhammad never excluded Sharp from these programs and services, nor did he ever prevent Sharp from attending or participating in any of these programs and services. *See* NT–10/18/07, at 33-34.

**The Ramadam Contract**

71.     Imam Muhammad did develop an agreement form for inmates wishing to participate in Ramadam. *See* NT–10/18/07, at 35-37. *See also* NT–10/16/07, at 41, 59, 62. However, this form did not require the inmates to profess or practice a specified religion; rather, the form represented a commitment on the part of the inmate to wholly participate in all aspects of Ramadam. *See* NT–10/18/07, at 35-37.

**Defendant Coleman**

72.     As Security Captain, Coleman played no role in the processing or the approval or disapproval of inmate requests for religious accommodation. *See* NT–10/18/07, at 64.

*The Videotape of Imam Muhammad's Sermon*

73.    Coleman had a discussion with Sharp regarding an issue Sharp had with a sermon given by the Muslim Chaplain at SCI-Greene, Imam Muhammad, which was recorded and broadcast to inmates in the RHU. *See* NT–10/16/07, at 41-44; NT–10/18/07, at 64. Upon being informed of the issue by Sharp, Coleman presented the issue to Mears and asked her to review the tapes with the Chaplaincy Department. *See* NT–10/18/07, at 64, 69. No other inmate complained to Coleman about the sermons given by the Muslim Chaplain at SCI-Greene. *See* NT–10/18/07, at 65.

74.    Coleman was subsequently copied on correspondence from Mears to Sharp which indicated that the tapes of the Muslim Chaplain's sermons had been reviewed "and there was nothing derogatory in it." *See* NT–10/18/07, at 65. Consequently, Coleman had no further involvement with any issue surrounding the sermons given by the Muslim Chaplain at SCI-Greene, and never discussed the issue with Sharp again. *See* NT–10/18/07, at 65.

*The Search of Sharp's Cell*

75.    Coleman never told Sharp that he could not pursue his chosen religion, nor did he ever take any action or make any decision affecting Sharp based upon Sharp's expressed religious preferences. *See* NT–10/18/07, at 67-68. Specifically, Coleman never ordered Sharp's cell to be searched in order to retrieve or confiscate Sharp's religious materials. *See* NT–10/18/07, at 74.

**H.    SHARP'S TRANSFER TO SCI-DALLAS**

76.    On June 13, 2006, Sharp was transferred from SCI-Greene to SCI-Dallas. Sharp has been permanently confined at SCI-Dallas since his transfer there from SCI-Greene on June 13, 2006. SCI-Dallas remains Sharp's permanent location. *See* NT–10/18/07, at 66-67. *See also* Defendants' Exhibit D.

## CONCLUSIONS OF LAW and DISCUSSION

Sharp has presented two claims, both predicated on asserted deprivations of his federal rights. The first is brought under the First Amendment to the United States Constitution –made applicable to the States through the Fourteenth Amendment– which, among other things, guarantees individuals the free exercise of their chosen religion. The second claim is brought under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), which is a federal law enacted by Congress to alleviate government burdens on prisoners' religious exercise and to facilitate opportunities for prisoners to engage in the free exercise of religion. See Madison v. Riter, 355 F.3d 310, 317 (4th Cir. 2003). See also Cutter v. Wilkinson, 544 U.S. 709, 713-716 (2005).

## MOOTNESS

Initially, Plaintiff's claims for injunctive and declaratory relief at both Count 1 (First Amendment) and Count 2 (RLUIPA) have been rendered moot by his respective transfers out of SCI-Pittsburgh and SCI-Greene. "In the prison context, the transfer of an inmate from the facility complained of moots claims for injunctive relief involving that facility." Santiago v. Sherman, 2007 WL 217353, *3 (W.D.Pa. 2007)(citing Abdul-Akbar v. Watson, 4 F.3d 195 (3d Cir. 1993) and Sutton v. Rasheed, 323 F.3d 236 (3d Cir. 2003)). See also Panton v. Nash, 2007 WL 914078, *8 (M.D. Pa. 2007)(citing Weaver v. Wilcox, 650 F.2d 22, 27 n. 13 (3d Cir. 1981)); Miskovitch v. Hostoffer, 2007 WL 433142, *2 (W.D.Pa. 2007) and Brown v. Hogsten, 2007 WL 2301098, *3 (M.D.Pa. 2007).

The concept of an inmate's transfer mooting claims for injunctive and/or declaratory relief has been specifically applied in the context of RLUIPA claims. In Neal v. Lucas, 75 Fed.Appx. 960 (5th Cir. 2003), the court sua sponte dismissed –pursuant to the screening

provisions of 28 U.S.C. §§ 1915(e)2 and 1915A– a *pro se* prisoner-plaintiff's RLUIPA claims seeking injunctive and declaratory relief related to a corrections institution's denial of his request for certain religious publications. The <u>Neal</u> court held that the prisoner-plaintiff's RLUIPA claims for injunctive and declaratory relief were rendered moot when he was transferred out of the facility where the publications were denied. <u>See Neal</u>, 75 Fed.Appx. at 960 (<u>citing Herman v. Holiday</u>, 238 F.3d 660, 665 (5th Cir. 2001)).

