IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SHAWN C. SHARP                    :
              Plaintiff           :
                                  : Civil Action no. 00-2156
        v.                        :
                                  : Magistrate Judge Hay
SUPERINTENDENT PHILLIP L.         :
JOHNSON, et al.,                  :
              Defendants          :

PROPOSED FINDINGS OF FACT AND CONCLUSIONS

OF LAW ON BEHALF OF THE PLAINTIFF

## I. INTRODUCTION:

The Plaintiff Shawn C. Sharp, (hereinafter "Plaintiff"), an inmate at the state correctional institution at Dallas, (Hereinafter referred to as "Dallas"), bring this action to challenge Defendants unconstitutional deprivation of his religious belief. Plaintiff is a practicing member of the Muslim faith. Defendants refused to provide Plaintiff with services required by his religious needs and permissible law.

2. Defendants refusal to provide Plaintiff with services is not supported by a compelling or otherwise overriding legitimate state interest and places Plaintiff in the untenable position of having to either violate central tenets of his religion, or forego the practices mandated by his religion.

3. Defendants have also engaged in discriminatory and punitive actions in response to Plaintiffs attempts to practice his religion. Such actions included allowing others of the Islamic faith to practice their religion and teach that the beliefs of the Plaintiffs faith are deviant, while Plaintiff in expressing his faith just as others similarly situated, was placed in solitary confinement for these actions for 2 1/2 years in an effort to deny him and discourage him from vocally pursuing his constitutionally protected rights.

4. Plaintiff seeks an award of declaratory, and injunctive relief mandating

that his faith be recognized by the Department of Corrections and accommodated as separate and distinct from those of other Islamic faiths in any correctional facility to which he is or could be confined.

5. Plaintiff seeks Attorney fees for all research time expended in preparations for this case over an eight year period, filing fees, copying, mailing, office supply cost. Plaintiff avers that he has logged over 500 hours in the eight year time period in preparation for this case.

6. Plaintiff request that previously appointed counsel be paid an attorney fee for the expenditure of his time as compensation for his assistance as well. To be tabulated as a separate expenditure.

7. Plaintiff seeks punitive damages as a result of the willful, malicious, wanton disregard and violation of his constitutional rights and as a deterrent to such actions in the future by the Department of Corrections (Hereinafter DOC personnel) and the Defendants.

8. Plaintiffs right to relief is based upon claims brought pursuant to 42 USCA sec. 1983, the 1st and 14th Amendments to the U.S. Constitution, and the Religious Land Use and Institutionalized Persons Protections Act of 2000, 42 USCA sec. 2000cc, et seq., and any other pertinent laws of the land applying in this instance.

## II. JURISDICTION:

9. The jurisdiction of this court is premised upon 28 USCA sec. 1331 and 1343 which concern the original jurisdiction of the district court over federal questions and the jurisdiction of the district court to award appropriate relief for the violation, under the color of state law, of any constitutional right or federal statute providing for the protection of civil rights.

## III. PARTIES:

**PLAINTIFF:**

10. Plaintiff is Shawn C. Sharp, currently residing at SCI Dallas, Inmate no. BQ 8429, Follies Rd., Drawer K, Dallas, PA 18612.

DEFENDANTS ARE AS FOLLOWS:

11. Philip J Johnson served as Superintendent at SCIP from 1/1999 until late 2002.

12. Mark Krysevig served as Deputy Superintendent for Centralized Services at SCI Pittsburgh (Hereinafter "SCIP") beginning 7/1999.

13. Joel Dickson served as Deputy Superintendent for Internal Security at SCIP from 7/1998 until 2/2002.

14. William S. Stickman serviced as the Deputy Superintendent for Facility Management at SCIP from 1/1997 until 3/2002. He was promoted to Superintendent of SCI Greene (Hereinafter SCIG) thereafter.

15. Rhoda Winstead served as the Corrections Classification Manager at SCIP from 1997 to 1999.

16. Father William Terza a Catholic Priest served as the Facility Chaplain Program Director at SCIP beginning 3/1998.

17. Imam Tanko Ibrahiym was the Imam of the Sunni Muslim Community. He was employed as an Islamic Chaplain at SCIP from 1998 to 2004.

18. Brian Coleman was the Security Captain of SCIG from late 2000 until 10/03.

19. Jean Mears (name was legally changed to Blaine sometime after the incidents mentioned herein) was the Corrections Classification Program Manager for SCIG from 6/2002 to 12/2003.

20. Father George Moneck was the Facility Chaplain Program Director at SCIG beginning in 1997 to 12/2004.

21. Imam Abu Bakr Muhammad was employed by the DOC in 4/1995 as the Islamic Chaplain at SCIG and is still employed in that position.

## IV. STATEMENT OF FACTS:

22. Plaintiff was an inmate confined to SCIP and SCIG at the time of the events mentioned herein.

23. Plaintiffs right to relief is based upon the claims brought pursuant to 42 USCA sec. 1983 and the 1st and 14th amendment to the United States Constitution. Plaintiff is entitled to relief pursuant to the Institutionalized Persons Protections Act of 2000, 42 USCA Sec 2000cc et seq.

24. Plaintiff is a member of a globally recognized faith group that is generally termed as Ahlus Sunnati Wal Jama'ah, the Ash'ariyya in theological doctrine or those following the Shafi'i Madhaab (or Islamic School of Jurisprudence) in matters of practice and Habashiyya for the area from which these teachings geographically originated.

25. The term Ahlus Sunna or Sunni for short is a generic term like those of Christianity for Christians. This general term is used to clarify what type of Muslim one may be.

26. There is consensus amongst the Muslim population that there are different types of Sunni Muslims just as there are different types of Christians and thus ones beliefs are clarified by stating that you are Ash'ariy or Wahabi, etc.

27. The Habashi faith has existed for hundreds of years and make up the majority of Sunnis worldwide.

28. The Wahabi faith is a recent import to this country and are also interchangeable with the term Salafi.

29. Plaintiff, upon arrival at SCIP determined though attendance to Islamic services that those of the Wahabi sect of Sunni Muslims had religious services and were accommodated, but not those of his faith.

30. Defendant Terza, a Catholic Priest for the Diocese of Pittsburgh was employed by the DOC in the capacity of Chaplain Program Director as of March

1998 (NT. 10/16 p.142–143). As Facility Director, his responsibilities were to oversee the entire Chaplaincy Program for the Institution at SCIP. (NT 10/16 p.143) His duties also required him to investigate further than the Imam Chaplain if an conflict arose within the faiths. (NT 10/16 p.154–155).

31. After an initial discussion, Defendant recognized that Plaintiff was of a different branch of the Sunni community. (NT 10/16 p.159–160).

32. Plaintiff brought this to the attention of the Islamic Chaplain Tanko Ibrahiym and Chaplain Terza. During these repeated meetings, Plaintiff attempted to explain that like those who generally call themselves "Christians", Muslims of the Sunni practice also had varying denominations, and his denomination was in stark contrast to the Wahabi community and what they were teaching as Islam. (N.T. 10/16 p.148 1.8–25, p. 149 1.1–15).

32. Prior to Plaintiff's complaint and request for accommodations, Defendant Terza was made aware of the differing ideologies and belief that prevented the two faiths from practicing together. (NT 10/16 p.148 1.8–22).

33. The Defendant testified that it was policy of the DOC at the time that Plaintiff made clear the necessity for his accommodation, that there was only to be "one" Islamic community and that the Defendants were not going to deviate from what was DOC policy. (NT. 10/16 p.149 1.11–15).

34. However, Defendant confirmed that there was more than one Islamic group accommodated for (NT 10/16 p.143 1.18–20).

35. Defendant Tanko Ibrahiym was the Islamic Chaplain at SCIP. His duties was to provide Islamic Services to Muslim inmates. (NT 10/17 p.27 1.13–21.)

36. Defendant Ibrahiym verified that the Plaintiff attempted on numerous occasions to participate in what was available to have his religious needs met within what was established. (NT 10/17 p.29 1.4–20).

37. Defendant Ibrahiym spoke with Plaintiff regarding the differences in

practice, belief and curriculum being taught by him and others that those of Plaintiffs faith were deviants. Plaintiff provided him with volumes of literature which Defendant was familiar. (NT 10/16 p.13, p.32).

38. Plaintiff was subsequently instructed by both Defendants Terza and Ibrahiym to file a request for religious accommodation in accordance with DOC policy DC ADM 819. (NT 10/17 p.29 1.14-25).

39. Plaintiff filed two separate request for religious accommodations. One group request giving information to have the group recognized in a accordance with policy, and one individual request. Defendant Ibrahiym stated he did receive the request (NT 10/17 p.29 1.14-25, 10/17 p.41-42) Also Exhibit 1.

40. Witness John Blount was present when Plaintiff provided a "hand written" request form (NT 10/16 p.83, 10/17 p.134 1.9, p.137 1.8-25).

