IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


SHAWN C. SHARP,                    )
                                  )
            Plaintiff,            )
                                  )
    vs.                           )        Civil Action No. 00-2156
                                  )        Magistrate Judge Amy Reynolds Hay
SUPER. JOHNSON, et al.,           )
                                  )
            Defendants.           )


FINDINGS AND CONCLUSIONS BY THE COURT

HAY, Magistrate Judge

The plaintiff, Shawn Sharp ("Sharp"), an inmate in the custody of the Pennsylvania

Department of Corrections ("DOC"), initiated this civil rights action in 2000.  The action arises

out of Sharp's confinement at the State Correctional Institution at Pittsburgh ("SCI-Pittsburgh")

and the State Correctional Institution at Greene ("SCI-Greene").  After the disposition of various

pretrial motions, the remaining two claims against the remaining eleven defendants[1] were tried to

the Court on October 16-18, 2007.[2]  Having heard the testimony and reviewed the exhibits,

---

[1]  The eleven defendants include Philip Johnson, William S. Stickman, Joel Dickson, Mark Krysevig, Rhoda Winstead, Father William Terza and Imam Tank Ibrahiym, who were assigned at SCI-Pittsburgh during all times relevant to the respective allegations made by Sharp, and also include William S. Stickman, Brian V. Coleman, Jean Mears, Father George Moneck and Imam Abu Bakr Muhammad, who were assigned at SCI-Greene during all times relevant to the respective allegations made by Sharp.

[2]  In accordance with the provisions of 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73, the parties consented to have a United States magistrate judge conduct all proceedings in this case, including the entry of final judgment.  Dkt. [59].  Sharp proceeded to trial *pro se* after the Court granted his appointed counsel's motion to withdraw – as requested by Sharp – due to the apparent, serious and irreconcilable level of animosity displayed by Sharp against his own counsel.  Dkt. [114].

pursuant to Fed.R.Civ.P. 52(a)(1) the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1.        At Count 1 of the Second Amended Complaint, Dkt. [67], Sharp asserts a claim pursuant to 42 U.S.C. § 1983 that, while incarcerated at SCI-Pittsburgh and SCI-Greene, the defendants violated his right to the free exercise of his religion, Islam, specifically, Sunni Muslim beliefs, as protected by the First Amendment, as applied to the States through the Fourteenth Amendment, when they denied his request for a religious accommodation.

2.        At Count 2, Sharp asserts a claim pursuant to the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc, et seq., that, while incarcerated at SCI-Pittsburgh and SCI-Greene, the defendants deprived him of his right to the free exercise of his religion by imposing a substantial burden on his religious exercise when they denied his request for a religious accommodation.  Dkt. [67].

3.        Plaintiff sued all of the Defendants in both their individual and official capacities. He seeks monetary, injunctive and declaratory relief.

4.        Plaintiff Sharp is an inmate in the custody of the DOC, serving a life term following his conviction for first degree murder.  Plaintiff's Exhibit 21.  On September 18, 1998, Sharp was transferred to SCI-Pittsburgh from SCI-Somerset.  Trial Transcript ("TR")-10/18/07, at 67; Defendants' Exhibit D.  Sharp was transferred to SCI-Greene on May 23, 2001. Defendants' Exhibit D.  On June 13, 2006, Sharp was transferred to SCI-Dallas where he remains to date.  Id.

5.      Sharp is a member of the faith group known as Ahlus Sunnati Wal Jama'ah, also referred to as Sunni Muslim.  TR-10/16/07, at 56, 66-67; <u>see also</u>, Plaintiff's Findings of Fact, Dkt. [159], ¶¶ 24-25.

6.      Defendant Philip J. Johnson ("Johnson") served as the Superintendent at SCI-Pittsburgh from "January of 1999 until late 2002."  TR-10/17/07, at 63.  As Superintendent, Johnson "oversaw the daily operation of the entire facility, [and] all department heads who ultimately were responsible to answer to [him]."  TR-10/17/07, at 64.

7.      Defendant Mark Krysevig ("Krysevig") served as the Deputy Superintendent for Centralized Services at SCI-Pittsburgh for approximately two and a half years, beginning in July of 1999.  TR–10/17/07, at 115.

8.      Defendant Joel Dickson ("Dickson") served as the Deputy Superintendent for Internal Security at SCI-Pittsburgh from July of 1998 until "approximately March of 2002." TR–10/17/07, at 94-95.  As Deputy Superintendent for Internal Security, Dickson supervised the Security Office and was "concerned with any internal investigations conducted involving inmates and/or staff, contraband control, entering into the institution either through visiting room or whatever, telephone monitoring, monitoring of security threat groups, et cetera."  TR–10/17/07, at 95.

9.      Defendant William S. Stickman ("Stickman") served as the Deputy Superintendent for Facility Management at SCI-Pittsburgh from January of 1997 until March of 2002, when he was promoted to Superintendent at SCI-Greene.  TR–10/17/07, at 138-139.  As Deputy Superintendent for Facility Management at SCI-Pittsburgh, Stickman had responsibility

for "security, the [corrections] officer force, maintenance department and unit management." TR–10/17/07, at 139.

10.    Defendant Rhoda Winstead ("Winstead") served as the Corrections Classification Program Manager at SCI-Pittsburgh from "1997 to about 1999." TR-10/17/07, at 4. As Corrections Classification Program Manager, Winstead "supervised the various treatment programs within the institution, of which chaplaincy was one of them, [also] psychology, inmate employment, inmate records, education activities, volunteer programs." Id.

11.    Defendant Father William Terza ("Father Terza"), a Catholic priest, served as the Facility Chaplaincy Program Director at SCI-Pittsburgh beginning in March of 1998. TR–10/16/07, at 143. As such, Father Terza was "responsible for the entire chaplaincy program of the institution" which provided inmates with "[r]eligious practice for a number of faiths that were recognized by the Department of Corrections." TR–10/16/07, at 143.

12.    Defendant Imam Tanko Ibrahiym ("Imam Ibrahiym") is an Imam of the Sunni–or Sunni wal Jamaah– faith; he was employed by the DOC as the Islamic Chaplain at SCI-Pittsburgh from 1998 to 2004 when it closed. TR–10/17/07, at 26-27. His duties included providing "Islamic services to inmates, Muslim inmates, and spiritual counseling … study groups, Islamic study groups, teaching … Islamic literature, books and pamphlets." TR–10/17/07, at 27-28. He would also "visit Islamic Muslims in the RHU." Id.

13.    Defendant Brian V. Coleman ("Coleman") served as the Security Captain at SCI-Greene from "late 2000 … until October of '03." TR–10/18/07, at 63.

14.    Defendant Jean Mears ("Mears")[3] served as the Corrections Classification Program Manager at SCI-Greene from June of 2002 until she left the DOC in December of 2003. TR–10/17/07, at 74. As the Corrections Classification Program Manager at SCI-Greene, Mears supervised the Chaplaincy Department. TR–10/17/07, at 74, 76-77.

15.    Defendant Father George J. Moneck ("Father Moneck"), a Roman Catholic priest, served as the Facility Chaplaincy Program Director at SCI-Greene beginning in 1997 and ending when he left the DOC in December of 2004. TR–10/17/07, at 7-8.

16.    Defendant Imam Abu Bakr Muhammad ("Imam Muhammad") has been employed by the DOC since April 3, 1995, as the Islamic Chaplain at SCI-Greene. TR–10/18/07, at 32. At SCI-Greene, Imam Muhammad was "in charge of all Islamic programs, specifically for the Sunni Muslims. That includes, among other things, teaching them Islam, Qur'an, Arabic and other related issues with the Islamic teachings. [He] also conduct[ed] the Jumah service, which is held every Friday. [He was] also involved with special events like Ramadan programs, Islamic festivals. [He] also visit[s] the restricted housing units basically as a chaplain, but specifically to also take some Islamic literature to Muslims in general. [He is] also a spiritual advisor, so to speak, for the Muslim group." TR–10/17/07, at 33.

17.    The DOC has implemented and maintains a religious accommodation policy, which is codified at DC-ADM 819. Plaintiff's Exhibit 2; TR–10/16/07, at 16-18. See also Defendants' Exhibit A. Included in this policy are procedures for initiating requests for

---

[3] At the time of trial, this defendant's name had been changed legally to Jean Blaine. TR-10/17/07, at 73. However, the Court will identify her by the name she used at the time of the events in question.

recognition of a religion or religious group. Id. Specifically, the policy provides, in pertinent

part, as follows:

2. A request for religious accommodation ... shall be made as follows:

a. Each inmate must use a **DC-52, Inmate Religious Accommodation Request Form (See Attachment A)** to submit his/her request for accommodation to the FCPD [Facility Chaplaincy Program Director].

\* \* \*

c. The inmate shall obtain written information from his/her outside faith group, including any publications that describe the goals, beliefs, and practices of the group and supply this information to the FCPD for review.

d. The Religious Accommodation Review Committee shall review each inmate's request for a religious accommodation within 45 days of receipt and forward a recommendation to the affected Regional Deputy Secretary.

e. The Regional Deputy Secretary shall, within 15 days of receiving the recommendation from the Director of the Bureau of Inmate Services/designee, approve/disapprove the request and notify the Director of the Bureau of Inmate Services of the decision.

f. The Director, Bureau of Inmate Services shall, within 10 days, inform the Facility Manager and the FCPD of the requesting facility of the determination and ensure copies of all final determinations are provided to all Deputy Secretaries and Facility managers. The FCPD shall be responsible for informing the affected inmate of the outcome of his/her request no later than 10 working days from the date that the determination of approval/disapproval is received.

g. If an inmate is informed by the FCPD that the request will not be accommodated, the inmate may then file a grievance in accordance with Department policy **DC-804, "Inmate Grievances."** Grievances may only be submitted after the

6

> inmate has received notification of the decision on the
> requested accommodation.

DC-ADM 819, Religious Activities Policy, § VI.G.  See Defendants' Exhibit A.

18.    At SCI-Pittsburgh, the DOC provided religious accommodation for several

religious communities within the inmate population, including "Muslim, Jewish, Protestant,

Catholic, [and] Jehovah Witness."  TR–10/16/07, at 143.  See also TR–10/16/07, at 66-68.

Among the Muslims, three groups were recognized at SCI-Pittsburgh: "the Nation of Islam, the

Moorish Science Temple and the regular Muslim group."  Id.