Similarly, in <u>Bilal v. Lehman</u>, 2006 WL 3626808 (W.D.Wash. 2006), the Court granted summary judgment in favor of corrections staff-defendants with regard to the prisoner-plaintiff's RLUIPA claims. There, Bilal's RLUIPA claims arose when he requested and was denied a religious diet exception. <u>Id</u>. During the course of the lawsuit, Bilal was transferred out of the institution where that denial took place, and the Court held that that transfer rendered moot his claims for injunctive and declaratory relief. <u>Id.</u>, at *3-4.[5] As such, Sharp's claims for injunctive and declaratory relief are moot and judgment on these claims at both Count 1 (First Amendment) and Count 2 (RLUIPA) should be entered accordingly in favor of the Defendants and against the Plaintiff.

## COUNT 1: SECTION 1983/FIRST AMENDMENT CLAIMS

> To state a claim under 42 U.S.C. § 1983, a plaintiff must meet two threshold requirements. He must allege: 1) that the alleged misconduct was committed by a person acting under color of state law; and 2) that as a result, he was deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States. <u>West v. Atkins</u>, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); <u>Parratt v. Taylor</u>, 451 U.S. 527, 535, 101 S.Ct. 1908, 68

---

[5] The Court in <u>Bilal</u> ultimately granted summary judgment in favor of the corrections defendants finding that monetary damages were not available against individual defendants under RLUIPA. The court next held that, to the extent the individual defendants were sued for monetary damages in their official capacities, they were protected by the Eleventh Amendment, and finally, the Court determined that any claims for injunctive or declaratory relief were rendered moot by the prisoner-plaintiff's transfer to a new facility.

L.Ed.2d 420 (1981), *overruled in part on other grounds*, <u>Daniels v. Williams</u>, 474 U.S. 327, 330-331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

<u>Hunter v. Schouppe</u>, 2007 WL 4554251, *2 (W.D.Pa. 2007).

### *Personal Involvement*

In an action brought pursuant to Section 1983, "a plaintiff must show that each and every defendant was 'personal[ly] involve[d]' in depriving him of his rights. <u>Evancho v. Fischer</u>, 423 F.3d 347, 353 (3d Cir. 2005)." <u>Kirk v. Roan</u>, 2006 WL 2645154, *3 (M.D.Pa. 2006). See <u>also</u> <u>Hughes v. Eitner</u>, 2007 WL 2597901, *4 (W.D.Pa. 2007). "There is no liability for a supervising or reviewing defendant based on the theories of *respondeat superior* or vicarious liability." <u>Kirk v. Roan</u>, <u>supra</u> (citations omitted). <u>See also</u> <u>Pressley v. Johnson</u>, 2006 WL 2806572, *4 (W.D.Pa. 2006)("defendant must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*")(<u>citing</u> <u>Rizzo v. Goode</u>, 423 U.S. 362 (1976)). <u>Cf.</u> <u>Rodriguez v. Town of West New York</u>, 191 Fed.Appx. 166, 168 (3d Cir. 2006)("individual city officials must have 'personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of *respondeat superior*'")(<u>citing</u> <u>Evancho v. Fisher</u>, 423 F.3d 347, 353 (3d Cir. 2005)(<u>quoting</u> <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir. 1988)).

"A defendant's personal involvement may be shown through 'allegations of personal direction [of the deprivation of rights] or of actual knowledge and acquiescence [in the deprivation].'" <u>Kirk v. Roan</u>, 2006 WL 2645154, at *3 (<u>citing</u> <u>Evancho v. Fisher</u>, <u>supra</u>, <u>and</u> <u>Rode v. Dellarciprete</u>, <u>supra</u>). <u>See also</u> <u>Hughes v. Eitner</u>, 2007 WL 2597901, at *4. <u>Cf.</u> <u>Green v. Horn</u>, 2006 WL 1520757, *5 (W.D.Pa. 2006)("liability can only be imposed if [supervisory] official played an 'affirmative part' in the complained-of misconduct")(<u>citing</u> <u>Chinchello v.</u>

Fenton, 805 F.2d 126, 133 (3d Cir. 1986)).  However, such allegations of participation or actual knowledge and acquiescence must be made with appropriate particularity.  See Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005).

Participation in the after the fact review of a grievance is not enough to establish personal involvement.  See, e.g., Brooks v. Beard, 167 Fed.Appx. 923, 925 (3d Cir. 2006)(allegations that prison officials and administrators responded inappropriately to inmate's later-filed grievances do not establish their involvement in the underlying deprivation).  See also Cole v. Sobina, 2007 WL 4460617 (W.D.Pa. 2007); Ramos v. Pennsylvania Department of Corrections, 2006 WL 2129148 (M.D.Pa. 2006) and Jefferson v. Wolfe, 2006 WL 1947721 (W.D.Pa. 2006).  Cf. Wilson v. Horn, 971 F.Supp. 943, 947 (E.D.Pa. 1997), aff'd, 142 F.3d 430 (3d Cir. 1998)(prison officials' failure to respond to inmate's grievance does not state a constitutional claim).

### SCI-PITTSBURGH DEFENDANTS

Sharp's First Amendment claims arising from his confinement at SCI-Pittsburgh are centered on the denial of his request for religious accommodation which sought recognition of his identified religion and on a requirement by the PRC that he sign a contract indicating he would not practice his chosen religion.  Initially, several of the defendants are entitled to a verdict in their favor and against the Plaintiff because they had no personal involvement in the claimed violations.

#### Defendant Johnson

Johnson was the Superintendent at SCI-Pittsburgh when Sharp was confined there from 1999 through May of 2001.  Johnson was never presented with the opportunity to review Sharp's request for religious accommodation submitted at SCI-Pittsburgh in 1999.  Johnson never discussed Sharp's religious issues with Sharp while he was Superintendent at SCI-Pittsburgh.