41. Ibrahiym states that the "hand written" form (not the typed submission for group requirement of the policy) was then given to Chaplain Terza. (NT 10/17 p.41-42)

42. Defendant Terza was unaware of the standard form for accommodation provided by the DOC and utilized by Plaintiff that was present in every inmate handbook. (NT 10/16 p.152-153).

43. Defendant confirmed that Defendant Ibrahiym would turn over all accommodations submitted to him (NT 10/16 p.160 1.9-15) and would have processed any he received. (NT 10/16 p.161 1.3-7). However he denies ever receiving the "hand written form" from Ibrahiym. (NT 10/16 p.152 1.17-21)

44. The policy in effect under DC ADM 819 at the time of Plaintiffs request for accommodation included a standard form that stated:

> "If more than one inmate is filing a request, each inmate must submit a form.
> "If this is a group request", information must be submitted to the Facility Chaplain Director, who will compile information about the group request."

45. Plaintiff was asked to attend various meetings after the submission

of the two (individual and group) request regarding the month of Ramadhaan. At these meetings Plaintiff made clear to Defendants Terza, Ibrahiym, Winstead, and Krysevigh that his request for religious accommodations had not been responded to, or processed in accordance with policy. Defendant Krysevigh while in the presence of the above named Defendants acknowledged that they "dropped the ball" on handling the request or responding to them. (NT 10/17 p.134-136)(NT 10/17 p.137 1.18-25, p.134 1.9).

46. Plaintiff was then instructed not to attend the services of the Wahabi community and told to inform those of his faith not to attend services available to all Muslims. The Plaintiff refused and was then threatened with confinement if he failed to do so. (See initial complaint of Plaintiff and NT 10/16 p.24-25.)

47. At the conclusion of this meeting, it was agreed that Plaintiff "would" be permitted to attend and subsequently at another religious service required to walk though a "kangaroo line" of officers and interrogated as to what sect he belong to. (NT 10/16 p.25 and 84)

48. Plaintiff attended and observed inmates instructing classes under the supervision of Chaplain Tanko Ibrahiym teaching that those of the Plaintiffs faith were deviants. (A copy was provided of some materials during the testimony of Plaintiff marked Exhibit no.6)(NT 10/16 p.89-90).

49. During Plaintiffs time at SCIP, other Islamic groups were permitted to teach their faith under the supervision of Defendant Ibrahiym. These groups were allotted time for separate services. Plaintiff was subsequently denied his request for religious accommodation and confined.

50. Defendant Krysevigh justification for Plaintiffs confinement was as a result of Plaintiff "threatening and intimidating through institutional officials to have his group recognized." (NT 10/17 p.123 1.15-20)

51. Though no misconduct was issued against Plaintiff he remained confined

in the RHU for over 2 1/2 years.

52. Defendant Krysevigh confirmed that no staff was threatened or intimidated by Plaintiff. (NT 10/17 p.124 1.1-2). He confirmed that no complaint regarding Plaintiffs behavior ever came from Chaplain Ibrahiym regarding Plaintiffs actions outside of what Defendants Terza and Ibrahiym instructed him to do. (NT 10/17 p.124 1.22-25).

53. However Defendant Krysevigh contradicts himself stating that Plaintiff "did not" intimidate others, but incited them to retaliate against him. (NT 10/17 p.127 1.18-25, p.128 1.1) then concedes this was hearsay. (NT 10/17 p.129 1.9-11).

54. Defendant Stickman testified that while at SCIP he received reports from several "unidentified" inmates as a result of Plaintiff requesting religious accommodation. (NT 10/17 p.145-146). He reported these to Lt. Blakey.

55. Defendant Stickman also testifies that nothing occurred on the night Plaintiff was permitted to attend religious services after the meeting. (NT 10/17 p.146 1.6-20)

56. Both Defendants Stickman and Krysevigh confirmed that the reports were purely hearsay and no reports to security were written by either party though the matter was passed to Lt. Blakey.

57. As a result of the unfiled hearsay reports passed to Lt. Blakey and Deputy Dickson by Defendants Stickman and Krysevigh, Defendants Dickson and Lt. Blakey acted to confine Plaintiff for "alleged group activity" which was/is permitted under DC ADM 819 when regarding religious groups.

58. Defendant Dickson states Plaintiff was issued an "Other Report" and placed in the RHU for "Fomenting unrest in group activity." (NT 10/17 p.98 1.1-3) but could not recall whether there was evidence demonstrating Plaintiff did act in violation of ADM policy or prohibited group activity (NT 10/17 p.101 1.10-25).

59. No misconduct charges were levied against Plaintiff for unauthorized

group activity despite the Defendants strong belief that he engaged in unauthorized group activity or inciting or intimidating unidentified parties. (Krysevigh NT 10/17 p.123 1.15-25)(Dickson NT 10/17 p.101 1.10-25)(Stickman NT 10/17 p.145 1.22-25, p.146 1.1-5) yet Johnson confirmed that it was policy that if an inmate engaged in such activity a misconduct would be issued. (NT 10/17 p.102 1.6-16)

60. Plaintiff was placed in solitary confinement on November 30, 1999 after attending the above mentioned religious services. No misconduct was issued. Plaintiff was not given a hearing, notice of charges, ability to call witnesses, no statement of the evidence relied upon, and no opportunity to present a defense as mandated by DOC policy.

61. Plaintiff continued to file grievances and request to have his religion recognized, clarifying his desire to have the requests processed.

62. Defendant Winstead was the Classification manager at SCIP and supervisor of treatment programs which included the chapel-was present at the meeting on 11/29/99 with Plaintiff, Defendant Krysevigh, Defendant Ibrahiym, and Defendant Terza-responded to the grievance filed by Plaintiff in which he expressed his compliance with all policies and procedures in requesting his accommodation. (NT10/17 p.48 1.7-10)

63. Defendant Winstead was in attendance with Defendant Krysevigh and failed to rectify the staff created failure to process his request for accommodation and in turn claimed Plaintiff had not properly filed his request on the grievance response (See Exhibit no.4)

64. At the meeting of 11/29/99 none of the attending Defendants claimed that Plaintiff incorrectly filed his individual or group accommodation request. (NT 10/17 p.134-137, p.137 at 19-25).

65. Defendant Winstead was familiar with policy ADM 819 (religious

accommodations) and believed she was not party to any determination/review for accommodation (NT 10/17 p.45 1.15–17).

66. Defendant Winstead provided details as to the proper procedure to be followed after a request was filed (NT 10/17 p.54) and justified the denial of the grievance under the pretense that Plaintiff could not file a group request despite the failure of policy to instruct who may, how to file a group request, or if it was permissible. (NT 10/17 p.56 1.1–17). The grievance was subsequently denied under the belief that it was a "group grievance." (NT 10/17 p.57 1.8–24) despite the failure of the grievance to indicate it was.

67. Plaintiff appealed to Defendant Johnson explaining Plaintiff had filed an individual request for accommodation (Exhibit Grievance Appeal of PIT-0997-99) who failed to investigate the matter. He received not only the group request sent to all Defendants at SCIP, but also responded to this grievance without investigation of the claims raised on appeal.

68. Defendant Johnson was notified and aware of the matter from the numerous request forwarded to his office by Plaintiff.

69. After confinement, Plaintiff was required to write a "BEHAVIOR MODIFICATION" contract by Defendants Krysevigh and Dickson enumerating that he would not engage in "certain undefined" religious activities as a prerequisite to his release from confinement. (NT 10/17 p.97 1.11–19, p.108 1.11–20).

70. The DOC does not validate, support, authorize, or promote any "Behavior Modification Contractual Agreement" and never requested any inmate to write one related to their religious activities. (NT 10/17 p.109) and what activity he would/would not engage in.

71. Plaintiff was subsequently transferred to SCIG with a falsified security report indicating he was in possession of weapons as the basis for his confinement. (NT 10/17 p.150)

72. Plaintiff filed grievance no.2673 at SCIG that was reviewed on 9/6/01. It was determined that the security report was erroneous and should be removed from his file, however, Plaintiff remained in solitary confinement.

73. Security concerns at SCIG fell under the supervision of Defendant Captain Coleman (NT 10/18 p.63 1.24-25).

74. Despite the Hearing Examiner determining that the security report alleging Plaintiff was in possession of weapons was false, Captain Coleman upheld the override of Major Lockette and failed to remove the incorrect report.

75. Upon arrival of Defendant Stickman as Superintendent of SCIG, he verified that there was no factual basis for Plaintiffs continued confinement after a years held in SCIG's RHU. (NT 10/17 p.149-150).

76. Upon release on 4/9/2002 Plaintiff was subjected to the teachings by Defendant Muhammad stating that Plaintiff beliefs were deviants.

77. Plaintiff subsequently filed a second request for religious accommodation, requesting the same religious accommodation he had at SCIP.

78. Defendant Muhammad was the Islamic Chaplain for SCIG and admitted in his testimony that it was his duty to inform the inmate population about deviants (NT 10/18 p.48 1.4-16) and gave a sermon about the Habashi belief and community. (NT 10/18 p.51 1.1-9)

79. Plaintiff also attempted to participate in fasting for the month of Ramadhaan and contacted Defendants Moneck who was Head Chaplain at SCIG and Defendant Mears-the Program Manager in charge of all religious services- (NT 10/17 p.7 and p.74).