19.    Imam Ibrahiym, the Islamic Chaplain at SCI-Pittsburgh, provided weekly

religious instruction ("Taleem") and lead weekly prayer services ("Jumah") for Muslim inmates.

Imam Ibrahiym identified himself as Sunni or Sunni wal Jamaah.  TR–10/17/07, at 27-28.

20.    For a period of time, Sharp attended the Jumah services and the Taleem studies

offered by Imam Ibrahiym at SCI-Pittsburgh.  TR–10/17/07, at 29, 31-32.  Sharp was never

excluded or told he was not welcome at these Muslim services and study groups.  TR–10/16/07,

at 150; TR–10/17/07, at 32.

21.    There came a time when Sharp expressed to Imam Ibrahiym that there were

ideological differences between Sharp's Sunni "group" and the recognized Sunni group at SCI-

Pittsburgh.  Sharp believed that because of the differences in beliefs and practices, his "group"

could not be accommodated within the Sunni Muslim community at SCI-Pittsburgh.  Sharp

inquired of Imam Ibrahiym about what could be done to accommodate Sharp's "group."  TR-

10/16/07, at 11; TR-10/17/07, at 29.

22.    Imam Ibrahiym disagreed with Sharp and advised that if Sharp was Sunni Wal Jamaah, as he claimed to be, then there was no reason why Sharp could not be accommodated with the services and programs being offered to the Sunni Muslims at SCI-Pittsburgh.  TR-10/17/07, at 30-31.

23.    Nevertheless, Sharp submitted a 3-page, typewritten "Religious Accommodation Request for Ahlus Sunnati wal Jama'ah," dated October 14, 1999, requesting recognition and accommodation of the Ahlus Sunnati wal Jama'ah group or sect, comprised of "nearly 50 inmates."  Plaintiff's Exhibit 1;  see also  TR-10/17/07, at 30.

24.    Imam Ibrahiym and Father Terza discussed this group request.  TR-10/16/07, at 146-47; TR-10/17/07, at 30.

25.    Father Terza informed Sharp that his request was improperly submitted. Specifically, Sharp had submitted his request for religious accommodation as a group request instead of an individual request as required by DC-ADM 819.  TR-10/16/07, at 147.

26.    Sharp never presented an individual request form.  TR-10/16/07, at 146-47.

27.    There is no credible evidence that any other inmates submitted an individual request for the accommodation addressed in Sharp's group request, i.e., Exhibit 1.

28.    On or about November 28, 1999, a meeting was held between Krysevig, Winstead, Imam Ibrahiym, Father Terza and several inmates, including Sharp, to discuss Ramadan.  Specifically, discussions were held to determine how Ramadan, a month-long Muslim observance, would be accommodated amongst the various Muslim groups and inmates who wished to participate in the required prayer and fasting.  TR–10/16/07, at 20-22; TR–10/16/07, at 150-151; TR–10/17/07, at 46-49; TR–10/17/07, at 118-119.

29.     After this discussion, Sharp raised his group request for accommodation; however, no resolution of this request was achieved at this meeting.  TR–10/16/07, at 22-25.  See also, TR–10/17/07, at 48; TR–10/17/07, at 119.

30.     Subsequently, on November 30, 1999, Sharp was placed in Administrative Custody on the order of Lt. Blakey and on December 2, 1999, on the order of Capt. Zurich, it appearing that Sharp's efforts to organize a separate Sunni Muslim group were creating a threat to institutional security.  Sharp was attempting to establish himself as the leader of this group of inmates and this group had threatened disruption and violence if they were not recognized. Plaintiff's Exhibit 5; TR-10/17/07, at 97-98, 100-107; TR-10/17/07, at 123-31.

31.     Indeed, based on his conversations and interactions with Sharp, defendant Krysevig concluded that Sharp's concern was not religious accommodation but a desire to place himself in a position of leadership over a group of inmates.  TR-10/17/07, at 127.  As well, other inmates complained to Krysevig that Sharp was being disrespectful of their beliefs and, thus, inciting them to retaliate against Sharp.  TR-10/17/07, at 128.  "In essence, [Sharp] was fomenting unrest in group activity that was not in keeping with the guidance and rules of the institution."  TR-10/17/07, at 98.

32.     On December 1, 1999, Sharp filed Grievance No. PIT-0997-99, see Plaintiff's Exhibit 4, and several Inmate's Request to Staff Members forms, see Plaintiff's Exhibit 3, questioning why his *group* request for accommodation had not been acted upon.  Of note, none of these documents references or mentions any *individual* request for religious accommodation. Id.

9

33.     In response to Grievance No. PIT-0997-99, defendant Winstead wrote on

December 20, 1999, as follows:

> At the meeting you mentioned on November 28, 1999 it was verified that
> all staff mentioned received a copy of your proposal [i.e., Plaintiff's
> Exhibit 1].
>
> In accordance with DC-ADM 819-3 for religious accommodations, you
> were to submit the proper form requesting such an accommodation for you
> as an individual.  Any other inmates requesting an accommodation must
> be filed individually.  Your form should be forwarded to the chaplaincy
> coordinator.  Your form was improperly filed.
>
> Your concern regarding to attend Talum has been addressed.  All inmates
> requesting to attend are supplied with a pass.

Plaintiff's Exhibit 4.

34.     Thereafter, Sharp did not submit a form request for religious accommodation for

himself as an individual.  See TR-10/16/07, at 147-148, 152, 171-172.  See also TR-10/17/07, at

33, 48-49.

35.     Instead, Sharp wrote to the Grievance Coordinator, complaining *inter alia* that his

grievances on this matter seemed to be arriving late or not at all  - -  impliedly through no fault of

his own  - -  and challenging Winstead's statement that his request was improperly filed.  Sharp

claimed that he and other inmates had submitted individual, handwritten request slips, as well as

the group request for accommodation, and that these individual requests should be reviewed.

Plaintiff's Exhibit 4.

36.     Sharp's claim that he submitted an individual request is simply not credible.

Sharp failed to produce a copy of this request at his trial, claiming he did not keep a copy and did

not get his original request back.  This explanation is not believable given the fact that Sharp

meticulously maintained copies of all other important documents in this matter, including his initial group request, his grievances, his inmate's request to staff and the like. Additionally, in Grievance No. PIT-0997-99, dated December 1, 1999, in the section where the inmate is to provide a "[b]rief, clear statement of [the] grievance," Sharp wrote, "In accordance with DC-ADM 819 & Supplements 1-3 *I* filed a *group* request for religious accommodation." Plaintiff's Exhibit 4 (emphasis added). There is no mention in the grievance of any individual request for accommodation. Id. Further, there is no mention of any individual request in any of Sharp's Inmate's Request to Staff Member forms submitted after his placement in the RHU on Administrative Custody. Plaintiff's Exhibit 3. Finally, the Court finds the testimony of Father Terza and Imam Ibrahiym that the only request for accommodation they received from Sharp was Exhibit 1, i.e., the group request, to be credible. See TR-10/16/07, at 148; Tr-10/17/07, at 33.

37.    Sharp claims that the defendants further violated his religious freedom rights by requiring that he sign a contract in order to be released from Administrative Custody, wherein he would agree not to practice his religion. TR-10/16/07, at 29. See also Plaintiff's Exhibit 5.

38.    Those individuals charged with reviewing Sharp's Administrative Custody confinement in the RHU expressed "serious reservations" about placing Sharp back into the general population absent modification of his behavior. Therefore, the Program Review Committee ("PRC") offered Sharp the opportunity to return to general population if he agreed not to persist in the behavior that caused him to be placed on Administrative Custody confinement in the first place, i.e., showing disrespect for the religious beliefs and practices of others and "fomenting unrest." The terms of the so-called "behavior modification" contract were to be drawn up by Sharp. The issue was not the manner in which Sharp himself practiced his

religion but his attempt to engage others in the practice and his unwillingness to follow the prescribed rules and procedures in the process.  Contrary to Sharp's assertion, the Court finds that he was not and would not have been requested or required to execute a contract that would have predicated his release from Administrative Custody on his agreement not to engage in religious activity or to not practice a particular religion.  <u>See</u> Plaintiff's Exhibit 5; TR-10/17/07, at 97, 98, 100, 116.  Sharp did not enter into an agreement with his PRC.  TR-101/17/07, at 115-116.

39.    On May 23, 2001, Sharp was given an Administrative Transfer from SCI-Pittsburgh to SCI-Greene.  TR–10/16/07, at 35-37; TR–10/17/07, at 110; TR–10/18/07, at 67.  <u>See</u> <u>also</u> Plaintiff's Exhibit 21; Defendants' Exhibit D.

40.    While serving as the Superintendent at SCI-Pittsburgh, Defendant Johnson did not have any personal dealings with Sharp regarding Sharp's efforts to obtain a religious accommodation, and Johnson was never presented with or asked to review a request for religious accommodation submitted by Sharp.  <u>See</u> TR–10/17/07, at 64.

41.    Johnson never personally interfered with Sharp's ability to practice his chosen religion and he never directed or ordered any of his subordinates to take any action against Sharp based on Sharp's expressed religious preferences.  <u>See</u> TR–10/17/07, at 64-65.

42.     Johnson signed off on Sharp's appeal of Grievance No. PIT-0997-99 to the Facility Manager, but has no specific recollection of doing so.  <u>See</u> TR–10/17/07, at 65-66.  The appeal was returned to Sharp without action because it was untimely.  <u>See</u> TR–10/17/07, at 66.

43.     With respect to inmate requests for religious accommodation, the Deputy Superintendent for Facility Management "would have had a vote on the vote sheet that went around.  That would have been the extent of it."  TR-10/17/07, at 139.  However, while he was Deputy Superintendent for Facility Management at SCI-Pittsburgh, Defendant Stickman did not vote on any religious accommodation requested by Sharp while Sharp was confined at SCI-Pittsburgh.  Id.  Nor did Stickman participate in any discussions with Sharp regarding Sharp's religion, religious exercise or any religious accommodation at SCI-Pittsburgh.  Id.

44.     As Deputy Superintendent for Internal Security, Defendant Dickson played no role in the review or approval of inmate requests for religious accommodation.  See TR–10/17/07, at 95.

45.     Dickson did serve on the PRC at SCI-Pittsburgh which had responsibility, *inter alia*, for reviewing Administrative Custody placements in the RHU.  See TR–10/17/07, at 95.