Johnson's only participation in this matter was to deny Sharp's second level appeal from the denial of Grievance No. PIT-0997-99. However, this participation is not sufficient to establish his personal involvement in the claimed violation of rights. The evidence in this case fails to establish that Johnson had any personal involvement in the claimed violations of Plaintiff's rights. Accordingly, Sharp has failed to carry his burden of proof with respect to his Section 1983 claim against Johnson at Count 1. Johnson is entitled to a verdict in his favor and against the Plaintiff.

### Defendant Stickman

Stickman was the Superintendent for Facility Management at SCI-Pittsburgh when Sharp was confined there from November of 1999 through May of 2001. Stickman was never presented with the opportunity to review Sharp's request for religious accommodation submitted at SCI-Pittsburgh in 1999. Stickman never discussed Sharp's religious issues with Sharp while he was Deputy Superintendent for Facility Management at SCI-Pittsburgh. The evidence in this case fails to establish that Stickman had any personal involvement in the claimed violations of Plaintiff's rights at SCI-Pittsburgh. Accordingly, Sharp has failed to carry his burden of proof with respect to his Section 1983 claim at Count 1 arising from his confinement at SCI-Pittsburgh against Stickman. Stickman is entitled to a verdict in his favor and against the Plaintiff.

### Defendant Dickson

Dickson was the Deputy Superintendent for Internal Security at SCI-Pittsburgh when Sharp was confined there from November of 1999 through May of 2001. Dickson was never presented with the opportunity to review Sharp's request for religious accommodation submitted at SCI-Pittsburgh in 1999. Indeed, as Deputy Superintendent for Internal Security at SCI-Pittsburgh, Dickson had no assigned role in the review of inmate requests for religious

accommodation under DC-ADM 819. Dickson never discussed Sharp's religious issues with Sharp while he was Deputy Superintendent at SCI-Pittsburgh.

Dickson's only participation in this matter was as a member of the Program Review Committee ("PRC") which reviewed Sharp's Administrative Custody placement. Although Sharp claimed that the PRC required Sharp to sign a contract saying he would not practice his religion in order to obtain Sharp's release from the RHU; Dickson and Krysevig both testified that the PRC required no such thing. Rather, the evidence showed that Sharp was requested to sign an agreement that would reflect Sharp's promise to not engage in the type of behavior that caused his Administrative Custody placement in the first instance. Specifically, Sharp was being asked to sign a document indicating that he would not participate in unauthorized group activity. No restriction was placed on Sharp's ability to practice a particular religion nor was Sharp required to forego all religious practice in order to secure his release from the RHU.

Thus, the evidence in this case fails to establish that Dickson had any personal involvement in the claimed violations of Plaintiff's rights. Accordingly, Sharp has failed to carry his burden of proof with respect to his Section 1983 claim against Dickson at Count 1. Dickson is entitled to a verdict in his favor and against the Plaintiff.

### Defendant Krysevig

Krysevig was the Deputy Superintendent for Centralized Services at SCI-Pittsburgh when Sharp was confined there from November of 1999 through May of 2001. Krysevig may have had some awareness of Sharp's request for a group accommodation, but took no action on this request once it appeared that Sharp was attempting to use this request as an opportunity to place himself in a position of leadership over a group of inmates. Krysevig was never presented with nor did he ever act upon an individual request for accommodation from Sharp.

Krysevig was also involved in this matter as a member of the Program Review Committee ("PRC") which reviewed Sharp's Administrative Custody placement. Although Sharp claimed that the PRC required Sharp to sign a contract saying he would not practice his religion in order to obtain Sharp's release from the RHU; however, Krysevig and Dickson both testified that the PRC required no such thing. Rather, the evidence showed that Sharp was requested to sign an agreement that would reflect Sharp's promise to not engage in the type of behavior that caused his Administrative Custody placement in the first instance. Specifically, Sharp was being asked to sign a document indicating that he would not participate in unauthorized group activity. No restriction was placed on Sharp's ability to practice a particular religion nor was Sharp required to forego all religious practice in order to secure his release from the RHU.

Thus, the evidence in this case fails to establish that Krysevig had any personal involvement in the claimed violations of Plaintiff's rights. Accordingly, Sharp has failed to carry his burden of proof with respect to his Section 1983 claim against Krysevig at Count 1. Krysevig is entitled to a verdict in his favor and against the Plaintiff.

### Defendant Winstead

Winstead was the Corrections Classification Program Manager at SCI-Pittsburgh when Sharp was confined there from November of 1999 through May of 2001. Winstead, too, may have had some awareness of Sharp's request for a group accommodation, but took no action on this request once it appeared that Sharp was attempting to use this request as an opportunity to place himself in a position of leadership over a group of inmates. Winstead also responded to Sharp's grievance regarding his group request and informed Sharp that if he wished to pursue the matter, he would have to submit an individual request. Winstead was never presented with nor

did she ever act upon an individual request for accommodation from Sharp.  Indeed, after Sharp was informed by Winstead that his attempts to obtain a religious accommodation to that point were insufficient, Sharp never submitted any additional requests for accommodation at SCI-Pittsburgh.

Accordingly, the evidence fails to establish that Winstead had any personal involvement in the claimed violations of Plaintiff's rights.  Sharp has failed to carry his burden of proof with respect to his Section 1983 claim against Winstead at Count 1.  Thus, Winstead is entitled to a verdict in her favor and against the Plaintiff.