80. At this meeting, Plaintiff made clear the differences in Plaintiffs faith and that of the Defendant Muhammad. Despite the conflict, Defendants Moneck and Mears failed to investigate the matter any further. (NT 10/17 p.9 1.3-18).

81. As a result of the meeting, Plaintiff was not required to fill out a

contract due to the violation of his beliefs (instituted as a requirement to any inmate upon "his" release since Defendant Muhammad did not want certain individuals in the chapel during Ramadhaan (NT 10/16 p.104-106, and p.100-101).

82. The contract was not utilized amongst any other religious community (i.e Christians, Jews, etc.).

83. Plaintiffs request for religious accommodation was subsequently denied at SCIG claiming that he was able to practice under the supervision and in services held by Chaplain Muhammad and that no other religious services would be permitted for those of the Islamic faith.(NT 10/17 p.14 1.7-13).

84. SCIG provided separate Islamic services for the Nation of Islam, Sunni Community, and Moorish Science Temple.

85. Plaintiff appealed the denial of his accommodation and it was reviewed by Defendant Mears (NT 10/17 p.78 1.15-23 and Exhibit 10) which was standard procedure (NT 10/17 p.82 1.11-17).

86. While Plaintiff continued his appeals and was summarily denied, Defendant Muhammad continued fervently teaching Plaintiffs faith group were deviants and such comments were aired on the institutional prison channel on a regular basis which Plaintiff brought to the attention of Defendant Moneck, Mears, and Coleman (Coleman: NT 10/18 p.65 1-3)(Moneck: NT 10/17 p.23 1.18-25)(Mears: 10/17 p.91 1.10-23 Exhibit 11 and 7).

87. Defendants Mears and Moneck reviewed the video aired and stated that there was no disparaging comments were made (Moneck NT 10/17 p.23 1.18-25)(NT 10/17 p.17, p.24, p.75, p.80, p.83, p.91, 10/18 p.64, p.65).

88. However, Defendant Moneck testified that he did not know what/who or where the comments made by Defendant Muhammad were, nor could he identify them. Defendant was unaware of the identification of Habashi as the group Plaintiff belong to. (NT 10/17 p.24 1-25).

89. Defendant Moneck admitted that he had done no investigation of Plaintiffs beliefs and knew nothing of them(NT 10/17 p.19 1.9-25).

90. Defendant Mears could not recall reviewing the video of Imam Muhammad to determine if he said defamatory/slanderous statements. (NT 10/17 p.80 1.23-25, p.81 1.1).

91. After Defendants Mears and Moneck reviewed the video of Defendant Muhammad, a copy of their rational was provided to Defendant Coleman. (NT 10/18 p.65 12-18)

92. Though Plaintiff complained to Defendant Coleman, Defendant made no independent review of the matter. (NT 10/18 p.65 1-3).

93. As a result of Plaintiffs complaints to outside religious agencies who contacted the administration at SCIG, Plaintiffs cell was searched and associated religious material was confiscated and labeled "STG" or "Security Threat Group" and never returned. (NT 10/16 p.116-118, and 10/18 p.69, 71, 76).

94. As Security Captain, Defendant Coleman oversaw all of the actions within the security department, however he could not recall if the confiscated material seized from plaintiff was reviewed by security or sent to Camp Hill. (NT 10/18 p.71 1.11-17).

95. The following year, Plaintiff again contacted Defendant Mears and Moneck expressing his desire to participate in Ramadhaan. It was made clear by both Defendants that in order to participate in the fast, Plaintiff would have to sign a contract that violated his religious beliefs and make averments that would have amounted to heresy in his religion. When Plaintiff did not sign Plaintiff was not permitted to participate in the fast as required by his faith.

## V. CONCLUSION:

By all the above actions, the Defendants have unconstitutionally promoted and favored other faiths over his, and violated the Plaintiffs rights in the

following matter:

a. By allowing members of Christianity to have a greater variety of services than members of Islam.

b. By directing Plaintiff to attend religious services led by chaplains who have blatantly professed and taught that those of his faith were deviants.

c. By allowing such chaplains and inmates to produce and broadcast throughout the institution(s), videotapes stating not only their beliefs but beliefs about the faith of the Plaintiff specifically, while not affording the Plaintiff the same opportunities with those of his faith.

d. And by granting privileges to members of the Islamic denominations of the Wahabi/Salafi sect, the Nation of Islam, and the Moorish Science Temple that were denied to the Plaintiff.

Plaintiff was in fact confined and transferred for his attempt to practice his religion, due to "expressing" his beliefs just as those of other faiths had, but received punitive results unlike those similarly situated individuals in contradiction to the Equal Protection Clause of the US Constitution.

Plaintiff has suffered irreparable harm as a result of defamation of his character, and been discriminated against in a systematic way by members of the DOC in an effort to deny him his First and Fourteenth Amendment rights.

Defendants refusal to provide Plaintiff with services mandated by his religion, violates the DOC written policy and is in point of fact, superseded by an unwritten policy of only one religious community of Muslims that is applied only when the Plaintiff requested religious accommodations.

This discriminatory application of rules served as an insurmountable obstacle to Plaintiffs acquisition of religious accommodation in any DOC setting.

The acts undertaken by the Defendants were done with the purpose and intent of depriving the Plaintiff of his right to freedom of speech, assembly, due

process, and equal protection that are secured through the US Constitution even in a prison setting according to the First and Fourteenth Amendment.

It has always been the Plaintiffs contention that these actions placed upon him a substantial burden that amounts to an atypical hardship, and cruel and unusual punishment that is violate of the Eighth Amendment contrary to this court's ruling. It has further been the contention of the Plaintiff, that the Plaintiff was deprived of liberty without meaningful due process of law remedy in violation of the fourteenth amendment where decisions were made regarding his confinement that were arbitrary and based on falsified reports as attested to at trial by Defendant Stickman.

Plaintiff has exhausted all administrative remedies available, and found them to be perfunctory to the point of being meaningless, thereby amounting to no real due process in those remedies. This is made evident by the fact that the Defendants not only lied and tried to cover up the truth in the process, but continued to contradict themselves in their own testimony before the court in an effort to justify this arrogantly discriminative behavior with zero regard for the rights of the Plaintiff.

These actions and policies of the Defendants, as described above, are outrageous, intentional, willful, malicious, and have been undertaken with deliberate indifference to the known and clearly established constitutional and civil rights of the Plaintiff.

As a result of their actions it is clear that an award of punitive damages along with all other modes of grantible relief are the only means by which this egregious deprivation of rights may be remedied.

## PLAINTIFF'S BRIEF OF LAW

A. Plaintiff moves before this honorable court under claims that
his 1st and 14th amendment rights were violated. In essence, the
claims are that prison officials violated the establishment
Clause of the U.S. Constitution by allowing persons similarly
situated to the plaintiff to practice their religion in a group
setting as mandated by their religion, while obstructing/denying
his opportunities to do the same. The plaintiff his presented
claims that DOC officials gave preference to other religious
groups and also did not afford him the same in accordance with
the equal protection rights attached thereto.

B. Plaintiff further avers that he was deprived of the Free
Exercise of religion by being confined solely for his attempts to
practice as those similarly situated, where he was confined, and
required to sign a behavior modification contract enumerating
what religious activities he would engage in as a prerequisite
for his release back into general population. This attaches to it
the right to Free Speech which is also guaranteed by the U.S.
Constitution.

C. The Plaintiff further sets forth claims that his Due Process
and equal protection rights were denied in an effort to
discourage his pursuit of constitutionally protected rights.

## CASE LAW IN SUPPORT THEREOF:

" all men have a natural and indefeasible right to worship God
according to the dictates of their own consciences... No human
authority can, in any way whatsoever, control or interfere with
the rights of conscience..." Art. 1. Section 3, of the Pa.
Constitution.

"The printing press shall be free to every person who may
undertake to examine the proceedings of the legislature or "any"
branch of government, and no law shall ever be made to restrain
the right thereof. The free communication of thought and opinions
is one of the invaluable rights of man, and every citizen may

"freely speak", write, and point on any subject, being responsible for the abuse of that liberty..." Art. 1, section 7, Pa. Const.

In this instance it is the policy of the DOC to permit each inmate to satisfy his religious life, consistent with the security needs and orderly administration of the inst. (Pa. Code 37 Sec. 93.6(a) (Also cited as 1 Pa. Code Sec. 93.6(a).

The Pa. Code is an official publication of the Commonwealth of Pa. It contains regulations filed with the Legislative reference Bureau and under the Act of July 31, 1968 (P.L. 769, No. 240) (45 P.S. Sections 1101-1611) The text of the regulations published in the code are declared to be the only valid enforcable text of such a document, 45 Pa.C.S. Section 722 and 901. Courts are required to take judicial notice of the code. (See 45 Pa.C.S. Sections 506 and 507.)

The First Amendment broadly provides that "Congress shall make no law respecting establishment of religion, or prohibiting the free exercise thereof..." U.S. Const. Amend. 1.