46.      Dickson never told Sharp that he could not exercise his chosen religion, nor did Dickson ever take any steps to prevent Sharp from practicing his chosen religion.  See TR–10/17/07, at 98.  Dickson never took any action against Sharp based on Sharp's expressed religious preferences.  See TR–10/17/07, at 98.

47.     Defendant Krysevig did not recall seeing the group request for religious accommodation submitted by Sharp at SCI-Pittsburgh.  See TR–10/17/07, at 117.  The document was not addressed to Krysevig, although it was addressed to his predecessor.  See TR–10/17/07, at 117, 120-121.

48.    Krysevig participated in at least the one meeting in November of 1999 where Sharp was present which involved the accommodation of the various Muslim groups at SCI-Pittsburgh for the upcoming Ramadan observance.  See TR–10/17/07, at 118-119.

49.    Krysevig never told Sharp that he could not exercise his chosen religion, nor did Krysevig ever exclude Sharp or direct that Sharp be excluded from participating in any religious activity at SCI-Pittsburgh based on Sharp's expressed religious preferences.  See TR–10/17/07, at 120.

50.    As Corrections Classification Program Manager, it was not Defendant Winstead's responsibility to approve or disapprove an inmate's request for religious accommodation.  See TR–10/17/07, at 48-49. Winstead does not recall ever making a recommendation on an inmate's request for religious accommodation as Corrections Classification Program Manager at SCI-Pittsburgh, but may have seen the group request submitted by Sharp sometime in 1999.  See TR–10/17/07, at 45-46.

51.    The only interaction Winstead had with Sharp was at the meeting on November 28, 1999, to discuss how Ramadan would be handled that year.  See TR–10/17/07, at 46-49.

52.    Winstead did submit the Initial Review Response to the grievance filed by Sharp, i.e., Grievance No. PIT-0997-99, after he was placed in the RHU on Administrative Custody status, directing Sharp to file his request for individual religious accommodation in the proper form.  See TR–10/17/07, at 50-51, 59.  See also Plaintiff's Exhibit 4.

53.    As Facility Chaplaincy Program Director, it was not Defendant Father Terza's responsibility to approve or disapprove an inmate's request for religious accommodation.  <u>See</u> TR–10/16/07, at 145-146.

54.    Father Terza spoke with Sharp about his request for group accommodation after receiving a copy of the request from Imam Ibrahiym.  <u>See</u> TR–10/16/07, at 146-147.  During this discussion, Father Terza told Sharp "that he would have to submit the proper form, and once it was submitted to [Father Terza], then [he] would submit it to the rest of the institution for their recommendation, and then [he] would send it on to central office for approval."  <u>See</u> TR–10/16/07, at 147.  Father Terza was never provided with an individual request for religious accommodation by Sharp.  <u>See</u> NT–10/16/07, at 148, 152.

55.    Father Terza never told Sharp he could not profess a certain belief and never excluded Sharp from participating in any religious activity because of his faith.  TR 10/17/07, at p. 150.

56.    Imam Tanko Ibrahiym served as the Islamic Chaplain at SCI-Pittsburgh from 1998 -2004.  He obtained a Bachelor of Islamic Education and English Studies from the Islamic university known as Benson University.  Imam Ibrahiym provided Islamic services (Jumah), counseling and study (Taleem) to Muslim inmates.  He observed Sharp attending regularly the Taleem and Jumah while in general population at SCI-Pittsburgh; Imam Ibrahiym never excluded Sharp from any religious programs or services, and continued to meet and visit with Sharp even after he was placed in the RHU and if requested by Sharp, would bring him religious literature.  <u>See</u> TR–10/17/07, at 27, 29, 31-33, 37.

57.    At SCI-Greene, the DOC provided religious accommodation for several religious communities within the inmate population, including "Protestants, Catholics, Jewish, Jehovah, Yoke Fellowship, Native Americans."  See TR–10/18/07, at 61-62.  See also TR–10/16/07, at 68. Among the Muslims, at least two groups were recognized at SCI-Greene: Sunni and the Nation of Islam.  Id.

58    Imam Muhammad provided weekly religious instruction through the Taleem and led the weekly Jumah prayer services for Muslim inmates.  Imam Muhammad identified himself as Sunni or Ahlus Sunnati wal Jamaah.  See TR–10/18/07, at 33, 34.

59.    While at SCI-Greene, Sharp submitted a form DC-52 request for religious accommodation pursuant to DC-ADM 819, dated September 30, 2002.  See TR–10/16/07, at 38. See also Defendants' Exhibit B.  This request sought accommodation of Sharp's religion, identified as "[t]he Ashariy Comm[unity] of Ahlus Sunnah wal Jama'ah."  Id.

60.    This request was received by the Chaplaincy Department at SCI-Greene on October 21, 2002, where it was initially reviewed by the Facility Chaplaincy Program Director, Father Moneck.  TR–10/17/07, at 12.  After reviewing the request, Father Moneck initialed the corresponding Vote Sheet under the "Disapprove" column along with the date "10-21." TR–10/17/07, at 13.  Father Moneck also annotated the form as part of his recommendation: "Inmate can practice his religion privately.  Institution cannot accommodate another Muslim sect. The inmate is most welcome to join the Sunni or the Nation of Islam communities." TR–10/17/07, at 14.

61.     Father Moneck circulated the Vote Sheet to other staff at SCI-Green; all other staff voting also recommended that the requested accommodation be denied. TR–10/17/07, at 12-15; Exhibit C.  Father Moneck then forwarded the packet to DOC's Central Office.  Id.

62.     Father Moneck was subsequently informed that Sharp's request for religious accommodation had been denied by the deputy secretary; Father Moneck, in turn, notified Sharp that the request had been denied.  TR–10/17/07, at 15.  See also Defendants' Exhibit C.

63.     As mandated by DC-ADM 819, Sharp then submitted Grievance No. 39662, which challenged the denial of his request for accommodation.  Plaintiff's Exhibit 10.

64.     On January 7, 2003, in her capacity as Corrections Classification Program Manager, Mears provided the Initial Review Response to Grievance No. 39662.  TR–10/17/07, at 78-79.  See also Plaintiff's Exhibit 10.  In her response, Mears wrote:

> Your grievance dated December 27, 2002, was reviewed and investigated. You received a memo from Father Moneck dated December 18th, 2002, and he provided you with the information as to why the central office accommodations committee denied your request.  You were not denied the right to practice your faith as you imply in your grievance and you were not prohibited from maintaining your beliefs and praying in your cell since you have difficulty following the teachings of the Imam.  Your constitutional rights and due process are not being denied as you claim. You do not need to have a material structure or be with a group of others to pray to exercise your First Amendment right.  Should an individual be so [devout] in his beliefs, he would realize that his inner faith is his strength in believing and performing his prayers.  Based upon the above information, your grievance is denied.

Plaintiff's Exhibit 10.  See also TR–10/17/07, at 79.

65.     Sharp appealed the Initial Review Response to the Superintendent; however, the initial response was upheld.  Plaintiff's Exhibit 10.

66.     Sharp did not submit any other requests for religious accommodation while he was confined at SCI-Greene.  TR–10/16/07, at 57-58; TR–10/17/07, at 16.

67.     After being promoted to Superintendent at SCI-Greene in 2002, Defendant Stickman participated in reviewing an inmate's request for religious accommodation by entering a vote on the vote sheet.  TR–10/17/07, at 141.  However, Stickman did not participate in the review of the request for religious accommodation submitted by Sharp in October of 2002. TR–10/17/07, at 141-142; Defendants' Exhibit B.

68.     The Vote Sheet for Sharp's request reflects that Deputy Stowitzky as "Acting Superintendent" made the recommendation (to disapprove) on behalf of the Facility Manager on Sharp's request.  TR–10/17/07, at 142; Defendants' Exhibit B.

69.     While employed as the Superintendent at SCI-Greene, Stickman never took any action to prevent Sharp from practicing his chosen religion or to exclude Sharp from participating in any religious activity; nor did Stickman ever tell Sharp he could not believe in or practice his chosen religion.  TR–10/17/07, at  139-140, 142-143.

70.     Defendant Mears did not participate in the request for religious accommodation submitted by Sharp while he was at SCI-Greene.  TR–10/17/07, at 77.  Although Mears was the Corrections Classification Program Manager at SCI-Greene in October of 2002, the Vote Sheet for Sharp's request reflects the initials "MPB" and the date "10-21-02" in the space provided for the Corrections Classification Program Manager.  These are the initials of Michael P. Bruno, who would "have been in the acting capacity [of Corrections Classification Program Manager] if [Mears] had been out of the institution."  TR–10/17/07, at 77-78; Defendants' Exhibit B.

71.    Defendant Father Moneck initiated the review of Sharp's request for accommodation at SCI-Greene, entered his recommendation to disapprove the request and circulated the vote sheet to the other reviewing officials.  Father Moneck then forwarded the request to Central Office and subsequently advised Sharp of the negative decision on his request. TR–10/17/07, at 13-15.  However, Father Moneck was not the final decision maker on this request.  TR–10/17/07, at 14-15.

72.    Father Moneck was told by Mears that Sharp was complaining about the content of Imam Muhammad's sermons that were being broadcast over the prison network; particularly, that Sharp was contending that Imam Muhammad was slandering him.  TR–10/17/07, at 16-17. Father Moneck reviewed the videotape of Imam Muhammad's sermon with Mears and "found nothing inflammatory that Imam Muhammad had preached about…"  Id.

73.    Defendant Imam Muhammad did not participate in the review of or decision on Sharp's request for accommodation at SCI-Greene.  Defendants' Exhibit C.  Imam Muhammad provided religious services and programs for the Muslim inmates at SCI-Greene, see TR–10/18/07, at 32-33; however, Imam Muhammad never excluded Sharp from these programs and services, nor did he ever prevent Sharp from attending or participating in any of these programs and services.  TR–10/18/07, at 33-34.

74.    Imam Muhammad did develop an agreement form for inmates wishing to participate in Ramadan.  TR–10/18/07, at 35-37.  See also TR–10/16/07, at 41, 59, 62.  However, this form did not require the inmates to profess or practice a specified religion; rather, the form represented a commitment on the part of the inmate to wholly participate in all aspects of Ramadan.  TR–10/18/07, at 35-37.