### Defendant Terza

Father Terza was the Facility Chaplaincy Program Director at SCI-Pittsburgh when Sharp was confined there from November of 1999 through May of 2001.  Father Terza was aware of Sharp's request for a group accommodation; however, Father Terza informed Sharp that if he wished to pursue the matter, he would have to submit an individual request.  Father Terza was never presented with nor did he ever act upon an individual request for accommodation from Sharp.  Indeed, after Sharp was informed by Winstead that his attempts to obtain a religious accommodation to that point were insufficient, he never presented any additional requests for accommodation at SCI-Pittsburgh.

Thus, Sharp's evidence in this case does not prove that Father Terza had any personal involvement in the claimed violations of Plaintiff's rights.  Sharp has failed to carry his burden of proof with respect to his Section 1983 claim against Father Terza at Count 1.  Accordingly, Father Terza is entitled to a verdict in his favor and against the Plaintiff.

### Defendant Ibrahiym

Imam Ibrahiym was a Facility Chaplain at SCI-Pittsburgh when Sharp was confined there from November of 1999 through May of 2001. Imam Ibrahiym was aware of Sharp's request for a group accommodation; however, Father Terza informed Sharp that if he wished to pursue the matter, he would have to submit an individual request. After Sharp was informed by Winstead that his attempts to obtain a religious accommodation to that point were insufficient, he never presented any additional requests for accommodation at SCI-Pittsburgh.

Thus, the evidence in this case fails to establish that Imam Ibrahiym had any personal involvement in the claimed violations of Plaintiff's rights. Accordingly, Sharp has failed to carry his burden of proof with respect to his Section 1983 claim against Imam Ibrahiym at Count 1. Imam Ibrahiym is entitled to a verdict in his favor and against the Plaintiff.

### SCI-GREENE DEFENDANTS

Sharp's First Amendment claims arising from his confinement at SCI-Greene are centered on the denial of his request for religious accommodation which sought recognition of his identified religion, and on comments made by Imam Mohammed during religious sermons that were recorded and subsequently broadcast to other inmates over the prison's television system; an alleged "contract" Imam Muhammad required inmates to sign before participating in Ramadam and a search of Sharp's cell which allegedly culminated in the seizure of religious literature. The SCI-Greene Defendants are entitled to a verdict in their favor and against the Plaintiff because they had no personal involvement in the claimed violations.

### Defendant Stickman

Stickman was the Superintendent at SCI-Greene when Sharp was confined there from November of 1999 through May of 2001. Although as the Facility Manager Stickman would

ordinarily have had a role in the review of inmate requests for religious accommodation under DC-ADM 819, Stickman did not participate in the review of Sharp's request for religious accommodation submitted at SCI-Greene in 2002.  Rather, Sharp's request was reviewed by Deputy Superintendent Stowitzky, who was Acting Superintendent for Stickman when Sharp's request was processed.  Nor did Stickman participate in the review of Grievance No. 39662, which Sharp filed after his request for religious accommodation was denied by DOC's Central Office.  Moreover, Stickman never discussed Sharp's religious issues with Sharp while he was Superintendent at SCI-Greene.

Thus, the evidence in this case fails to establish that Stickman had any personal involvement in the claimed violations of Plaintiff's rights at SCI-Greene.  Accordingly, Sharp has failed to carry his burden of proof with respect to his Section 1983 claim arising from his confinement at SCI-Pittsburgh against Stickman.  Stickman is entitled to a verdict in his favor and against the Plaintiff.

### Defendant Mears

Mears was the Corrections Classification Program Manager at SCI-Greene when Sharp was confined there beginning in May of 2001.  Although as the Corrections Classification Program Manager at SCI-Greene Mears would ordinarily have had a role in the review of inmate requests for religious accommodation under DC-ADM 819, Mears did not participate in the review of Sharp's request for religious accommodation submitted at SCI-Greene in 2002. Rather, Sharp's request was reviewed by Michael P. Bruno, who was acting as Corrections Classification Program Manager for Mears when Sharp's request was processed.  Mears did participate –by providing the initial review response– in the processing and review of Grievance No. 39662, which Sharp filed after his request for religious accommodation was denied by

DOC's Central Office. However, this participation is not sufficient to establish her personal involvement in the claimed violation of rights.

Mears also participated in the review of the tapes of Mohammed's sermons which Sharp claimed contained slanderous statements directed against him. Mears along with Father Moneck reviewed the tapes and found them to be inoffensive. Mohammed indicated that his sermons espoused religious themes and principles central to the Sunni Muslim faith –which he was duty bound to teach to his followers and students– and that no slanderous or derogatory statements were directed to Sharp.

Thus, the evidence in this case fails to establish that Mears had any personal involvement in the claimed violations of Plaintiff's rights at SCI-Greene. Accordingly, Sharp has failed to carry his burden of proof with respect to his Section 1983 claim arising from his confinement at SCI-Greene against Mears. Mears is entitled to a verdict in her favor and against the Plaintiff.

### Defendant Coleman

Coleman was the Security Captain at SCI-Greene when Sharp was confined there beginning in May of 2001. Coleman was never presented with the opportunity to review Sharp's request for religious accommodation submitted at SCI-Greene in 2002. Indeed, as Security Captain at SCI-Greene, Coleman had no assigned role in the review of inmate requests for religious accommodation under DC-ADM 819. Coleman never discussed Sharp's religious issues with Sharp while he was Security Captain at SCI-Greene.