Prisoners retain their First Amendment right to free exercise of religion during their incarceration. O'lone v. Estate of Shabazz, 107 S.Ct. 2400 (1987), and the Supreme court has held that prison authorities must afford "reasonable opportunities to exercise that religious freedom guaranteed by the First Amendment. Cruz v. Beto, 92 S.Ct. 1079, 1081.

Prison officials are accorded considerable latitude in matters that involve the orderly running of their institution, and courts ordinarily defer judgment of prison officials in areas such as inmate discipline and inst. security. Bell v. Wolfish, 441 U.S. at 548. However, mere intonation of phrases like "official discretion" or "Security" do not alone insulate conduct of correctional officials from judicial scrutiny.

As the Third Circuit of Appeals noted in Woods v. Marks, 742 F.2d 770 (3rd Cir. 1984), "the policy of deference to the judgment of prison officials does not require that reviewing

courts defer to the arbitrary denial of inmates limited rights"
Id. at 773.

In this instance, the plaintiff has presented evidence and
the court has heard testimony that the plaintiff submitted "two"
separate request for religious accommodation in accordance with
DOC policy then in effect during his incarceration at SCI
Pittsburgh. One being a group request (N.T. 10/16 pgs. 17-19, and
exhibit one) and the other an individual request (10/16 pg. 83,
and 10/17 pgs. 41-42).

Unfortunately, neither request was ever responded to in
accordance with the policy while at SCI Pittsburgh.

At SCI Green the plaintiff continued to his request for
recognition of his faith by filing another request for religious
accommodation in accordance with policy. This one was processed
and denied on the basis that the plaintiff could practice in what
was already available while knowing that the contract chaplain
was not of his faith and deemed him to be a deviant according to
his own recorded sermons.

In Allah v. Menei 844 F. Supp. 1056 (E.D. Pa. 1994) we find
a situation very similar to the plaintiff's for a number of
reasons that govern the handling of his request in both
institutions.

In it the policy then in effect at the time of Plaintiff's
filing of a group request, and individual request while at SCI
Pittsburgh is enumerated.

In that case, a group called the Temple of Islam attempted
to have separate services from another muslim group called the
Nation of Islam because of ideological differences in their
beliefs and practices. The plaintiff's subsequently filed a
"group" request for religious accommodation in accordance with
DC-ADM 819 just as the plaintiff had in this case, and were
summarily denied since it was the DOC's contention that the
"Temple of Islam and the Nation of Islam are religiously
identical" Id. at 1060 II.

This is relevant to the matters before this court in that:
1. The group request which they had submitted was essentially the

same as the plaintiff's group request. But in this case, it was
claimed that a group request is not permitted to be filed
according to the policy and therefore never filed while at
Pittsburgh.

2. The contention that the plaintiff could practice with those of
the Wahabi/Salafi sect has been made because, as in the Allah
case, the defendants claim that both groups are essentially the
same.

In that case, the court began by taking a look at the
recognition of the competing interests in accordance with
Thornburgh v. Abbott, 490 U.S. 401, 407, 109 S.Ct. 1878, 104
L.Ed. 458 (1989)

It did so concluding as a previous court had in Weaver,
675 F.2d. at 119.

As the Weaver court noted:

.... the state must do more than simply offer conclusory
statements that a limitation on religious freedom is required for
security, health or safety in order to establish that it's
interests are of the highest order."

Here, the defendants have not made the allegation that the
request was denied for penological reasons regarding security.
They claim that the reason for the denial was that the request
was not properly filed in the case of the Pittsburgh defendants.
But the DOC in the instance of the Allah case, acknowledged that
a "group" request "could" be filed by the very act of processing
it in accordance with the policy, and denied it on other grounds.
In that case they use the second subsequent argument of the
defendants at SCI Green, which also did not stand judicial
muster.

In that instance, the court held: "There is a constitutional
difficulty in the state deciding whether 2 different religious
beliefs are essentially the same. (Allah v. Menei 844 F. Supp.
1056)

In that case, the courts made clear that, "There is a long
established policy of not picking and choosing among religious
beliefs." Welsh v. United States, 398 U.S. 333, 338, 90 S.Ct
1792, 1795, 26 L.Ed.2d 308 (1970); U.S. v. Seeger, 380 U.S. 163,

175, 85 S.Ct. 850, 858-859, 13 L.Ed.2d 733 (1965); see also Allegheny County v. Greater Pittsburgh A.C.L.U., 492 U.S. 573, 593, 109 S.Ct. 3086, 3101, 106 L.Ed.2d 472 (1989): (Government may not convey message that a particular religious belief is favored or preferred.)

The plaintiff therefore contends that this policy of allowing groups to request accommodation according to the policy had not changed at the time of the plaintiff's filing in the first instance, and therefore should have been deemed validly filed and processed since the form that was provided to every inmate at the time of the plaintiff's request clearly stated:

"If this is a "group request", information must be submitted to the Facility Chaplaincy Program Director, who will compile information about the group request." (DC-ADM 819 Inmate religious Accommodation Request Form also referred to as a DC-52 form in plaintiff's exhibit 2 at trial)

Furthermore, under DC-Adm 819 G. Recognition of Faiths then in effect, it states:

1. requests for recognition of faiths that are not well known will be handled as follows:

a. The inst. Chaplaincy Program Director will secure written information from the recognized outside faith group authority, including publications which describe the goals, beliefs, and practices of the "group".

b. All such material will be forwarded to the Administrator of Religion and Family Services who will determine the authenticity and religious needs of the "group".

At SCI Pittsburgh this was never done. Instead, the plaintiff was placed in solitary confinement for nearly a year and a half at that institution for allegedly "fomenting" hate, and "threatening through staff by seeking to have his religious group recognized." (N.T. 10/17 at pg 123) The defendants failed to present any proof/or reports in support thereof other than their claims that this was rumored through unknown sources that cannot be verified by anyone.

This brings forth the argument of violations of free speech, equal protection, due process, the right to redress

grievances against the government, and violations of the
establishment clause which are now before the court for the
following reasons.

a. Plaintiff has presented evidence and the court has heard
evidence that individuals of the Wahabi sect, Nation of Islam,
and Moorish Science Temple were all permitted to practice their
faiths collectively and in a group setting while the plaintiff's
weren't even processed to obtain such at SCI Pittsburgh.

b. The Wahabi community, who also consider themselves Sunni
muslims were specifically permitted to teach a curriculum that
espoused that those of the plaintiff's faith were deviant in both
penological setting at SCI Pitt. and SCI green. (Sermons labeling
the plaintiff's faith group deviants were even broadcast on the
prison channel on a regular basis for the entire inmate
population to view at SCI Green.)

c. The plaintiff was allegedly confined for not wanting to pray
behind an individual according to defendant Krysevigh (N.T. 10/17
pg. 128 lines 5-14), fomenting hate and a threat, specifically
for plaintiff's "effort to gain your (i.e. plaintiff's)
permission or whatever to practice your religion." according to
deputy Dickson (N.T. 10/17 pg. 100 at lines 11-12)

    According to these defendants, the plaintiff was creating a
threat to himself by expressing his views regarding their
differences in beliefs to "staff in an effort to get
accommodation", and as a result, was placed in solitary
confinement.

    The plaintiff was obligated to bring these matters to the
attention of staff in order to get his accommodation, and never
presented his opposing beliefs to another inmate as the other
inmates were permitted to do against members of his faith.

    This contradicts the well established premise of not giving
preference of one religion over another as enumerated in
allegheny County v. A.C.L.U, 109 S.Ct. 3100 which states:
" ..... the states may not "promote one religious theory against

another or even against the militant opposite.: Id.

In point of fact, the government may not favor one
legitimate faith group over another or question the rationale of
honestly held beliefs. Wallace v. Jaffree, 472 U.S. 38, 53, 105
S.Ct. 2479, 2488, 86 L.Ed.2d 29 (1985) (Citing Everson v. Board
of Education, 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711
(1947); U.S. V. Balard, 322 U.S. 78, 86, 64 S.Ct. 882, 886, 88
L.Ed. 1148 (1944)

In Everson v. Board of Education of Ewing, 330 U.S. 1, 67
S.Ct. 504, 91 L.Ed. 711 (1947) the courts held:
"The establishment of religion clause of the First Amendment mean
at least this: Neither a state nor the federal Government can set
up a church. Neither can pass laws which aid one religion, aid
all religions, or "prefer one religion over another". "Neither
can force nor influence a person to go to or remain away from
church against his will, or force him to profess a belief or
disbelief in any religion. NO PERSON CAN BE PUNISHED FOR
ENTERTAINING OR PROFESSING RELIGIOUS BELIEFS OR DISBELIEFS, for
church attendance, or non-attendance. No tax in any amount may be
levied to support any religious activities or inst., whatever
they may be called, or whatever form they may adopt to teach or
practice religion. Neither a state nor the federal government
can, openly or secretly, participate in the affairs of any
religious organizations or groups and vice versa" id. at 15-16,
67 S.Ct., at 511-512.