75.     As Security Captain, Defendant Coleman played no role in the processing or the approval or disapproval of inmate requests for religious accommodation.  TR–10/18/07, at 64.

76.     Coleman had a discussion with Sharp regarding Sharp's concerns about a sermon given by Imam Muhammad, which was recorded and broadcast to inmates in the RHU.  TR–10/16/07, at 41-44; TR–10/18/07, at 64.  Upon being informed of the issue by Sharp, Coleman presented the issue to Mears and asked her to review the tapes with the Chaplaincy Department.  TR–10/18/07, at 64, 69.  No other inmate complained to Coleman about the sermons given by the Muslim Chaplain at SCI-Greene.  TR–10/18/07, at 65.

77.     Coleman was subsequently copied on correspondence from Mears to Sharp which indicated that the tapes of the Muslim Chaplain's sermons had been reviewed "and there was nothing derogatory in it."  See TR–10/18/07, at 65.  Consequently, Coleman had no further involvement with any issue surrounding the sermons given by the Muslim Chaplain at SCI-Greene, and never discussed the issue with Sharp again.  TR–10/18/07, at 65.

78.     Coleman never told Sharp that he could not pursue his chosen religion, nor did he ever take any action or make any decision affecting Sharp based upon Sharp's expressed religious preferences.  See TR–10/18/07, at 67-68.  Specifically, Coleman never ordered Sharp's cell to be searched in order to retrieve or confiscate Sharp's religious materials.  TR–10/18/07, at 74.  Sharp's assertion to the contrary lacks evidentiary support and credence.

79.     On June 13, 2006, Sharp was transferred from SCI-Greene to SCI-Dallas.  SCI-Dallas remains Sharp's permanent location.  TR–10/18/07, at 66-67.  See also Defendants' Exhibit D.

CONCLUSIONS OF LAW

1.      Judgment in favor of the Defendants and against the Plaintiff is properly entered

on Plaintiff's claims for injunctive and declaratory relief.  As noted above, Sharp was transferred

out of SCI-Pittsburgh on May 23, 2001, and out of SCI-Greene on June 13, 2006.  Hence, these

transfers have rendered moot his claims for injunctive and declaratory relief.   "In the prison

context, the transfer of an inmate from the facility complained of moots claims for injunctive

relief involving that facility."  Santiago v. Sherman, 2007 WL 217353, at *3 (W.D.Pa. 2007)

(citing Abdul-Akbar v. Watson, 4 F.3d 195 (3d Cir. 1993) and Sutton v. Rasheed, 323 F.3d 236

(3d Cir. 2003)); see also Neal v. Lucas, 75 Fed.Appx. 960 (5th Cir. 2003)(Holding that prisoner's

RLUIPA claims seeking injunctive and declaratory relief related to a corrections institution's

denial of his request for religious publications were rendered moot by the prisoner's transfer out

of the facility where the publications were denied); Bilal v. Lehman, 2006 WL 3626808

(W.D.Wash. 2006)(Holding that transfer rendered moot the claims for declaratory and injunctive

relief related to prisoner's claim he was denied a religious diet exception).

In addition, Plaintiff's declaratory relief claims are barred because he seeks merely to

have this Court declare that past actions of the Defendants have violated his rights, something

that is forbidden.  The Eleventh Amendment "does not permit judgments against state officers

declaring that they violated federal law in the past."  P.R. Aqueduct & Sewer Auth. v. Metcalf &

Eddy, Inc., 506 U.S. 139, 146 (1993); Mehdipour v. Matthews, 22 Fed.Appx. 978, 978 n.1 (10th

Cir. 2001)("Mehdipour argues on appeal that absolute judicial immunity does not apply to his

claims for injunctive relief rather than damages.  The only injunctive relief sought by Mehdipour

in his complaint was a declaratory judgment that the defendants had violated his rights.

However, '[t]he Eleventh Amendment does not permit judgments against state officers declaring

that they violated federal law in the past.'")(quoting, Johns v. Stewart, 57 F.3d 1544, 1553 (10th

Cir. 1995)).

> 2.    In order for Mr. Sharp to
>
>> make out a claim under Section 1983, a plaintiff must demonstrate that the
>> conduct of which he is complaining has been committed under color of
>> state or territorial law and that it operated to deny him a right or rights
>> secured by the Constitution and laws of the United States. The plaintiff
>> must also establish that it was the acts of the defendant which caused the
>> constitutional deprivation.

Mosley v. Yaletsko, 275 F.Supp.2d 608, 613 (E.D.Pa. 2003)(citations omitted).    In addition,

Plaintiff has the burden of proof and persuasion as to each of these three elements under a

preponderance of the evidence standard.    Hemphill v. Farrand, No. C/A 9:99-0815-13RB, 2001

WL 34681743, at *5 (D.S.C. June 14, 2001)("As in any civil case, civil rights plaintiffs under 42

U.S.C. § 1983 bear the burden of proving each element of their case by a preponderance of the

evidence.") (citing, Jackson v. Crews, 873 F.2d 1105, 1107-08 (8th Cir. 1989)).

Instantly, the court concludes that Plaintiff has not carried his burden of proof or

persuasion as to his First Amendment claim.    He has not persuaded this Court by a

preponderance of the evidence that the Defendants at SCI-Pittsburgh caused any infringement on

his First Amendment rights.    Plaintiff's claim is that the Defendants at SCI-Pittsburgh denied

him his request for religious accommodation and this constituted a violation of his First

Amendment rights.    In fact, what caused his religious accommodation to not be granted was his

failure to adhere to the DOC procedures in place to request such an accommodation.    The Court

found as a fact that Plaintiff failed to properly submit his individual request for a religious

accommodation.  Plaintiff's evidence to the contrary was not credible nor persuasive.  Thus, Plaintiff has failed to carry his burden with respect to the SCI-Pittsburgh Defendants to establish each of the three elements of his Section 1983 action.  Accordingly, judgment should be entered in favor of the SCI-Pittsburgh Defendants.

As to the SCI-Greene Defendants.  In order to establish a violation of his First Amendment right, Plaintiff would have to satisfy the Turner v. Safley, 482 U.S. 78 (1987) standard.

Turner instructs courts to weigh four factors when applying this standard: first, whether the rule/policy/practice bears a "valid, rational connection" to a legitimate and neutral governmental objective; second, whether prisoners have alternative ways of exercising the circumscribed right; third, whether accommodating the right would have a deleterious impact on other inmates, guards, and the allocation of prison resources generally; and fourth, whether alternatives exist that "fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests."  Turner v. Safley, 482 U.S. at 91.  Directly contrary to the Plaintiff's repeated suggestion that the Defendants bear some burden, the Supreme Court held that "[t]he burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it."  Overton v. Bazzetta, 539 U.S. 126, 132 (2003).  Accord Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 127-28 (1977)("Without a showing that these beliefs [about the threats to penological interests] were unreasonable, it was error for the District Court to conclude that appellants needed to show more.  In particular, the burden was not on appellants to show affirmatively that the [prisoners] Union would be 'detrimental to proper penological objectives' or would constitute a 'present danger to security and order.'"); Covino v.

23

Patrissi, 967 F.2d 73, 79 (2d Cir. 1992);  Gates v. Rowland, 39 F.3d 1439, 1447 (9th Cir. 1994)

("The burden is on the inmates to show that the challenged regulation is unreasonable under

Turner.").  See also Shaw v. Murphy, 532 U.S. 223, 232 (2001)("Under Turner, the question

remains whether the prison regulations, as applied to Murphy, are 'reasonably related to

legitimate penological interests.'  To prevail, Murphy must overcome the presumption that the

prison officials acted within their 'broad discretion.'") (citations omitted).  In this regard, we read

the Supreme Court's holding in Overton, to sub silentio overrule our Court of Appeals earlier line

of cases that place a burden upon the defenders of prison rules to "demonstrate that 'the [New

Jersey] legislature might reasonably have thought that [the statute] would'advance the interest of

rehabilitating the sex offenders housed at the A.D.T.C."  Waterman v. Farmer, 183 F.3d 208, 219

(3d Cir. 1999); Wolf v. Ashcroft, 297 F.3d 305, 308 (3d Cir. 2002)("We have noted that the

party defending the policy should 'demonstrate' that the policy's drafters 'could rationally have

seen a connection' between the policy and the interests, and that this burden, though slight, must

'amount [ ] to more than a conclusory assertion.'  Waterman, 183 F.3d at 217, 218 n. 9.  Part of

the court's inquiry under Turner is whether the government has satisfied this requirement.").

Rather, pursuant to the Supreme Court decision in Overton, the burden is on a prisoner

challenging a prison rule/policy/practice to show that there is no possible legitimate state interest

that could be served and that the promulgators of the rule/policy/practice could not have

rationally seen a connection between the goal and the rule/policy/practice.  See Veney v. Wyche,

293 F.3d 726, 732 (4th Cir. 2002)("Veney must allege facts sufficient to overcome the

presumption of reasonableness applied to prison policies."); White v. Napoleon, 897 F.2d 103,

113 (3d Cir. 1990)("the judgment of prison authorities will be presumed valid unless it is shown

[presumably shown by the prisoner-plaintiff] to be such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such judgment.") . Cf. Heller v. Doe by Doe, 509 U.S. 312, 320 (1993) (requiring under rational basis test of equal protection that a person challenging a government regulation "negative every conceivable basis which might support it,")(citing Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364 (1973) (internal quotation marks omitted)). See also DeHart v. Horn, 227 F.3d 47, 61 (3d Cir. 2000)(en banc)("DeHart's Equal Protection claim focuses on the Jewish inmates in Johnson whose dietary restrictions were accommodated by the defendants. Turner is equally applicable here, and the appropriate analysis for this claim **is the same** as that for DeHart's Free Exercise claim. See Turner, 482 U.S. at 89, 107 S.Ct. 2254 ('[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.')") (emphasis added). Here, presuming the judgment of the prison administrators denying Plaintiff's request for a religious accommodation valid, including the presumption that their judgment serves legitimate penological goals, Plaintiff has utterly failed to carry his burden to show otherwise. Given his burden to negative every conceivable legitimate penological interest which might support SCI-Greene's denial of the accommodation, he failed to carry his burden. To the extent that he presented any evidence to rebut the rationality of the denial, the evidence was not found to be credible or persuasive. Accordingly, judgment on Plaintiff's First Amendment claims is properly entered in favor of the SCI-Greene Defendants.