Sharp complained to Coleman about the content of the sermons given by Mohammed which Sharp claimed contained slanderous statements directed against him. Coleman passed these concerns along to Mears and asked her to look into the matter. Coleman was subsequently informed by Mears that there was no merit to Sharp's complaints. Coleman had no further

discussions or contact with Sharp on this issue. Coleman also denied that he ordered or directed a search of Sharp's cell for the purpose of identifying and removing religious materials from Sharp's cell.

Thus, the evidence in this case fails to establish that Coleman had any personal involvement in the claimed violations of Plaintiff's rights at SCI-Greene. Accordingly, Sharp has failed to carry his burden of proof with respect to his Section 1983 claim arising from his confinement at SCI-Greene against Coleman. Coleman is entitled to a verdict in his favor and against the Plaintiff.

### *Defendant Moneck*

Father Moneck was the Facility Chaplaincy Program Director at SCI-Greene when Sharp was confined beginning in May of 2001. Father Moneck initiated the review of Sharp's request for accommodation at SCI-Greene, entered his recommendation to disapprove the request and circulated the vote sheet to the other reviewing officials. Father Moneck then forwarded the request to Central Office and subsequently advised Sharp of the negative decision on his request. However, Father Moneck was not the final decision maker on this request.

Father Moneck was told by Mears that Sharp was complaining about the content of Imam Muhammad's sermons that were being broadcast over the prison network; particularly, that Sharp was contending that Imam Muhammad was slandering him. Father Moneck reviewed the videotape of Imam Muhammad's sermon with Mears and "found nothing inflammatory that Imam Muhammad had preached about…"

Thus, the evidence in this case fails to establish that Father Moneck had any personal involvement in the claimed violations of Plaintiff's rights at SCI-Greene. Accordingly, Sharp has failed to carry his burden of proof with respect to his Section 1983 claim arising from his

confinement at SCI-Greene against Father Moneck, and he is entitled to a verdict in his favor and against the Plaintiff.

### Defendant Muhammad

Imam Muhammad was a Facility Chaplain at SCI-Greene when Sharp was confined there beginning in May of 2001. Imam Muhammad did not participate in the review of or decision on Sharp's request for accommodation at SCI-Greene. Imam Muhammad provided religious services and programs for the Muslim inmates at SCI-Greene; however, Imam Muhammad never excluded Sharp from these programs and services, nor did he ever prevent Sharp from attending or participating in any of these programs and services.

Imam Muhammad did develop an agreement form for inmates wishing to participate in Ramadam. However, this form did not require the inmates to profess or practice a specified religion; rather, the form represented a commitment on the part of the inmate to wholly participate in all aspects of Ramadam.

Thus, the evidence in this case fails to establish that Imam Muhammad had any personal involvement in the claimed violations of Plaintiff's rights at SCI-Greene. Accordingly, Sharp has failed to carry his burden of proof with respect to his Section 1983 claim arising from his confinement at SCI-Greene against Imam Muhammad. Imam Muhammad is entitled to a verdict in his favor and against the Plaintiff.

### Qualified Immunity

To the extent any First Amendment claim remains against any Corrections Defendant, such defendant(s) would be entitled to assert the defense of qualified immunity.

> Courts must conduct a two step inquiry to determine the merits of a claim of qualified immunity: 1) whether the facts alleged show the officer's conduct violated a constitutional right and 2) whether the constitutional right was clearly established at the time of violation.

> Saucier, 533 U.S. at 201, 121 S.Ct. 2151.  Further, public officials
> are entitled to qualified immunity if they acted 'reasonably in the
> good-faith fulfillment of their responsibilities.'     Wilson v.
> Schillinger, 761 F.2d 921, 929 (3d Cir. 1985), cert denied, 475
> U.S. 1096, 106 S.Ct. 1494, 89 L.Ed.2d 895 (1986).  '"Clearly
> established rights" are those with contours sufficiently clear that a
> reasonable official would understand that what he is doing violates
> that right.   A plaintiff need not show that the very action in
> question has previously been held unlawful, but needs to show that
> in light of the preexisting law the unlawfulness was apparent.'
> McLaughlin v. Watson, 271 F.3d 566, 571 (3d Cir. 2001)(citing
> Shea v. Smith, 966 F.2d 127, 130 (3d Cir.1992)), cert denied, 535
> U.S. 989, 122 S.Ct. 1543, 152 L.Ed.2d 469 (2002).

Watson v. Methacton School District, 513 F.Supp.2d 360, 382 (E.D.Pa. 2007).

Instantly, Sharp is essentially asserting that his First Amendment rights were violated when the Corrections Defendants failed to grant his request to provide accommodation for his religion, which he has identified as the Ahlus Sunnah wal Jama'ah.  Nevertheless, with respect to the instant litigation, at the two institutions where Sharp was confined the DOC had installed Muslim or Islamic Chaplains who identified themselves Sunni or Sunni wal Jamaah, the same religion as Sharp.  Moreover, these Chaplains provided weekly Taleem study groups and led weekly Jumah prayer services for the Sunni inmates, as well as offered opportunities to participate in Ramadam and access to religious literature.  Sharp was not excluded from or prevented from attending any of these programs or services.  Thus, the evidence shows that the Corrections Defendants acted reasonably in the good-faith fulfillment of their responsibilities when they took actions which ultimately resulted in the denial of Sharp's request for accommodation of a religious group where that specific group was already being accommodated at their respective institutions.