Here as in the Allah v. Menei case, the defendants'
position appears to favor the Wahabi/salafi sect over the
Habashi/Ashari/Shafi'i. The Wahabi sunnis were a recognized faith
group both at Green and Pittsburgh. The defendants have barred
recognition of the plaintiff's faith group, a faith group that
the plaintiff has established is clearly different from the
Wahabi community.

The defendants have attempted to assert that prison

officials may judge whether the plaintiff honestly believed
contention of difference between his faith and those of the
Wahabi are correct. The government has a constitutional obstacle
to making any such judgments. Ballard, 322 U.S. 78, 86-86, 64
S.Ct. 882, 886-887, 88 L.Ed. 1148 (1944); U.S. v. Seeger, 380
U.S. 163, 184-185, 85 S.Ct. 850, 863-64, 13 L.Ed.2d 733 (1965);
Lemon v. Kurtzman, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29
L.Ed.2d 745 (1971)

They presented unproven and opinionated testimony that
the plaintiff was attempting to be a leader and that this was
their problem, not the problem with his religious requests at
Pittsburgh as an alternative excuse for his confinement. However,
policy is in place that precludes any of this from ever happening
since inmates aren't allow to run services in the first instance,
and in the second instance, the plaintiff would argue that he had
individuals from the Islamic Supreme Council stating that "they"
were willing to come in and run the services for his group in the
second.

They appear to also question whether the plaintiff held
bona fide beliefs according to his faith as exhibited by the
testimony of defendant Krysevigh (N.T. 10/17 pg. 127) at lines
7-14.) He goes on to state that the plaintiff became a threat to
security by how plaintiff was going about getting his
accommodation at (N.T. 10/17 at pg. 129 line 1).

This brings forth the matters of protected speech.
Plaintiff does not contend that those of the Wahabi sect are not
entitled to express their views regarding differences in their
faith and his. The plaintiff merely contends that he was not
granted the same protections. Plaintiff avers that the defendants
acted to restrict religious expression and this strikes at the
very heart of the First Amendment. See: Gibson v. U.S., 781 F.2d
1334, 1338 (9th Cir. 1986); 479 U.S. 1054, 107 S.Ct. 928, 93
L.Ed.2d 979 (1987).

Furthermore, it was the criticism of the DOC officials
failure to comply with policy regarding his request for
accommodation, and their discriminatory practices that resulted

in the plaintiff being confined. There is no question that plaintiff has a protected interest in criticizing public officials in matters of public concern. See: McKinney v. City of Eloy, 705 F.2d 1110, 1113 (9th Cir. 1983)

They not only took this action, but attempted to undermine the grievance process by failing to investigate, purposely denying, obfuscating, ignoring, mischarachterizing, and failing to act on known wrongs in their responses, and in this instance, intentionally obstructed the right of the plaintiff to seek redress. This is precisely the sort of oppression that section 1983 is intended to remedy. See: franco v. Kelly, 854 F.2d 584, 589 (2nd Cir. 1988); Harrison, 780 F.2d at 1428.

Here the plaintiff makes the argument that he has a protected interest that required procedural due process that is "more than perfunctory". In this case the defendants have made it clear that it was then the DOC's "unwritten policy" that they would recognize only "one" Islamic community in every institution, (Even though this is contradicted by the numerous services held for anyone but the plaintiff's community.) As this was the case, this would mean that "any" request made by those within a particular faith group who are not being accommodated, could not be recognized as a distinct and separate faith regardless of how valid their faith may be within a particular religion.

As a result, the policy of requesting religious accommodation presented into evidence, and the Pa. Code enumerated above would be underminded by an unwritten policy and practice. This is even more relevant in light of the fact that this policy seemed to only apply to the plaintiff and his faith group since there were other faith groups of the Islamic community allowed to practice just as there were christian groups who each had separate services who were not bound by this policy at both institutions. As such, the plaintiff has set forth the claims of discrimination and preference clearly, according to the defendant's own testimony.

It is necessary that the plaintiff make clear that in the

case of Green and Pittsburgh, that the process of filing a request was meaningless and as such they have deprived the plaintiff of his fundamental rights under the color of state law. Section 1983 provides a remedy against "any person who, under color of state law, deprives another of rights protected the constitution. In Monell, the court held that Congress intended municipalities and other local government entities to be included among those to whom 1983 applies. 436 U.S. at 690, 98 S.Ct. at 2035.

As such, issues of Due Process may be raised to determine whether a violation of the process has occurred.

The due process clause of the 14th Amendment provides: "Nor shall any state deprive any person of life, liberty, or property without due process of law."

In Wolff v. McDonnell, 418 U.S. 539, 558, 94 S.C. 2963, 2975, 41 L.Ed.2d 935 (1974) the courts held that "The touchstone of due process is protection of the individual against arbitrary action of the government." See also: Dent v. West Virginia, 129 U.S. 114, 1123, 9 S.Ct. 231, 233, 32 L.Ed. 623 (1889).

Here the plaintiff has set forth claims that the government acted arbitrarily and deprived him of constitutional rights, "and" when they feigned granting due process, made it clear that the process was meaningless since the decision had been made prior to the process. Or in the alternative, blatantly underminded the process knowingly. This would be equivalent to going to trial with a jury who has already reached a judgment of guilty in one instance, or in another, had a judge, jury, and prosecutor who were all conspiring to convict and deny an individual justice.

The courts have ruled this to be blatantly unconstitutional when it said:
"By requiring the government to follow appropriate procedure when it's agents decide to deprive any person of life, liberty, or property, the due process promotes fairness in such decisions.

And by barring certain government actions regardless of the
fairness in such decisions, serves to prevent government power
from oppression. Murray's Les v. Hoboken Land & Imp. Co. 474 U.S.
332; Daniels v. Williams 106 S.Ct. 662, 474 U.S. 327 (1986).

The deprivations which the plaintiff claims go beyond
"respondeat superior". Here you have the highest levels of a
prison working in conjunction with their subordinates to attempt
to cover up errors of staff as in the case of SCI Pittsburgh and
Green. All of the defendants knew exactly what was going on at
the highest levels and played a direct role in the deprivations
claimed before this court by their own admissions.

The law is clear that supervisors can be liable for their
personal involvement in a constitutional violation, or "when
their corrective inaction amounts to deliberate indifference to
or tacit authorization of the violative practices" (Williams v.
Willits, 853 F.2d 586 (8th Cir. 1988) noted in  Fruit v. Norris
905 F.2d 1147 (C.A.8 (Ark.) 1990)

These actions were implemented from the top down contrary
to claims of the defense. It is the duty of staff in a
correctional setting to know everything that is going on.
Defendants would have this court believe that in one instance
they didn't know what was happening and in the next instance they
know everything when it appears convenient. People can't just
sign for an individual staff member in any correctional setting
without that staff member being apprised of what actions their
representatives took. If it is deemed the erroneous actions were
taken, it is their responsibility to correct those errors.

Therefore, in this instance the plaintiff reiterates that
these claims are not premised on resondeat superior, but on a
recognition that supervisory indifference or tacit authorization
of subordinates misconduct was a causative factor in the
constitutional injuries that have been inflicted upon an
individual in their care. See: Slakan v. Porter, 737 F.2d 368,
373 (4th Cir. 1984) cert. denied, 470 U.S. 1035, 105 S.Ct. 1413,
84 L.Ed.2d 796 (1985), (quoting) Opriano v. Johnson, 632 F.2d

1096, 1101 (4th Cir. 1980), 450 U.S. 929, 101 S.Ct. 1387, 67
L.Ed.2d 361 (1981).

QUALIFIED IMMUNITY:

The defendants have requested this court review the matter of a Qualified Immunity Defense, prior to entering any judgment. Qualified immunity shields state officials performing discretionary functions from suit for damages in their individual capacity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Wilson v. Layne 526 US 603, 609, 119 S.ct 1692, 143 L.ed.2d. 818(1999) (Quoting Harlow v. Fitzgerald 457 US 800, 818, 102 S.ct 2727, 73 L.ed.2d. 396 (1982)). Defendants are entitled to qualified immunity only if the court can conclude, based on the undisputed facts in the record, that defendants reasonably though perhaps mistakenly, believed that their conduct was lawful in light of the clearly established law and the information known to them at the time of the alleged constitutional violation. Mantz v. Chain 239 F.Supp.2d. 486, 496 (D.N.J. 2002).

However, the defendants are now presenting a possible defense that was not advocated on any of their previous response briefs, or claims. They are requesting this court-post summary judgment-provide it with relief where the court is now to consider the facts of the matter and render a decision thereof.

While the qualified immunity defense is frequently determined by the courts as a matter of law, a judge should decide disputed factual issues relevant to that determination Karnes 62 F.3d at 491. The trier of fact is to render a decision of disputed issues of credibility related to qualified immunity, but not qualified immunity itself. Curley v. Klem 499 F.3d 199 (C.A.3 NJ 2007).