Alternatively, in order to make out a claim under Section 1983, a plaintiff must establish that each defendant had personal involvement in the alleged wrongs since liability cannot be

predicated solely on the operation of *respondeat superior*. Rizzo v. Goode, 423 U.S. 362 (1976);

Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  Thus, individual liability can be

imposed under Section 1983 only if the state actor played an "affirmative part" in the alleged

misconduct.  Rode v. Dellarciprete, supra.  Personal involvement may be shown by either

personal direction or actual knowledge and acquiescence in a subordinate's actions.  Id.  In

summary, to maintain a claim for supervisory liability, Sharp "must show: 1) that the supervising

official personally participated in the activity; 2) that the supervising official directed others to

violate a person's rights; or 3) that the supervising official had knowledge of and acquiesced in a

subordinate's violations."  Hunter v. Schouppe, 2007 WL 4554251 (W.D.Pa. 2007)(citing

Robinson v. City of Pittsburgh, 120 F.3d 1286, 1293 (3d Cir.1997); Baker v. Monroe Tp., 50

F.3d 1186, 1190-91 (3d Cir.1995)).

Participation in the after-the-fact review of a grievance is not enough to establish personal

involvement.  See, e.g., Brooks v. Beard, 167 Fed.Appx. 923, 925 (3d Cir. 2006) (allegations that

prison officials and administrators responded inappropriately to inmate's later-filed grievances do

not establish the involvement of those officials and administrators in the underlying deprivation).

See also Cole v. Sobina, 2007 WL 4460617 (W.D.Pa. 2007); Ramos v. Pennsylvania Dept. of

Corrections, 2006 WL 2129148 (M.D.Pa. 2006) and Jefferson v. Wolfe, 2006 WL 1947721

(W.D.Pa. 2006).  Cf.  Wilson v. Horn, 971 F.Supp. 943, 947 (E.D.Pa. 1997), aff'd, 142 F.3d 430

(3d Cir. 1998)(prison officials' failure to respond to inmate's grievance does not state a

constitutional claim).

As discussed, Sharp's First Amendment claims against the SCI-Pittsburgh Defendants are

centered around the purported denial of his request for religious accommodation, that is,

recognition of his particular Sunni Muslim sect, and around the alleged requirement that he sign a contract indicating that he would not practice his chosen religion. Given the facts as found by this Court, the SCI-Pittsburgh Defendants are entitled to a verdict in their favor because they had no personal involvement in the claimed violations.

Defendant Johnson did not participate in any discussions with Sharp regarding his religion, religious exercise or any religious accommodation at SCI-Pittsburgh. Nor was Johnson ever presented with the opportunity to review Sharp's request for religious accommodation. Johnson's only participation in this matter was to deny Sharp's second level appeal from the denial of his grievance. See Findings of Fact at ¶¶ 40-42. However, this after-the-fact participation is not sufficient to establish Johnson's personal involvement in the claimed violation of rights. See, e.g., Brooks v. Beard, 167 Fed. Appx. at 925. The evidence in this case fails to establish that Johnson had any personal involvement in the claimed violations of Plaintiff's rights at SCI-Pittsburgh.

Defendant Stickman did not participate in any discussions with Sharp regarding his religion, religious exercise or any religious accommodation at SCI-Pittsburgh. Nor was Stickman ever presented with the opportunity to review Sharp's request for religious accommodation. See Findings of Fact at ¶ 43. Thus, the evidence in this case fails to establish that Stickman had any personal involvement in the claimed violations of Plaintiff's rights at SCI-Pittsburgh.

Defendant Dickson was never presented with the opportunity to review Sharp's request for religious accommodation submitted at SCI-Pittsburgh in 1999. Indeed, as Deputy Superintendent for Internal Security at SCI-Pittsburgh, Dickson had no assigned role in the

review of inmate requests for religious accommodation under DC-ADM 819.  Dickson never

discussed Sharp's religious issues with Sharp while he was Deputy Superintendent at

SCI-Pittsburgh.  Dickson's only participation in this matter was as a member of the Program

Review Committee ("PRC") ,which reviewed Sharp's Administrative Custody placement.

Although Sharp claimed that the PRC required him to sign a contract saying he would not

practice his religion in order to obtain his release from the RHU, this Court found as a fact that

the PRC - - including Dickson - - required no such thing.  The evidence showed that Sharp was

requested to sign an agreement that would reflect his promise to not engage in the type of

behavior that caused his Administrative Custody placement in the first instance.  Specifically,

Sharp was being asked to sign a document indicating that he would not participate in

unauthorized group activity.  No restriction was placed on Sharp's ability to practice a particular

religion nor was Sharp required to forego all religious practice in order to secure his release from

the RHU.  See Findings of Fact at ¶¶ 38, 44-46.  Sharp's evidence to the contrary was not

credible nor persuasive.  Thus, the evidence in this case fails to establish that Dickson had any

personal involvement in the claimed violations of Plaintiff's rights.

Defendant Krysevig was aware of Sharp's request for a group accommodation, but was

never presented with nor did he ever act upon an individual request for accommodation from

Sharp.  Krysevig was also involved in this matter as a member of the PRC, which reviewed

Sharp's Administrative Custody placement.  Again, although Sharp claimed that the PRC

required him to sign a contract saying he would not practice his religion in order to obtain his

release from the RHU, the Court found as a fact that the PRC - - including Krysevig - - required

no such thing.   The evidence showed that Sharp was requested to sign an agreement that would

reflect his promise to not engage in the type of behavior that caused his Administrative Custody placement in the first instance. Specifically, Sharp was being asked to sign a document indicating that he would not participate in unauthorized group activity. Recall that the fact of the matter was that Sharp was attempting to use his request for accommodation to place himself in a position of leadership over a group of inmates, which lead to security concerns. No restriction was placed on Sharp's ability to practice a particular religion nor was Sharp required to forego all religious practice in order to secure his release from the RHU. See Findings of Fact at ¶¶ 38, 47-49. Thus, the evidence in this case fails to establish that Krysevig had any personal involvement in the claimed violations of Plaintiff's rights.

Defendant Winstead had some awareness of Sharp's request for a group accommodation based on a discussion following the November 28, 1999 meeting concerning Ramadan. However, Winstead had no responsibility to act on any such request. Although Winstead responded to Sharp's grievance regarding his group request and informed Sharp that if he wished to pursue the matter, he would have to submit an individual request, this after-the-fact participation is not sufficient to establish Winstead's personal involvement in the claimed violation of rights. See, e.g., Brooks v. Beard, 167 Fed. Appx. at 925. Further, Winstead was never presented with nor did she ever act upon an individual request for accommodation from Sharp. See Findings of Fact at ¶¶ 26, 32-33, 50-52. Accordingly, the evidence fails to establish that Winstead had any personal involvement in the claimed violations of Plaintiff's rights.

Father Terza was aware of Sharp's request for a group accommodation; however, Father Terza informed Sharp that if he wished to pursue the matter, he would have to follow proper procedure and submit an individual request. Father Terza was never presented with nor did he

ever act upon an individual request for accommodation from Sharp. Father Terza never told Sharp he could not profess a certain belief and never excluded Sharp from participating in any religious activity because of his faith. See Findings of Fact at ¶¶ 26, 53-55. Thus, Sharp's evidence in this case does not prove that Father Terza had any personal involvement in the claimed violations of Plaintiff's rights.

As Facility Chaplain at SCI-Pittsburgh, Imam Ibrahiym was aware of Sharp's request for a group accommodation, having been given the group request (Exhibit 1) by Sharp. Imam Ibrahiym informed Sharp that if he wished to pursue the matter, he would have to follow proper procedure and submit an individual request. Imam Ibrahiym never received the requisite form DC-52 from Sharp requesting religious accommodation on his own behalf; the only request for accommodation Imam Ibrahiym ever received from Sharp was Exhibit 1, the group request. Imam Ibrahiym observed Sharp attending regularly the Taleem and Jumah while in general population at SCI-Pittsburgh; Imam Ibrahiym never excluded Sharp from any religious programs or services, and continued to meet and visit with Sharp even after he was placed in the RHU. See Findings of Fact, at ¶¶ 26, 56. Thus, the evidence in this case fails to establish that Imam Ibrahiym had any personal involvement in the claimed violations of Plaintiff's rights.

Having failed to establish any personal involvement in the claimed violations of Sharp's rights by the SCI-Pittsburgh Defendants, Sharp has failed to carry his burden of proof with respect to his Section 1983 claim against the SCI-Pittsburgh Defendants at Count 1. Accordingly, each SCI-Pittsburgh Defendant is entitled to a verdict in his or her favor and against the Plaintiff.

Similarly, Sharp has failed to establish any personal involvement by the SCI-Greene Defendants. As rehearsed, Sharp's First Amendment claims arising from his confinement at SCI-Greene are centered on 1) the denial of his request for religious accommodation which sought recognition of his identified religion; 2) comments made by Imam Muhammed during religious sermons that were recorded and subsequently broadcast to other inmates over the prison's television system; 3) an alleged "contract" Imam Muhammad required inmates to sign before participating in Ramadan; and 4) a search of Sharp's cell which allegedly culminated in the seizure of religious literature.

Defendant Stickman did not participate in the review of Sharp's request for religious accommodation submitted at SCI-Greene in 2002. Sharp's request was reviewed by Deputy Superintendent Stowitzky, who was Acting Superintendent for Stickman when Sharp's request was processed. Similarly, Stickman did not participate in the review of Grievance No. 39662, which Sharp filed after his request for religious accommodation was denied by DOC's Central Office. Moreover, Stickman never discussed Sharp's religious issues with Sharp while he was Superintendent at SCI-Greene. See Findings of Fact, at ¶¶ 67-69. Thus, the evidence in this case fails to establish that Stickman had any personal involvement in the claimed violations of Plaintiff's rights at SCI-Greene.