Indeed, for this same reason, the Corrections Defendants cannot be found to have violated Sharp's First Amendment Free Exercise rights.  Sharp contends that he was seeking the

opportunity to practice his faith, and to participate in religious programs and services of his faith. Yet, again, he has identified his faith as Ahlus Sunnah wal Jama'ah, which was the faith for which the DOC was providing religious programs and services while Sharp was confined at SCI-Pittsburgh and at SCI-Greene, respectively.  That Sharp chose not to participate or sought to interpose obstacles to his participation because of his desire to establish a group of inmates over whom he would have control does not establish that the Corrections Defendants acted to violate his First Amendment Free Exercise rights.  Moreover, every Corrections Defendant testified that they neither told Sharp that he was not allowed or not permitted to profess any particular religion, nor excluded or prevented Sharp from participating in any religious event.  Thus, the evidence fails to establish that any Corrections Defendant violated Sharp's First Amendment Free Exercise rights.  See, e.g., Muhammad v. City of N.Y. Department of Corrections, 904 F.Supp. 161, 197 (S.D.N.Y. 1995)(First Amendment did not require accommodation of Nation of Islam inmate's request for separate services), appeal dismissed, 126 F .3d 119 (2d Cir. 1997); Matiyan v. Commissioner Department of Corrections, 726 F.Supp. 42, 44 (W.D.N.Y. 1989) (refusal to honor Sunni inmate's request for Jumah separate from Shi'a inmates did not offend the Free Exercise Clause of the First Amendment).  Accordingly, the Corrections Defendants are entitled to a verdict in their favor and against the Plaintiff on this claim.

**COUNT 2: Religious Land Use and Institutionalized Persons Act ("RLUIPA") CLAIMS**

At Count 2 of his Second Amended Complaint, Sharp alleged that the Defendants violated his rights as protected by the Religious Land Use and Institutionalized Persons Act ("RLUIPA").  With respect to Count 2, all Corrections Defendants are entitled to a verdict in their favor and against the Plaintiff.

### Individual Capacity Claims

Initially, it has been determined that RLUIPA does not support claims against state officials in their individual capacity.  See Brown v. Department of Corrections Pennsylvania, 2007 WL 4322980, *16 (W.D.Pa. 2007)(prison official "is not liable for damages in his individual capacity because RLUIPA does not authorize money damages against individuals")(citing cases).  Thus, there can be no individual liability against any of the Corrections Defendants.  The Corrections Defendants are consequently entitled to a verdict in their favor and against the Plaintiff with respect to all individual capacity claims brought under RLUIPA.

### Official Capacity Claims

Moreover, because only official capacity claims remain against the Corrections Defendants, Sharp would only be entitled to injunctive relief if he were successful in establishing his claims because the Eleventh Amendment bars money damages sought against a state official acting in his or her official capacity.  See Scott v. Beard,  2007 WL 3194039, *1 (3d Cir. 2007)("RLUIPA claim for money damages against defendant in his official capacity –as claim essentially against state itself– is barred by the Eleventh Amendment)(citing Laskaris v. Thornburgh, 661 F.2d 23, 25-26 (3d Cir. 1981)(citing Edelman v. Jordan, 415 U.S. 651 (1974)). See also Morris-El v. Menei, 2006 WL 1455592 (W.D.Pa. 2006).  However, because Sharp has since been transferred from SCI-Pittsburgh and from SCI-Greene and is now permanently housed at the State Correctional Institution at Dallas, he is not entitled to injunctive relief against these Defendants.  See Brown v. Department of Corrections Pennsylvania, 2007 WL 4322980, at *16 ("Plaintiff is no longer in SCI-Mahanoy … so the claim for equitable relief is moot")(citing Marrie v. Nickels, 70 F.Supp.2d 1252, 1259 (D.Kan. 1999) and Chapdelane v. Keller, 1998 WL

357350, *4 (N.D.N.Y. 1998). Thus, there can be no official capacity liability against any of the Corrections Defendants. The Corrections Defendants are consequently entitled to a verdict in their favor and against the Plaintiff with respect to all official capacity claims brought under RLUIPA at Count 2.

### Qualified Immunity

The Corrections Defendants can also assert the defense of qualified immunity against any claim brought against them under RLUIPA because at the time of their respective actions, it had not been firmly established that RLUIPA provided inmates with religious protections. The doctrine of qualified immunity protects government officials performing discretionary functions from personal liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

Analyzing qualified immunity in Anderson v. Creighton, 483 U.S. 635 (1987), the United States Supreme Court held that whether a government official could be held personally liable for conduct that allegedly violated a constitutional or statutory right depended upon the objective legal reasonableness of the action. Id., at 639. Under this standard, government officials are shielded from civil liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Id.

In Brown v. Grabowski, 922 F.3d 1097 (3d Cir. 1990), cert. denied, 501 U.S. 1218 (1991), the Third Circuit interpreted Anderson to require analysis not only of the clear establishment of the right that an official is alleged to have violated, but also of the specific official actions alleged to have violated the right. More recently, the Third Circuit has taken the standard one step further stating that "qualified immunity encompasses mistaken judgments that

are not plainly incompetent." See Gilles v. Davis, 427 F.3d 197, 207 (3d Cir. 2005)(citing

Hunter v. Bryant, 502 U.S. 224, 229 (1991)).

>    Put succinctly, the qualified immunity analysis requires the application of a two-part test:

>> First, the court must determine whether the facts alleged show that
>> the defendant's conduct violated a constitutional or statutory right.
>> If so, the court must then determine whether the constitutional or
>> statutory right allegedly violated by the defendant was 'clearly
>> established.' If the court concludes that the defendant's conduct
>> did violate a clearly established constitutional or statutory right,
>> then it must deny the defendant the protection afforded by
>> qualified immunity.

Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006)(citing Saucier v. Katz, 533 U.S. 194, 201

(2001) and Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002)).

>    Until the question of qualified immunity is addressed, a court cannot reach the underlying

merits of the case. See Gruenke v. Seip, 225 F.3d 290, 299 (3d Cir. 2000). Here, judgment in

favor of the Corrections Defendants and against the Plaintiff is appropriate on the basis of

qualified immunity. First, the statutory rights in question –those promulgated in RLUIPA– did

not even exist when the SCI-Pittsburgh Defendants are alleged to have denied his request for

religious accommodation.

>    Indeed, to the extent Sharp seeks to assert a claim against the SCI-Pittsburgh Defendants

under RLUIPA, no viable claim is presented. RLUIPA in its present form was not even

introduced to the United States Senate as a bill until July 13, 2000. See PL 106-274, September

22, 2000, 114 Stat 803. It was enacted and deemed effective roughly two months later, on

September 22, 2000. Id. RLIUPA was enacted by Congress with an effective date of September

22, 2000. Sharp presented no evidence at trial of any act taken by any Defendant at SCI-

Pittsburgh affecting his religious practice which occurred on or after September 22, 2000.

Rather, evidence was presented that Sharp had submitted a group request for religious

accommodation at SCI-Pittsburgh at some point in 1999. However, the trial record is clear that at least as of December 21, 1999, Sharp had been informed that if he wished to have his request reviewed, he needed to submit an individual request on the proper form. However, the record is equally clear that Sharp never submitted any other request for religious accommodation while he was at SCI-Pittsburgh.[6]

Again, RLIUPA was enacted by Congress with an effective date of September 22, 2000. The protections of RLUIPA therefore did not become statutory rights to which Sharp could have been entitled until after the SCI-Pittsburgh Defendants committed any specific act attributed to them. Correspondingly, it necessarily follows that RLUIPA cannot be considered to have been "clearly established" for purposes of the qualified immunity analysis discussed above, at the time that the SCI-Pittsburgh Defendants took the actions relevant to this case.

In any event, all Corrections Defendants are protected by qualified immunity to the extent that Sharp derived any rights from the enactment of RLUIPA which arose on or after September 22, 2000. Indeed, although RLUIPA was enacted and became effective on September 22, 2000, it was not upheld as a constitutionally valid exercise of Congress' power until the United States Supreme Court's May 31, 2005 decision in Cutter v. Wilkinson, 544 U.S. 709 (2005). Inasmuch as the several complaints in this action were all filed prior to February 1, 2005 –several months prior to the Cutter decision– even decisions made by the Corrections Defendants after the effective date of RLUIPA did not violate law clearly established at that time.

---

[6] The only other specific allegation arising from Sharp's confinement at SCI-Pittsburgh is his claim that he was required by the PRC to sign a contract agreeing not to practice his religion in order to secure his release from the RHU. However, Sharp failed to produce sufficient evidence to sustain this claim. Moreover, the evidence presented by the Corrections Defendants established that Sharp's release from the RHU was never predicated on signing a contract or agreement wherein Sharp had to agree to forgo his religious preference or to not practice his chosen religion.

This principle has been repeatedly applied by federal district courts in this, and other, Circuits. Most analogously to the facts in this case, in Scott v. Beard, 2006 WL 2645150 (M.D.Pa. 2006), a *pro se* prisoner-plaintiff sought a religious hair length exception and was denied by the corrections defendants on June 24, 2000. Id., at *2. The plaintiff continued to challenge the applicable corrections grooming policy well into 2001. Id., at *2-3. The plaintiff subsequently brought a civil rights action specifically raising RLUIPA, among other Constitutional claims. Id., at *3. After a court-ordered stay pending the resolution of Cutter, the Court granted the corrections defendants' motion for summary judgment on the plaintiff's RLUIPA claims on the basis of qualified immunity, holding:

> at the time that the events in this case took place, neither the Supreme Court nor the Court of Appeals for the Third Circuit had yet held that RLUIPA was Constitutional or that a prison grooming policy violated it. Considering the fact that the predecessor to RLUIPA, the Religious Freedom Restoration Act (RFRA), which imposed the identical strict-scrutiny standard employed by RLUIPA, had been declared unconstitutional by the Supreme Court, see City of Boerne v. Flores, 521 U.S. 507 (1997), the defendants could have reasonably questioned the validity of RLUIPA. Consequently, it is difficult to conclude that the rights created by RLUIPA were 'clearly established.'

Scott, 2006 WL 2645150, *5. See also David v. G.J. Giurbino, 2007 WL 925802, (S.D.Cal. 2007)(*pro se* prisoner-plaintiff's RLUIPA claim dismissed in favor of the corrections staff-defendants on the basis of qualified immunity regarding the December 21, 2003 denial of a religious hair length exemption). See Ragland v. Angelone, 420 F.Supp.2d 507 (W.D.Va. 2006); and Bilal v. Lehman, 2006 WL 3626808 (W.D.Wash. 2006).

Thus both because statutory rights derived from RLUIPA did not exist as such at the time of some of the actions under review and because said rights cannot be considered to have been clearly established at any time prior to the filing of the operative complaint in this case, the

Corrections Defendants are entitled to qualified immunity in this case. Judgment should therefore be entered in favor of the defendants with regard to Plaintiff's claims for monetary damages under RLUIPA at Count 2.