For the defendants to raise a defense of Qualified immunity at this stage of the proceedings is a prejudicial move against the plaintiff and

his claims. Qualified immunity is immunity from suit rather than mere defense to liability, any claims to immunity are to be resolved at earliest possible stage in litigation before any other action is taken by the district court. Swanson v. Culberson 925 F.supp 478 (Tex 1996).

The question of a qualified immunity defense should have been answered at Summery Judgment stage where the court could have reviewed who claims that the absence of factual dispute on one or more of the issues or the applicability of any available defenses would eliminate the need to send those issues to the jury.

Summary Judgment is the stage where the defendants could have entered their defense of qualified immunity. It is the proceeding designed to effect a prompt disposition of controversies on their merits without resort to a lengthy trial. The defendants sought no refuge in a defense of qualified immunity and resolved themselves strictly to questions of law/facts before the court. Therefore the defendants can not bring a new dispute before the court at this time.

Under Rule 56 of FRCP it provides that summary judgment may be granted only when the evidence contained in the records shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Serbin v. Bora Corp 96 F.3d 66, 69 n.2 (3rd Cir 1996) In determining whether there remain any actual issue of factual dispute, the court must resolve all reasonable doubts in favor of the non moving party. Matsushita Elec. Indus co. v. Zenith radio Corp 475 US 574, 106 S.ct 1348, 89 L.ed.2d 538 (1986); Meyer v. Riegel Prods 720 F.2d 303, 307 n.2 (3rd Cir 1983). At summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v.

liberty Lobby Inc. 477 US 242, 249 106 S.ct 2502, 91 L.ed.2d. 202 (1986).

Once the plaintiff set forth a prima facia case for 1983 violation, the court was to determine which of the defendants, if any, are entitled to immunity for their actions. The United States Supreme Court has emphasized the importance of resolving immunity questions at the earliest possible stage in litigations because "the entitlement is an immunity from suit rather than a mere defense to liability." Hunter v. Bryant 502 US 224, 227, 112 S.ct 534, 116 L.ed.2d. 589(1991) (quoting Mitchell v. Forsyth 472 US 511, 526, 105 S.ct 2806, 86 L.ed.2d. 411(1985)).

Qualified immunity issue should be resolved at the earliest possible stage of litigation. Spiegel v. City of Chicago 920 F.supp 891, affirmed 196 F.3d as amended rehearing denied, certiorari denied 120 S.ct 2688, 530 US 1243, 147 L.ed.2d 961. The resolution of the defendants usage of this defense should have been done at the earliest convenience which would have been Summary Judgment. FRCP Rule 12, 56. and done pursuant to that rule. The defendants are attempting to inject a "new issue/defense" that was not previously litigated at any hearing.

Since the defendants did not advocate their defense of qualified immunity at the earliest convenience for the sake of the plaintiff and the court, they have waived their right to such defense. The concept of animating a qualified immunity defense at the last possible minute violates the entire judicial process and should be prohibited. The question should have been resolved earlier and would have if the defendants raised the issue before the court as required by law. Harlow v. Fitzgerald 457 US 800, 102, S.ct 2727, 73 L.ed.2d. 396 (1982). Had the defendants raised this earlier, they would had the ability not to stand trial.

Consideration of applying qualified immunity at this stage should be

prohibited by this court. The mere introduction of the concept by the defendants now violates the Rules of Federal Procedure. Worse it creates a substantial burden for the plaintiff to now have to respond to the plaintiffs "new defense strategy" when this matter should have been covered prior to trial. The defendants actions place the burden upon the court where they have purposely exhausted court resources only to subsequently claim immunity.

The defendants action is a grasp at straws at most. They are attempting to derail the process of justice which the plaintiff is entitled to as a result of the facts that have arisen from trial that the defendant are indeed liable. The defendants had their opportunity to prove that they were not liable failed miserable and waived the qualified immunity defense. Their blatant actions of deprivation of the plaintiffs constitutional/statutory/institutional rights became evident and was even admitted by the defendants at trial To provide them with an excuse to escape their liability and justify their actions now would corrupt the entire judicial process.

Therefore, the defendants are not entitled to raise the shield of qualified immunity at this stage in the proceeding. This matter should have been done at the earliest convenience providing all parties an opportunity to review and weigh the rational during or post summary judgment. Since the defendants have failed to raise this issue prior to trial, they are hereby barred from raising it now for the court to consider.

## DEFENDANT LIABILITY:

Defendant Johnson:

Defendant Johnson is liable in that he was the Superintendent of SCI Pittsburgh. As such it was his duty to oversee all operations pertinent to the orderly running of that institution. He is liable in that he played a direct role in the violations of the plaintiff's original and subsequent amended complaints in the following manner.

Plaintiff submitted a group request for religious accommodation in accordance with DOC policy that defendant Johnson verified he received in his testimony.

He at no time ever endeavored to forward that request to the proper individuals for filing, or instructed any of his subordinates to file said request in accordance with policy.

Instead, he ignored this request in contradiction to policy.

Furthermore, the plaintiff responded to grievance #Pitt-0997 (Exhibit 4) since in accordance with policy, the superintendent of each institution oversees all second level appeals grievances. It is his duty to carefully review and evaluate each complaint before him without prejudice.

In the instance of the above mentioned appeal submitted by plaintiff, it clearly states that the plaintiff had not only filed a request as a group for those of his faith, but also filed an individual request. However, instead of investigating the claims made in that appeal, the defendant dismissed the appeal claiming that it was not filed in a timely manner. This contradicts the policy which clearly states the time within which a grievance appeal must be filed. The plaintiff did file in a timely manner according to the testimony given and yet the defendant failed to respond in a direct effort to avoid the errors on the part of staff in handling his religious requests.

As such, this violates the plaintiff's 14th Amendment rights

and makes the defendant liable in that he had a duty to investigate the claims of the plaintiff in a meaningful manner rather than just claim an unfounded procedural error. Defendant Johnson failed to at least claim that it could have been a mistaken judgment, and therefore borders on incompetence and a deliberate act by the defendant.

Hence, qualified immunity is unavailable to the defendant where his actions violated a statutory right that was clearly established at the time of the claimed violation and cannot be considered a good faith fulfillment of his responsibilities as he had no excuse of the error.

Secondly, it should be noted that the defendant was also responsible for the second level of appeals regarding the plaintiff's confinement. In that instance the plaintiff sent the defendant a complete written statement of his version of evens which also enumerated the actions he had taken in regard to his religious accommodation. Therefore, plaintiff had two instances within which he could have investigated these claims and took no action.

In a third instance, the plaintiff sent the defendant request slips regarding this matter and claimed that the issues were being looked into, but never took corrective action. (See attached exhibits) Therefore, he is liable in that he knew very well, the claims of the plaintiff that are before this court and took no corrective measures to rectify the matter.

Defendant Krysevigh:

Defendant Krysevigh is liable in that he also acknowledged receipt of said group and individual requests for religious accommodation in accordance with the policy. He further testified that he was aware of the fact that an error had been made in the processing of the plaintiff's requests. Instead of rectifying the error, the defendant acted with deliberate indifference to plaintiff's requests and has not stated any action that he took to correct this matter except to report to security that the plaintiff was creating some type of disturbance (that have yet to

be substantiated in any concrete manner).

He subsequently sat on the plaintff's Program Review Committee board while the plaintiff was in confine and requested that the plaintiff write out a "contract" expressing what actions the plaintiff had engaged in that were violative of DOC rules, and what religious actions he would not engage in as a prerequisite for his release for confinement. This was done according to the defendant as a form of behavior modification that had never been used on any individual prior to the plaintiff's confinement.

The defendant testified that there was no policy in effect authorizing such techniques against inmates as a prerequisite for release from confinement.

What magnifies the defendant's liability is that he testified that the plaintiff brought to the attention of him (i.e. Krysevigh), Rhoda Winstead, and Chaplains Terza and Ibrahiym, at the meeting  two very important facts:
1. That the plaintiff had submitted an individual request for accommodation "and" a group request as instructed by staff, and that these were never processed.
2. The fact that there were those of the plaintiff's faith, which differed from defendant Ibrahiym's faith, that were not being accommodated on any level in that institution while the Wahabi/Salafi sect, Nation of Islam, and Moorish Science Temple were permitted to practice their religion in separate services as mandated by their faith, while he was not being accommodated.

Hence, the defendant is liable where he inhibited plaintiff's ability to practice his religion by "limiting" the profession of his religious via confinement, denying the plaintiff due process knowingly and intentionally, discriminating against the plaintiff through the denial of equal protection, and unconstitutionally abridging the plaintiff's rights.

The defendant has direct personal involvement and knowledge of every violation undertaken and as such must be held liable in his individual and official capacity.
Defendant Dickson:

Defendant Dickson is liable in that he also testified as
to his awareness of the plaintiff's requests for religious
accommodation. He also sat on the review board during the
plaintiff's confinement and participated in the request of the
plaintiff to write out a contract. This contract would have been
used to limit plaintiff's profession of his religion and curb his
actions in pursuit of accommodation. The defendants would have
utilized the coerced contract to restrict/ justify confinement of
the plaintiff for advocating his beliefs and would have been used
as a justification in the future if he advocated his beliefs in a
manner that they did not like.