Although as the Corrections Classification Program Manager at SCI-Greene Defendant Mears would ordinarily have had a role in the review of inmate requests for religious accommodation under DC-ADM 819, Mears did not participate in the review of Sharp's request for religious accommodation submitted at SCI-Greene in 2002. See Findings of Fact, at ¶ 70. Rather, Sharp's request was reviewed by Michael P. Bruno, who was acting as Corrections

Classification Program Manager for Mears when Sharp's request was processed. Id. Mears did participate - - by providing the initial review response - - in the processing and review of Grievance No. 39662, which Sharp filed after his request for religious accommodation was denied by DOC's Central Office. See Findings of Fact, at ¶ 64. However, this after-the-fact review of a grievance is not sufficient to establish her personal involvement in the claimed violation of rights. See, e.g., Brooks v. Beard, 167 Fed.Appx. at 925.

Mears also participated in the review of the tapes of Imam Muhammed's sermons which Sharp claimed contained slanderous statements directed against him. Mears, along with Father Moneck, reviewed the tapes and found them to be inoffensive. Imam Muhammed indicated that his sermons espoused religious themes and principles central to the Sunni Muslim faith - - which he was duty bound to teach to his followers and students - - and that no slanderous or derogatory statements were directed to Sharp. See Findings of Fact, at ¶ 72. Thus, the evidence in this case fails to establish that Mears had any personal involvement in the claimed violations of Plaintiff's rights at SCI-Greene.

Defendant Father Moneck participated in the matter at hand to the extent that he initiated the review of Sharp's request for accommodation at SCI-Greene, entered his recommendation to disapprove the request and circulated the vote sheet to the other reviewing officials. Father Moneck then forwarded the request to Central Office and subsequently advised Sharp of the negative decision on his request. Notably, Father Moneck was not the final decision maker on this request. See Findings of Fact, at ¶ 71.

Father Moneck was told by Mears that Sharp was complaining about the content of Imam Muhammad's sermons that were being broadcast over the prison network; particularly, that

32

Sharp was contending that Imam Muhammad was slandering him.  Id.  Father Moneck reviewed

the videotape of Imam Muhammad's sermon with Mears and "found nothing inflammatory that

Imam Muhammad had preached about…"  See Findings of Fact, at ¶ 72.    Thus, the evidence in

this case fails to establish that Father Moneck had any personal involvement in the claimed

violations of Plaintiff's rights at SCI-Greene.

Defendant Imam Muhammad did not participate in the review of or decision on

Sharp's request for accommodation at SCI-Greene.  Imam Muhammad provided religious

services and programs for the Muslim inmates at SCI-Greene; however, Imam Muhammad never

excluded Sharp from these programs and services, nor did he ever prevent Sharp from attending

or participating in any of these programs and services.  See Findings of Fact, at ¶ 73.

Imam Muhammad did develop an agreement form for inmates wishing to participate in

Ramadan.  However, this form did not require the inmates to profess or practice a specified

religion or specific tenets thereof; rather, the form represented a commitment on the part of the

inmate to wholly participate in all aspects of Ramadan.  See Findings of Fact, at ¶ 74.

Thus, the evidence in this case fails to establish that Imam Muhammad had any personal

involvement in the claimed violations of Plaintiff's rights at SCI-Greene.

Security Captain Coleman was never presented with the opportunity to review Sharp's

request for religious accommodation submitted at SCI-Greene in 2002.  Indeed, as Security

Captain at SCI-Greene, Defendant Coleman had no assigned role in the review of inmate

requests for religious accommodation under DC-ADM 819.  See Findings of Fact, at ¶ 75.

Coleman's only involvement arose when Sharp complained to Coleman about the content

of the sermons given by Imam Muhammed, which Sharp claimed contained slanderous

statements directed against him.  Coleman passed these concerns along to Mears and asked her to look into the matter.  Coleman had no further discussions or contact with Sharp on this issue. See Findings of Fact, at ¶ 76.

Additionally, the Court found as a fact that Coleman did not order or direct a search of Sharp's cell for the purpose of identifying and removing religious materials from Sharp's cell. Sharp's evidence to the contrary was not credible nor persuasive.  See Findings of Fact, at ¶¶ 78. Thus, the evidence in this case fails to establish that Coleman had any personal involvement in the claimed violations of Plaintiff's rights at SCI-Greene.

Having failed to establish any personal involvement in the claimed violations of Sharp's rights by the SCI-Greene Defendants, Sharp has failed to carry his burden of proof with respect to his Section 1983 claim against the SCI-Greene Defendants at Count 1.  Accordingly, each SCI-Greene Defendant is entitled to a verdict in his or her favor and against the Plaintiff.

To the extent any First Amendment claim remains against any Corrections Defendant, she/she would be entitled to assert the defense of qualified immunity.[4]

> Courts must conduct a two step inquiry to determine the merits of a claim of qualified immunity: 1) whether the facts alleged show the officer's conduct violated a constitutional right and 2) whether the constitutional right was clearly established at the time of violation. Saucier [v. Katz], 533 U.S. [194] at 201 ... [2001].   Further, public officials are entitled to qualified immunity if they acted 'reasonably in the good-faith fulfillment of their responsibilities.'  Wilson v. Schillinger, 761 F.2d 921, 929 (3d Cir. 1985), cert denied, 475 U.S. 1096, 106 S.Ct. 1494, 89 L.Ed.2d 895 (1986).

---

[4] Plaintiff's argument that the Defendants waived the defense of qualified immunity by failing to raise it in a motion for summary judgment lacks support in the law.  See Eddy v. Virgin Islands Water and Power Auth., 256 F.3d 204, 210 n. 3 (3d Cir. 2001)("For example, qualified immunity may be raised in a motion to dismiss at the pleading stage, in a motion for summary judgment after discovery, or as an affirmative defense at trial. (citations omitted)").

'"Clearly established rights" are those with contours sufficiently clear that a reasonable official would understand that what he is doing violates that right.  A plaintiff need not show that the very action in question has previously been held unlawful, but needs to show that in light of the preexisting law the unlawfulness was apparent.'  McLaughlin v. Watson, 271 F.3d 566, 571 (3d Cir. 2001)(citing Shea v. Smith, 966 F.2d 127, 130 (3d Cir.1992)), cert denied, 535 U.S. 989, 122 S.Ct. 1543, 152 L.Ed.2d 469 (2002).

Watson v. Methacton School Dist., 513 F.Supp.2d 360, 382 (E.D.Pa. 2007).

Instantly, Sharp is essentially asserting that his First Amendment rights were violated when the Defendants failed to grant his request to provide accommodation for his religion, which he has identified as the Ahlus Sunnah wal Jama'ah or Sunni Muslim.  Nevertheless, with respect to the instant litigation, at the two institutions where Sharp was confined, the DOC had installed Muslim or Islamic Chaplains who identified themselves Sunni or Sunni wal Jamaah, the same religion as Sharp.  Moreover, these Chaplains provided weekly Taleem study groups and led weekly Jumah prayer services for the Sunni inmates, as well as offered opportunities to participate in Ramadan and access to religious literature.  Sharp was not excluded from or prevented from attending any of these programs or services.  Indeed, at SCI-Pittsburgh he attended Jumah and Taleem.  Thus, even if Plaintiff had shown that his constitutional rights were violated, which the Court has determined he did not do, the evidence shows that the Defendants acted reasonably in the good-faith fulfillment of their responsibilities when they took actions which ultimately did not result in the recognition of Sharp's Sunni group or sect, where the Sunni Muslim group generally was already being accommodated at their respective institutions and where the evidence shows Sharp could otherwise practice his religion.  See, e.g., Muhammad v. City of N.Y. Dept. of Corrections, 904 F.Supp. 161, 197 (S.D.N.Y. 1995)(First Amendment did

not require accommodation of Nation of Islam inmate's request for separate services), <u>appeal dismissed</u>, 126 F .3d 119 (2d Cir. 1997); <u>Matiyan v. Commissioner Dept. of Corrections</u>, 726 F.Supp. 42, 44 (W.D.N.Y. 1989) (refusal to honor Sunni inmate's request for Jumah separate from Shi'a inmates did not offend the Free Exercise Clause of the First Amendment). Accordingly, the Defendants are entitled to a verdict in their favor and against the Plaintiff on this claim.

3.      As concerns Plaintiff's claims at Count 2, RLUIPA does not support damage claims against state officials in their individual capacity.  <u>See</u> <u>Brown v. Department of Corrections Pennsylvania</u>, 2007 WL 4322980, at *16 (W.D.Pa. 2007)(prison official "is not liable for damages in his individual capacity because RLUIPA does not authorize money damages against individuals")(citing cases).  <u>Accord</u>  <u>Smith v. Allen</u>, 502 F.3d 1255, (11th 2007)("Consequently, we conclude that section 3 of RLUIPA-a provision that derives from Congress' Spending Power-cannot be construed as creating a private action against individual defendants for monetary damages.  <u>See</u> <u>id.</u>  Thus, Smith is not entitled to pursue a claim against these defendant-appellees in their individual capacities under section 3 of RLUIPA.").  Thus, there can be no damages liability against any of the Defendants in their individual capacities. The Defendants are consequently entitled to a verdict in their favor and against the Plaintiff with respect to all individual capacity damage claims brought under RLUIPA.

Moreover,  RLIUPA does not authorize money damages against state actors in their official capacities as the Eleventh Amendment bars money damages sought against a state official acting in his or her official capacity absent a valid abrogation by Congress or consent of the State.  <u>Kentucky v. Graham</u>, 473 U.S. 159, 169(1985) ("absent waiver by the State or valid

congressional override, the Eleventh Amendment bars a damages action against a State in federal

court."); Congress did not validly abrogate or purport to abrogate the States' sovereign immunity

against **damages** claims under RLUIPA[5] nor has Pennsylvania waived its Eleventh Amendment

immunity.   See Scott v. Beard, 2007 WL 3194039, at *1 (3d Cir. 2007)(in a case against a

Pennsylvania State official sued in his official capacity, the Court declared that the "RLUIPA

claim for money damages against defendant in his official capacity –as claim essentially against

state itself– is barred by the Eleventh Amendment)(citing Laskaris v. Thornburgh, 661 F.2d 23,

25-26 (3d Cir. 1981)(citing Edelman v. Jordan, 415 U.S. 651 (1974)).   See also Morris-El v.