### RLUIPA Claims

Finally, even considering the claim on its merits, Sharp has not demonstrated that his ability to practice his religion was substantially burdened by any act of the Corrections Defendants.

> To establish a prima facie case under section 3 of RLUIPA, a plaintiff must demonstrate 1) that he engaged in a religious exercise; and 2) that the religious exercise was substantially burdened. See Adkins[ v. Kaspar, 393 F.3d 559,] at 567 [(5th Cir. 2004)]; 42 U.S.C. § 2000cc-1(a). The plaintiff 'bear[s] the burden of persuasion on whether the ... government practice that is challenged by the claim substantially burdens the exercise of religion.' 42 U.S.C. § 2000cc-2(b). If the plaintiff succeeds in demonstrating a prima facie case, the government must then demonstrate that the challenged government action is 'is in furtherance of a compelling governmental interest' and 'is the least restrictive means of furthering that compelling governmental interest.' 42 U.S.C. §§ 2000cc-1(a), 2000cc-2(b). In contrast, if the plaintiff fails to present evidence to support a prima facie case under RLUIPA, the court need not inquire into whether the governmental interest at stake was compelling. See Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1228 (11th Cir. 2004).

Smith v. Allen, 502 F.3d 1255, 1276 (11th Cir. 2007). See also Kretchmar v. Beard, 241 Fed.Appx. 863, 865 (3d Cir. 2007).

Instantly, Sharp requested recognition of his religion by filing a request for religious accommodation after he was transferred to SCI-Greene and placed in general population. Of the named Corrections Defendants, only Father Moneck participated in the review and recommendation process. Father Moneck recommended that the request be denied, and forwarded Sharp's request –along with the recommendation from SCI-Greene that the request be

denied– to DOC's Central Office.  There, the decision to deny Sharp's request was made by a deputy secretary at DOC's Central Office.

In his request, Sharp was seeking recognition of a religious group he identified as "[t]he Ashariy Comm[unity] of Ahlus Sunnah wal Jama'ah."  However, while Sharp was confined at SCI-Greene, the DOC offered programs and services for Muslim inmates and, specifically, had employed an Islamic Chaplain –Imam Muhammad– who identified himself as a Sunni Muslim. Sharp was permitted to attend the Taleem studies and Jumah services offered by Imam Muhammad; Sharp was also permitted to participate in Ramadam while at SCI-Greene.

Sharp has failed to show that the denial of his request substantially burdened his practice of religion where the DOC provided Sharp with the opportunity to attend and participate in religious programs and services for Sunni Muslims, which is the religion Sharp purports to profess.  Although Sharp identified some differences in the way he practices his faith as compared to Imam Muhammad and the other Sunni Muslims at SCI-Greene, these differences were not so significant as to substantially burden Sharp's practice.  Rather, at most, Sharp's evidence shows that these differences imposed incidental burdens on Sharp's ability to practice his religion.

Sharp has attempted to analogize his situation with Protestants and Catholics, asserting that requiring him to attend the services and programs offered by Imam Muhammad would be like having a Catholic attend a Catholic mass lead by Protestant clergy.  However, this analogy is quite misplaced because Sharp and  Imam Muhammad both identify themselves as Sunni Muslims.  Thus, the more apt comparison would be between different branches of the Protestant faith or different branches of the Catholic faith.  Yet, in terms of accommodation, the DOC offers religious services and programs for the Protestant faith, which provides opportunities and

accommodation for those who profess to be, for example, Presbyterian, Methodist or Episcopalian, and for the Catholic faith, which provides opportunities and accommodation for those who profess to be, for example, Roman Catholic, Anglican and Eastern Orthodox. *See*, *e.g.*, NT–10/16/07, at 155, 159-160. Thus, ultimately, the fact that Sharp identifies himself as a Sunni Muslim and the fact that the DOC accommodated Sunni Muslims at SCI-Greene by providing religious services and programs through a Sunni Imam establishes that Sharp's religion was accommodated and Sharp was provided the opportunity to practice his chosen religion without substantial burden. That Sharp chose not to participate in the programs and services offered by SCI-Greene for his chosen religion fails to carry his burden under RLUIPA to show that the DOC substantially burdened his practice of religion.

With respect to Sharp's other ancillary claims, specifically relating to Imam Muhammad's sermons, the alleged Ramadam "contracts" and the search of his cell and confiscation of religious materials, Sharp has not conclusively established in the first instance that these underlying events even occurred in the manner he has alleged. Nevertheless, even assuming these events took place as alleged, Sharp has not established that these actions imposed anything more than an incidental burden on the practice of his religion. See, e.g., Smith v. Allen, 502 F.3d 1255 (11th Cir. 2007). Thus, Sharp has failed to establish a violation of his rights under RLUIPA and a verdict should accordingly be entered in favor of the Corrections Defendants and against Sharp at Count 2.

WHEREFORE, the Corrections Defendants request that the foregoing Findings of Fact and Conclusions of Law be accepted as submitted on their behalf.

Respectfully submitted,

THOMAS W. CORBETT, JR.
Attorney General

s/ Scott A. Bradley

Office of Attorney General
6th Floor, Manor Complex
564 Forbes Avenue
Pittsburgh, PA 15219
Phone: (412) 565-3586
Fax:    (412) 565-3019

Scott A. Bradley
Senior Deputy Attorney General
Attorney I.D. No. 44627

Susan J. Forney
Chief Deputy Attorney General

Date:  February 15, 2008