The defendant was in charge of "all" security matters as
it related to SCIP. He was directly connected to the plaintiff's
confinement. According to his own testimony he has made the
unfounded claim that the plaintiff was fomenting hate. The
defendant could not point to one instance, documented report, or
place where the plaintiff engaged in these activities. On the
contrary, there "is" testimony that under the supervision of
Chaplain Ibrahiym, it was being taught that those of the
plaintiff's faith were deviants.

As a result of plaintiff's request for separate services
and "their" (the Wahabi's alleged) complaints, the plaintiff was
confined through the office of security, of which the defendant
was the supervisor, in an effort to deny him due process, and
those rights congruent with the 14th and 1st amendments.

The defendant is liable in that, not only was the
plaintiff confined for a year and a half at SCIP, but he was
confined again upon transfer to SCI Green on the basis of a
falsified security report alleging that his original confinement
at SCIP was for being in possession of illegal weapons. This
resulted in the plaintiff being confined upon arrival at SCI
Green and remaining confined for another year unjustly. As this
was based solely on falsified reports under the defendants
supervision, he is responsible in the he personally testified
that he reviewed "all" security reports and prepared them prior

to transfers. Therefore, it could only be construed that he knew this false report existed and did not correct it along with all of the other errors that the plaintiff avers.

Defendant Dickson was well aware of the errors made in plaintiff's requests for religious accommodation as they had been discussed in his presence numerous times at PRC. Therefore, he acted willfully and maliciously in total disregard for the rights of the plaintiff. As such, he is not eligible for qualified immunity due to the actions he took in violating the plaintiff's rights.

Defendant Rhoda Winstead:

Defendant Winstead attended the meeting mentioned in testimony regarding the issues of Ramadhaan at SCIP. This was required since it was her specific duty to supervise and oversee all programs related to SCIP as the Program Manager of that institution. (This included all religious programs)

She was present when the plaintiff raised the question of why his "two" requests for religious accommodation were not responded to. She heard defendant Krysevigh clearly state that they had erred in not processing the plaintiff's requests.

It would have been her duty at that time, as supervisor of all chaplaincy issues, to investigate the matter and rectify it. Instead, she blatantly lied, and claimed that the plaintiff had not filed the requests correctly on her grievance response when the plaintiff attempted address these issues.

Deputy Krysevigh testified at trial that the plaintiff had brought this matter to his (Krysevigh's), Rhoda Winstead's, Chaplain Terza's, and Ibrahiym's attention at the meeting that he had not only filed a group request, but also an individual request. This testimony was further corroborated by defendant Ibrahiym.

Instead of taking corrective action in regard to the plaintiff's grievance, the defendant acted with deliberate

indifference to the plaintiff's requests and grievance asking to have his request processed in accordance with policy. Instead, she falsified statements to undermine the process which makes her liable in her official and individual capacity.

As such, the defendant is not eligible for the defense of qualified immunity in that she acted knowingly and intentionally to deprive the plaintiff of his rights.
Defendant Ibrahiym:

Defendant Ibrahiym is liable in that he was contracted as the Islamic Chaplain for SCIP. As such, he oversaw all Islamic affairs as it related to that institution.

Plaintiff submitted both a request for group religious accommodation and an individual one directly to him. Defendant Ibrahiym testified that he in turn submitted those requests to his supervisor Chaplain Terza. He was well aware of the fact that defendant Winstead had claimed he had not filed these requests properly in that the plaintiff spoke to him regarding this matter during his visits to the RHU where he was confined. He took no corrective steps to rectify this situation.  The defendant also knew that each and every act that he took was under his specific instruction. He knew that the plaintiff had never disrupted any of the services he attended and to his knowledge had never been threatening or threatened in any way. He could he made this known to his superiors, and chose not to.

Furthermore, he participated in the denial of plaintiff's rights in that he informed Chaplain Terza that those of the Habashi faith could be provided for within the services of the Wahabi while at the same time knowing that the Habashi were not of the same faith as he had taught a curriculum to that extent claiming that they were deviants.

By his actions he is liable in that he acted to obstruct the plaintiff's rights by his actions and by his deliberate indifference to the plaintiff's constitutional rights.

As such he is not eligible for the defense of qualified

immunity in that he knew of the discrimnatory practices on the
part of staff and participated in them, and knew of contradictory
policies being applied to plaintiff and not to other groups.
Instead of addressing this matter he tried to implement them with
total disregard for the plaintiff's rights.
Defendant Terza:

As supervisor, Defendant Terza oversees the activities of
the chapel and is responsible for it's operation and filing of
religious accommodations. The defendant is liable in multiple
instances where his actions prejudiced or prevented plaintiff
from exercising his 1st and 14th amendment rights. As supervisor,
the defendant is required to be familiar with all religions and
the process in filing a request for accommodations pursuant to
DOC policy.

Defendant Terza was given a group and individual request
for accommodation by defendant Ibrahiym, but failed to review
them. Complications arise where the administrative staff (i.e.
defendant Krysevigh) was aware of the filing and recognized that
an "error" was made in their process in Mr. Terza's presence.

Defendant is liable for the failure to process the
plaintiff's accommodation forms and then claiming that the
plaintiff never submitted any in an attempt to prevent and
obstruct the plaintiff's pursuit of religious accommodation.

Furthermore, the defendant met with defendant Ibrahiym
and discussed the plaintiff's beliefs prior to the meeting
regarding Ramadhaan procedures, and after having received the
individual request for accommodation. However, defendant Terza
knew nothing of the plaintiff's religion nor did he make any
effort to understand anything about them. Subsequently, he
entered a determination on the accommodation without having any
understanding of the plaintiff's religious needs.

This act violates the plaintiff's 1st and 14th
amendment rights. The defendant failed to administer a fair and
impartial hearing/ review and thereby violated the plaintiff's

due process/ equal protection rights. Instead, he attempted to implement the policy of only one muslim community in disregard for the plaintiff's rights. Furthermore, there can be no true process of review when the decision is already predetermined.

Defendant Terza claimed that the plaintiff utilized incorrect forms in another attempt to justify the denial of his accommodation, however, he was unable to identify the form which appears in the DOC Inmate Handbook which instructs inmates to copy and utilize in their filing of accommodations.

Defendant also denied the plaintiff's group request claiming that the plaintiff incorrectly submitted it. However, plaintiff simply followed the instructions provided on exhibit 2 and those of defendant Ibrahiym, which directed him to deliver the information to him and that he would forward it to the Facility Chaplaincy Director (Defendant Terza).

Defendant Terza is therefore liable under the 1st and 14th amendment in the three counts alleged. The defendant placed a substantial burden on the plaintiff's religious exercise by:
1. failing to full understand the group accommodation process.
2. By denying the plaintiff's request based on his misunderstanding of the rules.
3. His failure to review the requests through fair and impartial eyes.

The defendant had a personal involvement that through his personal direction deprived the plaintiff of his rights. As a supervisor, the defendant played an affirmative role that removes any qualified immunity defense. The facts show that the defendant denied/ obstructed the plaintiff's Constitutional rights under the 1st and 14th amendment that were clearly established and expressed in the DOC policy which affords due process protections as well as equal protection safeguards.

The Defendant's actions cannot be reasonably construed to

have been in good faith fulfillment of his responsibilities where bias and clear disregard for the plaintiff's religious beliefs existed. Therefore, the defendant is liable in his official and individual capacity.

Defendant Stickman:

As the former Deputy of SCIP and Superintendent of SCI green, the defendant had direct knowledge of all the claims raised herein, and direct participation. While at SCIP, the defendant claimed that he also got a copy of the plaintiff's group request. He took no actions to forward this request for processing, nor did he take any action to investigate the claims of the plaintiff.

The defendant does make the claim that he heard rumors regarding the plaintiff's actions from individuals who were unidentified. He then passed "this" information on to security. However, at no time did he ever file any reports to staff in accordance with DOC policy regarding confidential source of information reports to staff that would have enumerated the reporting inmate, the specific actions engaged in, and where the actions had occurred.

The defendant is liable here where he violated the plaintiff's 14th amendment right in failing to follow the due process requirements that mandate him to carry out the above stated procedures. Especially since these hearsay claims were used to directly impede the plaintiff's constitutional pursuits.

Defendant Stickman is liable in that he was well aware of plaintiff's pursuits for religious accommodation in "accordance with policy", and chose to "not" follow policy as a mean to deny plaintiff of his constitutional rights.

Defendant Stickman is therefore liable in that he

unlawfully imposed a substantial burden on the plaintiff's constitutionally protected pursuits in an effort to hinder the plaintiff through confinement while at SCIP when he expressed his religious beliefs.

Therefore, the plaintiff is not eligible for qualified immunity in that instance regarding the claims against SCIP defendants.

Upon arrival at SCI Green, the plaintiff "is" credited with verifying that the security report upon which he was confined was not factual. However, the defendant then knowing the difficulties that the plaintiff had gone through, failed to act again in granting religious accommodation.