Menei, 2006 WL 1455592 (W.D.Pa. 2006); Gibb v. Crain, 2008 WL 744249, *3 (E.D.Tex. Mar

19, 2008) (NO. CIV.A. 6:04CV81)("the Court finds that under RLUIPA, the Plaintiff is not

---

[5]   Madison v. Virginia, 474 F.3d 118, 130-33 (4th Cir.2006)(Congress validly abrogated States' Eleventh Amendment immunity from injunctive and declaratory relief claims but not for monetary damages claims); Cardinal v. Metrish, No. 2:06-cv-232, 2008 WL 696479, at *4 (W.D.Mich. March 13, 2008) ("Because the RLUIPA does not contain an unambiguous waiver of sovereign immunity for monetary damages, Plaintiff may not state a claim for monetary damages against Metrish for violations of the RLUIPA.  Additionally, Plaintiff's claims for equitable relief are moot because Plaintiff has been transferred from the prison where the incident occurred."); Williams v. Miller, 2007 WL 2893641 (S.D.Ill., Sept. 28, 2007)("RLUIPA does not specify that receipt of federal funds constitutes a waiver of sovereign immunity.  Stated another way, mere receipt of federal funds does not effect a waiver of sovereign immunity, and Congress must unambiguously express its intent for such a quid pro quo waiver. Cherry [v. University of Wisconsin System Bd. of Regents], 265 F.3d [541] at 554 [(7th Cir. 2001].  For the above-stated reasons, the Eleventh Amendment bars monetary damages against Defendants insofar as they are sued in their official capacities.  Declaratory relief remains available, as does injunctive relief."); James v. Price, 2005 WL 483443, *2 (N.D.Tex. Mar. 2, 2005) ("To the extent plaintiff is suing the defendants for monetary relief, the suit against the defendants in their official capacities is barred by the Eleventh Amendment."); Limbaugh v. Thompson, Nos. 2:93cv1404-WHA, 2:96cv554-WHA, 2006 WL 2642388, at *6 (M.D.Ala. Sept. 14, 2006) ("to the extent the plaintiffs seek monetary relief against ... the individual defendants in their official capacities, the plaintiffs' claims are barred by the Eleventh Amendment and are subject to dismissal."). Cf. Benning v. Georgia, 391 F.3d 1299, 1305 (11th Cir.2004) (Congress validly required States to waive Eleventh Amendment immunity for both injunctive relief and monetary damages).

entitled to monetary damages from the Defendants in either their official or individual capacities.").[6]

In light of the foregoing, i.e., money damages are not permitted under RLUIPA against the Defendants in either their individual or official capacities, this leaves only Plaintiff's requests for injunctive relief.    However, as discussed earlier, because Sharp has since been transferred from SCI-Pittsburgh and from SCI-Greene and is now permanently housed at the State Correctional Institution at Dallas, he is not entitled to injunctive relief against these Defendants in either their individual or official capacities.  See Brown v. Department of Corrections Pennsylvania, 2007 WL 4322980, at *16 ("Plaintiff is no longer in SCI-Mahanoy … so the claim for equitable relief is moot")(citing Marrie v. Nickels, 70 F.Supp.2d 1252, 1259 (D.Kan. 1999) and Chapdelane v. Keller, 1998 WL 357350, at *4 (N.D.N.Y. 1998)).  Thus, there can be no damages liability against any of the Defendants in either their official or individual capacities.  Nor can Plaintiff obtain injunctive relief against the Defendants in either their official or individual  capacities.  The Defendants are consequently entitled to a verdict in their favor and

---

[6]  While the court acknowledges that there is a divergent view of whether the Eleventh Amendment bars money damages against a state or against a state actor in his/her official capacity, see, e.g., Sisney v. Reisch, 533 F.Supp.2d 952 (D.S.D. 2008)(collecting cases and analyzing the issue and concluding that the Eleventh Amendment does not bar official capacity damage claims), given the divergence, and in the absence of controlling authority from the Third Circuit, the court chooses to rely upon the unpublished non-precedential opinion of Scott v. Beard, 252 Fed.Appx. 491, 492-93 (3d Cir. 2007) as an indication of how the Court of Appeals might rule on this issue in a precedential opinion, in addition to relying on the well reasoned cases of Madison v. Virginia, 474 F.3d 118 (4th Cir. 2006) and Agrawal v. Briley, 2006 WL 3523750 (N.D.Ill. Dec. 6, 2006)(RLUIPA does not abrogate States' Eleventh Amendment immunity at least in so far as suits for damages against the State or State officers in their official capacity are concerned).  This court does not agree with the Agrawal Court's other conclusion that RLUIPA permits damage claims against individuals in their individual capacities.
.

against the Plaintiff with respect to all official and individual capacity claims brought under

RLUIPA at Count 2.

　　　　Furthermore, given that there is no evidence of any actions on the part of the Defendants

at SCI-Pittsburgh taking any adverse actions against Plaintiff's religious beliefs or practices after

September 22, 2000, the effective date of RLUIPA,  the question arises as to the retroactive

applicability of RLUIPA.  The Supreme Court has instructed that

> When a case implicates a federal statute enacted after the events in suit,
> the court's first task is to determine whether Congress has expressly
> prescribed the statute's proper reach. If Congress has done so, of course,
> there is no need to resort to judicial default rules. When, however, the
> statute contains no such express command, the court must determine
> whether the new statute would have retroactive effect, i.e., whether it
> would impair rights a party possessed when he acted, increase a party's
> liability for past conduct, or impose new duties with respect to transactions
> already completed. If the statute would operate retroactively, our
> traditional presumption teaches that it does not govern absent clear
> congressional intent favoring such a result.

Landgraf v. USI Film Products, 511 U.S. 244, 280 (1994).

　　　　The statutory language of RLUIPA does not address its retroactive applicability.  See 42

U.S.C. § 2000cc-1(a) et seq.; Mayweathers v. Terhune, 328 F. Supp. 2d 1086, 1098 (E.D. Cal.

2004).  Applying the principles of Langraf, it is clear that if we apply RLUIPA retroactively to

award monetary damages for acts predating enactment of the statute, we would attach new legal

consequences to past conduct.  Cathedral Church of the Intercessor v. Inc. Vill. of Malverne, 353

F. Supp. 2d 375, 389 (E.D.N.Y. 2005) (stating that "RLUIPA may not be applied retroactively

for monetary damages for pre-RLUIPA claims but may be applied retroactively for injunctive

relief since such relief is considered prospective regardless of when the actions occurred")[7]

(citing Prater v. City of Burnside, Ky., 289 F.3d 417, 433 (6th Cir. 2002); Kikumura v. Hurley, 242 F.3d 950, 961 n. 5 (10th Cir. 2001)); Mayweathers, 328 F. Supp. 2d at 1098; Orafan v. Goord, 2003 WL 21972735, at *8 (N.D.N.Y. 2003); Alexander v. Roberts, 2003 U.S. Dist. LEXIS 3782, at *36-37 (E.D. La. Jan. 29, 2003).   Hence, we may not apply RLUIPA retroactively to impose monetary damages given the presumption, which remains unrebutted, that a statute attaching new legal consequences to past actions will not be applied retroactively.

The Defendants are also entitled to qualified immunity because the law was not clearly established at the time of the purported denials of Sharp's requested accommodations that RLUIPA required providing Plaintiff a separate group religious worship service and separate group study and even as late as February 2008, such a requirement was not clearly established . See, e.g., Smith v. Kyler, 2008 WL 474252  (M.D.Pa. Feb. 20, 2008)(no violation of RLUIPA to deny a separate group worship service for Rastafarians); Searcy v. Broome, 2007 WL 4443062, at *10 (D.S.C., Dec.14, 2007) (no violation of RLUIPA for failure to provide separate Mennonite worship services).

Thus both because statutory rights derived from RLUIPA did not exist as such at the time of some of the actions under review and because said rights cannot be considered to have been clearly established at any time prior to the filing of the operative complaint in this case, the Defendants are entitled to qualified immunity in this case.  Judgment is therefore properly

---

[7]  Because Plaintiff was transferred out of SCI-Pittsburgh in May 2001, any injunctive relief claims against the Defendants at SCI-Pittsburgh are moot.

entered in favor of the Defendants and against Plaintiff with regard to his claims for monetary

damages under RLUIPA at Count 2.

Finally, even considering the claim on its merits, Sharp has not demonstrated that his

ability to practice his religion was substantially burdened by any act of the Corrections

Defendants.

> To establish a prima facie case under section 3 of RLUIPA, a plaintiff
> must demonstrate 1) that he engaged in a religious exercise; and 2) that the
> religious exercise was substantially burdened. See Adkins[ v. Kaspar, 393
> F.3d 559,] at 567 [(5th Cir.2004)]; 42 U.S.C. § 2000cc-1(a). The plaintiff
> 'bear[s] the burden of persuasion on whether the ... government practice
> that is challenged by the claim substantially burdens the exercise of
> religion.'  42 U.S.C. § 2000cc-2(b).  If the plaintiff succeeds in
> demonstrating a prima facie case, the government must then demonstrate
> that the challenged government action is 'is in furtherance of a compelling
> governmental interest' and 'is the least restrictive means of furthering that
> compelling governmental interest.'  42 U.S.C. §§ 2000cc-1(a),
> 2000cc-2(b).  In contrast, if the plaintiff fails to present evidence to
> support a prima facie case under RLUIPA, the court need not inquire into
> whether the governmental interest at stake was compelling.  See Midrash
> Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1228 (11th Cir. 2004).

Smith v. Allen, 502 F.3d 1255, 1276 (11th Cir. 2007).  See also Kretchmar v. Beard, 241

Fed.Appx. 863, 865 (3d Cir. 2007).

As explained by one court, a claim under RLUIPA includes four elements: (1) that an

institutionalized person's religious exercise has been burdened and (2) that the burden is

substantial, and it is a plaintiff's burden to establish this.  Spratt v. Rhode Island Dept. Of

Corrections, 482 F.3d 33, 38 (1st Cir. 2007).  Once a plaintiff has established that his religious

exercise has been substantially burdened, the onus shifts to the government to show (3) that the

burden furthers a compelling governmental interest and (4) that the burden is the least restrictive

means of achieving that compelling interest.  Id.

Plaintiff's initial burden of proof is to show that the challenged government action "substantially burdened" his exercise of religion.  See, e.g., 42 U.S.C. § 2000cc-2(b);[8] Baranowski v. Hart, 486 F.3d 112, 124 (5th Cir. 2007)("The threshold inquiry under RLUIPA is whether the challenged governmental action substantially burdens the exercise of religion. The burden of proving the existence of a substantial interference with a religious exercise rests on the religious adherent. 42 U.S.C. § 2000cc-2(b). If such a substantial burden is proven, it is then up to the government to demonstrate that the compelling interest test is satisfied.").