Instead, he makes the claim that he wasn't present when the vote sheet was passed around. However, as stated previously, he would have been well aware of any instances in which someone had acted in his steed and could have taken corrective action to rectify any matters that had been presented to his office. Rather than do so, he allowed the deprivations of the plaintiff's rights to continue and as such he is liable as well in his individual and official capacity.

Defendant Coleman:

Though defendant Coleman was not a party to the request for religious accommodation vote, he was well aware of the plaintiff's requests prior to arriving at Green and upon arrival at Green. (See: Attached Exhibits)

It was his duty to review and oversee "all" matters of security. In this instance, the defendant knew that the plaintiff was being confined on pretenses that were unfounded since it would have been his office's responsibility to verify all security reports. The plaintiff filed a grievance that was initially substantiated by the grievance coordinator regarding claims of his being caught in possession of weapons.

Subsequent to that, the defendant's office over rode the initial ruling and left this false report in the plaintiff's file to justify his confinement for a year.

When the plaintiff was released and submitted his requests
for religious accommodation in SCI Green, he ended up
experiencing the same discrimination and disparaging remarks from
staff. This time it was via the institutional channel as well as
interaction with other defendants as before. When the plaintiff
reported this matter to defendant Coleman, it was concluded that
the same alleged inflammatory remarks that the plaintiff had
allegedly been confined for at SCIP were allowed to be said at
SCI Green since they were said by staff. Therefore, the defendant
acted in deliberate indifference to the plaintiff's equal
protection rights.

The defendant also went a step further upon receiving the
plaintiff's complaint and letters from the Supreme Council
regarding his faith. The plaintiff instructed officers to shake
down the plaintiff's cell and confiscate all materials regard his
beliefs. This was done under the guise that the plaintiff's
religious belief were considered a security threat group. The
plaintiff was never given these material back and they were not
ever sent to Camp Hill for processing.

By all of these actions, the defendant is liable in that
he too worked to impede the plaintiff's constitution pursuits and
show deliberate indifference to the rights of the plaintiff.

Therefore, he is not eligible for the defense of qualified
immunity.

Defendant Moneck:

Defendant Moneck reviewed the plaintiff's request for
religious accommodation and entered a decision denying the
plaintiff without any investigation or knowledge of the
plaintiff's faith according to his testimony. He did this while
having all the information that the defendant provided as
exhibits regarding the plaintiff's faith along with books that
the plaintiff was required to provide as information on his faith
and practices). The defendant never read any of the material
provided and instead voted against the plaintiff's request. This
says nothing of the information that the plaintiff provided

verbally in a meeting that was held in the presence of defendant
Mears and Abu Bakr regarding his requested exemption from signing
a contract to fast for the month of Ramadhaan.

The Defendant also relied on the policy that there would be
only one Muslim Community in each institution just as they had at
Green as a basis for their denial. Of course the plaintiff and
defendants also testified that there "were" other groups who were
of the Islamic faith who "were" having separate services, thereby
debunking the policy. As he relied on this policy to deny the
plaintiff, he is liable for denying the plaintiff's due process
in that a fair review could not be made, most especially when
coupled with his failure to investigate the plaintiff's faith as
had been the case at SCIP.

The Defendant also reviewed the complaint of the plaintiff
regarding his subordinates statements pertaining to the
plaintiff's faith. In that instance he found no harm in defendant
Ibrahiym labeling the plaintiff's faith group deviants, while at
the same time, urging the plaintiff to participate with this
individual in order to practice his religion.

The defendant also authorized issuance of a "contract"
required for Ramadhaan participation which violated precepts of
the plaintiff's faith and required him to submit to various
degrees of religious agreements and compromises in violation of
his religious tenets.

Having spoken to the plaintiff in a meeting at SCI Green,
it was expressed at that time "why" this contract was violative
of the plaintiff's faith. As defendant Mears and Ibrahiym were
also present during this meeting, they each also heard the
reasons for the plaintiff's inability to sign such a contract and
exempted him from signing such after hearing his reasons "for
that year".

The following year, the plaintiff again requested exemption
from signing said contract, and was denied for the remainder of
the time he was housed at SCI Green, while the defendants knew
the reasons for which the exemption was requested. This was done

in total disregard for the plaintiff's constitutional rights and
as such the defendant is liable.

Defendant Moneck never reviewed the plaintiff's request for
accommodation that was filed by the plaintiff after that meeting,
and claimed to have no knowledge of the plaintiff's differences
in beliefs at trial. However, the plaintiff not only discussed
the matter of the contract with the defendants in that meeting,
but also verbally elaborated on the differences in practice and
belief from that of defendant Abu Bakr Muhammad. Therefore the
plaintiff acted with deliberate indifference to the plaintiff's
constitutional rights.

Therefore, defendant Moneck is not eligible for the defense
of qualified immunity in liable for his actions in an individual
and official capacity.

Defendant Mears:

Defendant Mears was the director of all programs within
SCI Green. This included all religious programs that were
provided by the DOC at that institution. Defendant Mears is
therefore liable for her personal involvement in reviewing the
plaintiff's request for religious accommodation, and the
grievance appealing the denial thereof. She is further liable in
that She also attended meetings in which the plaintiff enumerated
his differences of faith and practice from that of defendant
Ibrahiym that necessitated him requesting religious
accommodation. As she ignored all of this information and upheld
the denial of plaintiff's request while knowing that they were of
different faiths showed deliberate indifference.

In furtherance of the unwritten policy of only one muslim
community, she summarily denied the plaintiff's appeals and
disregarded not only his due process right, but also his equal
protection right.

As a supervisor, defendant Mears was also required to
view a video tape of defendant Abu Bakr making statements to the
effect that the plaintiff's faith group were deviants. In
reviewing this video she made the determination that there was no
harm in this defendant doing this and broadcasting it repeatedly

on the prison channel without any regard for the security of the institution. She furthermore, did this while knowing that she had informed the plaintiff that if he wished to practice his religious obligation, he would have to do so with this same individual in the services he provided and in which he taught these views as an "obligation" according to his own testimony.

For these reasons, defendant Mears is not eligible for the defense of qualified immunity in that she showed deliberate indifference to the plaintiff's rights.

Defendant Abu Bakr:

Defendant Abu Bakr is liable in that he confirmed the plaintiff's claims of his opposition to the plaintiff's faith. He testified that he would not have permitted any teachings under his supervision other than what he taught (which is consistent with the Wahabi Doctrine).

The defendant expressed at trial that it was his duty to state before those under his tutelage that those of the Habashi faith of which the plaintiff is a member, were deviants. The defendant worked to all ends to impede the plaintiff from ver having any outlet through which to practice his religion. By so doing he denied the plaintiff the right to equal protection under the law as mandated by the U.S. Constitution.

The defendant offered biased and prejudicial information to defendant Moneck when questioned about the plaintiff's faith needs, and by so doing, impeded the plaintiff's rights.

Defendant Muhammad also voted against the plaintiff's accommodation request in a further effort to impede his religious expression both willfully and maliciously and as such is liable.

The defendant is liable where he placed a substantial burden on plaintiff's exercise of religious expression by tainting the process abd opinions of defendant Moneck. He further burdened the plaintiff by employing the usage of a contract that he knew was violative of the plaintiff's faith in a

direct effort to prevent the plaintiff from being able to
participate in the fast or come to the chapel during Ramadhaan
as verified by inmate testimony of Mr. Calhoun and Mr. Brome
who both heard remarks that he had made to that effect.

Defendant Muhammad's personal involvement advocated the
denial and deprivation of the plaintiff's exercise of religion
where as Imam of the muslim community, he was required to provide
a means for all Islamic faiths to practice and failed to do so.

Qualified immunity is unavailable to the defendant where
the defendant violated the plaintiff's 1st and 14th amendment
rights of religious expression, and due process/ equal protec-
tion through the imjection of his personal biases and prejudices
which was prohibited at the time of the request. The defendant
cannot claim a good faith fulfillment of his responsibilities
due to his predisposition that plaintiff was a deviant according
to his personal beliefs.

Therefore, defendant Abu Bakr Muhammad is liable both in
his individual and official capacity for his violative actions.

### Conclusion:

In conclusion, it is hoped that this honorable court will
construe these arguments in a liberal light as the plaintiff
has presented them pro se.

It is further humbly requested that this court will
see fit to grant the plaintiff relief on the merit of the
claims herein presented.

Respectfully Submitted,

Shawn C. Sharp
(Pro Se Plaintiff)

PROOF OF SERVICE:

I do swear and affirm that a true and correct copy
of the plaintiff's Pro Se Conclusions of Fact and Brief of
Law was served upon the following via U.S. standard mail:

Magistrate Judge Amy Reynolds Hay
U.S. Post Office & Courthouse

700 Grant Street

Pittsburgh, Pa. 15219


and


Office of the Attorney General

6th Flr. Manor Complex

564 Forbes Avenue

Pittsburgh, Pa. 15219


Respectfully,

Shawn C. Sharp

Plaintiff Pro Se