The Court of Appeals has defined "substantial burden" as follows: "a substantial burden exists where: 1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." Washington v. Klem, 497 F.3d 272, 280 (3d Cir. 2007).

The Court concludes that Plaintiff did not carry his burden to show that failure to provide him group religious services and any other accommodations he requested imposed a substantial burden upon his exercise of religion.   In so finding, the failure to grant Plaintiff's requested accommodations did not force Plaintiff to choose between following the precepts of his religion

---

[8]  42 U.S.C. § 2000cc-2(b) provides that

> If a plaintiff produces prima facie evidence to support a claim alleging a
> violation of the Free Exercise Clause or a violation of section 2000cc of this
> title, the government shall bear the burden of persuasion on any element of the
> claim, except that the plaintiff shall bear the burden of persuasion on whether the
> law (including a regulation) or government practice that is challenged by the
> claim substantially burdens the plaintiff's exercise of religion.

and forfeiting benefits otherwise generally available to other inmates.    While engaging in group

worship and/or group study may be a precept of Plaintiff's religion, he was not required to forfeit

any benefits otherwise generally available to other inmates.  Nor did the denial of the

accommodation pressure Plaintiff to substantially modify his behavior and to violate his beliefs.

The Court so concludes based upon the collective reasoning of the following cases. Smith v.

Kyler, Civil No. 1:CV-03-0898, 2008 WL 474252  (M.D.Pa. Feb. 20, 2008); Searcy v. Broome,

C/A No. 6:07-CV-0154, 2007 WL 4443062 (D.S.C., Dec.14, 2007).

        For example, the court in Smith v. Kyler reasoned that

> Defendants have not deprived Smith or other Rastafarians of some benefit
> as a consequence of their religious belief or forced him to do something
> inconsistent with Rastafarian religious practices.  On the contrary,
> SCI-Huntingdon Rastafarian inmates are permitted to have religious books
> and materials in their cells as long as they comply with the inmate
> publications directives.  (DSMF at ¶ 38.)  They are also permitted to pray
> in their cells and to follow the tenets of their faith as long as those
> practices are consistent with the DOC directives and policies and do not
> disrupt the order, stability, and security of the institution.  (DSMF at ¶ 39.)
> They may also elect to have a personal Religious Advisor worship with
> them. (Dkt. Entry 66-2, DC-ADM 819 at R. 17.)  Plaintiff Smith, as well
> as many other Rastafarian believers, have been granted an exemption from
> the DOC hair length requirement in order to accommodate their faith
> practices. (DSMF at ¶ 40 and Dkt. Entry 78-3, Smith Decl. at RR. 2-3.)
> [FN6]  Thus, it cannot be said that Smith has been "forced to choose
> between following the precepts of his religion and forfeiting the benefits
> otherwise generally available to other inmates versus abandoning one of
> the precepts of his religion in order to receive a benefit."  Washington, 497
> F.3d at 280.  Nor do the circumstances of this case suggest that the DOC
> "puts substantial pressure on an adherent [of the Rastafarian religion] to
> substantially modify his behavior and to violate his beliefs." Id.  Stated
> otherwise, this is not a case where the prison administrators are forcing
> Smith to do something that conflicts with the practice of his religious
> beliefs.  While the DOC is not providing weekly services, their refusal to
> do so at DOC expense is a consequence of the inadequate demand for such
> services.

Courts have generally rejected the notion that, under RLUIPA, prison administrators must afford group services whenever one or a small number of inmates request them. [colleting cases]
. . . .

What was written by Judge Aldisert nearly forty years ago in the context of a free exercise claim remains applicable in the context of this RLUIPA claim:

> The requirement that a state interpose no unreasonable barriers to the free exercise of an inmate's religion cannot be equated with the suggestion that the state has an affirmative duty to provide, furnish, or supply every inmate with a clergyman or religious services of his choice.

Gittlemacker v. Prasse, 428 F.2d 1, 4 (3d Cir.1970).  At least where, as here, there are only a few inmates who have expressed an interest in group services for a particular religion, the state does not impose a substantial burden on religious exercise by refusing to provide at taxpayer expense an appropriate leader for such services.[7]

It is true that in Small v. Lehman, 98 F.3d 762, 767 (3d Cir.1996), the court recognized that there may be an affirmative duty to provide the facilities and persons for conducting services where "a substantial number of prisoners" seek to gather for prayer services. Here, a substantial number of Rastafarians at SCI-Huntingdon have not requested weekly group services. The affidavits tendered by Plaintiff confirm this fact. The prison administrators' decision is rationally based on the number of inmates submitting requests to congregate under a prayer leader. Less than ten have done so at SCI-Huntingdon over a several year period.

---

FN 6.  Notably, although Smith has asserted that 48 SCI-Huntingdon inmates have obtained exemptions from hair length regulations and 27 additional inmates have hair length accommodation forms pending based on their adherence to Rastafarian beliefs ... the evidence he has presented shows, at best, only 7 inmates requesting group religious services.

FN7. Smith does not dispute the DOC's valid security concerns that prohibit inmates from leading other inmates in worship, and thus, a religious leader is necessary for the establishment of weekly group Rastafarian services.

Smith v. Kyler, 2008 WL 474252 at *4 - *6.  Similarly, Plaintiff has failed to carry his burden to present evidence that was credible or persuasive to this Court to show that there existed a significant number of inmates at SCI-Greene who desired the group worship and study requested accommodations.  To the extent Plaintiff presented such evidence, the court finds it not credible and nor persuasive.

Even if the Court assumed that Plaintiff had presented such evidence to carry his burden to show a substantial burden, and that the Defendants had failed to carry their burden, the Defendants would still be entitled to judgment in their favor.  As to the damage claims against the Defendants in their individual capacities, they are entitled to qualified immunity.  As to damage claims against the Defendants in their official capacities, such damages are either barred by the Eleventh Amendment or RLUIPA has not authorized the waiver of such Eleventh Amendment immunity.  As for the injunctive relief claims, they are all moot.  As for any declaratory relief claims, they are barred as explained above.

With regard to Sharp's specific request for religious accommodation at SCI-Greene, of the named Defendants, only Father Moneck participated in the review and recommendation process.  Father Moneck recommended that the request be denied, and forwarded Sharp's request - - along with the recommendation from SCI-Greene that the request be denied  - - to DOC's Central Office.  There, the decision to deny Sharp's request was made by a deputy secretary at DOC's Central Office.

In his request, Sharp was seeking recognition of a religious group he identified as "[t]he Ashariy Comm[unity] of Ahlus Sunnah wal Jama'ah."  However, while Sharp was confined at SCI-Greene, the DOC offered programs and services for Muslim inmates and, specifically, had

employed an Islamic Chaplain  - -  Imam Muhammad  - -  who identified himself as a Sunni Muslim.  Sharp was permitted to attend the Taleem studies and Jumah services offered by Imam Muhammad; Sharp was also permitted to participate in Ramadan while at SCI-Greene. Sharp has failed to show that the denial of his request substantially burdened his practice of religion where the DOC provided Sharp with the opportunity to attend and participate in religious programs and services for Sunni Muslims, which is the religion Sharp purports to profess.  Although Sharp identified some differences in the way he practices his faith as compared to Imam Muhammad and the other Sunni Muslims at SCI-Greene, these differences were not so significant as to substantially burden Sharp's practice.  Of primary concern to Sharp was his inability to pray behind others whose beliefs were incompatible with and even antagonistic to Sharp's beliefs.  However, Sharp was free to engage in individual prayer in his cell without violating the tenets of his faith.  See  TR-10/18/07, at 42-43, 59.

Sharp has attempted to analogize his situation to that of Protestants and Catholics, asserting that requiring him to attend the services and programs offered by Imam Muhammad would be like having a Catholic attend a Catholic mass lead by Protestant clergy.  However, this analogy is misplaced because Sharp and Imam Muhammad both identify themselves as Sunni Muslims.  Thus, the more apt comparison would be between different branches of the Protestant faith or different branches of the Catholic faith.  Yet, in terms of accommodation, the DOC offers religious services and programs for the Protestant faith, which provides opportunities and accommodation for those who profess to be, for example, Presbyterian, Methodist or Episcopalian, and for the Catholic faith, which provides opportunities and accommodation for those who profess to be, for example, Roman Catholic, Anglican and Eastern Orthodox.  See,

e.g., TR–10/16/07, at 155, 159-160.  Thus, ultimately, the fact that Sharp identifies himself as a Sunni Muslim and the fact that the DOC accommodated Sunni Muslims at SCI-Greene by providing religious services and programs through a Sunni Imam establishes that Sharp's religion was accommodated and Sharp was provided the opportunity to practice his chosen religion without substantial burden.  That Sharp chose not to participate in the programs and services offered by SCI-Greene for his chosen religion fails to carry his burden under RLUIPA to show that the DOC substantially burdened his practice of religion.

With respect to Sharp's other ancillary claims, specifically relating to Imam Muhammad's sermons, the alleged Ramadan "contracts" and the search of his cell and confiscation of religious materials, Sharp has not conclusively established in the first instance that these underlying events even occurred in the manner he has alleged.  Nevertheless, even assuming these events took place as alleged, Sharp has not established that these actions imposed anything more than an incidental burden on the practice of his religion.  See, e.g., Smith v. Allen, 502 F.3d 1255 (11th Cir. 2007).

Thus, Sharp has failed to establish a violation of his rights under RLUIPA.  Accordingly, the Defendants are entitled to judgment in their favor and against Sharp at Count 2.

For the above-stated reasons, judgment will be entered in favor of the Defendants and against the Plaintiff on all counts.[9]

---

[9]  To the extent that Plaintiff has raised in his Findings of Fact and Conclusions of Law the claim that his due process rights were denied by his placement in Administrative Custody, which claim this Court previously decided against Plaintiff, see Dkt. [76], and any other claims not tried to this Court, they are not properly considered here.

_/s/ Amy Reynolds Hay_
_____United States Magistrate Judge

Dated: 7 April, 2008

cc:    Shawn C. Sharp
       BQ-8429
       SCI Dallas
       1000 Follies Road
       Dallas, PA 18612-0286

       Scott A. Bradley
       Senior Deputy Attorney General
       by Notice of Electronic Filing